UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

05 APR 29 PM 1:33

CLERK-ALBUQUERQUE

UNITED STATES OF AMERICA
EX REL. [UNDER SEAL]

Plaintiffs,

v.

Case No.: CIV-05-279 WJ WDS

[UNDER SEAL]

Defendants.

# FIRST AMENDED COMPLAINT

## FILED IN CAMERA AND UNDER SEAL

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA EX REL.
ROBERT C. BAKER,

Plaintiffs,

Case No.: CIV-05-279 WJ WDS

v.

COMMUNITY HEALTH SYSTEMS, INC.;
EASTERN NEW MEXICO MEDICAL
CENTER; MIMBRES MEMORIAL
HOSPITAL; NORTHEASTERN
REGIONAL HOSPITAL; and HELENA
REGIONAL MEDICAL CENTER,

Defendants.

**FIRST AMENDED COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT [31 U.S.C. §3729 et seq.]**

**FILED IN CAMERA AND UNDER SEAL**

*Qui tam* plaintiff Robert C. Baker, through his attorneys Phillips & Cohen LLP, on behalf of the United States of America, for his Complaint against defendants Community Health Systems, Inc., Eastern New Mexico Medical Center, Mimbres Memorial Hospital, Northeastern Regional Hospital, and Helena Regional Medical Center alleges as follows:

## I. INTRODUCTION

1. This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent statements, records, and claims made and caused to be made by Community Health Systems, Inc., Eastern New Mexico Medical

Center, Mimbres Memorial Hospital, Northeastern Regional Hospital, and Helena Regional Medical Center (referred to jointly hereafter as "Defendants") and/or their agents, employees and co-conspirators in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 et seq.

2. This case involves Defendants' pursuit of Medicaid payments from the Federal Government through improper manipulation of the New Mexico Medicaid's Sole Community Provider Hospital Payments and Sole Community Hospital Supplemental Payments programs. By fraudulently arranging with New Mexico county authorities to self-finance "county" contributions that are required for local hospitals to participate in support of such programs, Defendants were able to arbitrage temporary "donations" the hospitals made to counties they served into discretionary supplemental Medicaid payments refunded to the hospitals the full amount of their so-called donations plus three-to-one federal matching funds. As a result, and in violation of federal Medicaid rules, Defendants' claimed discretionary Medicaid payments that they knew they were not properly eligible to receive that were effectively funded 100% by the United States.

3. In addition, defendant Community Health Systems, Inc. has engaged in similar misconduct with defendant Helena Regional Medical Center, a former county-owned hospital located in Helena, Arkansas, that Community Health Systems purchased in February, 2002. Although that hospital became privately owned when it was sold to Community Health Systems, in violation of federal law, those defendants have continued to pay the "state" share of Arkansas's Medicaid Hospital IP Adjustment ("IP Adjustment") funding on behalf of Arkansas as if it were still a county-owned hospital. Defendants Community Health Systems, Inc. and Helena Regional Medical Center thus have been able to arbi-

trage "public hospital" payments that Helena Regional Medical Center promised to make to the state into large IP Adjustment payments that included three-to-one federal matching funds. As a result, and in violation of federal Medicaid rules, defendants Community Health Systems, Inc. and Helena Regional Medical Center claimed and received Medicaid IP Adjustment payments they knew they were not properly eligible to receive and that were effectively funded 100% by the United States.

4. As a direct result of Defendants' improper practices with respect to the New Mexico and Arkansas programs, the United States has been caused to make Medicaid DSH and IP Adjustment contributions benefitting Defendants that would not have been paid but for Defendants' false and fraudulent schemes.

## II. Background Regarding The False Claims Act

5. The federal False Claims Act was originally enacted during the Civil War. Congress substantially amended the Act in 1986 to enhance the ability of the United States Government ("Government") to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

6. The Act provides that any person who knowingly submits, or causes the submission of, a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages

sustained by the Government. Liability attaches when a defendant "knowingly" seeks payment, or causes others to seek payment, from the Government that is unwarranted. Requisite "knowledge" can include not only actual knowledge as to the impropriety of the claim but also acts taken in deliberate ignorance of the truth or falsity of such information and acts taken in reckless disregard of the truth or falsity of the information.

7. The Act allows any person having knowledge about a false or fraudulent claim against the Government to bring an action for himself and the Government, to share in any recovery, and to recovery reasonable costs, expenses, and attorney's fees from the defendant if the action is successful. The Act requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

8. Additionally, the Act prohibits employers from discriminating in any manner affecting terms and conditions of employment against employees because of lawful acts done in furtherance of an actual or potential False Claims Act lawsuit.

## III. PARTIES

9. Plaintiff/relator Robert Baker is a resident of Franklin, Tennessee. From November, 2001 until November, 2004, Baker worked in CHS's Revenue Management Department in Brentwood, Tennessee. During his employment with CHS, Baker learned of the New Mexico non-bona fide "donations" and the Helena Regional Medical Center IP Adjustment self-funding practices in Arkansas that are at issue in this complaint. By exploring the circumstances in which these payments were made and the relevant standards governing connection of such donations to supplemental Medicaid payments, came to realize that Defendants' New Mexico hospitals' "donations" to the counties the hospitals served

and Defendants' Arkansas "public hospital" payments to that state were sham transactions designed and implemented specifically to bilk the federal treasury. He resigned his position with CHS in October, 2004 (effective in November, 2004), in substantial part because of his discomfort with such misconduct. Baker is currently employed as a Reimbursement Manager for a healthcare company that is not a party to this lawsuit.

10. Community Health System, Inc. ("CHS"), is America's largest operator of non-urban hospitals in terms of revenue and number of facilities. As of September 30, 2004, CHS owned 71 hospitals, disbursed across 22 states, with an aggregate of 7,971 licensed beds. In 85% of the markets it serves, CHS is the sole provider of general hospital healthcare services. In most of the other markets it serves, CHS is one of two providers of these services.

11. CHS is a publically-traded company, incorporated under the laws of the state of Delaware, and headquartered at 155 Franklin Road, Suite 400, Brentwood, Tennessee 37027. For the fiscal year that ended December 31, 2003, CHS generated $2.8 billion in revenues. CHS is traded on the New York Stock Exchange under the symbol "CYH."

12. Eastern New Mexico Medical Center ("ENMMC"), is a 162-bed acute care hospital located in Roswell, Chaves County, New Mexico that is part of the CHS hospital chain. ENMMC provides a wide variety of inpatient and outpatient services. According to ENMMC's website, Southeastern New Mexico depends on ENMMC for specialized medical and surgical care and 24-hour emergency services. ENMMC claims to have the ability to perform almost any type of diagnostic test, procedure or treatment, including: cancer care, total joint replacements, cardiac caths, MRIs and CT scans, mental health services, outpatient surgery and endoscopy. ENMMC's New Mexico Medicaid provider

number is B2978. Its Medicare provider number is 32-0006.

13. Mimbres Memorial Hospital ("MMH") is a 49-bed acute care hospital located in the City of Deming, Luna County, New Mexico that is part of the CHS hospital chain. Services at Mimbres Memorial Hospital include Anesthesiology, Cardiology, Dentistry, Emergency Medicine, Family Practice, Gastroenterology, Gerontology, Gynecology, Internal Medicine, Obstetrics, Ophthalmology, Orthopedics, Pathology, Pediatrics, Podiatry, Pulmonology, Radiology and Surgery. MMH's New Mexico Medicaid provider number is B2113. Its Medicare provider number is 32-0014.

14. Northeastern Regional Hospital – commonly also referred to as Alta Vista Regional Hospital ("AVRH") – is a 54-bed acute care hospital located in Las Vegas, San Miguel County, New Mexico that is part of the CHS hospital chain. Services at AVRH include Emergency Medicine, Family Practice, General Surgery, Gynecology, Internal Medicine, Obstetrics, Orthopedics, Pathology, Pediatrics, Radiology, Urology and Vascular Surgery. AVRH's New Mexico Medicaid provider number is 76546. Its Medicare provider number is 32-0003.

15. Helena Regional Medical Center ("Helena") is a 155-bed acute care hospital located in Helena, Arkansas that became part of the CHS hospital chain in February, 2002. Prior to that time Helena was a county-owned hospital. Services provided at Helena include Emergency Medicine, ENT, Family Practice, General Surgery, Internal Medicine, Gynecology, Obstetrics, Ophthalmology, Pediatrics, Radiology and Urology. Helena's Arkansas Medicaid provider number is 146 593 105. Its Medicare provider number is 04-0085.

## IV. JURISDICTION AND VENUE

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

§1331, 28 U.S.C. §1367 and 31 U.S.C. §3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730. Under 31 U.S.C. §3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. Relator, moreover, would qualify under that section of False Claims Act as an "original source" of the allegations in this Complaint even had such a public disclosure occurred.

17. This Court has personal jurisdiction and venue over the Defendants pursuant to 28 U.S.C. §§1391(b) and 31 U.S.C. §3732(a), because that section authorizes nationwide service of process and because defendant CHS has minimum contacts with the United States. Moreover, defendant CHS and each of the defendant hospitals except Helena Regional Medical Center can be found in, reside in, and/or transact business in the District of New Mexico.

18. Venue is proper in this District pursuant to 31 U.S.C. §3732(a) because one or more of the Defendants can be found in and transact business in the District of New Mexico. At all times relevant to this Complaint, all Defendants except Helena Regional Medical Center regularly conducted substantial business within the District of New Mexico. In addition, statutory violations, as alleged herein, occurred in this district.

## V. MEDICAID PROGRAM BACKGROUND

19. Title XIX of the Social Security Act (the "Medicaid Act") authorizes Federal grants to the States for Medicaid programs to provide medical assistance to persons with limited income and resources. Medicaid programs are administered by the States in accordance with Federal regulations. State Medicaid agencies conduct their programs according to a Medicaid State plan approved by the Center for Medicare Medicaid Services ("CMS").

To carry out the mandates of the Medicaid program, the State agency pays providers for medical care and services provided to eligible Medicaid recipients. Providers that wish to participate in the Medicaid program must agree to comply with certain requirements specified in a provider agreement.

20. While Medicaid programs are administered by the States, they are jointly financed by the Federal and State governments. The Federal Government pays its share of medical assistance expenditures to the State on a quarterly basis according to statements of expenditures submitted by the State and a formula described in sections 1903 and 1905(b) of the Medicaid Act. The amount of the Federal share of medical assistance expenditures is called Federal Financial Participation ("FFP"). The State pays its share of medical assistance expenditures from state and local government funds in accordance with section 1902(a)(2) of the Medicaid Act.

21. Different levels of federal funding are provided to different states depending on state need. The minimum federal matching rate share is 50% of total program costs. In New Mexico and Arkansas, the annual federal share of Medicaid expenditures during the period relevant to this Complaint has approached or exceeded 75% of total program costs.

### A. State-Funding Abuses – Non-Bona Fide Provider Donations and InterGovernmental Transfers

22. Because of past abuses that have undermined the proper balance in Medicaid financing actually provided respectively by the State and Federal Governments, since 1991, federal Medicaid regulations have excluded from Federal financial participation State medical assistance expenditures for which the States' and/or its local government entities' share of Medicaid costs are obtained from pass-through provider donations or revenues generated by certain health-care-specific taxes. Those rules also include provisions that establish

limits on the aggregate amount of payments a State may make to disproportionate share hospitals for which FFP is available.

23. Under section 1903(w) of the Medicaid Act, a reduction in FFP will occur if a State receives donations made by, or on behalf of, health care providers unless the donations are "bona fide" donations or meet out-stationed eligibility worker donation requirements. The law also specifies the types of health care-related taxes a State is permitted to receive without a reduction in FFP.

24. "Donations" from health-care providers to State or local governments that are made with the express or implied understanding that such funds will be used for the purpose of fulfilling State matching-fund obligations to the Medicaid program for the benefit of the "donating" provider do not meet the definition of "bona fide" donations that are exempt from reductions in FFP. See 42 C.F.R. § 433.54. The result of such arrangements is that there is no true State-funded match of federal funds used to pay such Medicaid expenditure. Rather, there is only a hold harmless "donation" of funds by the provider hospital itself, which is ultimately returned to the hospital -- along with additional "matching" funds from the Federal Government -- within the year of the so-called "donation."

25. Under such improper arrangements, providers make it possible for State or local government officials to substantially increase federal Medicaid payments to the providers at no actual cost to State or local government. Such arrangements thus undermine the safeguards Congress designed into the Medicaid program to condition certain categories of federal Medicaid spending (up to established overall limits) on the willingness of State and local governments to bear a defined, fair portion of the extra costs in exchange for the additional benefits such payments provide Medicaid participants within their jurisdiction.

26. Another area of State funding abuse that Congress and the Centers for Medicare and Medicaid Services ("CMS") explicitly has sought to curb in recent years is misuse of the Medicaid Upper Payment Limit ("UPL") and Intergovernmental Transfers ("IGTs"). Effective March 19, 2002, for example, a final rule went into effect that lowered the UPL for nonstate government-owned or -operated hospitals from 150 percent to 100 percent. This change was made in substantial part because of the Federal Government's discovery of misuse of IGTs to divert much of the supplemental Medicaid payments that were previously justified as being needed for the specific benefit such public hospitals for use by the States of other purposes, leaving the government-owned hospitals with only a fraction of the supplemental payments and causing funding of such payments to be paid in actual effect 100% by the Federal Government. *Federal Register*, 67, no. 13:2602-11 (January 18, 2002).

27. While the new regulations continued to permit States to provide special supplement benefits to nonstate government-owned and -operated hospitals, based on their purported special needs and role in serving the Medicaid population, CMS concluded that the abuses that had become apparent demonstrated that the need was less than previously thought and that there was a need to restore greater equity among hospital providers and across provider types. Id., at 2603.

**B. New Mexico's Sole Community Provider Fund and Sole Community Provider Hospital Payments**

28. In New Mexico, one supplemental source of Medicaid funding to hospitals is the Sole Community Provider Fund ("SCPF"), which was created in 1993 by the New Mexico State Legislature. The Sole Community Provider Fund is administered by the Human Services Department/ Medical Assistance Division ("MAD") and is funded – for pur-

poses of fulfilling the State's obligation to share in Medicaid expenditures with the Federal Government – by county and local governments. Those locally-generated funds are then used by the State to draw down matching federal funds, which are sent directly to participating hospitals.

29. The Sole Community Provider Fund was created to provide greater care to the indigent population in counties that are willing to contribute state-share dollars for sole community hospitals servicing their region. Through "Sole Community Provider Hospital Payments," New Mexico hospitals serving counties and local communities that contribute to the fund (for the benefit of hospitals serving those communities) receive a federal match of approximately $3 for every $1 the county or local government contributes.

30. The Sole Community Provider Hospital Payments are designed to benefit eligible hospitals, that because of isolated location, weather or travel conditions, or absence of other hospitals, are the only source of inpatient hospital services reasonably available in a geographic area. Working with other government entities, these hospitals provide access to hospital services to as many clients as possible. Federal payments for these purposes are contingent upon the State and/or local governments' commitment to fund the State share of these Medicaid expenditures.

31. There are several steps that must be completed in order for a hospital to participate in Sole Community Provider Hospital Payments from the SCPF. Hospitals must first request financial support each year from the county (or counties) in which the hospital is located and/or serves. Hospitals serving multiple counties must request financial support for the upcoming year from each such county. The counties then approve a dollar amount

that they will pay the SCPF program in support of the hospitals and send the approval back to the hospital.

32. Hospitals must submit the local-funding commitments they have received from the counties to New Mexico's Medical Assistance Division not late than February 15th of each year.

33. Once all local-funding commitments have been provided by the hospitals to the Medical Assistance Division, MAD calculates the Market Basket Increase ("MBI") (the annual inflation increase due the hospitals) and informs the hospitals how much they will be paid that year in Sole Community Provider Hospital Payments. The Medical Assistance Division also informs the participating counties on or before July 1st of the total dollar amount they will be required to pay as the state-share of such payments. Reminder letters are sent by MAD to participating counties prior to the end of each quarter, identifying the amount that is due to be paid MAD by the county before the end of the quarter.

34. Quarterly payments are made by MAD to the hospitals only after all monies from the counties have been received by the Medical Assistance Division.

35. Funds hospitals receive for the Sole Community Provider Fund must be used for direct patient care or services related to direct patient care.

**C. New Mexico's Sole Community Hospital Supplemental Payments**

36. In addition to the Sole Community Provider Hospital Payments described above, MAD also administers a second-tier Medicaid program that provides hospitals that obtain additional county funding commitments with "Sole Community Hospital Supplemental

Payments." These payments are made by MAD only if, and to the extent, other Medicaid funding has not exceeded the annual federal funding limit.

37. Each year, MAD calculates the Medicare Upper Payment Limit (UPL) for New Mexico and determines how much federal money remains available for possible distribution. MAD then notifies hospitals of the amount of funds available. To gain a share of these additional federal funds, the hospitals must secure county commitments to fund the "state" share of these Medicaid payments in essentially the same manner as is done with respect to Sole Community Provider Hospital Payments: The hospitals are responsible for making requests to the counties for local funding and for forwarding approvals from the counties to MAD. If certain hospitals are not able to secure commitments for county funding of the "state" share of such supplemental payments, funds that might have gone to those hospitals is made available to hospitals whose county governments are willing to make matching contributions for those additional amounts.

38. Once all county commitments have been received, MAD notifies the hospitals what the final amount of their supplemental payments will be and the counties are told what final amount they must forward to the state to match and draw down the federal contribution. As with Sole Community Provider Hospital Payments, the federal share of these Sole Community Hospital Supplemental Payments matches the Federal Government's routine share of New Mexico Medicaid expenditures, or about $3 federal funds for every $1 of committed local funding.

39. Because the amounts of these supplemental payments are tied to annual federal spending limits, all county checks must be received by MAD by the deadline it sets so that such payments can be deposited and processed in time for MAD to issue checks for the com-

bined local and federal payments to the hospitals before the September 30 end of the Federal Government's fiscal year.

40. In September, 1999, based on the calculation of the Medicare Upper Payment Limit (UPL) and county commitments, a supplemental amount of approximately $4.2 million was available to distribute to the sole community hospitals in New Mexico. Similarly, approximately $33 million became available for distribution in September, 2000; approximately $7.5 million became available in September, 2001; approximately $13.5 million became available in September, 2002; approximately $15.9 million became available in September, 2003; and approximately $24.2 million became available in September, 2004.

**D. <u>Arkansas's Disproportionate Share Payments to Hospitals</u>**

41. Arkansas provides special Medicaid Disproportionate Share ("DSH") payments to qualified, private hospitals that serve a large number of poor and indigent patients. Arkansas, however, treats government-owned hospitals differently. Whereas privately-owned hospitals are eligible only for less lucrative DSH payments that are distributed from a shared DSH payment funds pool based on the relative Medicaid utilization rates of all eligible hospitals government-owned hospitals are paid based on Medicaid Upper Payment Limit ("UPL") calculations, government-owned hospitals are paid substantially higher amounts through Medicaid Hospital IP Adjustment that are based on Medicaid Upper Payment Limit ("UPL") calculations. This means that – relative to their size and Medicaid utilization rates – privately-owned hospitals in Arkansas receive less supplemental Medicaid funding for care to indigent patients than do their government-owned counterparts.

42. County-owned hospitals in Arkansas, moreover, have been permitted to maximize IP Adjustment payments for themselves by making Intergovernmental Transfer ("IGT") payments (as branches of the Counties that own them) to the State in order to satisfy Arkansas's matching-fund obligations to the Medicaid program.

43. No provision exists in Arkansas or Federal law to permit privately-owned hospitals to assume the standing of government-owned hospitals either for purposes of eligibility for UPL-based IP Adjustment payments or for purposes of making IGTs to the State in order to maximize any such IP Adjustment payments.

## VI. DEFENDANTS' MISCONDUCT

### A. Misconduct at the New Mexico Hospitals.

44. Relator Baker was hired in November, 2001 to work in CHS's Revenue Management Department as a Revenue Manager. In that capacity, Baker reported directly to Craig Plattner, CHS's Senior Director of Revenue Management, and Larry Carlton, Assistant Vice-President of the Revenue Management.

45. In early August, 2004, Baker was assigned to be CHS's revenue manager for Eastern New Mexico Medical Center. This was Baker's first experience working on the account of a CHS hospital in New Mexico. In the course of updating Baker about reimbursement issues relevant to ENMMC, Craig Plattner informed Baker that ENMMC had been receiving quarterly Sole Community Provider Hospital Payments from New Mexico's Sole Community Provider Fund. Plattner also made Baker aware, however, that in order to receive such payments, the hospital was required to make quarterly donations to Chaves County to defray the county's expense in supporting the Fund.

46. Shortly thereafter, the State of New Mexico released to participating hospitals its calculations detailing the Sole Community Provider Hospital Payments that hospitals in New Mexico were to receive for fiscal year 2004-2005.

47. Having received such notification to Eastern New Mexico Medical Center, Leanne Hacker, ENMMC's CFO, called Baker to inform him that the State's letter arrived and that she was working on a letter to the County that would set forth details about payments the hospital would be making to the County in order to offset the County's cost of funding the mandatory state-financed share of this Medicaid program. Baker asked her to send him an advance copy of the letter she intended to send. Accordingly, on August 17, 2004, Hacker faxed Baker a copy of the signed letter that she planned to mail to the County on August 26, 2004.

48. The letter – which was based directly on similar letters that had been sent to Chaves County in prior years – calculated a total "donation" payment that ENMMC would make to the County based exclusively on the hospital's detailed calculation of how much money it expected the County would be required to pay the State during the upcoming year to fund its share of Sole Community Hospital Program payments for the hospital. The letter noted that the donation was being made "for the purpose of maintaining our current level of sole community funding for fiscal year 2004-2005." The letter further stated that the donation "will be made in quarterly increments to coincide with the schedule Chaves County has for matching fund submissions to the State" and that the hospital "will make its quarterly donations [of $269,170] by the 1st of the month in which payment is due" to the State from the County.

49. Because he was unfamiliar with the processes to Sole Community Provider Hospital Payments in New Mexico, to confirm that everything was in order, Baker called the State of New Mexico to gain a better understanding of how the Sole Community Provider Fund reimbursement worked. Relator Baker explained that he was calling to inquire as to when the hospital could expect to receive its SCPF payments, and to verify when the hospital needed to pay the County. Anna Bransford, Financial Manager of the Program Administration Bureau of New Mexico's Medical Assistance Division, told Baker the hospital could *never* pay the County for contributions made to the State by the County in support of the hospital, as such practices would violate federal Medicaid regulations.

50. Coincidentally, at about the same time, the business office manager working under Mimbres Memorial Hospital's new CFO, Remer DeLoach, also called someone at the State, asking to whom Mimbres should send its check to for its Sole Community Provider Fund payment. That manager was given the same response by a New Mexico official as Baker.

51. Remer DeLoach then called Baker to ask for guidance. Baker told him that he had gotten the same response from the State, and instructed DeLoach to take no action until Baker could determine what was happening and how to proceed.

52. However, before Baker could get far in his research, DeLoach called Doug Gleeson, Vice-President of Finance at CHS, and told Gleeson about Baker's call to the State. Alarmed, Gleeson informed Larry Carlton and told him that Baker may be creating trouble for CHS by talking to the State about the payments CHS's New Mexico hospitals had been making to the counties funding their Sole Community Provider Fund payments. Baker was called to Larry Carlton's office soon thereafter to meet with him and Doug Gleeson.

53. During that meeting, Baker explained that, in fact, he had contacted MAD with questions he had regarding the SCPF program. Baker also explained that he was told by the State that the hospital could not legally fund the payment for the SCPF contribution made by the County to the State and expressed his concern that Defendants' arrangements with the counties looked like fraud.

54. Carlton chastised Baker for calling MAD and for even investigating this component of the hospital's reimbursement at all. Carlton told Baker that he was never again to call any state about regulatory issues until he knew what he is talking about. Carlton falsely characterized the payment to Chavez County was a "*bona fide donation*" because it was labeled "unrestricted" and because the County thus could always choose to keep the money and not make the payment the hospital intended the donation to support. Carlton told Relator Baker that he was never to use the word "fraud" again, nor was he allowed to say "appearance of impropriety" as it related to any CHS issue.

55. When, however, Baker showed Carlton the letter Hacker planned to send to the County Manager of Chaves County and explained that the tie between ENMMC's annual "donations" to Chaves County and its SCPF payments also was evident in how that hospital had been accounting for those dealings in its ledgers, Carlton recognized the paper trail showing the purpose of the payments was all too clear. He therefore instructed Baker to have Hacker remove all detail regarding the purpose of the donation and how the amount of the "donation" was calculated from her letter. He further instructed Baker to prepare a memo to all Revenue Managers with responsibility for any of CHS's three New Mexico hospitals on how uniformly to account for donations and Sole Community Provider Fund payments to the hospitals on corporate books, so that the connection between the dona-

tions and SCPF Medicaid receipts would not be evident on the face of the hospitals' accounting entries.

56. Thereafter, in reviewing CHS files on the payments to the counties to secure SCPF payments, Baker discovered that this scheme was devised several years earlier between Larry Carlton and Ron Schaefer (then CEO of ENMMC) when Chaves County appeared unable to meet the State's funding requirements for the hospital's participation in the SCPF program. Carlton, himself, came up with the idea to pay the County the amount needed to transfer to the State before the County needed to do so. The hospital's payment to the County would be labeled an "unrestricted" donation, although the true purpose for the donation would be made known to the County. The concept was then used as well by CHS to insure that the rest of its New Mexico hospitals also would gain the maximum amount of federal discretionary funding potentially available to them through the SCPF program each year.

57. Other CHS documents verified for Baker the *quid pro quo* purpose of donations to counties by CHS's New Mexico facilities. For example, on June 25, 2004, Ted Lomicka, Director of Strategic Analysis at CHS, sent a memo to Larry Cash, Executive Vice President and CFO of CHS informing him that New Mexico SCPF payments are received on the condition that "the hospital must first pledge an unrestricted donation to the County Indigent Fund (in a specified dollar amount determined by a formula or special agreement), which the state will use to obtain Federal matching-dollars (subject to the Upper Payment Limit)." Larry Cash wrote a hand-written note to Dave Medley, CHS's AVP of Finance, asking "What do we pay and receive [at each of the CHS's three sole community New Mexico hospitals?]"

58. Based on his discussions with other people at CHS and his review of documents relating to this issue, Baker believes and therefore alleges that the misconduct described herein was done knowingly and intentionally, that it has occurred with respect to each Defendant hospital since at least Fiscal Year 2001, and that it continues to this day.

59. Defendants have made such payments to the counties specifically so that the counties would continue to pledge and provide contributions on behalf of Defendants to the SCPF that would result in maximum federal disbursements to Defendants from that fund. Defendants have communicated to the counties in the past what the specific purpose of these donations is and what Defendants seek as a result of making those donations. The counties, moreover, understand that future donations from Defendants of this kind will be forthcoming only if the counties use the funds for Defendants' benefit in maximizing annual SCPF awards.

60. New Mexico counties are willing to cooperate with Defendants' ruse because the scheme funnels millions of dollars of additional federal funding to defendant hospitals providing healthcare to people in those counties without the net outlay of county funds that would be required if the rules of SCPF program participation were followed.

61. As a result of Defendants' misconduct in New Mexico, the United States Treasury has been damaged in an amount that cannot yet be finally determined but which substantially exceeds $10 million.

**B. <u>Misconduct at Helena Regional Medical Center in Arkansas.</u>**

62. In July, 2003, relator Baker was assigned to be CHS's revenue manager for Helena Regional Medical Center ("Helena"). This was Baker's first experience working on the account of a CHS hospital in Arkansas.

63. In the course of updating Baker about reimbursement issues relevant to Helena, Larry Carlton informed Baker that CHS had purchased the hospital from the county in which it was located in February, 2002, and had structured the acquisition agreement so that the county and Arkansas Division of Medical Services ("AR DMS"), which administers the Medicaid program on behalf of the State, would allow Helena to receive IP Adjustment reimbursement as if the hospital remained a "public" hospital owned by the county.

64. Each year by July 31, public hospitals are required to complete and submit to AR DMS an Upper Payment Limitation calculation based on the hospital's most-recently-audited Medicare/Medicaid cost report. On July 31, 2003, Baker submitted his first computation of Helena's UPL reimbursement to AR DMS. This computation would be used to calculate Helena's IP Adjustment/UPL for the State Fiscal Year ("SFY") beginning July 1, 2003 and ending June 30, 2004. Resulting IP Adjustment payments to the hospital were to begin in September or October, 2003.

65. Because Helena was claiming IP Adjustment reimbursement as if it continued to be a county-owned hospital, it paid the "State" contribution to its own IP Adjustment reimbursement by writing checks to Arkansas for the same amount that the County previously would have paid the State via IGTs.

66. The "state"-funded portion of Medicaid disbursements in Arkansas is roughly 25%, meaning that the Federal Government contributes approximately $3 for every $1 dollar of reimbursement attributed to the State.

67. In addition to the "state" portion of the IP Adjustment payments it ultimately would receive, Helena (and truly "public" Arkansas hospitals) pay the State an 20% of the IP Adjustment/UPL to be received. This additional payment from the hospital is used by the

State for its own purposes. Thus, one reason that AR DMS may have gone along with this improper arrangement is that the State itself reaped a profit as a result of the sham.

68. Quarterly, beginning in August or September each year, AR DMS sends each public hospital (and Helena) an "invoice" stating the IP Adjustment/UPL reimbursement to be received by the hospital and the payment needed from the hospital in order to qualify for the reimbursement. These form invoices are drafted and sent on the assumption that the recipient hospitals are legitimate public entities and, therefore, that they are qualified to make legitimate IGT payments to the State and entitled to the benefits of IP Adjustment/ UPL payments for government-owned hospitals.

69. In response to the quarterly invoices it has received from AR DMS since February, 2002, with Defendant CHS's knowledge and at its direction, Helena has paid the invoiced amounts and accepted payment of IP Adjustment/UPL reimbursement. At all times relevant to this complaint, defendant CHS and Helena acted with knowledge that Helena was not a government-owned or -operated hospital and that its behavior was designed to evade the letter and intent of federal regulations designed to ensure that "State" funds used to elicit additional federal Medicaid expenditures represented true state and/or local government funding so that the Federal Government was not alone bearing the true cost of discretionary Medicaid spending.

70. Because Baker was unfamiliar with the process involved in obtaining IP Adjustment/UPL reimbursement from AR DMS, in October, 2003, he called AR DMS to gain a better understanding of how the reimbursement worked and to get direction for disputing Helena's SFY 2004 UPL calculation, as prepared by AR DMS. During the course of several months during which Baker pursued an appeal of Helena's SFY 2004 UPL

calculation, Baker had several conversations with Kim Russell and Tom Show of AR DMS.

71. During one of those conversation, Mr. Show informed Baker that, although Baker technically had a legitimate contention as to the data used to determine Helena's SFY 2004 UPL, Helena's overall position was rather weak because Mr. Show believed Helena to not qualify as a "public" hospital for the purpose of making IGT payments that would qualify for a Federal match. Mr. Show went on to state that, although this was his interpretation of CMS guidelines, his office did not intend to make any change to their procedures unless and until CMS expressed a similar view. Show warned Baker that, should CMS do so, it was certain that all matching funds reimbursement would cease, and it was probable that CHS and Helena would have to repay all Federal matching funds received based in payments made from CHS's and Helena's private funds.

72. In December 2003, Baker discussed this issue with Carlton and informed Carlton of Mr. Show's points. Carlton, however, directed Baker to continue treating the issue as CHS and Helena had in the past.

73. After engaging Carlton in September, 2004 in the dispute regarding payment of "donations" by New Mexico hospitals to their counties that has been previously described in this Complaint, Baker conducted further research generally into both the New Mexico and Arkansas situations and concluded that both situations appeared fraudulent. Having been subjected to harassment and threats during his discussions with Carlton regarding the New Mexico situation, however, Baker decided that further pursuit of the argument in relation to Helena also would be counterproductive. On October 18, 2004 Baker gave notice of his resignation.

74. As a result of its fraudulent conduct, defendants CHS and Helena Regional Medical Center gained approximately 50% of the total of $3,416,056 in IP Adjustment reimbursement paid to Helena in 2002 (proportionate to CHS's time of ownership of the hospital that year compared to the county's, when such payments remained lawful); $2,260,755 of such reimbursement in 2003; $2,579,057 of such reimbursement in 2004; and $3,810,822 of such reimbursement in 2005 that it otherwise would not have received. Approximately 75% of those totals (or approximately $7.76 million) represents federal funding that would not have been paid but for defendant CHS's violations of the False Claims Act.

**COUNT I**
False Claims Act
31 U.S.C. §3729(a)(1)

75. Plaintiff realleges and incorporates by reference the allegations in paragraphs 1-74.

76. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§3729 *et seq.*, as amended.

77. Through the acts described above, Defendants have knowingly presented or caused to be presented to the United States Government false or fraudulent claims for federal matching funds on New Mexico's Medicaid Sole Community Provider payments and Supplemental Sole Community Provider Payments and on Arkansas's IP Adjustment/UPL Medicaid payments.

78. As a result of these false claims, the United States has been damaged and continues to be damaged, in an amount that cannot yet be finally determined but which substantially exceeds $18 million.

**COUNT II**
False Claims Act
31 U.S.C. §3729(a)(2)

79. Plaintiff realleges and incorporates by reference the allegations in paragraphs 1- 74.

80. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§3729 *et seq.*, as amended.

81. Through the acts described above, Defendants have knowingly made, used, and caused to be made and used false records and statements to get paid false or fraudulent claims for federal matching funds on New Mexico's Medicaid Sole Community Provider payments and Supplemental Sole Community Provider Payments and on Arkansas's IP Adjustment/ UPL Medicaid payments.

82. As a result of these false claims, the United States has been damaged and continues to be damaged, in an amount that cannot yet be finally determined but which substantially exceeds $18 million.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff/relator Robert C. Baker prays for judgment against the Defendants as follows:

1. that Defendants cease and desist from violating 31 U.S.C. §3729 et seq.;

2. that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §3729;

3. that plaintiff/relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act;

4. that plaintiff/relator be awarded all costs of this action, including attorneys' fees and expenses; and

5. that the United States and plaintiffs/relators be granted all such other relief as the Court deems just and proper.

**REQUEST FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiffs/relators hereby demand a trial by jury.

Dated:

By: James P. Lyle
Clyde DeMersseman
LAW OFFICES OF JAMES P. LYLE, P.C.
1116 2ND Street NW
Albuquerque, NM 87102
Telephone: 505-843-8000
Fax: 505-843-8043

and

Peter W. Chatfield
Michael P. Brown
Matthew B. Smith
PHILLIPS & COHEN, LLP
2000 Massachusetts Ave, N.W.
Washington, D.C. 20036
Tel: (202) 833-4567
Fax: (202) 833-1815

Attorneys for *Qui Tam* Plaintiff