**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

————————————

UNITED STATES OF AMERICA, EX. REL.
ROBERT C. BAKER,

        Plaintiff,

        v.                                      Civil No. 05-279 WJ/WDS

COMMUNITY HEALTH SYSTEMS, INC.,
EASTERN NEW MEXICO MEDICAL
CENTER; MIMBRES MEMORIAL
HOSPITAL; NORTHEASTERN REGIONAL
HOSPITAL; and HELENA REGIONAL
MEDICAL CENTER,

        Defendants.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN
PART DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT OF
QUI TAM PLAINTIFF ROBERT C. BAKER ("RELATOR")**

       THIS MATTER comes before the Court upon Defendants' Motion to Dismiss Second

Amended Complaint of Qui Tam Plaintiff Robert C. Baker ("Relator"), filed August 28, 2009

(**Doc. 55**).[1]  Having considered the parties' briefs and the applicable law, I find that Defendants'

motion has merit on some of the issues raised, and will be granted on those issues; the motion is

otherwise denied, as set forth below.

**BACKGROUND**

       This is a qui tam case[2] alleging Medicaid fraud based on violations of the False Claims

---

    [1]  Defendants have also filed a Motion to Dismiss Complaint of the United States in
Intervention (Doc. 53), which the Court will address separately.


    [2]  A "qui tam action" is an action brought under a statute that allows a private person to
sue for a penalty, part of which the government or some specified public institution will receive.

Act, 31 U.S.C. § 3729(a) ("FCA").  Defendants are alleged to have manipulated the Medicaid

funding program by a scheme which resulted in the illegal receipt of federally funded Medicaid

payments. The Relator seeks the maximum amount allowed to a qui tam plaintiff under §

3730(d).[3]  The United States seeks to recover damages and civil penalties from Defendants, in an

amount exceeding tens of millions of dollars, arising from false and/or fraudulent statements,

records, and claims of FCA violations.  In this motion, Defendants seek dismissal of all

allegations in the Second Amended Complaint ("SAC") on the basis of insufficient pleading.

The motion also required the Court's attention to several initial matters, namely: whether

jurisdiction over the additional claims in the SAC is barred under 31 U.S.C. § 3730(e)(4)(A), and

whether an amended provision of the FCA, which is relevant to this case, should apply to the

claims in this case.[4]

## BACKGROUND[5]

Defendant Community Health Systems, Inc. ("CHSI") is a publicly-traded company

incorporated under the laws of the State of Delaware and headquartered in Tennessee.

Defendants (collectively "the Hospitals,"or "hospital providers"), are indirect subsidiaries of

---

Black's Law Dict., 7th ed.

[3]  A qui tam plaintiff receives between 15 and 25 percent of any proceeds of an action or settlement of claims brought under the False Claims Act, "depending upon the extent to which the person substantially contributed to the prosecution of the action." § 3730(d).

[4] The Second Amended Complaint refers to both versions of the relevant provision: the former § 3729(a)(2) and the new version, § 3729(a)(1)(B).   For ease of reference, the Court will refer to the current version of the statutory provision.

[5]  Throughout this Memorandum Opinion and Order, the Court's reference to "Plaintiff" will refer to the general position taken by the Relator and the Government, unless otherwise specified.

CHSI, and are licensed acute care hospitals in New Mexico that provide a full range of emergency, inpatient, and outpatient medical services. Each is qualified as a "sole community provider hospital" under New Mexico's Medicaid program, providing millions of dollars in health care annually to the indigent citizens of the counties they serve.

## I.     Background on Medicaid Funding

In order to better understand the parties' positions and the legal arguments made in this case, it is helpful to gain some understanding of the way Medicaid funding works. Medicaid programs are administered by the States in accordance with Federal regulations, but they are jointly financed by the Federal and State governments. The Federal Government pays its share of medical assistance expenditures to the State on a quarterly basis according to statements of expenditures submitted by the State and a formula used to calculate how much of the total reported expenditures the Federal Government will reimburse the State.[6]  In turn, the State pays its share of medical assistance expenditures from state and local government funds in accordance with certain provisions of the Medicaid Act.  *See* 42 U.S.C. § 1396a(a)(2).

In New Mexico, two sources of Medicaid funding to hospitals are the Sole Community Provider ("SCP") fund and the Sole Community Provider Supplemental Payment ("SCP supplemental payment") program. The State share of SCP funds and SCP supplemental payments to hospitals must be funded by county and local governments.[7]  These funds were

---

[6]  *See* §§  42 U.S.C. §§ 1396b and 1396d(b)] of the Medicaid Act.

[7]  The SCP supplemental payment program is a second-tier Medicaid funding program which provides hospitals with additional funding to the extent other Medicaid funding has not exceeded the annual federal funding limit.  Parties refer to the program differently.  *Cmp*. Relator's Second Amended Compl., Doc. 41, ¶ 37 ("Sole Community Supplemental Payments")

3

created by the New Mexico State Legislature in order to provide greater care to the indigent population in counties that are willing to contribute state-share dollars for sole community hospitals servicing their region.  The SCP fund is administered by the Human Services Department/Medical Assistance Division and is funded by county and local governments in order to fulfill the State's obligation to share in Medicaid expenditures with the Federal Government.  These locally-generated funds are then used by the State to draw down matching federal funds, which are sent directly to participating hospitals.  Through "Sole Community Provider Payments," New Mexico hospitals serving counties and local communities that contribute to the SCP fund (for the benefit of hospitals serving those communities) receive a federal match of approximately $3 for every $1 the county or local government contributes.

In 1991, in order to curb extraordinary increases in federal Medicaid expenditures resulting from states trying to shift portions of their funding obligations to the federal government, Congress prohibited the use of health-care provider donations to fund state Medicaid spending, because such donations caused disbursement of federal matching funds with no true state contribution. According to the SAC, "donations" were made where counties could not meet the State's funding requirements to be able to pledge contributions on Defendants' behalf, in order for the State to be eligible for federal matching funds.  Sec.Am.Compl., ¶ 57.

The Medicaid Act's implementing regulations require a reduction in Federal Financial Participation ("FFP") in Medicaid expenditures if a state receives donations from health care providers unless the donations are "*bona fide*."  42 C.F.R. §§ 433.66, 433.74(d).  The FFP is calculated based on the state's qualifying Medicaid expenditures, which themselves are funded

with Intervenor (Government) Complaint, Doc. 37, ¶ 5 ("Sole Community Hospital Supplemental Payments ("SCHSP") programs).

in part by transfers of funds from counties within the state ("Inter-Governmental Transfers" or "IGT's").  A provider-related donation is "*bona fide*" only if it has no direct or indirect relationship to Medicaid payments to the health care provider, which means that the donations cannot be returned to the provider under a "hold harmless provision or practice." 42 C.F.R. §§ 433.54(a), (b).[8]  Plaintiff alleges that Defendants' donations had a direct or indirect relationship to the Medicaid payments they received under the Sole Community, and consequently were non-bona fide donations.  This qui tam case is based on Defendants' alleged pursuit of Medicaid payments from the Federal Government through improper manipulation of the New Mexico's Sole Community Provider Fund and Sole Community Provider Supplemental Payments programs, in violation of the FCA,  31 U.S.C. § 3729(a).

## II.    Defendants' Alleged Conduct

Plaintiff asserts violations of the FCA against Defendants. Under 31 U.S.C. §3729(a)(1)(A) [formerly § 3729(a)(1)], liability is imposed for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  Under § 3729(a)(1)(B) [formerly § 3729(a)(2)], liability is imposed for any person who "knowingly

---

[8]  A donation is "non-bona fide" if "[a]ll or any portion of the payment made under Medicaid to the donor... varies based only on the amount of the total donation received . . .," or the "unit of local government receiving the donation provides for any payment, offset, or waiver that guarantees to return any portion of the donation to the provider."

A "hold harmless practice" exists if any portion of the payment made under Medicaid to the donor varies based only on the amount of the donation, or if the state or local government provides for any payment that guarantees that any portion of the donation will be returned to the provider. 42 C.F.R. § 433.54(c).

The Second Amended Complaint suggests that counties have less incentive to scrutinize a hospital's escalating demand SCP funding where a hospital's donations relieve the county of the burden of budgeting itself for the cost of indigent care.  *See* Second Amended Complaint, ¶ 76.

makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

The SAC alleges that Defendants provided New Mexico  counties with purported "donations" that in fact were "pass-through" payments to fund the counties' contributions to the SCP fund, which is used to fund the State's share of the SCP program ("donation" claims). Defendants purportedly had no charitable intent in making the "donations."  Rather, the payments simply enabled the counties to pledge funds to the SCP fund, and in turn to cause New Mexico's Medical Assistance Division to return to Defendants the purported donation, along with the federal matching funds that the donations fetched (three times the value of the donations themselves), to maximize payments Defendants received for providing care to Medicaid-eligible patients. Because Defendants knew that their contributions to the SCP fund were ineligible for federal matching, they falsely characterized those payments as "unrestricted donations" in an effort to make them appear *bona fide*.  The "donation" claims are asserted as violations of both § 3729(a)(1)(A) and §3729(a)(1)(B) in Counts I and II of the SAC.

Defendants are also alleged to have fraudulently overstated their costs of providing uncompensated indigent care to obtain federally subsidized Medicaid funds ("inflation" claims). As a result of the alleged conduct, New Mexico claimed and obtained tens of millions of dollars in federal funds in reimbursement for the Medicaid payments to Defendants, in violation of the federal prohibition on federal funding where states or counties receive non-bona fide donations from providers. Defendants characterize these "inflation" claims as the "new allegations" which were added to the SAC.

Defendants also note that the SAC refers to three additional New Mexico hospital corporation affiliates which were acquired up by Defendant CHSI since the filing of the First

Amended Complaint , but which are not named Defendants ("former Triad Hospitals").[9]

## III.    Standard of Review

The instant motion challenges the viability of all of Relator's claims in the SAC, but moves to dismiss the "inflation" claims  – the allegations added in the SAC – on jurisdictional grounds.   The parties disagree on whether the Court should address the jurisdictional issues under Rule 12(b)(1) or Rule 56 of the Federal Rules of Civil Procedure.  Defendants contend that Rule 12(b)(1) should be used, and that the Court consider, in addition to the allegations in the SAC, also consider a copy of the counterclaims asserted in a state court case out of the Fifth Judicial District in Chaves County, New Mexico which Defendants attach as an exhibit to their motion.  Relator submits two declarations as attachments to the response for the Court's consideration, maintaining that Rule 56 is appropriate in this instance.

Rule 12(b)(1) of the Federal Rules of Civil Procedure empowers a court to dismiss a complaint for "lack of jurisdiction over the subject matter." Fed.R.Civ.P. 12(b)(1). When making a Rule 12(b)(1) motion, a party may go beyond the allegations in the complaint to challenge the facts upon which jurisdiction depends by relying on affidavits or other evidence properly before the court. *See New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995); *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir.1995). A court has broad discretion to consider affidavits or other documents to resolve disputed jurisdictional facts under rule 12(b)(1). *Holt*, 46 F.3d at 1003. In those instances, a court's reference to evidence outside the pleadings does not necessarily convert the motion to a Rule 56 motion. *Id.* (citation omitted). However, when subject matter jurisdiction is dependent upon the same statute which provides

---

[9]  These are the Carlsbad Medical Center, the Lea Regional Medical Center, and Mountain View Regional Medical Center.  SAC, ¶ 11.

the substantive claim in the case, the jurisdictional claim and the merits are considered to be

"intertwined," and when both parties submit evidence beyond the pleadings, a motion to dismiss

is properly characterized as one for summary judgment.  *Trainor v. Apollo Metal Specialties,*

*Inc.*, 318 F.3d 976, 978 (10th Cir.2002); *Jencks v. Modern Woodmen of America*, 479 F.3d 1261,

1263 n.2 (10th Cir. 2007).

The nature of this case, as well as Tenth Circuit precedent, dictates that conversion to

Rule 56 is appropriate, because a challenge under the FCA's jurisdictional bar set out in §

3730(e)(4) is considered to be "necessarily intertwined with the merits" and is, therefore,

properly treated as a motion for summary judgment:[10]

> As the parties correctly note, the statutory provisions of 31 U.S.C. § 3730(e)(4)
> implicate the district court's subject matter jurisdiction. Jurisdictional challenges
> brought under that section arise out of the same statute creating the cause of
> action ( i.e., the FCA) and are thus necessarily intertwined with the merits of the
> case . . . As such, the court's jurisdictional inquiry should be resolved under
> Federal Rule of Civil Procedure 12(b)(6) or, after proper conversion into a motion
> for summary judgment, under Rule 56. . . In the present case, the district court
> apparently treated defendant's motion as a motion to dismiss for lack of subject
> matter jurisdiction under Rule 12(b)(1). However, because the jurisdictional
> question was intertwined with the merits, and because the court relied on
> affidavits and other evidentiary material submitted by the parties, Spectrum's
> motion to dismiss should have been treated as one for summary judgment under
> Rule 56(c). . . . Accordingly, we exercise our plenary power and consider
> Spectrum's motion as a motion for summary judgment. . .   . . . whether we
> consider Spectrum's motion as a motion to dismiss under Rule 12(b)(1) or a
> motion for summary judgment, Appellants' burden remains essentially the same –
> they must present affidavits or other evidence sufficient to establish the court's
> subject matter jurisdiction by a preponderance of the evidence. . . . *See*
> *Trentacosta v. Frontier Pacific Aircraft Indus., Inc.*, 813 F.2d 1553, 1559 (9th

---

[10]  *See also*, *U.S. ex rel. Reagan v. East Texas Medical Center Regional Healthcare
System,* 384 F.3d 168 (5th Cir. 2004); *U.S. ex rel. Hafter D.O.v. Spectrum Emergency Care, Inc.*,
190 F.3d 1156, 1160 & n.5 (10th Cir. 1999) (noting that statutory provisions of 31 U.S.C. §
3730(e)(4) implicate the district court's subject matter jurisdiction because jurisdictional
challenges brought under that section arise out of the same statute creating the cause of action
and are thus necessarily intertwined with the merits of the case).

Cir.1987) (noting that nonmovant's burden under Rule 12(b)(1) is essentially the same as Rule 56(e)'s requirement that the nonmoving party to a motion for summary judgment set forth specific facts, beyond his pleadings, to show that a genuine issue of material fact exits); *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir.1995) (noting that when a Rule 12(b)(1) motion challenges the substance of a complaint's jurisdictional allegations, the nonmovant must "present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction." (citation omitted)

*U.S. ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.*,190 F.3d 1156, 1159-60 & n.5 (10th Cir. 1999).

The Court will thus consider the jurisdictional argument under the usual summary judgment standard, thereby allowing a consideration of the declarations which the Relator offers, as well as the state court lawsuit offered by Defendants.[11]  *See Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir.1996) (summary judgment is appropriate if the pleadings, depositions, discovery, and admissions on file, together with any affidavits, show no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law).

## II.     Jurisdictional Argument - 31 U.S.C. § 3730(e)(4)(A).

Defendants contend that Relator's new allegations regarding purportedly inflated funding requests and the former Triad Hospitals are jurisdictionally barred because they are based upon publicly disclosed allegations of which the Relator is not the original source.

The FCA jurisdictionally bars a relator's action if it is based on allegations or transactions already in the public domain – *unless* the relator can show that he is an "original source" of the information on which the allegations are based.  *In re Natural Gas Royalties Qui*

---

[11]  It is not clear how Defendants could argue that the Court may consider the *Sisneros* counterclaims as matters outside the pleadings without converting the standard to a Rule 56 standard, but that the Court's consideration of Plaintiff's submitted affidavits are beyond the scope of Rule 12(b)(1).

*Tam Litigation, Grynberg v. Pacific Gas and Electric Co., et al.,* 562 F.3d 1032, 1034 (10th Cir.

2009).[12]  Defendants contend that the new allegations, or "inflation" claims set out in the SAC

are jurisdictionally barred, because they were previously advanced in a prior state court

proceeding, and because they are based upon the allegations in the First Amended Complaint.

Defendants rely on the jurisdictional provision of the FCA upon which states that:

> No court shall have jurisdiction over an action under this section based upon the **public disclosure** of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an **original source** of the information.

31 U.S.C. § 3730(e)(4)(A) (emphasis added).  The purpose of this jurisdictional bar is to

accommodate the primary goals of the FCA, which is to promote private citizen involvement in

exposing fraud against the government and at the same time, to prevent parasitic suits by

opportunistic late-comers who add nothing to the exposure of fraud. *U.S. ex rel. Reagan v. East*

*Texas Medical Center Regional Healthcare System*, 384 F.3d 168, 174 (5th Cir. 2004) (citing

*United States ex rel. Rabushka v. Crane Co*., 40 F.3d 1509, 1511 (8th Cir.1994)). This inquiry

involves four separate questions:

> (1) whether the alleged "public disclosure" contains allegations or transactions from one of the listed sources;

> (2) whether the alleged disclosure has been made "public" within the meaning of the False Claims Act;

---

[12]  The word "information" refers to the information on which the relator's allegations are based rather than the information on which the publicly disclosed allegations that triggered the public-disclosure bar are based. *See Rockwell Intern. Corp. v. U.S.*, 549 U.S. 457, 458, 127 S.Ct. 1397, 1400 (2007);*U.S. ex rel. King v. Hillcrest Health Center, Inc*.,  264 F.3d 1271, 1280 (10th Cir. 2001) ("information on which the allegations are based" means the information underlying or supporting the fraud allegations contained in the plaintiff's qui tam complaint) (citations omitted).

(3) whether the relator's complaint is "based upon" this "public disclosure"; *and, if so,*

(4) whether the relator qualifies as an "original source" under section 3730(e)(4)(B).

*United States ex rel. Fine v. MK-Ferguson Co.*, 99 F.3d 1538, 1544 (10th Cir.1996). A court must address the purported public disclosure *before* analyzing whether the relator is an original source. If the answer to any of the first three questions is "no," the inquiry is complete and § 3730(e)(4) does not bar the relator's complaint. However, if each of the first three questions is answered "yes," then the court must consider whether the relator qualifies as an "original source" under section 3730(e)(4)(B). *Id*. at 1004; *see U.S. ex. rel. Fine*, 99 F.3d at 1544; *In re Natural Gas Royalties,* 562 F.3d 1032, 1039 (10th Cir. 2009) (accord). An "original source" has "direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action . . . based on the information." § 3730(e)(4)(B). *Rockwell Intern. Corp. v. U.S.* 549 U.S. 457, 457 (2007).

A.       Whether New Allegations are Based on Prior Public Disclosure

Defendants contend that the new allegations regarding inflated charges and the former Triad Hospitals must be analyzed as discrete claims subject to the jurisdictional analysis under § 3730(e)(4)(A). They argue that the allegations in these claims are barred based on allegations previously made in the Relator's First Amended Complaint as well as putative class action "counterclaims" which was filed in the Fifth Judicial District in Chaves County, *Roswell Hosp Corp. v. Sisneros*, Case NO. D-504-CV-200800485 ("*Sisneros*" case, attached as Ex. 1 to Doc. 56). Relator responds that the new allegations are simply amendments to a former complaint, and these amendments add detail concerning a previously pled claim.

The initial inquiry here is whether the new allegations in Counts I and II of the SAC are "based upon" prior public disclosures. The "public disclosure" analysis is not a rigorous one.

11

The Tenth Circuit treats it as a "threshold analysis . . .  intended to be a quick trigger for the more exacting original source analysis." *United States ex rel. Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1051 (10th Cir.2004).  The idea behind the provision is that, "once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds. . . ." *See U.S. ex rel. Boothe v. Sun Healthcare Group, Inc.,* 496 F.3d 1169, 1173 (10th Cir. 2007) (citing *Grynberg United States ex rel. v. Koch Gateway Pipeline Co*., 390 F.3d 1276, 1279 (10th Cir.2004)).  The term "based upon" is defined to mean "supported by" and has been held to encompass actions "even partly based upon" prior public disclosures. *U.S. ex rel. Boothe v. Sun Healthcare Group, Inc*., 496 F.3d 1169 (C.A.10 (N.M.),2007).[13] Moreover, it is not necessary that the information concerning allegations be potentially accessible to any member of the public, only that it be accessible to some members of the public, in order to be considered publicly disclosed within the meaning of 31 U.S.C.A. § 3730(e)(4)(A).  *See U.S. ex rel. Doe v. John Doe Corp*. 960 F.2d 318 (2nd Cir. 1992).

Defendants argue that both the *Sisneros* case and the Relator's First Amended Complaint constitute "prior public disclosures."

*1.      Can the Court Consider a State Court Case in the Analysis?*

Defendants point to case law which supports their position that state court proceedings may be considered in an analysis of the FCA's public disclosure bar.  *See U.S. ex rel. Hafter D.O.v. Spectrum Emergency Care, Inc*., 190 F.3d 1156, 1161 (10th Cir. 1999) ("Our reading of § 3730(e)(4)(A), together with other provisions of the FCA, does not convince us this statute's

---

[13]  The Tenth Circuit's interpretation of "based upon" is accepted by most other circuits. *See U.S. ex rel. Boothe v. Sun Healthcare Group, Inc*., 496 F.3d 1169, 1174 (10th Cir. 2007); *See also* Hays v. Hoffman 325 F.3d 982, 988 (8th Cir. 2003) (A suit is "based upon" a public disclosure if the allegations are "derived from" or "supported by" the disclosure).

reference to "civil, criminal and administrative hearings" applies only to federal proceedings, and not state proceedings. . . ."); *U.S. ex rel. Reagan v. East Texas Medical Center Regional Healthcare System*, 384 F.3d 168, 174 (5th Cir. 2004) (finding allegations disclosed in state court lawsuit were publicly disclosed under the FCA). In *Reagan*, the Fifth Circuit stated that "[a]ny information disclosed through civil litigation and on file with the clerk's office should be considered a public disclosure of allegations in a civil hearing for the purposes of section § 3730(e)(4)(A)" and "[t]his includes civil complaints. . . ."

The Government contends that the *Sisneros* case cannot be used as a "prior public disclosure" because the statutory language applies only to federal – not state – proceedings. However, the case on which the Government relies for this contention is inapposite. *See U.S. ex rel. Wilson v. Graham County Soil & Water Conservation Dist.*, 528 F.3d 292 (4th Cir. 2008).[14] The type of disclosure considered in *Wilson* case was very different from what is at issue here. Section 3730(e)(4) has two categories of listed disclosure types. Category 1 relates to "a disclosure of allegations or transactions in a criminal, civil, or administrative hearing. . . ." Category 2 concerns any "congressional, administrative, or Government Accounting Office report, hearing audit, or investigation. . . "  In *Wilson*, the court found that audit reports which were provided only to state and local officials did not constitute "administrative reports" within meaning of the FCA's public disclosure bar because the term "administrative report" was listed squarely in the middle of a list of obviously federal sources (category 2). The instant case is quite different from the *Wilson* case because it involves material from a state court proceeding, which clearly belongs in "category 1," and which is not limited in any way to federal sources.

_____

[14]   The audit reports at issue in *Wilson* regarded irregularities in the performance of emergency watershed protection contracts by county soil and water conservation districts.

The Government asks the Court to defer ruling on this issue until the *Wilson* case is heard on appeal by the U.S. Supreme Court.  Given the case law already available on this issue, as well as the inapposite nature of *Wilson*, deferring ruling on this jurisdictional issue will not be helpful. Accordingly, the Court finds that the *Sisneros* case may be included in considering a "disclosure of allegations or transactions in a criminal, civil or administrative hearing" under § 3730(e)(4), and in deciding whether the "inflation" claims in the SAC are "based upon" the allegations made in the *Sisneros* suit.

       None of the parties has raised the issue concerning whether it makes any difference that there was only one defendant in the *Sisneros* case – the Roswell Hospital Corporation d/b/a Eastern New Mexico Medical Center– where the instant case includes several other defendants in addition to the Roswell Hospital Corporation.   The Court assumes that a complete identity of parties is not required, since the purpose of the public disclosure requirement is to give the Government enough information to discover related frauds. Naming only one defendant would thus put the Government on sufficient notice to go after other hospitals, particularly other hospitals within the same hospital system. *See, e.g. U.S. ex rel. Boothe v. Sun Healthcare Group, Inc*., 496 F.3d 1169, 1173 (10th Cir. 2007) (public disclosure bar applied where prior qui tam suits alleged similar abuses by defendant's affiliates).

       2.      *First Amended Complaint as a basis for "prior public disclosure"*

       The Relator's position is that the SAC simply adds details about the previously pled fraud scheme outlined in the First Amended Complaint, and thus, the First Amended Complaint should not be considered as a prior public disclosure.  However, § 3730(e)(4) envisions

subjecting an amended complaint to the same scrutiny as an initial complaint:[15]

> In our view, the term "allegations" [in § 3730(e)(4)] is not limited to the allegations of the original complaint.  It includes (at a minimum) the allegations in the original complaint as amended. The statute speaks not of the allegations in the "original complaint" (or even the allegations in the "complaint"), but of the relator's "allegations" *simpliciter*. Absent some limitation of § 3730(e)(4)'s requirement to the relator's initial complaint, we will not infer one. Such a limitation would leave the relator free to plead a trivial theory of fraud for which he had some direct and independent knowledge and later amend the complaint to include theories copied from the public domain or from materials in the Government's possession. Even the Government concedes that new allegations regarding a fundamentally different fraudulent scheme require reevaluation of the court's jurisdiction.

*Rockwell Intern. Corp. v. U.S.*  549 U.S. 457, 473, 127 S.Ct. 1397, 1408 (2007).

The Relator insists that the new allegations in the SAC are part of the previously pled cause of action because a "claim" or "cause of action" includes all allegations arising from the same transaction, event, or series of transactions. *Wilkes v. Wyoming Dept. of Employment Div. of Labor Standards*, 314 F.3d 501, 504 (10th Cir. 2002).  The *Wilkes* case addresses the "transactional approach" to claim preclusion, and is not relevant to an analysis under § 3730(e)(4).  Still, the Court finds some merit in the Relator's argument that § 3730(e)(4) should not bar new allegations that add detail to a pre-existing cause of action –  as long as the new allegations can withstand scrutiny on their own as required under § 3730(e)(4).

Defendants do not present any case law, nor can the Court find any, which characterizes an initial complaint as the "prior public disclosure."  On the other hand, the Relator points to an

---

[15]  *See also U.S. ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730 (7th Cir. 2007) (finding that relator's proposed third amended complaint in qui tam action under the FCA withstood jurisdictional bar because allegations were not actually derived from any publicly disclosed information given by provider to United States Attorney's Office and then passed onto relator), *overruled on other grds. by Glaser v. Wound Care Consultants, Inc*., 570 F.3d 907 (7th Cir. 2009); *Hays v. Hoffman*, 325 F.3d 982, 990 n.3 (8th Cir. 2003) (concluding that relator's own whistleblower letters to state agency were public disclosures).

unpublished federal district court case out of the eastern district of Washington which supports his position: *United States ex rel. Trice v. Westinghouse Hanford Co*., unpubl. opin., 2000 WL 34024248 (E.D.Wash.,2000).[16]   In that case, the court found that the relator's amended complaint was "a continuation of the original joint Complaint" which "delved into these allegations [of fraudulent fee proposals and fraudulent cost savings initiatives and incentive fees . . . ] in greater detail" and included "more supporting information."   Because the amended complaint was a continuation of the original joint initial public disclosure, the *Trice* court found that it was not affected by the ban created by public disclosure provisions in the FCA.   The position espoused by Defendants would result in a jurisdictional bar to any amendment to a complaint and creates a kind of reverse bootstrapping: an amended complaint would be barred simply because a previous complaint had been filed.   This position does not comport with the objective behind § 3730(e)(4), which is to prevent filings by opportunistic late-comers to a lawsuit.

        *3.*       *Whether the "New Allegations" made in the SAC are based on prior public disclosures?*

       In light of my findings thus far, the "prior public disclosure" inquiry will proceed on whether the new allegations in the SAC are based on those made in the *Sisneros* case, which was filed, or "publicly disclosed" on April 13, 2009 (attached as Ex. 1 to Defts' Mot, Doc. 55), three months prior to the Relator's filing of the SAC on July 2, 2009.[17]

_____

      [16]  The Relator cites the case under its Lexis cite: *United States ex rel. Trice v. Westinghouse Hanford Co*., 2000 U.S. Dist. LEXIS 8838 (E.D. Wash. Mar. 1, 2000).

      [17]  It is not entirely clear whether the *Sisneros* complaint, or the relevant counterclaims, were filed on April 13, 2009, since the exhibit bears no date stamp.  *See* Doc. 55, Ex. 1. However, Relator does not dispute the date provided by Defendants, and under a summary judgment standard (advanced by the Relator), the Court accepts those representations as a

In determining whether the new allegations are based upon prior public disclosure, the Court may consider all the relevant disclosures. *See e.g.*, *U.S. ex rel. Reagan v. East Texas Medical Center Regional Healthcare System*, 384 F.3d 168, 174 n.8 (5th Cir. 2004) (finding that the entire basis of plaintiff's claim had been disclosed within the meaning of the FCA when the court considered other disclosures in addition to the state law claim). The test is whether a "substantial identity" exists between the publicly disclosed allegations or transactions and the qui tam complaint – or, in this case, between the "inflation" claim allegations in the SAC and the similar allegations made in the *Sisneros* case. *See, e.g., U.S. ex rel. Grynberg v. Praxair, Inc*., 389 F.3d 1038, 1051 (10th Cir. 2004) (finding substantial identity between qui tam complaint and amended complaint).

Based on the Court's review of the SAC, the new claims asserting "inflation" claims are: ¶ 93(g) & (h) in Count I of the SAC, alleging violations of § 3729(a)(1)(A)) and ¶ 97(e) & (f), in Count II of the SAC, alleging violations of § 3729(a)(1)(B). Defendants list the new allegations as SAC ¶¶ 68, 74, 76, 93(f)-(g), 97(f). *See* Doc. 55 at 5. However, the Court views ¶¶ 74, 76 and 93(f) as allegations which are connected with "donation" claims rather than "inflation" claims. Also, ¶ 97(e), not listed by Defendants as a "new allegation," appears to be an "inflation" claim as well.

*For Count I: ¶ 93(g) and (h):*

> (g) submitting to the counties that Defendants' hospitals served statements regarding purported "uncompensated" levels of indigent care that substantially overstated the properly reportable cost to the hospital's of providing relevant care and thus that did not provide fair notice to those counties when [SCP fund] program payments had grown to the point that they substantially exceeded the properly reimbursable cost to defendants of providing care eligible for such program payments;

material undisputed fact.

17

and

(h) inflating hospital charges used to report "uncompensated care" at outrageous levels designed primarily to game Medicaid, Medicare and other insurers' reimbursement formulas and systems;

*For Count II: ¶ 97(e) and (f):*

(e) Causing New Mexico to submit statements of state Medicaid spending that are inaccurate as to the proper amount of such spending entitled to FFP payments; and

(f) Providing county officials with statements regarding uncompensated indigent care that create the false impression that, at past reimbursement levels, Defendants' hospitals would not already being paid the full cost to the hospitals of providing eligible care to Medicaid eligible patients and using such misleading reporting as the basis for seeking and obtaining approval and payment of ever increasing amounts from [SCP fund] programs that now far exceed the properly reimbursable cost to Defendants of providing covered care.

The *Sisneros* case is posturally different from the instant case. In the instant case, the hospital corporations are Defendants. However, in *Sisneros*, a hospital corporation is the plaintiff, and Chaves County residents are the defendants.[18] Thus, the allegations made by the Relator in this case in the SAC are analogous to the counterclaims asserted by defendants in the *Sisneros* lawsuit. The question is whether these counterclaims contain allegations which have publicly disclosed the new allegations contained in the SAC of our case. The *Sisneros* counterclaims also included "donation" claims as well as "inflation" claims, alleging that the defendant's hospitals had been investigated concerning unlawful donations to Chaves County, which resulted in exponential increases in funding requests and the receipt by the hospital defendant of tens of millions of federal and state monies. *Sisneros* Counterclaims, Defts' Ex. 1, ¶¶ 23-26. The "prior public disclosure" inquiry in this case is limited to the "inflation" claims

---

[18] Defendants offer no information on the basis for the hospital's lawsuit in *Sisneros*.

which are being challenged by Defendants.

Under the relevant case law, the Court finds that the allegations in the *Sisneros* counterclaims are sufficient to constitute a "prior public disclosure" of the "inflation" claims asserted in the SAC.  The Court notes that the term "based upon" does not require that the allegations be completely alike, but may be even "partly based upon" prior public disclosures. *See Boothe*, 496 F.3d at 1173-74 (rejecting that relator's "time, place, and manner" distinction was sufficient to escape public disclosure bar and finding claims materially identical to previously disclosed allegations in other qui tam actions).

The *Sisneros* counterclaims by the putative class members allege that defendant submitted false or improper claims and the manipulation of "gross billings" and "self-pay billings" reported to the county in order to receive a multiplication of funds paid back to the hospital.  Counterclaim ¶¶ 23-25.  Under the alleged scheme, the Hospitals overcharged the local uninsured population in order to create the false impression that, at past reimbursement levels, they were not being paid the full cost of providing eligible care to Medicaid eligible patients. The hospitals allegedly used an "unconscionable" two-tiered pricing scheme to overcharge uninsured or self-pay patients in order to make up for what the hospitals cannot get for the same treatment of insured patients. ¶¶ 21-23. The counterclaim also asserts that the hospitals used the putative class members to create artificial and fraudulent "justification" for its receipt of millions of dollars of Sole Community Provider funds.

The new allegations in SAC state that Defendants are making money from Medicaid funds, based on falsely reported inflated annual costs incurred in providing indigent care.  The *Sisneros* counterclaim asserts allegations regarding inflated charges and costs which were manipulated by the defendants hospitals in order to result in a multiplication of funds that were

paid directly back to those hospitals.  The SAC's new allegations regarding inflated charges and costs are thus facially "supported by" and therefore "based upon" the *Sisneros* allegations. The new allegations represent more than the Relator just "fleshing out" the allegations in the First Amended Complaint.

As a result, the Court finds that the "inflation" claims newly asserted in the SAC were derived from a "prior public disclosure" – specifically, the *Sisneros* counterclaim.  This finding requires that the Court proceed to the next step of the jurisdictional analysis under § 3730(e)(4), which is to determine whether the relator qualifies as an "original source" under section 3730(e)(4)(B).  *See United States ex rel. Fine v. MK-Ferguson Co.*, 99 F.3d 1538, 1544 (10th Cir.1996).

### 4.      *Allegations Against Former Triad Defendants*

Defendants' jurisdictional argument encompasses Relator's claims against hospitals which Defendant CHS had acquired since the filing of the previously filed complaint. In paragraph 11 of the SAC, the Relator notes for the first time that Defendant CHS is the owner and parent company of the New Mexico hospital corporations named as Defendants, and that CHS has acquired three additional hospitals.  Defendants argue that the Relator's claims against these "former Triad Hospitals" are identical to the allegations against Defendant Hospitals set forth in the First Amended Complaint and are thus jurisdictionally barred.

For reasons I have given above, assertions regarding these entities are not barred by virtue of the sole fact that a previous complaint had been filed against Defendant CHS.  The former Triad Hospitals are not named as Defendants in the SAC, and are therefore not considered added parties.  They are mentioned in the SAC in order to further define Defendant CHS.  Thus, claims against the former Triad Hospitals are barred only to the extent that claims

20

are barred against the already-named Defendants.  I have already found that the "inflation" claims newly asserted in the SAC were based upon a "prior public disclosure" in the *Sisneros* counterclaim.  This finding necessarily applies to any claims that would include the "former Triad Hospitals."

Jurisdiction under § 3730(e)(4) is not barred if the Relator can show he is the "original source" of the allegations.

B.    <u>Original Source / Voluntary Disclosure</u>

An "original source" "has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action. . .  based on the information." § 3730(e)(4)(B).  The term "information" means information on which the relator's allegations are based rather than the information on which the publicly disclosed allegations that triggered the public-disclosure bar are based. *Rockwell Intern. Corp. v. U.S.,* 549 U.S. at 458.  However, a "relator need not . . .  have in his possession knowledge of the actual fraudulent conduct itself; knowledge 'underlying or supporting' the fraud allegation is sufficient." *Kennard v. Comstock Resources, Inc*., 363 F.3d 1039, 1044-45 (10th Cir. 2004).

1.    *Original Source*

Under Tenth Circuit authority, knowledge is "direct and independent" if it is "marked by the absence of an intervening agency," and "unmediated by anything but the relator's own labor." *In re Natural Gas Royalties Qui Tam Litigation,* 467 F.Supp.2d 1117, 1146 -1147 (D.Wyo. 2006) (citing *United States ex rel. Fine v. MK-Ferguson Co*., 99 F.3d 1538, 1547 (10th Cir.1996)). Independent knowledge is knowledge which is not secondhand; rather, a relator must demonstrate that he discovered the information on which the allegations are based through his

own efforts and not by the labors of others, and that the information was not derivative of the information of others. *United States ex rel. Hafter v. Spectrum Emergency Care, Inc*., 190 F.3d 1156, 1162 (10th Cir.1999). "To establish original source status knowledge, a qui tam plaintiff must allege specific facts – as opposed to mere conclusions – showing exactly how and when he or she obtained direct and independent knowledge of the fraudulent acts alleged in the complaint and support those allegations with competent proof." *Id*.  Secondhand information, speculation, background information or collateral research do not satisfy a relator's burden of establishing the requisite knowledge. *Id*. at 1162-63.  The original source" requirement must be satisfied "through all stages of the litigation"  – which means that the allegations in the SAC must also comply with the requirement.  *See Rockwell Intern. Corp. v. U.S.*  549 U.S. 457, 473  (2007).

Defendants contend that the Relator has not alleged facts showing either "direct" or "independent" knowledge of the information underlying the new allegations in the SAC regarding inflated charges and hospital reimbursement claims to counties.  However, the SAC does provide detail as to how the Relator came to realize not only that the Hospitals' "donations" were sham transactions, and describes the kinds of false records or statements that were made in the form of letters to the county.  *See* SAC, ¶¶ 45-58.  Read narrowly, the factual allegations in the SAC are generally more relevant to the "donation" claims than to the claims regarding inflated annual costs incurred in providing indigent care.  In this way, there is some merit to Defendants' argument that the Relator has not made the requisite showing as the original source for the "inflation" claims within confines of the SAC.  However, the declarations submitted by the Relator preclude judgment in favor of Defendants on this issue.

As Revenue Manager for CHS from 2001-2004, the Relator, Robert Baker, was responsible for preparing and maintaining information concerning actual cost-to-charge rations

for a number of CHS Hospitals.  Doc. 66, Ex. 1 (Baker Decl.).  Part of his job duties required

that he gather the information concerning the actual costs that the Hospitals incurred and the

actual charges that were billed to payors.  The Relator himself observed that most CHS Hospitals

increased their charge rates by 5-10% (or more) several times a year, and that these increases

generally did not correspond to cost increases.  These cost-to-charge ratios were also used to

calculate "outlier" payments, which compensate Medicare[19] providers for furnishing care that is

substantially more expensive than expected for a similarly-situated patient.  The Relator received

the reports detailing the cost-to-charge ratios used to calculate these "outlier" payments.  He also

raised the issue with Larry Carlton, a Vice President at CHS, who told the Relator that CHS was

entitled to change its rates as much or as often as it wished, and could generate increased

revenue from outlier claims by doing so.  The statements made in the Relator's declaration

qualify as evidence that the Relator in this case had "direct and independent knowledge" of the

alleged "inflation" claims.

> ### 2. *Voluntary Disclosure*

The other prong of the "original source" requirement is the "voluntary disclosure"

requirement – whereby a relator must have disclosed "the essential elements or information on

which the *qui tam* allegations are based" before filing a complaint containing those allegations.

*U.S. ex rel. King v. Hillcrest Health Center, Inc.,* 264 F.3d 1271, 1280 (10th Cir. 2001):

> More must be done to qualify as an original source than to file the action. The
> government must be voluntarily notified beforehand." . . . . The pre-filing
> voluntary disclosure requirement encourages private individuals to come forward
> with their information of fraud "at the earliest possible time and ... discourage[s]
> persons with relevant information  from remaining silent" (cited case omitted).

---

[19] There is some confusion whether the "inflation" claims concern Medicare or Medicaid
funds.  The SAC refers to Medicaid (compare ¶ 97(f) in the SAC to Resp. at 13).

> Besides giving the government more time than the post-filing period to act on the fraud allegations, this requirement also gives the government the chance "to consider whether there has already been public disclosure of the matters, whether the prospective relator in fact possesses direct and independent knowledge of the matters he is disclosing, and whether he is making disclosure on a voluntary basis. . . .

*Hillcrest Health Center, Inc*., 264 F.3d at 1280 -1281.

Defendants do not exercise much of a challenge to this prong. Indeed, the declaration provided by the Relator's attorney, Peter Chatfield, satisfies the "voluntary disclosure" requirement (Doc. 66, Ex. 2, Chatfield's Decl.). Mr. Chatfield states that he provided Robert McAuliffe, an attorney from the Department of Justice ("DOJ") with a draft of the SAC over a month before it was filed. Prior to the filing of the SAC, Mr. Chatfield engaged in discussions of the draft, including the "inflation" claims, with Mr. McAuliffe and obtained the Government's stipulation for the lodging and filing of the complaint. The Court notes that §3730(e)(4) is not very specific in the "voluntary disclosure" requirement. *See Hillcrest Health Center, Inc*., 264 F.3d at 1280 ("The statute does not lay out and the courts have not settled on what it means to have 'voluntarily provided the information to the Government before filing an action.'"). At any rate, I find that Mr. Chatfield's declaration statements make the necessary showing that the Relator voluntarily disclosed the "essential elements" of "information" on which the *qui tam* allegations of the SAC are based.

Defendants contend that the Relator cannot be an "original source" for any information he observed or saw in 2006, two years after his employment ended at CHS. For example, in ¶ 10 of his declaration, the Relator states that he saw a document in 2006 sent by Eastern New Mexico Medical Center ("ENMMC") to Chaves County indicating that CHS's hospital were seeking reimbursement from New Mexico for the cost of providing "uncompensated indigent

care" on the basis of charges, rather than costs.

The actual dates of the Relator's employment at CHS has no critical significance, and information which the Relator became privy is not jurisdictionally barred for consideration solely because it became available to him only after his employment ended. The relevant case law "[reveals] no requirement that a relator be a corporate insider." *Kennard v. Comstock Resources, Inc.*,363 F.3d 1039, 1044-45 (10th Cir. 2004); *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 803 (10th Cir.2002) (fact that relator alleging defective process for manufacturing "pondcrete" was not physically present at the nuclear weapons plant when production began is immaterial to relevant question of whether relator had direct and independent knowledge of the information underlying his claim), *rev. on other grds.* by *Rockwell Intern. Corp. v. U.S.*, 549 U.S. 457 (2007).[20] A relator need only possess "direct and independent knowledge of the information on which the allegations are based." *Id.* (quoting 31 U.S.C. § 3730(e)(4)(B)).

Accordingly, the Court finds that the Relator has sufficiently shown that he is the "original source" for the "inflation" claims in the SAC challenged by Defendants, and that he "voluntarily" disclosed the information as required under the FCA's jurisdictional provision.[21]

_____

[20] "Pondcrete" is a form of processed toxic waste. *See Rockwell Intern. Corp. v. U.S.*, 549 U.S. 457 (2007).

[21] Defendants state that the survival of the Relator's claims under the jurisdictional inquiry based on the Relator's declaration would create a factual issue as to which jurisdictional discovery would be warranted.  Doc. 76 at 4, n.3.  The Court is satisfied that the Relator has met the jurisdictional requirement without the need for further discovery.  *See Mortensen v. First Federal Sav. and Loan Ass'n* 549 F.2d 884, 891 (3rd Cir. 1977) (existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims); 5 C. Wright and A. Miller, Federal Practice and Procedure § 1350 (1969) (jurisdictional inquiry is flexible: "[A]s there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court") (citing *Gibbs v. Buck*, 307

Defendants seek dismissal of the SAC on the basis of Rule 12(b)(6) as well as Rule 8(a). However, the parties disagree on whether an amended provision of the FCA applies to Plaintiff's claims, and the Court must first resolve this issue before proceeding further.

## III.   Retroactivity of FERA provision

The Fraud Enforcement Recovery Act of 2009 ("FERA"), Pub L. No. 111-021, § 4(a)(1), 123 Stat. 1617, 1621 (May 20, 2009), amended 31 U.S.C. § 3729(a)(2) (1986) and recodified it as 31 U.S.C. § 3729(a)(1)(B) (2009), removing the requirement that a false record or statement have been made "to get" a claim paid by the federal government. *See* Pub L. No. 111-021, § 4(a)(1)(B).

Before FERA, § 3729(a)(2) stated that liability attaches when a defendant "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." The post-FERA version of the provision (now § 3729(a)(1)(B)) states that liability exists for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent." The new version broadens the required intent required to trigger liability, because it creates the possibility of FCA liability even where a false statement or records is not made "for the purpose" of getting a false or fraudulent claim paid or approved by the federal government.

One year before the FERA amendments were passed, the United States Supreme Court decided *Allison Engine Co. v. United States ex rel. Sanders*, 128 S. Ct. 2123 (June 7, 2008)

---

U.S. 66, 71-72 (1939) and *Wetmore v. Rymer*, 169 U.S. 115 (1898) (district court is free to determine facts relevant to its jurisdiction).  Further, while Defendants dispute the appropriate standard for the jurisdictional inquiry (including urging the Court not to consider Plaintiff's declarations), Defendants do establish any undisputed material fact militating against jurisdiction, nor do they rebut any "facts" presented by The Relator on the issue.

(*Allison Engine I*), which held that the FCA required a party asserting § 3729(a)(2) liability to demonstrate that the defendant intended that the government itself pay the claim, rather than just show that a false statement resulted in the use of government funds to pay a false or fraudulent claim. *Id*. at 2128. The *Allison* court held that "to get" in former section § 3729(a)(2) (now § 3729(a)(1)(B)  in the statutory language "denotes purpose," a person must have the purpose of getting a false or fraudulent claim "paid or approved by the Government" in order to be liable. At the same time,  the court emphasized that "a defendant is not answerable for anything beyond the natural, ordinary, and reasonable consequences of his conduct" and that there needs to be a "direct link" between the defendant's conduct and the Government's decision to pay or approve a false claim. *Id*. at 2130.  Thus, if a subcontractor made a false statement to a private entity but does not intend for the Government to rely on the statement as a condition of payment, the direct link between the statement and the Government's decision to pay or approve a false claim would be "too attenuated to establish liability." *Id*.  Thus, the FERA legislation can be viewed as a legislative overruling of the *Allison Engine* decision.

Defendants raise two main arguments: (1) that the FERA does not apply to the claims asserted in this case and (2) that applying the new amendment would violate the Ex Post Facto Clause of the United States Constitution.  The Relator contends that Congress intended to apply the post-FERA version to this case, and that because the FCA is a civil remedial statute, it implicates no constitutional concern. The Government filed a "Statement of Interest" setting forth which its position on the retroactivity issue.  (Doc. 68). The Government first urges the Court to attempt to resolve the issue without resorting to the constitutional argument if possible. The Government rejects Defendant's contention that application of the post-FERA version of § 3729(a)(1)(B) would violate the ex post facto clause because it does not affect Defendant's

settled expectations, nor would it punish Defendants.

The Court may summarily dispense with the Government's contention that the constitutional issues can be avoided if it finds that the SAC adequately alleges intent which comports with the post-FERA version. The constitutional issues cannot be avoided. The SAC may well allege conduct that passes muster under the post-FERA version of the statutory provision, but that does not answer the question of what version should be used to try those allegations on their merits at trial.

A.    Application of FERA by Congressional Intent

Whether the FERA applies to the claims in this case is actually the threshold prong of an analysis under *Landgraf v. USI Film Products*, 511 U.S. 244, 281 (1994), although the parties do not approach the issue as such formally.[22] Retroactivity is not favored in the law. *Landgraf*, 511 U.S. at 264 (courts apply a presumption against the retroactivity of a statute absent a clear congressional intent to the contrary) (cited in *Pritchett v. Office Depot, Inc.*, 420 F.3d 1090, 1095 (10th Cir. 2005)).[23] A statute may not be applied retroactively absent a clear indication from Congress that it intended such a result. *Id*. When reading the plain language, statutory definitions normally control the meaning of statutory words.

Determining congressional intent for the retroactive application of a statute is part of a two-part test established by the Supreme Court for determining whether a statute applies

_____

[22]   *Landgraf*  has been construed as applying to the retroactivity of civil statutes. *See Exxon Mobil Corp. v. Allapattah Svcs., Inc.*, 545 U.S. 546, 125 (2005).

[23]   Statutes are presumed to be prospective in their operation unless expressly made retrospective. *Griffon v. United States Dep't. of Health and Human Servs.*, 802 F.2d 146, 152 (5th Cir.1986); *Jackson v. People's Republic of China*, 794 F.2d 1490, 1497 (11th Cir.1986), *cert. denied*, 480 U.S. 917, 107 S.Ct. 1371, 94 L.Ed.2d 687 (1987); *United States v. Kairys*, 782 F.2d 1374, 1381 (7th Cir.), *cert. denied*, 476 U.S. 1153 (1986).

retroactively.  The first question in *Landgraf v. USI Film Products* is whether Congress expressed its intentions as to the temporal reach of the statute. *Valdez-Sanchez v. Gonzales*, 485 F.3d 1084, 1088 (10th Cir. 2007) (citing *Landgraf*, 511 U.S. at 280)).  If congressional intent cannot be ascertained, then the court moves to the second step of the *Landgraf* analysis and consider whether the statute has a retroactive effect. *Id*. A statutory provision has a "retroactive effect" when its application impairs rights a party possessed when he acted, increases a party's liability for past conduct, or imposes new duties or new disabilities with respect to transactions already completed. *Id*.  If application of the statute creates a retroactive effect, "our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result." *Valdez-Sanchez v. Gonzales* 485 F.3d 1084, 1088 (10th Cir. 2007) (citing *Landgraf*, 511 at 280).

Section § 4(f)(1) of the FERA makes the new section § 3729(a)(1)(B) applicable to "all **claims** under the False Claims Act. . . . that are pending on or after [June 7, 2008]" (emphasis added).  The issue is whether Congress intended the retroactivity language to apply to "cases" pending on June 7, 2009, or to "claims" pending on June 7, 2009. The Government argues that the placement of the word "claims" before the phrase "False Claims Act" indicates that Congress intended for FERA's amendments to apply to FCA *cases* pending on or after June 7, 2008. Under the Government's interpretation, the new version of § 3729(a)(1)(B) would apply to this case which was filed in federal court in 2005.

Defendants have the better argument on this question because their position is bolstered by other statutory language which pins down the meaning of FERA § 4(f)(1).  Section 3729(b)(2)(A) defines "claim" as "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or

property . . . ."  Also, FERA § 4(f)(2), which directly follows the provision making §

3729(a)(1)(B) applicable to "claims" pending on or after June 7, 2008, makes other FERA

amendments applicable "to cases pending on the date of enactment." Since the language in

statutory provisions should be construed narrowly, *see Caterpillar Inc. v. Williams*, 482 U.S. 386

(1987), it is clear that Congress intended to distinguish "claims" from "cases."  *See also U.S. ex*

*rel. Sanders v. Allison Engine Co., Inc*., 2009 WL 3626773 at 4 (S.D. Ohio) (*Allison Engine II*)

("had Congress intended the retroactivity of subsection 4(f)(1) to be measured by 'cases,' it

would have said so as it did in subsection 4(f)(2)").

    In addition, Defendants offer two cases, both which were decided post-*Allison*, and

which rely on the FERA's statutory language and the legislative history in holding that the

revised language is applicable to "claims" as defined in § 3729(b)(2)(A). *See Allison Engine II*

(definition of "claims" in FERA § 4(f)(1) as demand for money or property supported by

statutory definition in § 3729(b)(2)(A) as well as legislative history); *U.S. v. Science*

*Applications Intern. Corp*., 653 F.Supp.2d 87, 107, 2009 WL 2929250, 14 (D.D.C.)

(D.D.C.,2009) (noting that Senate Report's explanation of FERA's amendments to the FCA

utilizes "claims" to refer to a defendant's request for payment and "cases" when discussing civil

actions for FCA violations, following statutory definition in § 3729(a)(1)(B) (citing S.Rep. No.

110-10 (2009)).

    Congress has clearly indicated that the revised language at issue here is applicable to

"claims" pending on June 7, 2008, and not to "cases" pending on June 7, 2008.  Defendants in

this case claim that the "majority" of claims at issue in this case were pending prior to June 7,

2008, Doc. 74 at 5.[24]  Thus, the retroactivity clause in FERA § 4(f)(1) does not apply to them, and the prior version of the FCA (§ 3729(a)(2)) applies to claims brought under that provision.

The retroactivity inquiry can end here because, by its plain meaning, the FERA does not apply to the claims asserted in this case.  Alternatively, the Court finds that application of the amendment would violate the Ex Post Facto Clause.

B.    Ex Post Facto Analysis

The retroactive application of a law that is intended to punish violates the *ex post facto* clause of the United States Constitution. *See United States v. Lawrance*, 548 F.3d 1329, 1332 (10th Cir. 2008).[25]  Defendants argue that the FCA and FERA were intended to be punitive, based on the legislative history. The Government contends that application of the new §3729(a)(1)(B) does not violate the Ex Post Facto clause because the FCA is a remedial, not punitive, statute.

In assessing whether the retroactive application of a civil statute violates the *Ex Post Facto* clause, the Court should consider first whether "the legislature meant the statute to establish 'civil' proceedings." *Smith v. Doe*, 538 U.S. 84, 92 (2002) (quoting *Kansas v.*

---

[24]  If there is a question as to whether Defendants in fact submitted claims that were pending as of June 7, 2008, the parties have not brought this to the Court's attention, and for that reason, the Court declines to delve into the matter further.

[25]  The Ex Post Facto Clause generally applies only to the retroactive applications of criminal statutes. *Landgraf*, 511 U.S. at 266; *Collins v. Youngblood*, 497 U.S. 37, 41(1990) (Ex Post Facto Clause of the Constitution "applies only to penal statutes which disadvantage the offender affected by them"); *U.S. ex rel. Sanders v. Allison Engine Co., Inc*., 2009 WL 3626773 at 5 (S.D.Ohio,2009) (*Allison Engine II)* ("Traditionally, criminal statutes have been examined for violation of the Ex Post Facto Clause"). However, civil statutes may also violate the Ex Post Facto Clause. *Landgraf*, 511 U.S. at  281 (1994) (citing *Louis Vuitton S.A. v. Spencer Handbags Corp*., 765 F.2d 966, 9717-2 (2d Cir.1985)(the punitive nature of the treble damages provision in the Trademark Counterfeiting Act of 1984 could implicate ex post facto concerns).

31

*Hendricks*, 521 U.S. 346, 361 (1997)). If the intention was to enact a regulatory scheme that is civil and nonpunitive, the Court we must further examine whether the statutory scheme is "so punitive either in purpose or effect as to negate [the legislature's] intention' to deem it 'civil.'" *Id*.   A civil as well as a criminal sanction constitutes punishment when the sanction as applied in the individual case serves the goals of punishment. *U.S. v. Halper*, 490 U.S. 435, 447-448, 109 S.Ct. 1892, 1901 - 1902 (1989), *abrog. on other grds. by Hudson v. U.S*., 522 U.S. 93 (1997).

    *1.     Settled Expectations*

    Under *Landgraf*, a provision has a retroactive effect if it "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." . . . In making this determination, courts should be guided by "familiar considerations of fair notice, reasonable reliance, and settled expectations." . *Hem v. Maurer*, 458 F.3d 1185, 1190 (10th Cir. 2006) (citing *Landgraf*, 511 U.S. at 270).

    The Government contends that retroactive application of FERA to this case would not upset Defendants' settled expectations, because the Supreme Court's decision in *Allison Engine I* was not decided at the time Defendants acted.  The Relator correctly pinpoints the weakness in the Government's argument by noting that the Government incorrectly assumes that *Allison Engine I* did not accord with pre-existing case law.  There is no indication from a reading of *Allison Engine I* that the Supreme Court changed a previous interpretation of the law, nor is there any support for this theory provided by the Government.  *Allison Engine I*  interpreted the meaning of pre-FERA § 3729(a)(1)(B) which was in effect at the time Defendants acted.  *See United States v. Security Industrial Bank*, 459 U.S. 70, 79 (1982)) (a judicial interpretation is "traditionally regarded as an expression of pre-existing law").   Thus, the real question is whether retroactive application of § 3729(a)(1)(B), as interpreted by *Allison Engine I*, would

violate the Ex Post Facto clause.

    2.    *Whether the FCA is Sufficiently Punitive in Nature to Violate Ex Post Facto clause*

The Government contends that the Ex Post Facto clause does not prohibit the application of post-FERA § 3729(a)(1)(B) to this case because Congress intended the FCA to be remedial and not punitive. In support of its contention, the Government cites to the legislative history of one of the previous amendments to the FCA, which states that "[t]he statute is a remedial one. It is intended to protect the Treasury against the hungry and unscrupulous host that encompasses it on every side. . . ."  S. REP. 99-345, 11, 1986 U.S.C.C.A.N. 5266, 5276.  The Government also refers to *Cook County, Ill. v. U.S. ex rel. Chandler*, 538 U.S. 119, 131 (2003), which noted that treble damages under the FCA has a compensatory side, and that it serves a remedial purpose as well as a punitive objective.

The Government is correct that a civil statute may advance punitive ends as well as remedial goals without violating the Ex Post Facto clause.  *See U.S. v. Halper*, 490 U.S. 435 (1989); *Doe v. Bredesen*, 507 F.3d 998, 1005 (6th Cir. 2007) (penal component of sex offender registration law did not render the statute "punitive" for the purpose of the *ex post facto* clause). However, the Government's argument does not go far enough. The fact that a civil statute may serve remedial ends is not dispositive to the Ex Post Facto inquiry, and the  labels "criminal" and "civil" are not of paramount importance. *U.S. v. Halper*, 490 U.S. 435, 447-448 (1989).

For this reason, the Government's reliance on legislative history and *Chandler* does not resolve the question of whether application of the post-FERA would violate the Ex Post Facto clause.  The cited legislative history is a generic comment on the nature of the FCA based on a previous amendment – not the FERA specifically.  In addition, *Chandler* would be

mischaracterized to stand for the proposition that the FCA is generically a civil remedial statute to which the Ex Post Facto does not apply.  The question in *Chandler* was whether a municipal entity could be considered a "person" under the FCA, particularly in the context of an imposition of treble damages.  The Supreme Court noted that treble damages served a compensatory purpose, and did not equate with classic punitive damages. 538 U.S. at 131. Despite the punitive nature of treble damages under the statute, the Court concluded that a municipal corporation was considered a "person" under the FCA and could be exposed to treble damages under the statute. There was no discussion on the punitive nature of the FCA in the context of a violation of the Ex Post Facto clause.  Thus, *Chandler* is not helpful to the analysis here.

The determination of whether a given civil sanction constitutes punishment in the relevant sense "requires a particularized assessment of the penalty imposed and the purposes that the penalty may fairly be said to serve." *Halper*, 490 U.S. at 448; *Allison Engine II*, 2009 WL 3626773, at 5 (the "threshold question in an ex-post facto analysis is whether the legislature intended to impose punishment when it enacted the law) (citing *Smith v. Doe*, 538 U.S. 84, 92 (2003)).  Defendants argue that the Ex Post Facto clause precludes use of the post-FERA version because application of the post-FERA version could result in punishing Defendants for conduct that was not unlawful.  As Defendants note, a more careful reading of the legislative history indicates that Congress intended for the FCA to be punitive, and that case law comports with this view.

Because a statute can be both punitive and remedial, it is necessary to make a more careful assessment of the legislative history than an legislative observation that FCA proceedings

are "civil and remedial in nature." S.Rep. No. 3451986, U.S.C.C.A.N. 5296.[26]  In *Allison Engine*

*II*, the district court for the Southern District of Ohio embarked on a comprehensive look into the

legislative history of the FCA, relying on actual statements made by Senators debating the

FERA.  The Court sees no need to reiterate the entire case here, but includes a portion here:

> On April 20, 2009, FERA co-sponsor Senator Patrick Leahy indicated that
> passage of the FERA would help law enforcement "track down and punish"
> people. 155 Cong. Rec. S4409 (daily ed. Apr. 20, 2009)("As the economic crisis
> worsened last fall, I called upon Federal law enforcement to track down and
> punish those who were responsible for the corporate and mortgage frauds that
> helped make the economic downturn far worse than anyone predicted. . . .  On
> April 23, 2009, Senator Leahy again indicated that his amendments were meant to
> punish. Congressional Record: April 23, 2009 (Senate) at S4630 ("If fraud goes
> unprosecuted and unpunished, then victims across America lose money.")
> (emphasis added). On April 27, 2009, Senator Charles Grassley, author of the
> modern FCA, argued that the FCA amendments he sponsored would ensure
> punishment. 155 Cong. Rec. S4737 (daily ed. Apr. 27, 2009) ("This legislation
> fixes this, thus ensuring that no fraud can go unpunished by simply navigating
> through the legal loopholes.")(emphasis added). On April 27, 2009, Senate
> Majority Leader Harry Reid added his voice to the call for punishment. 155 Cong.
> Rec. S4725-S4726 (daily ed. Apr. 27, 2009)("[FERA] provides critical funding
> and new tools to let law enforcement prosecute and punish those responsible for
> the mortgage and corporate frauds that have hurt countless hard-working
> Americans and led to the worst financial crisis in decades.") (emphasis added).
> . . . Senator Leahy has also praised the punitive use of and effect of the FCA.
> 2008 WL 511861 (F.D.C.H. Feb. 27, 2008)("Today again in the midst of war and
> facing reports of billions lost to fraud and waste in Iraq and Afghanistan, we are
> considering important new improvements to the [FCA]-not only to punish and
> deter those who seek to defraud our nation, but also to recover billions in taxpayer
> dollars stolen from the public trust . . .  [The FCA] has been used to punish
> contractors selling defective body armor to our police. . . to punish health care
> and drug companies for defrauding billions from Medicaid and Medicare. . . .")
> (emphasis added).

*Allison Engine II*, 2009 WL 3626773 at 6 (S.D.Ohio 2009).  It was also noted that courts, from

---

[26]  Further, under an Ex Post Facto analysis, even if Congress' intention was to enact a
regulatory scheme that is civil and nonpunitive, the inquiry must continue to examine whether
the statutory scheme is "so punitive either in purpose or effect as to negate [the legislature's]
intention' to deem it 'civil.'" *Smith v. Doe*, 538 U.S. 84, 92 (2002).

the Supreme Court,[27] to circuit and district courts, have confirmed Congressional intent to

impose punishment through the FCA.[28]  *See, e.g. U.S. ex rel. Burlbaw v. Orenduff,* 548 F.3d 931,

956 n.24 (10th Cir. 2008) (citing *Vermont Agency of Natural Resources v. U.S. ex rel. Stevens,*

529 U.S. 765 (2000) and other cases explaining the punitive nature of FCA); *United States ex*

*rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 734 (10th Cir. 2006)

(Hartz, J., concurring) ("[T]he False Claims Act is a punitive statute. . . . The availability of

treble damages, even though it has a compensatory side, also has a punitive character. . . ."

(internal quotation marks and citation omitted)).

  Affixing a "civil" label to the FCA does not answer the question of whether the statute

violates the Ex Post Facto clause.  *See U.S. v. Hinckley*, 550 F.3d 926, 937 (10th Cir. 2008), *cert.*

*denied*, 129 S.Ct. 2382 (2009) (a "civil" legislative label is "insufficient to render a statute civil

in nature"). Courts have used a seven-factor test noted in *Kennedy v. Mendoza-Martinez*, 372

U.S. 144 (1963):  (1)whether the sanction involves an affirmative disability or restraint; (2)

whether the sanction has historically been regarded as a punishment; (3) whether the sanction

comes into play only on a finding of scienter; (4) whether operation of the sanction will promote

the traditional aims of punishment-retribution and deterrence; (5) whether the behavior to which

the sanction applies is already a crime; (6) whether an alternative purpose to which it may

rationally be connected is assigned to the sanction; and (7) whether the sanction appears

---

  [27]  *See Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 784-85 (2000) (characterizing the treble-damages provision of the FCA as "essentially punitive in nature" and inconsistent with state qui tam liability in light of the presumption against imposition of punitive damages); *PacifiCare Health Systems, Inc. v. Book*, 538 U.S. 401 (2003) (accord).

  [28]  *See Allison Engine II*, 2009 WL 3626773 at 7 (citing to Sixth, Seventh, Ninth and Eleventh Circuit decisions, as well as several district court cases).

excessive in relation to the alternative purpose assigned. 372 U.S. at 168-69.  These factors are

neither exhaustive nor dispositive, but they do provide a framework for the analysis. *Smith v.*

*Doe*, 538 U.S. 84, 97 (2003).

   *Allison Engine II* relied on this framework in concluding that four of the seven *Kennedy*

factors weigh in favor of finding that the civil FCA sanctions are punitive in nature and effect.

2009 WL 3626773 at 9. The four factors which the *Allison Engine II* court found to weigh in

favor of finding that the FCA has a punitive nature or effect were: (1) that FCA sanctions have

historically been regarded, at least in part, as punitive; (2) that the FCA requires a scienter in that

it requires evidence to support an inference of knowing fraud; (3) that sanctions as provided in

the civil version of the FCA are intended to deter conduct; and (4) that the sanctions are

excessive in relation to the purpose of compensating the Government for its loss, particularly the

treble damages provision.[29]

   The Court agrees with, and herein adopts, the analysis conducted by the court in *Allison*

*Engine II*.  I would add that the 2009 FERA amendment suggests that another *Kennedy* factor

weighs in favor of finding the FCA punitive in nature.  The behavior proscribed by the civil

version of the FCA is also sanctioned as a crime under the criminal version of the FCA, which

the *Allison Engine II* court found to weigh in favor of finding of civil purpose or effect for the

civil version of the FCA.  2009 WL 3626773 at 9.  However, I propose that the post-FERA

---

   [29]   The Supreme Court also acknowledged that "very idea of treble damages [as opposed
to only double damages] "reveals an intent to punish the past, and to deter future, unlawful
conduct. . . ." *Texas Industries, Inc. v. Radcliff Materials, Inc*., 451 U.S. 630, 639 (1981) (cited
in.*Vermont Agency of Natural Resources v. U.S. ex rel. Stevens*, 529 U.S. 765, 785 (2000).

version of § 3729(a)(1)(B) effectively broadens the liability base for § 3729(a)(1)(B).[30]  I

therefore find that the behavior to which the FERA now attaches liability was not previously

considered sufficient to find liability under the same provision.

In sum, I find that the FCA's statutory scheme is punitive in purpose and effect, that

retroactive application of the post-FERA provision, § 3729(a)(1)(B) to Plaintiff's claims in this

case would punish Defendants for conduct that was not unlawful at the time Defendants acted,

and that as a result, retroactive  application of the FERA would violate the Ex Post Facto clause.

Accordingly, the prior version of § 3729(a)(1)(B) (formerly § 3729(a)(2)) applies to the claims

in this case which are set forth in Count II of the SAC.

## IV.    Sufficiency of the Complaint[31]

Defendants move for dismissal of both Counts I and II of the SAC, contending that the

SAC fails to plead fraud with particularity as required by Rule 9(b), and fails to state a claim

under Rule 8(a) and Rule 12(b)(6).  The Relator has incorporated the Government's Complaint

---

[30]  Pre-FERA, § 3729(a)(2) stated that liability attaches when a defendant "knowingly makes, uses, or causes to be made or used, a false record or statement **to get** a false or fraudulent claim paid or approved by the Government." Section 3729(a)(1)(B) now states that liability exists for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement **material** to a false or fraudulent.  The amendment removes the requirement that a false record or statement have been made "to get" a claim paid by the federal government – thereby removing a specific purpose requirement from the provision.

[31]  In moving to dismiss Relator's SAC, Defendants incorporated arguments from their motion to dismiss the Government's Complaint in Intervention.  *See* Doc. 56 at 12.  For this reason, the Court has considered those arguments (*see* Doc. 53).  While this Memorandum Opinion and Order does not directly address Defendants' motion to dismiss the Government's Complaint, the Court recognizes that the findings herein will have a direct bearing on the Court's rulings on that pending motion.

Also, having found that retroactive application of § 3729(a)(1)(B) would violate the Ex Post Facto clause, the Relator's allegations will be considered under the pre-FERA version of that provision.

in Intervention ("Government's Complaint," Doc. 37) into the allegations contained in the SAC, (SAC, ¶ 1), and thus the Court's consideration of the Relator's SAC must encompass the Government's Complaint in Intervention as well.

Defendants' basic argument is that the SAC provides insufficient factual information regarding Defendants' alleged "fraudulent scheme," specifically, that the Relator does not adequately explain what was allegedly false about the claims submitted by the State of New Mexico ("State") for federal funds, nor how public and lawful donations made by Defendants had a role in the State's presentation of false claims to the Government.  Defendants contend that the Relator fails to present, identify or describe with particularity any claims, such as a Form CMS 64.11 ("CMS Form 64") submitted by the State to the federal government for payment.[32]

Defendants also contend that the SAC does not satisfy the less stringent requirements of Rules 8(a) and 12(b)(6) in stating a "plausible" claim for relief.   They describe the Relator's allegations as "rhetoric" which attempts to frame Defendants' lawful conduct as a "fraudulent scheme."  Doc. 56 at 14.  Defendants put considerable emphasis on the fact that neither federal nor state law prohibits the making of donations by hospital providers. This is true, but it is also true that federal law does require that non-bona fide donations are to be deducted by the Centers for Medicare and Medicaid Services" ("CMS") from the State's reported expenditures before calculating the FFP amount. Thus, federal law prohibits non-bona fide donations made for the

---

[32]  Federal regulations require that the State file one "Form 64" quarterly, which includes a Form CMS 64.11 ("CMS Form 64"), which details the State's actual recorded Medicaid expenditures.  On this form, the State must also report all donations and provider-related taxes received by all counties from any hospital in the State, and must categorize such donations and axes as qualifying or non-qualifying State contributions. Doc. 54, Mem. Ex. 1. Defendants' brief (Doc. 54 at 6-11) contains a considerable amount of detailed information regarding the federal Medicaid reimbursement process.

purpose of improperly receiving Medicaid funds. Defendants also emphasize that the Hospitals do not control the operation of the state-federal funding mechanism, that the Hospitals have no role in actually presenting the claims which result in Medicaid reimbursement, and that no federal payments are made to SCP hospitals.  These observations are also true, but they do not insulate Hospitals from liability under the FCA, which imposes liability for acts which "cause" false or fraudulent claims to be presented to the Government for payment.

A.    Legal Standards

Rule 8(a)(2) requires that a pleading contain a short and plain statement of the claim entitling the plaintiff to relief. Rule 12(b)(6) provides for dismissal of a complaint only when the plaintiff fails to allege sufficient facts to state a claim to relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009), *citing Twombly*, 550 U.S. at 570. The court must take as true all well-pleaded facts in a plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Twombly,* 550 U.S. at 555-56. The "plausibility" requirement means that relief must follow from the facts alleged. *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008).

Rule 9(b) requires that in alleging fraud, "a party must state with particularity the circumstances constituting fraud[. ] Thus, FCA claims, which involve averments of fraud, are held to a higher standard. *See U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702 (10th Cir. 2006) (Underlying schemes and other wrongful activities that result in submission of fraudulent claims, as element of FCA claim, are included in "circumstances constituting fraud and mistake" that must be pled with particularity under federal rules). FCA claims must be dismissed where they describe a fraudulent scheme but do not allege "the specifics of any actual claims submitted." 473 F.3d at 726.

The purpose of Rule 9(b) is to put the defendant on notice of the conduct complained of, to eliminate fraud actions in which all the facts are learned after discovery, to protect defendants from frivolous claims, and to protect defendants from the harm to their goodwill and reputation that may result from fraud claims. *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 784 (4th Cir. 1999).  A relator thus must allege the "'who, what, where, when and how'" of the alleged fraud – the "first paragraph of any newspaper story." *United States ex rel. Lusby v. Rolls Royce Corp.,* 570 F.3d 849, 853 (7th Cir. 2009) (citations omitted); *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah,* 472 F.3d 702, 727 (10th Cir. 2006).

The Tenth Circuit requires that a relator "must provide details that identify particular false claims for payment that were submitted to the government" which would include, but not be confined to: details concerning the dates of the claims, the content of the forms or the bills submitted, their identification numbers, the amount of money charged to the government, the particular goods and services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices are the types of information that may help a relator to state his or her claims with particularity.  *Sikkenga,* 472 F.3d at 727-28.   Not all of these details need be included, but the Tenth Circuit requires that at least some of the claims must be pleaded in order to satisfy Rule 9(b).

B.      Allegations Regarding Whether "False" Records or Statements Were "Made or Used"

At a minimum the FCA requires proof of an objective falsehood. *See United States ex rel. Lamers v. City of Green Bay,* 168 F.3d 1013, 1018 (7th Cir. 1999). A case may not proceed under the FCA without factual allegations that support a conclusion that "a false or fraudulent claim" was made. *U.S. ex rel. Morton v. A Plus Benefits, Inc.,* 139 Fed.Appx. 980, 982-983,

2005 WL 1672221, 3 (10th Cir. 2005) (citing *Lamers v. City of Green Bay*, 168 F.3d at 1018).

Defendants contend that the Relator fails to allege facts showing an objectively false record or statement.  Specifically, Defendants contend that Plaintiff has failed to present any fact showing that donations were not unrestricted, or that Defendants had provided county officials with statements that created the false impression that the Hospitals were not being paid their full costs of providing care to indigent patients.

The FCA recognizes two types of actionable claims-factually false claims and legally false claims. *U.S. ex rel. Conner v. Salina Regional Health Center, Inc*., 543 F.3d 1211, 1217 -1218 (10th Cir. 2008).  A factually false claim involves "an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *Id*. (citation omitted).  For a claim based on an alleged legal falsehood, the relator must demonstrate that the defendant has "certifie[d] compliance with a statute or regulation as a condition to government payment," yet knowingly failed to comply with such statute or regulation. *Id*.

In the Tenth Circuit, legally false certification claims can rest on one of two theories – express false certification, and implied false certification. *Salina*, 543 F.3d at 1217-18. An express false certification theory applies when a government payee "falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment." Mikes, 274 F.3d at 698. This promise "may be any false statement that relates to a claim, whether made through certifications on invoices or any other express means." *Id*.; *see U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1172 (9th Cir.2006) ("So long as the statement in question is knowingly false when made, it matters not whether it is a certification, assertion, statement, or secret handshake; False Claims liability can attach.").  Under an implied false certification theory, courts do not necessary look to a defendant's actual statements. Rather,

the focus is on underlying contracts, statutes, or regulations themselves to ascertain whether they make compliance a prerequisite to the Government's payment.

The recurring theme which permeates Defendants' briefs is that there is no federal or state law which prohibits the hospitals from making donations to the county.  However, Defendants cannot distance themselves from FCA liability by labeling donations as "unrestricted" and by claiming that they did not make any agreements which legally obligated the counties to use donated funds in any particular manner.  Nor can they isolate themselves from the allegations by arguing that the State – and not the Hospitals – submitted the CMS 64 Forms.  The FCA does not require that the false record or statement be presented to the Government; liability under § 3729(a)(1)(A) may be premised on a fraudulent course of conduct which *causes* the Government to pay a claim for money.

Defendants also assert that there is no allegation that Defendants were under any legal obligation to make any disclosure or certification to the State or federal government, including any disclosure regarding the subject donations.  Doc. 54 at 12. However, while Defendants were not legally obligated to certify the donations as such, they nevertheless were aware that HHS guidelines require the State to obtain certification of the funding source.  CHS never provided this certification and the Hospitals never supplied the State with the necessary certification, either.  Gov't Compl., ¶¶ 87-90.

Defendants select certain paragraphs in the SAC to bolster their argument, and choose to ignore those parts of the SAC which do allege the falsity of documents and statements.  For example, Defendants ignore ¶¶ 50-56 of the SAC, which chronicles statements made by Doug Gleeson, Vice-President of Finance at CHS, to the Relator, telling him that his call to the State and discussing payments the hospital had been making to the counties may be "making trouble"

43

for CHS. ¶ 53.  Defendants also ignore a specific letter which Leanne Hacker, ENMMC's CFO planned to send to Chaves County setting forth details about payments the hospital would be making to Chaves County in order to offset the County's cost of funding the mandatory state-financed share of the Medicaid program.  The letter is quoted as being made "for the purpose of maintaining [CHS's] current level of [SCP] funding for fiscal year 2004-2005." ¶ 49.

The Government's Complaint describes similar letters, e-mails and statements as for each of the Defendant hospital corporations.  The Complaint is divided by sections corresponding to each of the Defendants, with "Overview" and "Chronology" sections.  In addition to providing specific factual bases for the alleged falsity of the donations (through identification of specific communications, e-mails and letters), the Complaint provides a factual underpinning for the allegation that the donations were purported to be unrestricted, but which were provided to the counties in order to affect and ensure their Medicaid reimbursements. The assertions in the Government's Complaint (which is incorporated into Relator's SAC) is backed up by Exhibit 1 exhibit to the Government's Complaint showing five Tables which list the donations (dates and amounts) discussed in the Complaint. The first three Tables correspond to each of the Defendant Hospital Corporations, the fourth (Table D) represents a grid of the SCP fund and requests for SCP supplemental payments submitted by each of the Defendants, and Table E lists the quarterly Medicaid Statements of Expenditures for the Medical Assistance Program submitted by the State to CMS.

The Government's Complaint alleges that the State's claims for federal matching funds were factually false.  The CMS-64 Forms submitted by the State certified that "the required amount of state and/or local funds were available and used to match the state's allowable expenditures" included in the report. Gov't Compl., ¶¶ 46, 337, 386.  However, required local

44

funds were not used; instead, counties substituted Defendants' payments for all or part of the sums that they were supposed to provide.  *See, e.g.,* ¶¶ 139, 223, 337, 389; SAC ¶¶ 21-27.

The claims submitted by the State are sufficiently alleged as legally false, as well. State payments eligible for federal matching funds must be reduced by the amount of non-bona fide donations a state receives from health care providers and uses to pay for federally subsidized programs.  Defendants' statements and letters to the counties characterized the hospital's quarterly donations to the counties as "unrestricted" (*see, e.g.,* ¶¶ 122, 129), yet expressed the intention to provide the counties with a match for the SCP funds (*see, e.g.*, ¶¶ 127, 136).  The CMS-64 Forms submitted by the State stated that the funds used to match the state's allowable expenditures included in the report were "in accordance with all applicable federal requirements for the non-federal share match of expenditures." ¶¶ 46, 386-93. However, the amounts requested were not in compliance with federal requirements.[33]

The Complaints allege the legal falsity of the documents and statements which accompanied those donations with regard to the individual Defendants.  For example, ENNMC is alleged to have instructed the Relator to prepare an internal memorandum for Revenue Managers which would instruct how to account in CHS' accounting records for donations and SCP fund payments to the Hospitals without showing the connection between the donations and SCP fund payments on the accounting entries.  Thereafter, the hospitals revised their letters to

---

[33]  The Government did not intervene in Relator's claims under 31 U.S.C. §3729(a)(1)(B).  However, the Court agrees with Plaintiff that the Government's Complaint regarding claims under § 3729(a)(1) contain factual allegations that directly support the Relator's claims which are set forth in the SAC as Count II.  The SAC parses out § 3729(a)(1) into two subsections, whereas Count I in the Government's Complaint impliedly includes both subsections.  Further, the Government's factual allegations concerning the false nature of the CMS 64 Forms submitted by the State comport with the Relator's allegations under § 3729(a)(1(B).

the county so that they no longer specified the purpose of the donations. Gov't Compl., ¶¶ 150, 153.  The Hospital changed their letters to the county so that the letters no longer specified the purpose of the donation money.

As explained above, a provider-related donation is "*bona fide*" only if it has no direct or indirect relationship to Medicaid payments to the health care provider, which means that the donations cannot be returned to the provider under a "hold harmless provision or practice." 42 C.F.R. §§ 433.54(a), (b).  Both Complaints identify repeated, explicit acknowledgments (letters, statements and e-mails) by Defendants that the donations were intended to secured to "match" the State share of Medicaid payments, and that the donations were in fact not "unrestricted" and therefore not bona fide donations.  *See, e.g.*, Gov't Compl., ¶¶ 127, 137, 242. Donations were made quarterly to coincide with the counties' schedule for matching fund submissions to the State.  *See*, e.g., Gov't Compl. ¶¶ 138, 244.  For example, Defendant Alta Vista Regional Center ("Alta Vista")[34] expected to receive over $266,000 in SCP fund payments from July 1, 2000 through June 30, 2001, but discovered that the county would have a problem providing the State with matching funds in order for the hospital to obtain the SCP fund payments.  The Complaint identifies numerous e-mails and letters which documents the alleged machinations by Alta Vista's CEO Jay Hodges whereby the hospital provided "unrestricted" donations to San Miguel County so that it could secure the matching portion to send to the State – and thereby secure the SCP fund payments to the hospital.  *See* Gov't Compl., ¶ 330-381.

As alleged in the Complaints, the agreements between Defendant Hospitals and the counties contained "hold harmless provisions" because they explicitly conditioned SCP

[34] It appears that Alta Vista Regional Medical Center is part of the San Miguel Hospital Corporation (and predecessor to Northeastern Regional Hospital). *See* Gov't Compl, ¶ 29.

payments to the Defendant Hospitals on "donations" to fund county health care services.  *See, e.g.*, SAC, ¶¶ 62, 69-71, 93(a)-(b), Gov't Compl., ¶¶ 53, 118, 221, 318, 337-40.  The "hold harmless" test is alleged to have been met in that the counties guaranteed to return any portion of the donation to the hospital provider (in the form of SCP payments), and that the Defendants got back all of their donation money, plus approximately three times that amount in matching funds.  Gov't Compl., ¶¶ 382-83, Tables A-C.

The list of factual allegations which support Plaintiff's FCA claims have not been exhausted herein.  The Government's Complaint alone (which is incorporated into Relator's SAC) contains over 400 allegations.  Even the partial examples selected by the Court here should make it obvious that the SAC is sufficient to withstand Defendants' motion to dismiss under Rule 8(a)(2) and Rule 12(b)(6).

The Court expresses some concern, however,  over Plaintiff's "inflation" claims.  As noted earlier, these allegations were added to the SAC, which was filed about one month after the Government filed its Complaint.  The Government's Complaint does not contain these "inflation" claims, which are described for the most part in the SAC in ¶ 93(g) & (h) and ¶ 97(e) & (f) in the SAC and which allege that Defendants falsely reported inflated annual costs of providing indigent care in order to obtain greater federally-subsidized SCP fund payments. I find that these allegations meet the minimum requirements of Rule 8(a)(2) and rule 12(b)(6), but will not withstand scrutiny under Rule 9(b), as I will discuss below.

C.      Allegations Regarding Whether Defendants "Caused" the Submission of False Claims, Statements and Records

The Complaint alleges, in part, that Defendants "caused" the State of New Mexico to submit false claims and to make and use false statements and records.  The FCA does not require

that the false record or statement be presented to the Government – liability may be predicated on knowingly causing the record or statement to be made or used. *See U. S. ex rel. Marcus v. Hess*, 317 U.S. 537, 544-545 (U.S. 1943) (the FCA reaches "any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government").

Generally, mere knowledge of the submission of claims and knowledge of the falsity of those claims is insufficient to establish liability under the FCA.  *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 714 (10th Cir. 2006).  The elements of "causation" under the FCA have been likened to the familiar elements of tort law – requiring "some sort of affirmative action, and more than mere passive acquiescence. . . ." *Id.*  The objective of the specificity requirement is to determine whether there is a "sufficient nexus between the conduct of the party and the ultimate presentation of the false claim to support liability under the FCA." *Id*. at 715.

Under  § 3729(a)(1)'s requirement that a person "cause" a false claim to be presented, the appropriate focus of the inquiry is on "the specific conduct of the person from whom the Government seeks to collect" and whether that conduct causes the presentment of a false claim. *Sikkenga*, 472 F.3d at 714. The appropriate focus in this case would be on the conduct of Defendant Hospitals.  The SAC alleges that the purpose and intended consequences of Defendants' conduct was that the State submit claims for payment from the federal government for the State's share of Medicaid, without reduction for non-bona fide donations made by Defendant Hospitals. The question here is whether there is a sufficient link alleged between Defendants' conduct and the ultimate presentment of those claims for payment with that purpose in mind.  I find that a sufficient link exists in order to state a viable claim under Rule 8(a) and

48

Rule 12(b)(6). The Complaints allege specific facts and refer to specific documents and letters which describe, often in chronology, how Defendants' conduct led to a fraudulent claim for payment by the Government.  The referenced documents and letters allege that Defendant Hospitals agreed with the counties to self-fund the county share of SCP payments, expecting and intending that those payments would result in Defendants receiving repayment through the SCP fund program that not only refunded their donation but tripled the investment.  *See* SAC, ¶¶ 45-58, 77-89, 93(a), (d).  The documents and letters allegedly show that Defendants took steps to have the counties on board with this plan by offering donations which would coordinate with the amount of "matching" funds the counties needed to contribute their share to the State for Medicaid reimbursement.  Gov't Compl., ¶¶ 112, 169, 178, 181, 185, 189-97, 219-25, & Table B.  Part of this scheme involved overstating the true annual uncompensated care costs. SAC, ¶¶ 93 (g)-(h).  The Government's Complaint is replete with specific transactions indicating the amounts and dates of donations by each Defendant hospital, the "matching" amount made by the county, and the SCP fund payment made to the donating hospital.  Gov't Compl., Tables A-C. For example, Table A shows that the $717,422.21 donation made to Chaves County by ENMMC on August 25, 2000 matches almost exactly the payment then made by the county to MAD just nine days later, to fund the "state" share of the $2,694,206 SCP payment ENMMC received in return for its donation on September 22, 2000.  Gov't  Compl., ¶ 119 and Table A.[35]  The Tables are significant in that they indicate a continuing cycle whereby Defendants made donations to fund the county share of the State's "matching" funds, fully expecting the State to follow

---

[35] The Relator's response references other such examples in the Complaint, and need not be reiterated here.  Resp. at 30-31.  Likewise, allegations in the Government Complaint supplements the information provided in the Tables, and vice versa.  *See* Gov't Compl., ¶¶ 140-50, 249-60, 346-48, 350.

through and submit claims for FFP to the federal government and collect such funds.

Defendants repeated this cycle every quarter, knowing that their "donations" would be returned

at least three-fold.

Defendants argue that the actions of the counties or State are intervening events that

sever the causal chain.  However, this argument fails here where the filing of those claims were

foreseeable and intended. The Complaints can be easily read to assert that Defendants' actions

were taken with the full intention that those claims would be submitted and Medicaid

reimbursements would be received – even though Defendants were aware that the counties

would not qualify for the funds without their donations to self-fund the counties' obligations.[36]

The last effort by Defendants on the causation issue is the argument that Defendants'

conduct amounted to "passive acquiescence" with an insufficient nexus to the State's submission

of claims to the federal government.  *See Sikkenga*, 472 F.3d at 714-15 ("a standard requiring

more than mere passive acquiescence is most consistent with the purposes of the FCA).

However, the Relator does not allege "passive acquiescence" in this case, but rather conduct by

Defendants carried out with the filing of claims as the intended result.  The "winnowing out" of

claims as mentioned in *Sikkenga* does not refer to the type of claims asserted by Plaintiff in this

---

[36] The Relator points to a case in which the defendant in that case attempted a similar argument, which was rejected by the United States District Court of Massachusetts. In *United States ex rel. Franklin v. Parke-Davis,* 147 F. Supp. 2d 39, 52 (D.Mass. 2001), the defendant was a pharmaceutical company alleged to have violated the FCA by an illegal marketing campaign.  Defendant argued that the relator had not stated a claim because the allegedly false claims for off-label uses of a drug were the result of prescriptions from physicians and the filling of those prescriptions by pharmacists, and thus were not caused by the pharmaceutical company. The court rejected the argument, finding that the participation of doctors and pharmacists in submission of false Medicaid claims was not only foreseeable, but an intended consequence of defendants' conduct.  The court noted that "an intervening force only breaks the causal connection when it is unforeseeable. . . .").  147 F.Supp. 2d 52.

case. *See Sikkenga*, 472 F.3d at 714 (proximate cause test "separates the wheat from the chaff, . . . winnowing out those claims with only attenuated links between the defendants' specific actions and the presentation of the false claim.").

For the foregoing reasons, the Relator's Complaint sufficiently alleges that Defendants "Caused" the submission of false claims, statements and records under the FCA, and meets the requirements of Rule 8(a) and Rule 12(b)(6).

D.   Allegations Regarding Whether False Records and Statements were "Material"

The essence of Defendants' argument here is that the records and statements identified in the Complaints cannot be considered "materially" false within the meaning of the FCA because even though the donation agreements between the Defendants and the counties concealed the actual purpose of the donations, Defendants had no real influence over whether the State or CMS ever saw those agreements. In other words, none of the agreements legally obligated the counties to use the donated funds in the manner allegedly desired by Defendants.

False elements of a claim are "material" if they have a tendency to influence or are capable of influencing government action. *Bahrani*, 465 F.3d at 1200 *United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1198 (10th Cir. 2006) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)).[37]

---

[37] Interestingly, Defendants make this argument notwithstanding that they also argue that the post-FERA version of § 3729(a)(1)(B) does not apply to them. The amended provision premises liability on knowingly making, using, or causing to be made or used, "a false record or statement *material* to a false or fraudulent claim paid by the Government." § 3729(a)(1)(B) (emphasis added). Before FERA, the word "material" was not part of the language, and instead stated that liability existed for anyone who "knowingly  makes, uses, or causes to be made or used, a false record or statement *to get* a false or fraudulent claim paid or approved by the Government." *Id.* (emphasis added). The Court addresses the issue because it was raised by Defendants and responded to by Plaintiff, but my findings on the retroactivity issue render this particular argument largely irrelevant.

Defendants' argument ignores the regulatory mechanism for the reporting and funding of Medicaid dollars to counties.  Count I of the SAC alleges that New Mexico submitted claims for payment of federal government money to match the portion of state payments funded by Defendants' non-bona fide donations.  SAC, ¶¶ 92-93.  Count II (under the pre-FERA version) alleges that Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.  These claims were allegedly false because the counties' share of indigent care payments (and therefore the amount forwarded by the State to the federal government) was ineligible for federal matching funds because the claims failed to identify the source of donations as non-bona fide donations.  Statements omitted about the source of the donations were "material" because they were essential to the State's eligibility for the federal matching funds paid – that is, the federal government would not have paid out the funds reimbursed to the counties had the claims been truthful.

The omitted information is required under federal regulations: the State must report all provider-related donations, whether bona fide or not.  SAC, ¶ 27 (citing 42 C.F.R. § 433.74); Gov't Compl., Ex. 1 at 3); and the State must certify that the funds used to calculate the federal matching portion complied with applicable federal requirements for the "non-federal share match of expenditures."  Gov't Compl., ¶ 46, 386.  Funds would be reduced in proportion to the amount of non-bona fide provider-related donations.  SAC, ¶ 27 (citing 42 C.F.R. §§ 433.66 and 433.74(d)). The Government's Complaint asserts that SCP and SCP supplemental payments varied based only upon the donations identified in the Tables as amounts donated by the hospital providers.  Gov't Compl., ¶¶ 106, 209, 314.  Thus, the donation agreements – which allegedly concealed the actual nature of the donations – were material in influencing the federal

government's reimbursement of matching funds because they influenced how the State

submitted the claims to the federal government.

E.    Allegations Regarding Whether Defendants "Knew" and Intended that False Claims
      Would Be Submitted

        Defendants are liable for their alleged misconduct if they "knowingly" presented or

caused the presentation of false or fraudulent claims or "knowingly" made or used false records

or statements material to false or fraudulent claims.  31 U.S.C. § 3729(a)(1).  Under the FCA,

"knowledge" includes "actual knowledge of the information" or actions "in deliberate ignorance

. . . [or] reckless disregard. . . of the truth or falsity of the information." § 3729(b)(1).

        Both Complaints are replete with allegations which cite to specific documents,

statements, letters and events facts which indicate knowledge on the part of Defendants that they

could not self-fund the counties' contributions to the SCP program from which they would be

paid for providing indigent care.  Plaintiff's response mentions some of these relevant

allegations (Doc. 66 at 45-47), and the Court lists a few here:

- July 27, 2000 email to several CHS corporate and hospital officials from ENMMC's
  CFO stating that "County funds CAN NOT come from the hospital." Gov't. Compl., ¶
  84.

- August 8, 2000 memorandum between two high-level CHS executives noting the risk of
  detection and rejection of Defendants' scheme.  Gov't Compl., ¶ 92.[38]

        Such statements indicate Defendants' actual knowledge that federal law prohibited the

---

[38]  The memorandum stated:
The last risk I would bring to your attention would be the feds determining, based
upon state reports, that the county participation in the program was funded by a
provider donation, *i.e.*, the hospital. Under that scenario, the excess or matching
portion of the funds could be withheld from future SCH payments. Moreover, it
would be budget neutral in the long-run and we would in effect collect our cash in
advance.
Gov't Compl., ¶ 92.

self-funding of federally subsidized Medicaid payments.

Further, the Complaints specifically allege Defendants explicitly acknowledged internally that the purpose of their purported "donations" was to self-fund counties' SCP fund contributions:

- Larry Carlton allegedly instructed Relator to prepare a memorandum for CHS Revenue Managers on "how to account . . . for donations and SCP fund payments to the Hospitals so that the connection between the donations and SCP fund payments would not be evident on the face of the accounting entries."  Gov't Compl., ¶ 150.

- negotiation of payments to the Luna County by Mimbres Hospital's CEO for the stated purpose of obtaining a certain level of SCP funds, calculating the return on the investment but falsely characterizing the payments as "unrestricted donations."  ¶¶ 219, 224.

- creating sham "donation" letters and contracts for external review purposes which would create the false impression that the "donations" were "unrestricted" when they were not, and to make it appear that the "donations" were related instead to some contractual obligation other than the desire to self-fund SCP fund payments.

SAC, ¶¶ 97(a)-(c).

Numerous other such allegations pepper the Complaints, particularly the Government's Complaint. In short, the Complaints present allegations of a "cover-up," imparting the distinct message that Defendants knowingly embarked on their actions with a specific purpose in mind – a purpose that was in violation of the FCA and the related federal regulations.  These allegations are specific and factual, and are sufficient to withstand Defendants' motion to dismiss based on Rule 8(a) and Rule 12(b)(6).

F.      Whether Complaints Sufficiently Allege Fraud

Rule 9(b) of the federal rules requires, at a minimum, that claims of fraud be pled with sufficient particularity. *U.S. ex rel. Lacy v. New Horizons, Inc*., 2009 WL 3241299 (10th Cir. 2009).  The plaintiff must set forth the "who, what, when, where and how" of the alleged fraud,

as well the time, place, and contents of false representation, and the identity of party making false statements.  *Id*.

Defendants contend that the SAC fails to satisfy these minimum pleading requirements under Rule 9(b), in that the SAC repeatedly refers generically to "claims," but never specifies the category of documents or requests.  Defendants also contend that Plaintiff offers no facts in support of the inflation claims alleged in the SAC.

The Court disagrees with that part of Defendants' argument relating to the pleading requirements regarding the "donation" claims.  Table E attached to the Government's Complaint lists numerous CMS 64 Forms submitted by New Mexico to CMS.  Tables A, B and C target each Defendant regarding dates and amounts of donations; the dates and amounts of the county's "match," and the resulting SCP fund payment to the Defendant.  Table D indicates the funding requests submitted by each Defendant, with the dates of each request.  This information, in addition to the other assertions which the Court has previously discussed relating to the "donation" claims, satisfies the "who, what, when, where and how" requirements of Rule 9(b).  Because the Relator incorporated the allegations of the Government's Complaint into the SAC (¶ 1), the SAC also satisfies those requirements.

However, the Court agrees with Defendants' argument regarding the "inflation" claims newly asserted by the Relator in the SAC.  I previously found that the SAC sufficiently alleged these claims under Rule 8(a) and Rule 12(b)(6), but I also expressed some concern that Plaintiff's "inflation" claims may not be sufficient under more rigorous scrutiny.  As noted earlier, the Government's Complaint, which was filed before the Relator filed the SAC, did not allege "inflation" claims.  The SAC alleges that Defendants falsely reported inflated annual costs of providing indigent care in order to obtain greater federally-subsidized SCP fund payments,

but lacks any specificity which could fairly be regarded as passing muster under Rule 9(b). *See* SAC ¶¶ 93(g) & (h),  97(e) & (f).  Rule 9(b) does not require every detail about every claim, and need not be comprehensive, but must provide some examples of specific false claims that "are representative samples of the broader class of claims."). *Lacy*, U.S. ex rel. Lacy v. New Horizons, Inc. Slip Copy, 2009 WL 3241299 at 4.  The SAC contains no detail at all concerning which hospital(s) allegedly inflated charges, which specific charges those hospitals allegedly inflated, or when the allegedly inflated charged were presented – in contrast to the "donation" claims, which are presented in detail both in the assertions and in table form.

The Court will allow the Relator to amend the SAC on or before Monday, April 19, 2010 to provide specificity regarding the "inflation" claims referenced in the SAC, setting forth details identifying the time, place and contents of false representation, including the identity of the party or parties making false statements, and sufficient identification of documents, events, records, etc., to meet the requirements of Rule 9(b).

## CONCLUSION

In sum, the Court finds and concludes:

- The jurisdictional issues raised in the briefs shall be addressed under a Rule 56 standard. The jurisdictional challenge in this case arise out of the same statute creating the cause of action, and thus a jurisdictional analysis is intertwined with the merits because it involves a look at matters outside the pleadings.

- On the question of whether jurisdiction is barred under 31 U.S.C. § 3730(e)(4)(A) regarding the new allegations (i.e. "inflation claims") added to the Second Amended Complaint:

  - when considering "prior public disclosure" under § 3730(e)(4), the Court may include consideration of a state court case (here, the *Sisneros* case) as belonging to the category of a "disclosure of allegations or transactions in a criminal, civil or administrative hearing" under § 3730(e)(4)  In this case, the Court determined that allegations related to the "inflation" claims in the SAC were based upon the allegations in the *Sisneros* case.

56

- ○ However, jurisdiction is not precluded over these claims because the Court finds and concludes that the Relator has shown that he is the "original source" of the new allegations in the SAC and that he voluntarily disclosed this information to the Government, as required under § 3730(e)(4)(A) and (B).

- On the retroactivity issue: § 4(f)(1) of the FERA applies to "claims" as defined in the FCA, and not "cases," and thus the pre-FERA version, and not the amended version, applies to this case.  Alternatively, I find and conclude that the FCA's statutory scheme is punitive in purpose and effect, that retroactive application of the post-FERA provision, § 3729(a)(1)(B) to the Relator's claims in this case would punish Defendants for conduct that was not unlawful at the time Defendants acted, and that as a result, retroactive application of the FERA would violate the Ex Post Facto clause.   For this reason as well, the pre-FERA version of § 3729(a)(1)(B) [what was formerly § 3729(a)(2)] applies to the claims which would come under this provision in the SAC, namely, the claims brought under Count II in the SAC.

- The SAC, which incorporates the substantive allegations in the Government's Complaint, states a claim under Rule 8(a) and Rule 12(b)(6).

- However, the SAC does not meet the more stringent requirements of pleading fraud under Rule 9(b).  Relator may amend the SAC to meet these requirements on or before Monday, April 19, 2010.  Failure to amend the SAC by that date will be an indication on Relator's part that the "inflation" claims have been waived.

**THEREFORE,**

**IT IS ORDERED** that Defendants' Motion to Dismiss Second Amended Complaint of Qui Tam Plaintiff Robert C. Baker ("Relator") (**Doc. 55**) is hereby GRANTED IN PART and DENIED IN PART, for reasons set forth in this Memorandum Opinion and Order.

_____
UNITED STATES DISTRICT JUDGE