# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA, EX. REL.
ROBERT C. BAKER,

        Plaintiff,

        v.                          Civil No. 05-279 WJ/WDS

COMMUNITY HEALTH SYSTEMS, INC.,
EASTERN NEW MEXICO MEDICAL
CENTER; MIMBRES MEMORIAL
HOSPITAL; NORTHEASTERN REGIONAL
HOSPITAL; and HELENA REGIONAL
MEDICAL CENTER,

        Defendants.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS THE COMPLAINT OF THE UNITED STATES IN INTERVENTION

THIS MATTER comes before the Court upon Defendants' Motion to Dismiss the Complaint of the United States in Intervention, filed August 28, 2009 (**Doc. 53**). Having considered the parties' briefs and the applicable law, I find that Defendants' motion is not well-taken and shall be denied.

## BACKGROUND

This is a *qui tam* case alleging Medicaid fraud based on violations of the False Claims Act, 31 U.S.C. § 3729(a) ("FCA").[1] Defendants are alleged to have manipulated the Medicaid funding program by a scheme which resulted in the illegal receipt of federally funded Medicaid

---

[1]    A "*qui tam* action" is an action brought under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive. Black's Law Dict., 7th ed. Under the qui tam provision of the False Claims Act, any individual can sue on behalf of the United States government to recover for the government's payment of fraudulent claims. 31 U.S.C. § 3730(b).

payments. The Relator seeks the maximum amount allowed to a qui tam plaintiff under §

3730(d).  The United States (the "Government") seeks to recover damages and civil penalties

from Defendants, in an amount exceeding tens of millions of dollars, arising from false and/or

fraudulent statements, records, and claims of FCA violations.  In this motion, Defendants seek

dismissal of the Government's Complaint in Intervention (Doc. 37) ("Complaint" hereinafter)

because the Complaint fails to plead a violation of the FCA under Fed.R.Civ.P. 9(b) and

12(b)(6); and also because the Complaint fails to state a claim for recovery of payment by

mistake.

The Court recently granted in part and denied in part Defendants' motion to dismiss the

Second Amended Complaint filed by the Relator (Doc. 83).  Specifically, I found there was

merit to Defendants' arguments that an amended provision of the FCA did not apply to this case,

and that the former version of the provision (that is, 31 U.S.C. § 3729(a)(2)) would govern

instead.[2]  The motion was denied on the grounds that the Second Amended Complaint was found

to be sufficient under Fed.R.Civ.P. 8(a) and 12(b)(6).  However, I also found that the "inflation

claims" asserted in the Second Amended Complaint filed by the Relator did not meet the

stringent requirements for pleading fraud, and the Relator was given the opportunity to amend

the Second Amended Complaint.[3] On the jurisdictional question raised by Defendants, I found

that the allegations related to the "inflation" claims in the Second Amended Complaint were

_____

[2]  The Fraud Enforcement Recovery Act of 2009 ("FERA"), Pub L. No. 111-021, §
4(a)(1), 123 Stat. 1617, 1621 (May 20, 2009), amended 31 U.S.C. § 3729(a)(2) (1986) and
recodified it as 31 U.S.C. § 3729(a)(1)(B) (2009), removing the requirement that a false record
or statement have been made "to get" a claim paid by the federal government.  *See* Pub L. No.
111-021, § 4(a)(1)(B).

[3]  The Relator recently provided the Court with notice that he has elected not to amend
the SAC, and understands that he is thus voluntarily waiving the "inflation" claims. Doc. 90 at 2.

based upon "prior public disclosures" under § 3730(e)(4)(A), but that jurisdiction was not precluded over those claims because the Relator demonstrated that he is the "original source" of those allegations, and that he voluntarily disclosed this information to the Government, as required under § 3730(e)(4)(A) and (B).

## II.     The Parties

Robert C. Baker filed the initial *qui tam* complaint as a Relator under 31 U.S.C. § 3730(b)(2).  The initial Complaint filed by the Relator remains under seal. Defendants are Community Health Systems, Inc. ("CHSI") and three of its New Mexico Hospitals: Eastern New Mexico Medical Center ("Eastern"), Mimbres Memorial Hospital ("Mimbres"), and Alta Vista Regional Hospital ("Alta Vista") (collectively "the Hospitals"). Defendant CHSI is a publicly-traded company incorporated under the laws of the state of Delaware and headquartered in Franklin, Tennessee. (*Id*. ¶ 26.) Defendants Eastern, Mimbres, and Alta Vista,[4] each owned by separate, indirect subsidiaries of CHSI, are licensed acute care hospitals in New Mexico that provide a full range of emergency, inpatient, and outpatient medical services. (*See id*. ¶¶ 27-29.) Each is qualified as a "sole community provider ("SCP") hospital under New Mexico's Medicaid program, providing millions of dollars in health care services annually to the indigent populations of the counties they serve.

## III.    The Medicaid Funding Process

A description of the Medicaid Funding process is necessary to put into context the arguments which will be addressed by the Court.  This background is based on representations from the parties' briefs, the Government's Complaint, and relevant statutes and regulations.

---

[4] Before 2004, Alta Vista was known as Northeastern Regional Hospital. (*See* Compl. ¶ 29).

Medicaid programs are administered by the states in accordance with federal regulations, but they are jointly financed by the federal and state governments.  While the State of New Mexico ("State") administers the state Medicaid program, a significant portion of the funding for Medicaid originates with the Government which pays its share of medical assistance expenditures to the State on a quarterly basis according to statements of expenditures submitted by the State and a formula used to calculate how much of the total reported expenditures the Government will reimburse the State.[5]  In turn, the State pays its share of medical assistance expenditures from state and local government funds in accordance with certain provisions of the Medicaid Act.  *See* 42 U.S.C. § 1396a(a)(2).

In order to participate in Medicaid, New Mexico must fund a certain percentage of its total Medicaid expenditures, with the remainder being funded by the U.S. Government.  *See* 42 U.S.C. § 1396b; 42 C.F.R. § 433.10.  In New Mexico, two sources of Medicaid funding to hospitals are the Sole Community Provider Fund ("SCPF") and the Sole Community Hospital Supplement Payments ("SCHSP") programs.  *Id*. ¶¶ 5, 58. Funds are available to the SCHSP program as a kind of second-tier Medicaid funding program which provides hospitals with additional funding to the extent other Medicaid funding has not exceeded the annual federal funding limit. Doc. 54 at 15.  The State share of payments going to the SCPF and SCHSP must be funded by county and local governments. *Id*. ¶¶ 60, 62.

Each year, sole community provider hospitals agree with counties on the amount of Sole Community Provider funding for the next fiscal year, based on the hospital's total anticipated cost of providing services to qualifying indigent residents in the coming year. The hospitals then

---

[5] *See* §§  42 U.S.C. §§ 1396b and 1396d(b) of the Medicaid Act.

submit payment requests to the State. *Id*. ¶¶ 65-66; *see also* Doc. 54 at 6-8.  The State's approval of the funding agreement triggers the county's statutory obligation to transfer funds through "Inter-Governmental Transfers" ("IGT"'s) at the beginning of each quarter from the county's indigent fund to the State's Sole Community Provider fund. NMSA 1978 27-5-12.2(E), 27-5-7.1(A)(1), 27-5-6.1. County IGT's to the State may be derived from several sources, including State and local tax revenues or donations made to the counties by Medicaid provider hospitals ("provider-related donations").  *See* 42 U.S.C. § 1396b(w); 42 C.F.R. § 433.57; NMSA 1978 §§ 27-5-6, 27-5-7.  Counties are supposed to transfer county funds to the State, which the State then combines with federal funds of approximately triple the amount of the county contribution, and then pays the hospitals the total of the combined county contribution and matching federal funds. *Id*. ¶¶ 68 - 75. The State obtains the federal  reimbursement by drawing down federal funds made available to it by the Government. *Id*. ¶¶ 42-43, 71-72. The State submits claims quarterly, which are called CMS 64 Forms ("64 Forms"), to the Government for payment or approval of the matching federal funds paid to hospitals, including the SCPF and SCHSP payments. *Id*. ¶¶ 17, 44, 76, 383, Table E (Quarterly Medicaid Statements of Expenditures for the Medical Assistance Program Submitted by the State of New Mexico to CMS).[6] The amount the Government will reimburse changes year-to-year and is based largely on the poverty level of the state.

The Government's contribution, called the "federal financial participation" is calculated based on the State's qualifying Medicaid expenditures, which themselves are funded in part by

---

[6]  Although Tables A through E are technically exhibits, they may nevertheless be considered by the Court.  *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citation omitted) ("In evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself, but also attached exhibits, and documents incorporated into the complaint by reference.").

IGT's from counties within the State. The Medicaid Act's implementing regulations require a reduction in federal financial participation in Medicaid expenditures if a state receives donations from health care providers unless the donations are "bona fide." *See* 42 U.S.C. § 1396b(w); 42 C.F.R. § 433.57; 42 C.F.R. §§ 433.66, 433.74(d); NMSA 1978 §§ 27-5-6, 27-5-7. A provider-related donation is bona fide only if it has no direct or indirect relationship to Medicaid payments to the health care provider, which means that the donations cannot be returned to the provider under a "hold harmless provision or practice." 42 C.F.R. §§ 433.54(a), (b).[7] The purpose of these regulations was to curb extraordinary increases in federal Medicaid expenditures resulting from states using donations from health care providers to fund the state share. These non-bona fide donations are deducted by the Centers for Medicare and Medicaid Services ("CMS") from the State's reported expenditures before calculating the FFP amount.[8]

## IV.   Defendants' Alleged Conduct

The Complaint alleges that, in 2000, Defendants and their parent company, CHSI, devised a fraudulent scheme whereby they would make payments, which they called "unrestricted donations," to New Mexico counties, for the purpose of receiving back Medicaid payments in the amount of their payments plus triple those amounts from the resulting federal financial participation. Compl., ¶¶ 79, 82-83, 91- 94.  Defendants implemented their scheme

---

[7]  A donation is "non-bona fide" if "[a]ll or any portion of the payment made under Medicaid to the donor... varies based only on the amount of the total donation received . . .," or the "unit of local government receiving the donation provides for any payment, offset, or waiver that guarantees to return any portion of the donation to the provider."  A "hold harmless practice" exists if any portion of the payment made under Medicaid to the donor varies based only on the amount of the donation, or if the state or local government provides for any payment that guarantees that any portion of the donation will be returned to the provider. 42 C.F.R. § 433.54(c).

[8]  This lawsuit is brought on behalf of CMS.  Doc. 54 at 10.

over the ensuing eight years, paying counties over $19.5 million and receiving back tens of millions of dollars in Medicaid payments in return. *Id.* ¶¶ 102- 105, 205-208, 310-313; Tables A - C. Defendants' donations had a direct or indirect relationship to the Medicaid payments they received, and consequently were non-bona fide donations. *Id.* ¶¶ 106-108, 209-211, 314-316. According to the complaint, the purpose and effect of Defendants' scheme was to profit by illicitly obtaining federally reimbursed Medicaid payments in violation of federal law. As a result of Defendants' alleged scheme, Defendants received Medicaid payments for which the State claimed and obtained federal reimbursement, with no reduction of Defendants' non-bona fide donations, in violation of the Medicaid statute's and regulations' prohibition on federal funding for Medicaid payments to a provider in instances where the state or county has received donations from the provider that have a direct or indirect relationship to those Medicaid payments. *Id.* ¶¶ 9, 15, 17-19, 382-384, 387.

Defendants point out that provider-related donations are allowed under federal and state law. *See, e.g.*, 42 C.F.R. § 433.74 (reporting requirements for provider-related donations); NMSA 1978 § 27-5-6(G) (county may accept contributions to County Indigent Fund). However, Defendants are ignoring the obvious corollary – which is that a donation is not legal under the FCA when it is made for the purpose of obtaining Medicaid payments reimbursed by the Government, and knowing that such reimbursement is prohibited by federal law. *See, e.g.,U.S. ex rel. Monahan v. Robert Wood Johnson University Hosp. at Hamilton*, unpubl. opin., 2009 WL 4576097 (D.N.J.,2009) (where defendant hospital argued that its charge structure was lawful, court denied its motion to dismiss an FCA complaint alleging that by rapidly increasing its charges defendant engaged in a fraudulent scheme that resulted in its receipt of federal payments in violation of federal law) (emphasis added). This is the very essence of the Complaint: not that

Defendants made donations to their respective counties, but that they caused the submission of false claims to the United States, and initiated a chain of events that resulted in the presentation of false claims to the Government by the State for federal funds.  ¶ 6.  As a result of the presentation of those false claims to the Government, the Government alleges that Defendants improperly received matching federal funds.

The Complaint contains two counts.  Count One asserts violations of the False Claims Act under 31 U.S.C. § 3729(a)(1).  Count Two asserts a claim of "Payment by Mistake."

## DISCUSSION

### I.   Relevant Statutes under the FCA

The FCA "covers all fraudulent attempts to cause the government to pay out sums of money." *United States ex rel. Boothe v. Sun Healthcare Group, Inc*., 496 F.3d 1169, 1172 (10th Cir.2007) (quotation omitted). To state a claim under § 3729(a)(1) of the FCA, a plaintiff must allege: (1) that the defendant presented or caused to be presented to an agent of the United States; (2) a claim for payment; (3) that the claim was false or fraudulent; (4) that the defendant knew the claim was false or fraudulent; and (5) that the falsity of the claim was material to the government's payment decision. *Id. at 1165*; *see also United States ex rel. Bahrani v. Conagra, Inc*., 465 F.3d 1189 (10th Cir. 2006) (recognizing materiality element of FCA)

Liability for certain acts under 31 U.S.C. § 3729(a) of the FCA is set forth in part as follows:

  (1) In general.--Subject to paragraph (2), any person who--

      (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

      (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

Section 3729(a)(1)(B) was formerly codified as § 3729(a)(2), prior to the recent amendments to the FCA effected by the Fraud Enforcement Recovery Act of 2009 ("FERA").[9] Section 3729(a)(2) stated that liability attaches when a defendant "knowingly  makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." The FERA recodified that section as § 3729(a)(1)(B), imposing liability on any individual who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  The amended provision removes the requirement that a false record or statement have been made "to get" a claim paid by the federal government, and broadening the intent required to trigger liability, because it creates the possibility of FCA liability even where a false statement or record is not made "for the purpose" of getting a false or fraudulent claim paid or approved by the Government.  Thus, aside from the substantive changes effected by the FERA, the amendment collapses the former subsections (a)(1) and (a)(2) both into subsection (a)(1).

In a footnote, Defendants raise the issue of whether recent amendments to the FCA apply to the Government's claims, contending that the FERA does not apply to Plaintiff's claims because the amendments apply to conduct occurring after May 20, 2009.[10]  Doc. 54 at 19, n.9. This issue has already been decided with regard to the claims asserted in this case, with the Court previously ruling in favor of Defendants and finding that the former version of § 3729(a)(2) shall govern the case instead of the FERA version (§ 3729(a)(1)(B)). Doc. 83 at 25-

---

[9]  Pub L.No. 111-021, § 4(a)(1), 123 Stat. 1617, 1621 (May 20, 2009).

[10]  It is not clear whether Defendants' reference to the term "Plaintiff" concerns the claims asserted in all the complaints of the Relator as well as the Government, or in one complaint in particular.

38.  That being said, the Court is not altogether clear whether the Government is bringing claims under the provision of the FCA which is affected by the FERA amendments. Count One in the Complaint alleges violations of the FCA under § 3729(a)(1). The post-FERA version of § 3729(a)(1) consists of subsection (A) which deals with "presenting" violations, and subsection (B) which deals with "making or using" violations.  The Government describes the claims in Count One only as "Causing To Be Presented To The United States False Claims" and does not make reference to "making or using" violations.  This leads the Court to assume that the FCA claims asserted by the Government are limited to presentment of claims only, under § 3729(a)(1)(A).  Also, the fact that the Government did not make any argument related to the retroactivity issue in its response brief supports this conclusion.[11] If my assumption is correct, then the FCA claims asserted in the Government's Complaint are premised only on violations of § 3729(a)(1)(A), which was not affected by the FERA in substance and thus the contentions concerning retroactivity raised by Defendants are moot.[12]

## II.      Sufficiency of the Complaint Under Rule 9(b)

Rule 9(b) of the federal rules requires, at a minimum, that claims of fraud be pled with

---

[11]  The Government filed a "Statement of Interest" setting forth its position on the retroactivity issue related to the Relator's claims (Doc. 68) in which it argued that the post-FERA amendments did apply to the Relator's claims.

[12]  Defendants filed a Notice of Supplemental Authority, to which the Government and Relator responded (Docs. 79, 80, 81) concerning mostly the applicability of the FERA. Defendants offered a recent Eleventh Circuit case which found that the FERA did not apply retroactively – which is the conclusion reached by this Court with regard to the Relator's claims and would also affect claims asserted by the Government.  The Eleventh Circuit also affirmed the district court's dismissal of plaintiff's claims under the FCA finding that the complaint failed to meet Rule 9's requirements.  *See Hopper v. Solvay Pharmaceuticals, Inc*., _____ F.3d _____, 2009 WL 4429519 (11th Cir. 2009).  However, I do not find that case to be helpful here because, unlike the plaintiff in *Hopper*, the Government has sufficiently alleged the existence of more than one actual false claim.

sufficient particularity. *U.S. ex rel. Lacy v. New Horizons, Inc*., 2009 WL 3241299 (10th Cir. 2009).  The plaintiff must set forth the "who, what, when, where and how" of the alleged fraud, as well as the time, place, and contents of false representation, and the identity of party making false statements.  *Id*.  The purpose of Rule 9(b) is to provide defendants "with a more specific form of notice as to the particulars of their alleged misconduct." *See, e.g., United States ex rel Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 503 (6 Cir.  2007); *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 726 (10th Cir.2006) (At a minimum, Rule 9(b) requires that a plaintiff set forth the "who, what, when, where and how" of the alleged fraud and "must set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof."). (internal quotations and citations omitted). Review under Rule 9(b) is based on the "text of the complaint." *Id*., 472 F.3d at 726.

However, while Rule 9(b) adds particularity requirements for allegations of fraud or mistake, it should nevertheless be read to be in harmony with Rule 8, which requires that a complaint provide "a short and plain statement of the claim" made by "simple, concise, and direct allegations." *Id*. (quoting Fed. R. Civ. P. 8(a)). Under Rule 8, a complaint need not allege an exhaustive roadmap of a plaintiff's claims, but must be sufficient to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89 (2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)).

A defendant's presentation of a false or fraudulent claim to the Government is a "central element of every False Claims Act case." *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 727 (10th Cir. 2006). In this case, Defendants contend that the Complaint fails to identify and describe a single allegedly false claim submitted to the federal Government.

They also challenge the adequacy of Table E, attached to the Complaint and offered by the Government as a list of the 64 Forms presented to the Government, on the basis that the Complaint only a generic list of dates on which each federal fiscal quarter ended between September 2000 and June 2008. Defendants' arguments are flawed because: (1) Defendants focus almost exclusively on the actual claims submitted by the State, ignoring their own alleged conduct which *caused* fraudulent claims to have been submitted by the State and which is central to the Government's claims; and because (2) Defendants apply Rule 9 standards separately to Table E and the assertions contained in the Complaint, instead of viewing the Tables (including Table E) as supportive exhibits of the Complaint.

The Court has reviewed the Government's Complaint and the attached exhibits, and finds that the Government has alleged its FCA claims against Defendants in sufficient detail to satisfy the "who, what, when, where and how" implicit within the Rule 9(b) standard. The "who" in the alleged fraud includes the Defendants (¶¶ 119-204 for Eastern; ¶¶ 205-309 for Mimbres; and ¶¶ 310 - 381 for Alta Vista). The Complaint alleges that the 64 Forms identified in Table E (Quarterly Medicaid Statements of Expenditures for the Medical Assistance Program Submitted by the State of New Mexico to CMS) list the relevant 64 Forms presented to the federal government on a quarterly basis, and are the false claims presented to the Government. Compl. ¶¶ 383, 387. Tables A-C indicates the amount of SCPF and SCHSP payments made by the State to Defendants. These payments were claimed as expenditures in the 64 Forms listed in Table E.[13] The Complaint alleges the time of the false claims: from the Summer of 2000 through June

---

[13] Defendants are correct that federal payments (FFP contributions) are not paid to the hospitals but to the State. However, it would be wrong to imply that there is no direct relationship between the FFP and the SCP funds received by the hospitals. Defendants themselves describe the process thus:

2008.  ¶¶ 5, 383, Table E. The place of the alleged fraud is included in the Complaint: Chaves,

Luna, and San Miguel Counties. Compl. ¶¶ 10, 27-29, 383.  The Complaint further alleges that

the 64 Forms were presented to CMS, the federal agency that administers Medicaid on the

federal level.  ¶¶ 36, 44, 383, Table E.

The Complaint alleges the content of the false claims. The SCPF and SCHSP payments

made by tje State to Defendants were claimed as expenditures in the 64 Forms, ¶ 383; and that

the amounts of the SCPF and SCHSP payments to defendants were not reduced by the amounts

of Defendants' donations. *Id.* ¶ 384. Certifications in the 64 Forms before September 2001 stated

that "the information shown above . . . is correct . . . ," and certifications starting in September

2001 stated that "[t]he required amount of state and/or local funds were available and used to

match the state's allowable expenditures included in this report, and such state and/or local funds

were in accordance with all applicable federal requirements for the non-federal share match of

expenditures." *Id.* ¶¶ 385-386.

The Complaint alleges *how* the claims were false. Defendants' donations had a direct or

indirect relationship to the SCPF and SCHSP payments to defendants. *Id.* ¶¶ 384, 387. Those

---

By State law, before each State fiscal year, New Mexico county governments
participating in the [Sole Community Provider]Program are required to negotiate annual
levels of [Sole Community Provider] funding with each participating [Sole Community
Provider] hospital based on the hospital's total anticipated cost of providing services to
qualifying indigent residents in the coming year. *See* NMSA 1978 § 27-5-12.2(D). These
annual funding agreements must be approved by the State. . . After all county IGTs to the
State SCP Fund are made, **the State distributes quarterly [Sole Community Provicer]
payments to qualifying hospitals in accordance with the pre-approved SCP funding
agreements** and draws down its allotted share of federal funds. *See* 8.311.3.12(F)(6)
NMAC. Hospitals then use these [Sole Community Provider] payments to cover the cost
of treating indigent patients meeting county-defined eligibility requirements, and submit
claims for reimbursement to their respective counties for review and approval. . . .

Doc. 54 at 14 (emphasis added).

13

payments were claimed for federal reimbursement, but the claims were not reduced by the amount of Defendants' donations. *Id*. The claiming of federal reimbursement for the SCPF and SCHSP payments to Defendants, without the reduction of the amount of Defendants' donations, violated the Medicaid statute and regulations and was not correct notwithstanding the pre-September 2001 certification in the 64 Forms. *Id*. ¶ 387-388. The required amounts of State and/or local funds were not available and/or not used to match the State's SCPF and SCHSP payments to defendants which were claimed for federal reimbursement notwithstanding the post-September 2001 certification in the 64 Forms. *Id*. ¶ 389. State and/or local funds were not in accordance with all applicable federal requirements for the non-federal share match of the SCPF and SCHSP payments to defendants which were claimed for federal reimbursement notwithstanding the post-September 2001 certification in the 64 Forms. *Id*. ¶ 390.

The Complaint alleges the consequences of the false claims. The amount of federal financial participation is determined in part on the basis of the 64 Form. *Id*. ¶ 44. New Mexico obtained federal reimbursement for approximately 75% of the SCPF and SCHSP payments to defendants. *Id*. ¶ 19. Consequently, defendants received Medicaid payments for which the State claimed and obtained federal reimbursement, with no reduction of defendants' non-bona fide donations, in violation of the Medicaid statute's and regulations' prohibition on federal funding for Medicaid payments to a provider in instances where the state or county has received donations from the provider that have a direct or indirect relationship to those Medicaid payments. *Id*. ¶¶ 9,15, 17-19, 382-384, 387.

The Court easily rejects Defendants' contention that the Complaint fails to identify or describe with particularity even a single 64 Form that was actually submitted to the Government is one that is easily rejected.  While Table E is indeed only a list of 64 Forms with corresponding

14

dates on which the forms where submitted to the federal government, the Table does not exist in

a vacuum. The Complaint –  to which Table E is attached – is replete with information about the

individual 64 Forms which were submitted.  Defendant implies that the Government is only

lately offering to supply the Court with the relevant 64 Forms.  *See* Doc. 75 at 7, n.4.  This

inaccurately represents the Government's position. What the Government actually stated was

that the sheer volume of 64 Forms prevented the Government from attaching all 2100 pages, but

that the entire set was available to the Court should the Court determine it necessary in order to

rule on Defendants' motion.  Doc. 67 at 9, n.6.  Moreover, the Government need not have

attached *any* Tables to the Complaint in order to withstand Defendants' motion to dismiss – as

long as the necessary information is contained in the Complaint.  Defendants seek detail which is

not necessary under Rule 9(b) and certainly not necessary at this stage in the litigation. *See U.S.*

*ex rel. Grubbs v. Kanneganti*,565 F.3d 180 (5th Cir. 2009) ("a plaintiff does not necessarily need

the exact dollar amounts, billing numbers, or dates to prove to a preponderance that fraudulent

bills were actually submitted. To require even these details at pleading is one small step shy of

requiring production of actual documentation with the complaint, a level of proof not demanded

to win at trial and significantly more than any federal pleading rule contemplates."); *U.S. ex rel.*

*Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009) (not essential for a relator to

produce the invoices and accompanying representations at outset of suit).

   In support of its arguments, Defendants rely on several cases where the courts dismissed

plaintiff's claims because the complaint did not allege fraud under the FCA with particularity.

However, the holdings in the cases cited by Defendants ride on the facts of each of those cases,

and thus are relevant only in cases where a plaintiff fails to allege sufficiently specific facts

under Rule 9 standards.  Thus, those cases are not relevant here.

For example, in *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, the First Circuit affirmed the dismissal of plaintiff's FCA claim because the complaint consisted of conclusory allegations that the defendants submitted actual false or fraudulent claims to the government, and was devoid of any information relating to the source of information and factual basis for the allegations. *Id.* at 233. In fact, the plaintiff himself conceded that his complaint failed to set forth specifics "of any one single cost report, or bill, or piece of paper that was sent to the Government to obtain funding." *Id.* The court noted that averments of fraud must specify the "time, place, and content" of the alleged false or fraudulent representations – meaning that a relator must provide details that identify particular false claims for payment that were submitted to the Government. 360 F.3d 220, 232-233 (1st Cir. 2004). The First Circuit stated that a complaint should include some details "for at least some of the claims" such as: dates of the claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices are the types of information that may help a relator to state his or her claims with particularity. As I have noted above, the Government has provided such details for at least some of the claims.

Defendants also point to *U.S. ex rel. Serrano v. Oaks Diagnostics, Inc.*, 568 F.Supp.2d 1136, 1142-43 (C.D.Cal.,2008), which dismissed plaintiff's FCA claims because the complaint provided no specifics regarding any of the allegedly false claims. While the complaint included a chart listing each of the alleged false claims including the "date, internal control number, referring physician, amount billed and amount paid for each of the claims[,]", the complaint did not identify any dates of service, an example of a test performed, or a single patient involved in

16

the tests.  *Id.* at 1142-43.  Again, this deficiency does not exist in the Complaint.

Defendants attempt to compare the Government's purported failure to identify a single allegedly false claim to the basis for dismissal of plaintiff' claims in *United States ex rel. Conner v. Salina Reg. Health Ctr., Inc.,* 543 F.3d 1211 (10th Cir. 2008).  However, the comparison here is inapposite legally as well as factually. The relator in *Conner* alleged violations of certain Medicare and Medicaid statutes and regulations which the court found (and relator himself conceded) did not condition payment for services rendered by the hospital upon the hospital's compliance with those statutes and regulations.[14] Instead, the relator attempted to rely on the certification language contained in the hospital's annual cost reports.  The Tenth Circuit affirmed dismissal of the relator's claims because it found that the certification language  contained "only general sweeping language" and did not contain language "stating that payment is conditioned on perfect compliance with any particular law or regulation." 543 F.3d at 1218.[15]  In contrast, the

---

[14]  The relator asserted violations of 42 C.F.R. § 482.1 et seq. (setting forth conditions of participation for hospitals participating in Medicare); 42 U.S.C. § 1395dd (requirements for examination and treatment of emergency medical conditions); § 2000d (prohibition against discrimination in federally assisted programs); § 1320a-7(b)(6)(B) (allowing the Secretary of Health and Human Services to exclude from Medicare participation those facilities failing "to meet professionally recognized standards of health care").

[15]  By regulation, the provider's administrator or chief financial officer must make the following certification with each annual cost report:

> I hereby certify that I have read the above certification statement and that I have
> examined the accompanying electronically filed or manually submitted cost
> report and the Balance Sheet Statement of Revenue and Expenses prepared*1219
> by _____ (Provider Name(s) and Number(s)) for the cost reporting period
> beginning ___ and ending ___ and that to the best of my knowledge and belief,
> this report and statement are true, correct, complete and prepared from the books
> and records of the provider in accordance with applicable instructions, except as
> noted. I further certify that I am familiar with the laws and regulations regarding
> the provision of health care services, and that the services **identified in this cost**

alleged basis for liability in the instant case is different. Unlike the relator in *Conner*, the Government is not "hanging its hat," so to speak, on statutes or regulations which do not condition payment on compliance, nor on the generic certification language in an annual cost report. Instead, the Government alleges that certifications by Defendants (hospital providers) were false because payments made to the Sole Community Provider funds and supplemental funds were related to defendants' non-bona fide donations, were claimed for federal reimbursement, and the claims were not reduced by the amount of Defendants' non-bona fide donations. The statutes and regulations on which the Government bases its allegations *do* condition payments to certain funds (such as SCPF and SCHSP programs) on compliance, because failing to meet those conditions is a violation of the FCA.

In *United States ex rel. Boothe v. Sun Health Care Group, Inc.*, No. 03-1276 RB/DJS, 2008 WL 2669266, *2, 5 (D.N.M. June 2, 2008), U.S. District Judge Robert C. Brack stated that the who/what/when/where/how "minimum requirements" identified by the Tenth Circuit for purposes of Rule 9(b) do not "constitute a checklist of mandatory requirements that must be satisfied for each allegation in a complaint[.]" Nor does Rule 9 require "minute detail" regarding every bill ever submitted to the Government. *Boothe*, 2008 WL 2669266, *5. Judge Brack denied a Rule 9(b) motion to dismiss in an FCA claim and finding that each of the following allegations satisfied Rule 9(b)"

1.     "In 2002, Sun overcharged Medicare $240,000 for pharmacy charges at Northview Psychiatric hospital in Boise, Idaho."

---

**report were provided in compliance with such laws and regulations**. 42 C.F.R. § 413.24(f)(4)(iv).

543 F.3d 1218-19 (emphasis added).

2.     "In 2001, $200,000 worth of medical supplies were stolen by the central supply clerk at Denver Mediplex Speciality Hospital in Denver, Colorado. Sun fraudulently billed Medicare $200,000 for the supplies stolen by the central supply clerk at Denver Mediplex Speciality Hospital as though patients had used the supplies, and Medicare paid for them."

3.     "In 2000, 2001, and 2002, at Denver Mediplex Specialty Hospital, Sun overcharged medicare $540,000 when it funneled costs from the outpatient clinic owned by SunDance into the hospital cost reports for Medicare Reimbursement."

*United States ex rel. Boothe v. Sun Health Care Group, Inc*., No. 03-1276 RB/DJS, 2008 WL 2669266, *2, 5 (D.N.M. June 2, 2008).[16]  In his analysis, Judge Brack noted that the plaintiff's allegations were in contrast to the allegations being considered in *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 727 (10th Cir. 2006), in which the plaintiff's allegations were "tentative and speculative."  *Id*., *4-5.  He described the private scheme in detail, but then never alleged  the specifics of any actual claims submitted or any false certifications, settling for allegations that "claims requesting illegal payment must have been submitted, were likely submitted or should have been submitted to the Government." *Id*. The "who, what, when, where and how" facts missing in *Sikkenga* were not missing in *Boothe*[17] – and are not missing in the Government's Complaint.

        Inexplicably, Defendants contend that *Sikkenga* is more similar than dissimilar to the instant case, in that the alleged donations were inherently lawful and there were no underlying

_____

    [16]  On appeal, *Boothe* was reversed in part on the Tenth Circuit's finding that three of the ten claims in Ms. Boothe's *qui tam* action were "based upon" publicly disclosed allegations of fraud upon the government and Ms. Boothe was not their "original source," thus depriving the court of jurisdiction over those particular claims. *U.S. ex rel. Boothe v. Sun Healthcare Group, Inc*., 496 F.3d 1169 (10th Cir. 2007). However, Judge Brack's findings were otherwise  affirmed on appeal.

    [17]  Judge Brack found plaintiff's allegations in *Boothe* to be straightforward and direct: defendant billed more than it should have for pharmacy services; it charged for stolen items; and it charged for costs incurred by someone else. *Boothe*, 2008 Wl 2669266, *5.

misrepresentations.  Doc. 54 at 18, n.11.  However, these arguments simply beg the central

questions which need not have an answer at the pleading stage; they need only to be alleged

sufficiently under the federal rules.

As the Tenth Circuit stated in *Sikkenga*, details that identify particular false claims for

payment that were submitted to the federal government "do not constitute a checklist of

mandatory requirements that must be satisfied for each allegation included in a complaint.

*Sikkenga*, 472 F.3d at 727-28.  However, "some of this information, for at least some of the

claims must be pleaded in order to satisfy Rule 9(b)." *Id.*  I find that the Complaint contains this

mandatory information, and thus meets the specificity requirements of Rule 9(b).

## III.     Sufficiency of the Complaint Under Rule 8(a) and 12(b)(6)

Defendants contend that the Complaint fails to satisfy the less demanding requirements

of Rule 8(a) and Rule 12(b)(6) which require an articulation of a "plausible" claim for relief.

To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to "state a claim for relief that is plausible on its face."  *Ashcroft v. Iqbal*, 129

S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just

speculatively) has a claim for relief."  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir.

2008). When considering a motion to dismiss, the Court must assume as true all well-pleaded

facts, drawing all reasonable inferences in favor of the plaintiff. *See Moore v. Guthrie*, 438 F.3d

1036, 1039 (10th Cir. 2006).

## A.     Allegations Relating to Causation

Courts use the "proximate cause" standard of tort law to analyze causation for damages

under the FCA, calling for proximate cause.  *Sikkenga*, 472 F.3d at 714-15.  Thus, the Complaint

must allege a sufficient link or nexus between Defendants' conduct and the ultimate presentation of the false claim to support liability under the FCA. Defendants contend that the Complaint fails to allege facts which support such a link, and pose these arguments: (1) that Defendants' lack of control over or input into the discretionary governmental decisions which occurred before the State submitted any claim to the Government injected "intervening causes," thus relieving Defendants of any liability for any false claims submitted and; (2) that because it was the *State's* duty, and not the hospital providers' duty, to accurately report the components of its Medicaid expenditures (that is, whether any of the donations were non-bona fide provider donations), the Government cannot show a causal link between the providers' conduct and the submission of false claims.

Defendants underestimate the FCA's reach, which extends to "any person who knowingly *assisted* in causing the government to pay claims which were grounded in fraud without regard to whether that person had direct contractual relations with the government." *United States v. Mackby*, 261 F.3d 821, 827 (9th Cir. 2001)(quoting *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544-45 (1943)) (emphasis in *Mackby*). A person may be liable for causing the submission of a false claim if he pursues a scheme that would ultimately result in the submission of a false claim, even if that person did not participate in the submission of the claim. *United States v. Bornstein*, 423 U.S. 303, 309 (1976) (upholding FCA liability of a subcontractor who causes a prime contractor to submit a false claim); *Hess*, 317 U.S. at 543-45 (holding electrical contractors liable under the FCA even though the claims were submitted by local government entities without any participation by the contractors in the preparation or submission of the claims); *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 243-44 (3 Cir. 2004) (holding manufacturer of orthopedic implants liable under the FCA for causing a hospital to

submit false claims). Further, there is no requirement that a defendant receive federal payments resulting from the false claims in order for liability to attach for causing the presentment of false claims. 31 U.S.C. § 3729(a)(1); *Zimmer*, 386 F.3d at 242-245.  In this case, however, the funds received by Defendants in the form of SCPF and SCHSP payments as a result of their donations were initially funded by matching federal funds. Compl. ¶¶ 15, 17-19, 382-383.

Defendants' common refrain is that the alleged donations were inherently lawful.  *See, e.g.,* Doc. 54 at 18, n.11.  However, liability can attach under the FCA even if the donations themselves did not contain a false statement within the claim.  The only issue is whether a defendant *caused to be presented* a false claim. *United States ex rel. Franklin v. Parke-Davis*, No. Civ. A. 96-11651 PBS 2003 WL 22048255, *4-5 (D.Mass. Aug. 22, 2003) (emphasis added). The FCA does not require that the "cause" be fraudulent or "otherwise independently unlawful. *Id*. at *2; *see also*, *Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 531 (10th Cir. 2000) (upholding the theory of an implied false certification of contractual compliance under § 3729(a)(1)).

The Complaint alleges causation under the FCA by alleging that Defendants' conduct "initiated a chain of events that resulted in the presentation of false claims to the United States for federal Medicaid funds."  Compl., ¶ 6, *see also* ¶ 392.  The Complaint distinctly alleges that the providers set the process in motion by making payments which they characterized as donations to the counties in which Defendants are located; that these donations had an impact on the amount of contributions made by these counties to the State for the non-federal share of Medicaid Funds; and that the amount of SCPF and SCHSP payments ultimately made to Defendants varied based on the amount of Defendants' donations received by the counties.  ¶¶ 10-18.  Thus, regardless of whether it was the State's duty (as opposed to the hospital providers'

22

duty) to report the nature of its Medicaid expenditures accurately, the Complaint alleges that Defendants' conduct had an effect on how the county made its contributions to the State and how the State carried out its duty.  *See U.S. ex rel. Pogue v. Diabetes Treatment Centers of America, Inc.*, 238 F.Supp.2d 258 (D.D.C., 2002) (Diabetes treatment center could not avoid liability under FCA by alleging that another was responsible for presentation of claims to government, although center could not be liable without proof fulfilling the Act's scienter requirement).

The Court rejects Defendants' argument that any causal link between the providers' donations and the State's submission of false Forms 64 claims is severed by layers of "intervening discretionary governmental acts and decisions by county, State and federal government officials."  Doc. 54 at 25.  This argument fails now as it failed before when I denied Defendants' motion to dismiss the Relator's Complaint:

> Defendants argue that the actions of the counties or State are intervening events that sever the causal chain. However, this argument fails here where the filing of those claims were foreseeable and intended. The [Complaints of the Relator and the Government] can be easily read to assert that Defendants' actions were taken with the full intention that those claims would be submitted and Medicaid reimbursements would be received – even though Defendants were aware that the counties would not qualify for the funds without their donations to self-fund the counties' obligations.

Doc. 83 at 50.   I also noted that an intervening force breaks the chain of causation only if it is unforeseeable. *Id.* at 50, n.36; *see U.S. ex rel. Franklin v. Parke-Davis, Div. of Warner-Lambert Co.* 2003 WL 22048255, 5 (D. Mass. 2003) (citations omitted).[18]

The Government's description of the providers' donations as "seed money" is apt. Compl., ¶¶ 71, 74-76.  The Complaint further alleges that the fact that New Mexico sought

---

[18]  In my previous opinion regarding the Relator's Complaint, the Court relied on *U.S. v. Parke-Davis*, 147 F.Supp.2d 39 (D.Mass.2001), which is a decision by the District of Massachusetts on an earlier motion to dismiss.

federal reimbursement for its SCPF and SCHSP payments to the hospitals was not only

foreseeable to Defendants, but it was the intended consequence of Defendants' donations. ¶ ¶ 6,

79, 83, 91.  The purpose of the donations was to obtain federal matching funds. *Id.* ¶¶ 79, 83, 91.

Defendants knew that SCPF and SCHSP payments were reimbursed by the federal government.

¶ 83. Each year, defendants requested from the State the SCPF payments.  ¶¶ 66, 109, 212, 317,

Table D. Defendants knew that the State could not receive federal funding for Medicaid

payments to a provider where counties received non-bona fide donations from that provider.  ¶¶

80-82, 84-86, 92. Defendants were aware that if the federal government discovered that "county

participation in the program was funded by a provider donation . . ." then federal reimbursement

would be withheld.

Therefore, I find that the Complaint is sufficient under Rules 8(a) and 12(b)(6), based on

what is required to allege causation under the FCA.

B.    Allegations Relating to Claims Being "Materially False"

Defendants contend that the Complaint fails to plead falsity or materiality under the

FCA.[19]

1.    *Falsity*

The FCA recognizes two types of actionable claims – factually false claims and legally

false claims. *U.S. ex rel. Conner v. Salina Regional Health Center, Inc*., 543 F.3d 1211, 1217-

---

[19]  Defendants also argue that, as a matter of law, the Government cannot allege that any
false claims were submitted by the State to CMS after March 2005, when the Relator filed his
*qui tam* complaint.  Defendants note that at that point, CMS officials were aware of allegations
that the Hospitals were making donations to counties which would require a reduction in the
State's reported Medicaid expenditures in its 64 Forms.  The Court makes no finding here
regarding the scope or breadth of the alleged FCA violations except to state that I am inclined to
find that such considerations concern damages rather than liability.

1218 (10th Cir. 2008).  Proving falsehood in a "factually false" case is relatively straightforward:
A relator must generally show that the government payee has submitted "an incorrect description
of goods or services provided or a request for reimbursement for goods or services never
provided." *Id*.  By contrast, in a claim based on an alleged legal falsehood, the relator must
demonstrate that the defendant has "certifie[d] compliance with a statute or regulation as a
condition to government payment," yet knowingly failed to comply with such statute or
regulation. *Id*.; *see also Shaw v. AAA Eng'g & Drafting, Inc*., 213 F.3d 519, 531 (10th Cir.2000)
(allowing § 3729(a)(1) liability to attach under a theory of false certification for invoices
submitted for payment where contractor failed to comply with specific requirements within its
contract with the government).

      In the Tenth Circuit, legally false certification claims can rest one on of two theories –
express false certification, and implied false certification. *Conner*, 543 F.3d at 1217. An *express*
false certification theory applies when a government payee "falsely certifies compliance with a
particular statute, regulation or contractual term, where compliance is a prerequisite to payment."
*Id*.  This promise may be any false statement that relates to a claim, whether made through
certifications on invoices or any other express means.  *Id*. (citation omitted).  Under an *implied*
false certification theory, courts do not consider a actual statements.  Rather, the analysis focuses
on the underlying contracts, statutes, or regulations themselves in order to determine "whether
they make compliance a prerequisite to the government." *Id*., *see also Shaw*, 213 F.3d at 531-33.

      The Government states that the 64 Forms identified in the Complaint are "factually false"
because they did not disclose Defendants' donations.  The Government contends that the claims
alleged in the Complaint are "legally false" under both the express and the implied false
certification theories.  First, the certifications in the 64 Forms before 2001 expressly stated that

"the information shown above . . . is correct . . . ," and certifications starting in September 2001 expressly stated that "[t]he required amount of state and/or local funds were available and used to match the state's allowable expenditures included in this report, and such state and/or local funds were in accordance with all applicable federal requirements for the nonfederal share match of expenditures." *Id*. ¶¶ 385-386.  These express certifications were false because the SCPF and SCHSP payments to Defendants were related to Defendants' non-bona fide donations, were claimed for federal reimbursement, and the claims were not reduced by the amount of Defendants' non-bona fide donations, Compl., ¶ 387-389. The Government contends that the claims are also false under the implied certification theory because the Medicaid statute and regulations regarding non-bona fide donations make compliance with them a prerequisite to the Government's payment. *Conner*, 543 F.3d at 1218 (claims are false under the implied certification theory where the statutes and regulations make compliance a prerequisite to government payment).

The Court agrees with the Government that the Complaint, along with the 64 Forms identified in the Complaint, states violations of the FCA under both the "factually false" and "legally false" theories.  As noted above, the certification language in *Conner* was found to be "only general sweeping language" and did not contain language "stating that payment is conditioned on perfect compliance with any particular law or regulation." 543 F.3d at 1218. There, the plaintiff argued that defendant's failure to comply with *any* underlying Medicare statute or regulation during the provision of any Medicare-reimbursable service rendered the certification false, and the resulting payments fraudulent.  Here, the Government does not premise liability on "general sweeping" certification language, but rather on the language in the 64 Forms relating federal requirements for the non-federal share match of expenditures – which

26

would include the IGT contribution by the counties, as well as the State's submission of 64

Forms to the Government.  Those federal requirements include the Medicaid statute's and

regulations' prohibition on federal funding for Medicaid payments to a provider in instances

where the state or county has received donations from the provider that have a direct or indirect

relationship to those Medicaid payments.   Also, in this case, the counties received non-bona fide

donations from Defendants, Compl. ¶¶ 108, 211, 316, yet the State claimed federal

reimbursement for the payments made to Defendants which were related to Defendants' non-

bona fide donations without deducting the nonbona fide donations. *Id*. ¶ 387.  According to the

Tables attached to the Complaint, all or a portion of the county contributions (IGT's) varied

based on the amount of Defendants' donations, which the counties used to help satisfy their

obligations to make contributions to the State for the non-federal share of the SCPF and SCHSP

payments to Defendants   Compl., ¶ 12-13, 113-114, 118, 169, 213-214, 253-255, 318-319.   As

a result, the IGTs were "derived from" Defendants' non-bona fide donations, and, federal

reimbursement to the State where the State used those IGTs as the non-federal share of the

Medicaid payments to defendants violated federal law.[20]  Thus, these allegations sufficiently

state an FCA claim under an implied certification theory as well.

     Defendants contend that the Complaint does not allege facts showing that the State failed

---

[20]  *See* 42 U.S.C. § 1396b(w)(6)(A)(6)(A):
Notwithstanding the provisions of this subsection, the Secretary may not restrict
States' use of funds where such funds are derived from State or local taxes. . .
transferred from or certified by units of government within a State as the
non-Federal share of expenditures under this subchapter, regardless of whether
the unit of government is also a health care provider, except as provided in
section 1396a(a)(2) of this title, unless the transferred funds are derived by the
unit of government from donations or taxes that would not otherwise be
recognized as the non-Federal share under this section.

to provide all relevant information regarding its expenditures in its 64 Forms.  Doc. 54 at 22.

The State's certification of compliance with Medicaid statutes and regulations could be

considered a "false" certification if the State did not reduce the amounts requested for federal

reimbursement in the 64 Forms by the amount of Defendants' allegedly non-bona fide donations.

The Complaint clearly alleges that the 64 Forms should have been – but were not – so reduced

under applicable Medicaid statutes and regulations, which ultimately (and allegedly

fraudulently) affected the SCPF and SCHSP payments received by Defendants.  *See, e.g.,*

Compl., ¶¶ 15, 18, 47, 50, 383, 384-388, 392, 393. In addition, the Tables attached to the

Complaint provide information concerning amounts that were allegedly non-bona fide donations.

Further, Defendants were aware that the State had the responsibility to obtain the necessary

certification of the funding source from the donating entity in establishing that a donation was in

fact bona fide.  ¶¶ 82, 87. These facts allege that the State failed to provide all relevant

information regarding its expenditures in its 64 Forms because the amounts requested in those

Forms were not reduced by the allegedly non-bona fide donations provided by Defendants to the

counties.

Defendants also argue that the Complaint "asserts no facts supporting a plausible

inference that the county IGT's here were 'derived from' Hospital donations as opposed to some

other permissible source." Doc. 54 at 23.  On the contrary, the Complaint is replete with

allegations that Defendants intended for its donations to help out the county in making its

matching payments to the State (IGT's).  *See, e.g.,* Compl., ¶¶ 112, 114, 121, 127 128, 129, 132,

152, 210, 314, 315, 319, 325.

2.      *Materiality*

False claims are material if they have a tendency to influence or are capable of

influencing agency decisonmaking. *United States ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1200 (10th Cir. 2006); *see, also*, *Neder v. United States*, 527 U.S. 1, 16 (1999). The Complaint satisfies Rule 8(a) and Rule 12(b)(6) in materiality as well as falsity. The amount of federal contribution is determined in part on the basis of the 64 Form, which includes the State's recorded Medicaid expenditures claimed for federal reimbursement. Compl., ¶¶ 44, 382. This amount is based on the matching SCPF and SCHSP payments made by the counties to the State. ¶¶ 71-76. Thus, including of the SCPF and SCHSP payments to Defendants on th e 64 Forms, without reduction of the amount of Defendants' non-bona fide donations, had a tendency to influence, and was capable of influencing, federal payments because the amount of federal financial participation is determined in part on the basis of the 64 Form. Compl., ¶¶ 44, 384, 387, 388-389. As a result, I find that the Complaint sufficiently pleads a plausible claim for relief under Rule 8(a) and Rule 12(b)(6).

C.      Allegations Relating to Scienter

Defendants contend that the Complaint alleges only generalized legal conclusions that Defendants knew that the State would present false claims to CMS. They claim that there are no facts indicating that Defendants knew or recklessly disregarded that: (1) any county IGTs to the State would be derived from non-bona fide or restricted sources; (2) that the State would fail to properly classify or report the donations on its Form 64 submissions; or (3) that the State would report these IGTs as Medicaid expenditures on its Forms 64 without  subtracting the donations.

Under the FCA, "knowledge" includes actual knowledge, or acting in deliberate ignorance or reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)(A) (2009); *United States ex rel. Burlbaw v. Orenduff*, 400 F. Supp. 2d 1276, 1285 (D.N.M. 2005) (*Burlbaw I*), *aff'd*, 548 F.3d 931 (10th Cir. 2008); *Shaw v. AAA Engineering &*

*Drafting, Inc*., 213 F.3d 519, 531, n.11 (10th Cir. 2000); *see also  United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 245 n.12 (3d Cir. 2004) (reckless disregard standard under FCA addresses the refusal to learn of information which an individual, in the exercise of prudent judgment, should have discovered).

As a participant in the Medicare program, Defendants would have had a duty to familiarize themselves  with the legal requirements for cost reimbursement.  *See Heckler v. Community Health Services of Crawford County, Inc*., 467 U.S. 51, 63-64 (U.S.1984).  The Court agrees with the Government that the Complaint includes more than conclusory allegations that Defendants were aware of, or acted with reckless disregard of these requirements.  Compl., ¶¶ 20, 80-82, 83-84.  The Complaint contains facts describing communications among CHS corporate and hospital officials which relate to federal Medicaid regulations prohibiting the use non-bona fide provider donations for the non-federal share of Medicaid expenditures.  *See, e.g.,* Compl., ¶¶  85-87, 90, 91-96.  The Complaint contains facts alleging that Defendants' purpose in making the donations was to receive federally funded Medicaid payments (¶¶ 79, 91, 128-129, 138, 140, 154, 156), and that Defendants knew that the counties were using their donations to fund their contributions to the State for the SCPF and SCHSP programs (¶¶ 113-114, 118, 169, 213-214, 253-255, 318-319).

Defendants argue that the facts show only that Defendants believed that the counties' IGT's to the State were derived from qualifying public funds (that is, *non*restricted donations). Doc. 54 at 26-27.  The problem with this argument is that it is supportable only by taking the allegations in the Complaint out of context.  As just one example, ¶ 92 in the Complaint, on its own, can certainly be inferred to support Defendants' position.  However, viewed in conjunction with the preceding paragraph, ¶ 91, the inference is clearly that Defendants intended for their

restricted donations to be used in obtaining federal reimbursements.[21]

In an effort to distance themselves from any responsibility in the Medicaid funding process, Defendants resurrect the argument that liability is precluded because the relevant legal provisions apply to the counties and the State, but not to them.  Again, the Court rejects that argument as meritless.  Defendants' conduct is alleged to have had an effect on the counties' matching contribution to the State, and the State's reporting on the 64 Forms.  This alleged conduct is sufficient to state a viable claim under the FCA. *See, United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, 238 F.Supp.2d 258, 266 (D.D.C. 2002) (rejecting defendant's contention that FCA liability is precluded because law does not apply to defendant, and concluding that defendant could be liable if it caused a claim to be presented by an entity that is covered by the law).

Defendants also argue that this case is much like a case from the Eastern District of Texas, which was dismissed on the court's finding that the defendant hospital did not knowingly violate Medicaid funding regulations under the FCA where it made a contribution to a county that the county then forwarded as an IGT to the state Medicaid agency to draw down federal financial participation funds. *United States ex rel. Rose v. East Texas Regional Healthcare Sys.*, No. 2:05-CV-216, 2008 WL 4056601 (E.D. Tex. Aug. 25, 2008) (unpublished).  The *Rose* Court

---

[21] Paragraph ¶91 asserts that:
In an August 7, 2000 memorandum to CHS Executive Vice President and Chief Financial Officer Larry Cash, CHS Group Vice President Michael Portacci wrote that:

> [o]ur concern over the past few weeks has been how to get $.7 M to the county for them to pay the [sole community provider] program and we receive back $2.6 M ($1.9 M net). Eastern NM and possibly Larry Carlton [CHS Vice President of Revenue Management]; moreover, thought there might be a restriction on hospitals making a direct donation to the county. Within each facility, we were formulating alternative strategies to make donations to the county.

found that there were "multiple interpretations of what funds may be used to fund [county] IGTs, rendering suspect the allegations that [the hospital] knowingly made a false claim." *Id.* at *8.

Defendants contend that the situation in *Rose* applies to the instant case, where Defendants' unrestricted donations cannot be reasonably interpreted as "knowingly" causing the submission of a false claim. However, *Rose* can be distinguished from this case for several reasons. The hospital involved in *Rose* was owned by a county and operated by a non-profit organization. Here, no county-owned hospitals are involved – just the Defendants' for-profit hospitals. Also, in *Rose*, in funding the county's IGT's by its donations, the hospital had relied on advice of general counsel for a statewide hospital advocacy organization which worked in conjunction with Texas' Health and Human Services Commission.  Defendant had been advised that the hospital was in some respects indeed operating as a public hospital, and thus was entitled to transfer its operating revenue to fund the county's IGT and and to receive matching federal funds. The *Rose* court also concluded that the relevant Medicaid regulations were not clear regarding what was required to make a provider "public," and that in fact it was not unreasonable to read to the regulation to mean that the hospital was a "public agency," particularly in light of the hospital's reliance on legal advice.

While the question regarding whether the hospital was a "public" or "private" entity did not have to be decided by the court in *Rose*, it had a pivotal role in the court's finding that there was insufficient evidence that the hospital acted with the reckless disregard necessary to support an FCA claim.  There is no analogous issue in this case.   There is no issue regarding whether the relevant federal reimbursement regulations apply to Defendant hospitals, and no buffer to liability in the form of Defendants' reliance on legal advice.  Finally, the dismissal in *Rose* occurred on summary judgment, after discovery was conducted.

Two other cases cited by Defendants were dismissed in large part because the regulations at issue were determined to be unclear and thus could not support a claim under the FCA. In *U.S. ex rel. In  Swafford v. Borgess Medical Center*, 98 F.Supp.2d 822 (W.D.Mich.,2000), the court entered summary judgment in favor of defendants where plaintiff alleged that various physicians and health care providers defrauded the government by falsely charging for vascular ultrasound services they did not provide.  In that case, it was not even clear whether physicians were required to review the hard copy data of venous ultrasounds or whether compliance with certain standards were a prerequisite for reimbursement by Medicare for venous ultrasounds.  *See also U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999) (differences in interpretation growing out of a disputed legal question are not false under the FCA).

As with *Rose*, dismissal in these cases came on summary judgment.  Here, the motion under consideration by the Court challenges only the threshold sufficiency of the Complaint. If in fact there is merit to Defendants' argument that the federal Medicaid regulations are unclear so as to neutralize the Government's allegations of "knowing" or "reckless" submissions of false claims, that determination may be made at a later time in the litigation, and is not appropriate for consideration on a motion to dismiss under Rule 8(a) and Rule 12(b)(6) standards.

Based on the foregoing discussion, I find that the Complaint sufficiently alleges a claim under the FCA under Rule 8(a) and Rule 12(b)(6) standards.

## IV.   "Payment by Mistake"

Count II in the Complaint alleges a claim against all Defendants based on "Payment by Mistake."  As their last assail on the Government's Complaint, Defendants contend that the Complaint does not – and cannot – state a claim under that theory because the payments in question were not mistakenly made, and any alleged falsity in the State's claims to the federal

government was not material to the payments at issue.

Under a theory of payment by mistake, the Government is "entitled to obtain repayment from a third party into whose hands the mistaken payments flowed where that party participated in and benefitted from the tainted transactions." *LTV Education Systems, Inc. v. Bell*, 862 F.2d 1168, 1175 (5th Cir. 1989): th *United States v. Mead*, 426 F.2d 118, 124 (9th Cir. 1970); *see also U.S. ex rel Trim v. McKean*, 31 F.Supp.2d 1308, 1316 (W.D.Okla.,1998).

Defendants offer several arguments, each of which are flawed.  First, Defendants argue that the State – not the federal government – made SCPF payments to hospitals, and that somehow there is a "disconnect" between the money paid out by CMS and the money received by the hospital providers.  This argument ignores the flow of money as alleged in the Complaint: that the alleged non-bona fide donations by Defendants influenced the amount of IGT's by the counties to the State, which the State then combined with federal funds of approximately triple the amount of the county contribution.  This money was funneled back to the hospitals into the SCPF and SCHSP programs to fund Medicaid expenditures.[22]  If the amount being paid into those programs was falsely inflated because the 64 Forms were not appropriately reduced by the amount of non-bona fide donations, then the excess funding would be considered to be paid out by the Government by mistake.  In other words, the purpose of the donations was allegedly to

---

[22]  Defendants' own description of the funding process acknowledges that while the State funds the programs on which the hospital providers rely for Medicaid expenditures, much of that money comes from the federal government:

> At the start of each quarter, the federal government, through CMS, gives New Mexico . . . a grant that is based . . . on . . .  the report of its estimated quarterly Medicaid expenditures. *See* 42 C.F.R. § 430.30(b). **The State uses the federal grant, together with State funds, to pay provider claims and otherwise fund the State's [Sole Community Provider] program** during the quarter. *Id.*

Doc. 54 at 16 (emphasis added).

34

obtain federal matching funds in excess of what the hospital providers were entitled to, and that excess was paid to the providers by mistake.  The fact that the funding came through the State to the hospitals instead of directly through the Government has no relevance to a "payment by mistake" theory, as long as the money was paid by the Government – or in this case specifically, by CMS.  *See* n.8, above.

Next, Defendants contend that payments by CMS were in fact in error, then such payments are subject to recoupment from future Medicaid payments through an administrative process, and not by this lawsuit.  Defendants refer to the process set out in 42 C.F.R. §§ 430.3, 430.35-48.  However, this procedure does not appear to supplant the Government's right to take legal action to recover funds which have been erroneously paid out by its agents.  *See U.S. v. Wurts*, 303 U.S. 414, 415 (1938) ("No statute is necessary to authorize the United States to sue" in order to recover funds which its agents have wrongfully, erroneously, or illegally paid).  Further, this administrative scheme referred to by Defendants does not seem to provide a remedy for, or otherwise address, allegations of FCA violations by hospital providers.  Instead, the regulations deal with a state's lack of compliance with federal requirements (42 C.F.R. § 430.35), or where a specific claim is not reimbursable or allowable (§ 430.42).  These regulations are not a substitute to redress an alleged improper scheme on the part of hospital providers to receive federally reimbursed Medicaid payments in violation of the Medicaid statute and regulations.

Finally, Defendants argue that any money paid out by CMS after it was notified about the errors on the State's submitted 64 Forms cannot be said to have been "material to the decision to pay" because CMS continued to pay even after CMS knew about the errors.  The Court rejected this argument earlier when presented on a slightly different basis, and found it more appropriate

35

as an argument dealing with mitigation of damages. *See* n.19, above.[23]

**Conclusion**

In sum, the Court finds no merit to the various arguments raised in Defendants' motion to dismiss.

I find and conclude that Count I of the Complaint meets the specificity requirements of Rule 9(b), and alleges a claim under the FCA under Rule 8(a) and Rule 12(b)(6).

I also find and conclude that Count II of the Complaint does state a claim based on "payment by mistake."

**THEREFORE,**

**IT IS ORDERED** that Defendants' Motion to Dismiss the Complaint of the United States in Intervention **(Doc. 53)** is hereby DENIED for reasons set forth in this Memorandum Opinion and Order.

_____
UNITED STATES DISTRICT JUDGE

---

[23]  It is not altogether clear from the Complaint that CMS was ever notified of the errors. Defendants refer to ¶ 101 in the Complaint and Tables A-E, but neither indicates CMS' knowledge of the errors on the 64 Forms submitted by the State.