IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. ROBERT C. BAKER, | ) | |
| Plaintiff, | ) | |
| v. | ) | NO. CIV 05-279 WJ/WDS |
| COMMUNITY HEALTH SYSTEMS, INC.; ROSWELL HOSPITAL CORPORATION D/B/A EASTERN NEW MEXICO MEDICAL CENTER; DEMING HOSPITAL CORPORATION D/B/A MIMBRES MEMORIAL HOSPITAL AND NURSING HOME; SAN MIGUEL HOSPITAL CORPORATION D/B/A ALTA VISTA REGIONAL MEDICAL CENTER; and COMMUNITY HEALTH SYSTEMS PROFESSIONAL SERVICES CORPORATION | ) | |
| Defendants. | ) | |

FIRST AMENDED COMPLAINT OF THE UNITED STATES IN INTERVENTION FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. §§ 3729-3733) AND COMMON LAW

**TABLE OF CONTENTS**

Introduction ........ 2

Jurisdiction and Venue ........ 6

Parties ........ 6

The False Claims Act ........ 8

Federal Agency and Program ........ 9

New Mexico Agency and Programs ........ 15

General Overview ........ 18

Eastern ........ 24
- Overview ........ 24
- Chronology ........ 26

Mimbres ........ 42
- Overview ........ 42
- Chronology ........ 44

Alta Vista ........ 56
- Overview ........ 56
- Chronology ........ 58

CHSI's Cash Management Program ........ 66

The False Claims ........ 68

Claims for Relief ........ 70
- Count One, False Claims Act ........ 70
- Count Two, Payment by Mistake ........ 71

Prayer for Relief ........ 72

Table A: Eastern Donations; Chaves County Match; SCPF and SCHSP Payments to Eastern ........ 74

Table B: Mimbres Donations; Luna County Match; SCPF and SCHSP Payments to Mimbres ........ 77

Table C: Alta Vista Donations; San Miguel County Match; SCPF and SCHSP Payments to Alta Vista ........ 80

Table D: SCPF and SCHSP Funding Requests ..........................................................................84
Table E: Quarterly Medicaid Statements of Expenditures for the Medical Assistance Program Submitted by the State of New Mexico to CMS .......................................................86

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA, ex rel. ROBERT C. BAKER,

Plaintiff,

v.

COMMUNITY HEALTH SYSTEMS, INC.; ROSWELL HOSPITAL CORPORATION D/B/A EASTERN NEW MEXICO MEDICAL CENTER; DEMING HOSPITAL CORPORATION D/B/A MIMBRES MEMORIAL HOSPITAL AND NURSING HOME; SAN MIGUEL HOSPITAL CORPORATION D/B/A ALTA VISTA REGIONAL MEDICAL CENTER; and COMMUNITY HEALTH SYSTEMS PROFESSIONAL SERVICES CORPORATION

Defendants.

NO. CIV 05-279 WJ/WDS

**FIRST AMENDED COMPLAINT OF THE UNITED STATES IN INTERVENTION FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. §§ 3729-3733) AND COMMON LAW**

Plaintiff, United States of America (United States), for its First Amended Complaint against defendants Community Health Systems, Inc. (CHSI) and three of its wholly owned subsidiaries, Roswell Hospital Corporation d/b/a Eastern New Mexico Medical Center (Eastern), Deming Hospital Corporation d/b/a Mimbres Memorial Hospital and Nursing Home (Mimbres), and San Miguel Hospital Corporation d/b/a Alta Vista Regional Medical Center, successor to Northeastern Regional Hospital, (Alta Vista), and Community Health Systems Professional

Services Corporation (CHSPSC) (collectively defendants) alleges as follows:

## INTRODUCTION

1. This is a civil action for damages and penalties arising from the false and/or fraudulent claims defendants caused to be submitted to the United States Department of Health and Human Services ("HHS"), Centers for Medicare & Medicaid Services ("CMS"), for purposes of obtaining payment or approval for payment, in violation of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, as amended, and at common law.

2. This action was originally brought on behalf of the United States by relator Robert Baker pursuant to the qui tam provisions of the FCA. 31 U.S.C. §3730(b).

3. The FCA provides that any person who, with actual knowledge, or in reckless disregard or deliberate ignorance of the truth, causes to be submitted a false or fraudulent claim to the United States Government for payment or approval is liable for a civil penalty of up to $11,000 for each claim, plus three times the amount of the damages sustained because of the false claim. The FCA allows any person having knowledge of a false or fraudulent claim against the United States to bring an action for himself and for the federal government, and to share in any recovery. The party bringing the action is known as a relator and the action that a relator brings is called a qui tam action.

4. In this qui tam action, the United States alleges that defendants violated the FCA by knowingly causing to be presented to the United States false claims for payment or approval of federal Medicaid funds.

5. Beginning no later than the Summer of 2000, defendants improperly obtained federal

Medicaid funds through the New Mexico Sole Community Provider Fund (SCPF) and Sole Community Hospital Supplemental Payments (SCHSP) programs.

6. Defendants' conduct was a substantial factor that led to defendants' improper receipt of federal Medicaid funds, and defendants initiated a chain of events that resulted in the presentation of false claims to the United States for federal Medicaid funds. The presentation of those false claims to the United States was foreseeable to defendants, and was the intended consequence of defendants' actions. As a result of the presentation of those false claims to the United States, defendants improperly received federal Medicaid funds.

7. The Medicaid program is jointly financed by the federal and state governments.

8. The portion of Medicaid payments financed by a state is called the state or non-federal share.

9. In the late 1980s and early 1990s, extraordinary increases in federal Medicaid expenditures occurred as the result, in part, of states using donations from health care providers as the required state or non-federal share to obtain matching federal Medicaid funds. Since the federal government paid to the state a multiple of the amount matched by the state, a state using "donations" from health care providers to make this match could obtain significant federal dollars without putting at risk any state funds. The result was that states and health care providers received many times their initial matching funds, all at the expense of the federal government. Recognizing that this "no risk" arrangement invited abuses, Congress enacted the "Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of

1991," which, among other things, eliminated federal Medicaid matching payments resulting from health care provider donations, except in very limited circumstances. In particular, in order to ensure that state or local funds are the basis for the federal matching funds, the Medicaid statute and regulatory provisions prohibit federal funding for Medicaid expenditures in instances where the state or county has received provider-related donations that have a direct or indirect relationship to Medicaid payments made to the provider. 42 U.S.C. § 1396b(w); 42 C.F.R. §§ 433.54, 433.57.

10. Defendants made payments, which they characterized as donations, to the counties in which Eastern, Mimbres and Alta Vista are located.

11. Defendants' donations had a direct or indirect relationship to Medicaid payments made to defendants under New Mexico's SCPF and SCHSP programs.

12. The counties made contributions to the State of New Mexico for the non-federal share of the SCPF and SCHSP payments to defendants.

13. All or a portion of those contributions varied based only upon the amount of defendants' donations received by the counties.

14. The contributions guaranteed to return the amount of defendants' donations, plus approximately triple those amounts in federal funds, to defendants.

15. New Mexico made SCPF and SCHSP payments to defendants in the amount of approximately four times the defendants' donations, which included the amounts of the donations plus triple those amounts in federal funds.

16. All or a portion of the SCPF and SCHSP payments to defendants varied based only on the

amount of defendants' donations received by the counties.

17. New Mexico submitted claims to the federal government for federal Medicaid reimbursement for approximately 75 percent, as identified in paragraph 40, of the SCPF and SCHSP payments to defendants.

18. The claims were false because defendants' donations had a direct or indirect relationship to the SCPF and SCHSP payments to defendants, and the SCPF and SCHSP expenditures were not reduced by the amount of defendants' donations, in violation of the Medicaid statute and regulations.

19. New Mexico obtained from the federal government federal Medicaid reimbursement for approximately 75 percent, as identified in paragraph 40, of the SCPF and SCHSP payments to defendants.

20. Defendants knew, or acted with reckless disregard or deliberate ignorance of the truth, that

(1) The Medicaid statute and regulatory provisions prohibit federal funding for Medicaid expenditures in instances where the state or county has received provider-related donations that have a direct or indirect relationship to Medicaid payments made to the provider.

(2) Defendants' donations had a direct or indirect relationship to Medicaid payments made to defendants under New Mexico's SCPF and SCHSP programs.

(3) The counties made contributions to the State of New Mexico for the non-federal share of the SCPF and SCHSP payments to defendants.

(4) All or a portion of those contributions varied based only upon the amount of defendants' donations received by the counties.

(5) The contributions guaranteed to return the amount of defendants' donations, plus approximately triple those amounts in federal funds, to defendants.

(6) New Mexico made SCPF and SCHSP payments to defendants in the amount of approximately four times the defendants' donations, which included the amounts of the donations plus triple those amounts in federal funds.

(7) New Mexico claimed and obtained federal Medicaid reimbursement for approximately 75 percent, as identified in paragraph 40, of the SCPF and SCHSP payments to defendants.

(8) The claims the State submitted for federal reimbursement for the SCPF and SCHSP payments to defendants were false because they did not comply with the Medicaid statute and regulations.

## JURISDICTION AND VENUE

21. This case arises under the FCA, as amended, 31 U.S.C. §§ 3729 - 3733. This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. §§ 1331, 1345.

22. This Court has personal jurisdiction over the defendants because the defendants conduct business in this district, the events or omissions which give rise to this action occurred in this district, and defendants received payments funded by the United States in this district.

23. Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c), and 31 U.S.C. § 3732(a) in that the defendants conduct business in this district and the events or omissions which give rise to this action occurred in this district.

## PARTIES

24. The United States is a plaintiff in this action. It sues on behalf of HHS, which is an agency and instrumentality of the United States, and its respective operations and obligations are paid by funds from the United States Treasury.

25. This action originally was filed under seal by relator Robert Baker on or about March 14, 2005 pursuant to the qui tam provisions of the FCA, 31 U.S.C. § 3730(b). Mr. Baker filed a first amended complaint on or about April 29, 2005. Mr. Baker is a resident of Tennessee. From November, 2001 through November, 2004, Mr. Baker worked in CHS corporate Revenue Management Department in Brentwood, Tennessee.

26. Defendant CHSI is a publicly traded company incorporated under the laws of Delaware, with its principal place of business located at 4000 Meridian Boulevard, Franklin, Tennessee. CHSI, through its wholly owned direct and indirect subsidiaries, owns, operates, or leases approximately 120 general acute care hospitals across the United States.

26A. Defendant Community Health Systems Professional Services Corporation is a wholly owned subsidiary of defendant CHSI, incorporated under the laws of Delaware, with its principal place of business located at 4000 Meridian Boulevard, Franklin, Tennessee.

26B. CHSPSC does not manage any hospitals that are not owned, directly or indirectly, by CHSI.

26C. CHSI and CHSPSC (together "CHS corporate") share overlapping officers and directors and corporate offices.

26D. CHSI, through majority voting control, controls all of its direct and indirect subsidiaries, including CHSPSC, Eastern, Mimbres, and Alta Vista.

27. Roswell Hospital Corporation d/b/a Eastern New Mexico Medical Center (Eastern) is an acute care hospital with its principal place of business located at 405 West Country Club Road, Roswell, New Mexico 88201, in Chaves County, New Mexico, and during all relevant times to this Complaint has been a wholly owned subsidiary of CHSI.

28. Deming Hospital Corporation, d/b/a Mimbres Memorial Hospital (Mimbres) is an acute care hospital with its principal place of business located at 900 West Ash Street, Deming, New Mexico 88030, in Luna County, New Mexico, and during all times relevant to this Complaint has been a wholly owned subsidiary of CHSI.

29. San Miguel Hospital Corporation d/b/a Alta Vista Regional Medical Center, successor to Northeastern Regional Hospital, (Alta Vista) is an acute care hospital with its principal place of business located at 104 Legion Drive, Las Vegas, New Mexico 87701, in San Miguel County, New Mexico, and during all times relevant to this Complaint has been a wholly owned subsidiary of CHSI.

## THE FALSE CLAIMS ACT

30. The False Claims Act (FCA) provides, in pertinent part that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval . . .
>
> * * *
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .
>
> (b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

31. On May 20, 2009, the FCA was further amended. The amended version of the FCA provides as follows:

> (a) Liability for Certain Acts. -- (1) In general. -- Subject to paragraph (2), any person who – (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . .

* * *

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .
>
> (b) Definitions. – For purposes of this section – (1) the terms "knowing" and "knowingly" – (A) mean that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud . . . .

31 U.S.C. § 3729 (as amended 2009).

32. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, *47103 (1999), the civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

## FEDERAL AGENCY AND PROGRAM

33. The federal health care program involved in this action is Medicaid.

34. Title XIX of the Social Security Act (the "Medicaid Act") authorizes federal grants to the states for Medicaid programs to provide medical assistance to persons with limited income and resources. 42 U.S.C. §§ 1396 et. seq.

35. Medicaid programs are administered by the states in accordance with federal statutes and regulations and pursuant to state plans which must be approved by the Secretary of HHS. 42 C.F.R. § 430.0.

36. CMS administers Medicaid on the federal level.

37. CMS was formerly known as the Health Care Financing Administration (HCFA).

38. While Medicaid programs are administered by the states, they are jointly financed by the federal and state governments.

39. The amount of the federal share of medical assistance expenditures is called the Federal Financial Participation (FFP). 42 C.F.R. § 430.1.

40. In New Mexico, the annual federal share of Medicaid expenditures during the relevant period varied year to year but has been between 71 and 78 percent. In other words, for every dollar spent by New Mexico to fund its Medicaid program, the federal government provided the State an amount roughly from $.71 to $.78. Published rates for certain quarters in federal fiscal years 2003 and 2004 were revised, replacing the previously published annual rates for those years. Applicable rates are illustrated in the table below.

FEDERAL MEDICAL ASSISTANCE PERCENTAGES BY FEDERAL

FISCAL YEAR

| FFY | % |
|---|---|
| 2000 | 73.32 |
| 2001 | 73.80 |
| 2002 | 73.04 |
| 2003 | 74.56 |
| 2004 | 74.85 |
| 2005 | 74.30 |
| 2006 | 71.15 |
| 2007 | 71.93 |
| 2008 | 71.04 |
| 2009 | 70.88 |
| 2010 | 71.35 |
| 2011 | 69.78 |

| | Quarter | % |
|---|---|---|
| Q1 | 10/01/2002 - 12/31/2002 | 74.56 |
| Q2 | 01/01/2003 - 03/31/2003 | 74.56 |
| Q3 | 04/01/2003 - 06/30/2003 | 77.51 |
| Q4 | 07/01/2003 - 09/30/2003 | 77.51 |
| | | |
| Q1 | 10/01/2003 - 12/31/2003 | 77.51 |
| Q2 | 01/01/2004 - 03/31/2004 | 77.51 |
| Q3 | 04/01/2004 - 06/30/2004 | 77.51 |
| Q4 | 07/01/2004 - 09/30/2004 | 74.85 |

41. Generally, state Medicaid agencies pay health care providers for services rendered to Medicaid beneficiaries from state or local funds and from federal funds made available to them by the federal government for that purpose.

42. Each quarter, based on the state's estimate of anticipated Medicaid expenditures, CMS makes available to the state federal funds for reimbursement of Medicaid expenditures. 42 C.F.R. § 430.30.

43. The state periodically draws down those federal funds and uses those funds to pay providers.

44. A state submits a CMS 64 Form (64 Form) to CMS detailing its actual recorded Medicaid expenditures. 42 C.F.R. § 430.30(c). The amount of FFP is determined in part on the basis of the 64 Form. 42 C.F.R. § 430.30(a)(2).

45. Before September 2001, each 64 Form required a state to certify that "the information shown above and on the CMS-64 Summary Sheet and the Supporting Schedules is correct to the best of my knowledge and belief."

46. Starting in September 2001, each 64 Form requires a state to certify that "[t]he required amount of state and/or local funds were available and used to match the state's allowable expenditures included in this report, and such state and/or local funds were in accordance with all applicable federal requirements for the non-federal share match of expenditures." (Emphasis added).

47. If CMS determines, based upon its review of the 64 Forms, that federal funds were paid improperly by the state to providers, CMS may recoup the amount of erroneously expended federal funds by reducing the amount of money provided to the state in any subsequent quarter. 42 U.S.C. § 1396b(d)(2)(A); 42 C.F.R. § 433.300, et seq.

48. In order to ensure that state or local funds are the basis for the federal match, the Medicaid Act prohibits federal funding where the state or unit of local government has received certain types of donations from health care providers called non-bona fide donations.

49. A non-bona fide donation is a donation that has a direct or indirect relationship to Medicaid payments to the provider. 42 U.S.C. § 1396b(w)(2)(B).

50. For purposes of determining the amount of federal funding to be paid to a state, the total amount expended by the state for Medicaid payments must be reduced by the amount of non-bona fide provider donations received by the state or unit of local government. 42 U.S.C. § 1396b(w)(1)(A).

51. Donations that have no direct or indirect relationship to Medicaid payments, known as bona fide donations, do not need to be deducted from the total amount expended by the state for Medicaid payments for purposes of determining the amount of federal funding to be paid to a state. 42 U.S.C. § 1396b(w)(1)(A).

52. Payment of federal funds for Medicaid expenditures is conditioned upon, among other things, compliance with the Medicaid Act's prohibition on federal funding for Medicaid expenditures in instances where the state or county has received provider-related donations that have a direct or indirect relationship to Medicaid payments made to the provider.

53. The Medicaid regulations define "bona-fide donations" as follows:

> (a) A bona fide donation means a provider-related donation ... made to the State or unit of local government, that has no direct or indirect relationship, as described in paragraph (b) of this section, to Medicaid payments made to –
>
> > (1) The health care provider...
>
> (b) Provider-related donations will be determined to have no direct or indirect relationship to Medicaid payments if those donations are not returned to the individual provider ... under a hold harmless provision or practice, as described in paragraph (c) of this section.
>
> (c) A hold harmless practice exists if any of the following applies:
>
> > (1) The amount of the payment received (other than under Title XIX of the Act) is positively correlated either to the amount of the donation ...

> (2) All or any portion of the payment made under Medicaid to the donor... varies based only on the amount of the total donation received...
>
> (3) The State or other unit of local government receiving the donation provides for any payment, offset, or waiver that guarantees to return any portion of the donation to the provider.

42 C.F.R. § 433.54. Effective April 22, 2008, subpart (c) of 42 C.F.R. § 433.54 was amended to read as follows:

(c) A hold harmless practice exists if any of the following applies:

> (1) The State (or other unit of government) provides for a direct or indirect non-Medicaid payment to those provides or others making, or responsible for, the donation, and the payment amount is positively correlated to the donation. A positive correlation includes any positive relationship between these variables, even if not consistent over time.
>
> (2) All or any portion of the payment made under Medicaid to the donor... varies based only on the amount of the donation, including where Medicaid payment is conditional on receipt of the donation.
>
> (3) The State (or other unit of local government) receiving the donation provides for any direct or indirect payment, offset, or waiver such that the provision of that payment, offset, or waiver directly or indirectly guarantees to return any portion of the donation to the provider (or other parties responsible for the donation).

42 C.F.R. § 433.54 (amended 2008).

54. CMS presumes that donations from any health care organizational entity not exceeding $50,000 per year are bona fide. 42 C.F.R. § 433.54(d)(2). This presumption is rebuttable. 42 C.F.R. § 433.54(e).

55. However, for donations in excess of $50,000 per year, states must obtain "explicit authorization from [CMS] prior to [such donations] being considered bona fide." 57 Fed.

Reg. 55,118 (Nov. 24, 1992) (Supplementary Information regarding the Interim Final Regulation on FFP relating to Provider Donations, 42 C.F.R. §§ 433 and 447), at 55,121.

56. It is the "responsibility of the State to obtain the necessary certification of the fund source from the donating entity in establishing that a provider-related donation is bona fide." *Id.*

**NEW MEXICO AGENCY AND PROGRAMS**

57. In New Mexico, the Medicaid program is administered by the Human Services Department, Medical Assistance Division (MAD).

58. In New Mexico, two sources of Medicaid funding to hospitals are the SCPF and SCHSP.

59. New Mexico's SCPF and SCHSP programs were created by the New Mexico Indigent Hospital and County Health Care Act (State Statute). Chapter 27, Article 5, N.M.S.A. 1978, § 27-5-1, et seq.

60. The purpose of the State Statute was to 1) recognize that counties are the responsible State agencies for hospital care to indigent patients, 2) provide a means whereby each county can discharge that responsibility through a system of payments to hospitals for the care of indigent patients, and 3) recognize that counties are responsible for supporting indigent patients by providing local revenues to match federal funds for the State Medicaid program, including the provision of matching funds for payments to sole community provider hospitals. N.M.S.A. § 27-5-2.

61. A sole community provider hospital is a hospital that is a sole community provider hospital under federal Medicare guidelines or an acute care hospital licensed by the State to receive distributions from the SCPF. N.M.S.A. § 27-5-4(J); 42 C.F.R. § 412.92.

62. New Mexico's SCPF consists of funds provided by counties to match federal funds for Medicaid sole community provider hospital payments. N.M.S.A. § 27-5-6.1(A). The matching monies provided by the counties are considered to be the State, or non-federal, share under this program.

63. Under New Mexico's Medicaid Plan, effective for the quarter beginning July 1, 1993, the SCPF amount paid to a hospital was equal to the amount the hospital received from the county for calendar year 1992 plus an inflation factor. New Mexico Administrative Code (N.M.A.C.) § 8.311.3.12(F)(6)(c).

64. For each subsequent year, the SCPF amount equals the lesser of the amount paid in the previous year plus an inflation factor increase or an amount agreed upon by the hospital and the county. N.M.A.C. § 8.311.3.12(F)(6)(f).

65. Under the State Statute, each year a sole community provider hospital must negotiate with each county the amount of indigent hospital payments anticipated for the following fiscal year. N.M.S.A. § 27-5-11(B).

66. The hospital must then provide to the State the amount of indigent hospital payments anticipated for the following fiscal year, *id.*, and must submit its county-approved sole community provider payment request to the State. N.M.A.C. § 8.311.3.12(F)(6)(d); (F)(6)(e).

67. The agreement between the hospital and the county must be in compliance with federal regulations regarding intergovernmental transfers and provider contributions and shall not

include provisions for reimbursements by hospitals to counties of matching funds. N.M.S.A. § 27-5-12.2(D).

68. Counties transfer to the State their SCPF matching funds on a quarterly basis. *Id.* at § 27-5-6(N).

69. The money in the SCPF is used by the State to make payments to sole community provider hospitals under the Medicaid program. *Id.* at § 27-5-6.1(B).

70. The State pays each sole community provider hospital on a quarterly basis under the SCPF program. N.M.A.C. § 8.311.3.12(F)(6)(b).

71. The SCPF payments to sole community provider hospitals include the amount transferred from the county plus the amount of the federal match, which typically would result in payments to the hospitals of approximately three federal dollars for every county dollar.

72. The State draws down, receives, or uses federal funds for the payments to the hospitals.

73. In addition, each August the State determines whether SCHSP funds are available, based upon whether the Medicare Upper Payment Limit has been exceeded.

74. If SCHSP funds are available, the State notifies the counties of the additional contributions that they must make in September to cover the State matching funds necessary to secure their share of the additional federal matching funds. N.M.A.C. § 8.311.3.12(F)(6)(g).

75. To obtain this supplemental funding, each county must transfer to the State its SCHSP matching funds, which the State then uses to obtain the approximately three times federal match and to pay the hospitals.

76. New Mexico includes as Medicaid expenditures in its 64 Forms the SCPF and SCHSP payments made to the sole community provider hospitals.

## GENERAL OVERVIEW

77. At all times relevant to this complaint, CHSI, through its wholly owned direct and indirect subsidiaries, has owned, operated, or leased general acute care hospitals across the United States.

78. At all times relevant to this complaint, CHSI has owned and operated Eastern (in Chaves County), Mimbres (in Luna County), and Alta Vista (in San Miguel County) in the State of New Mexico. (Chaves County, Luna County, and San Miguel County are hereinafter referred to as the "Counties"). At all times relevant to this complaint, Eastern, Mimbres, and Alta Vista have been sole community provider hospitals.

78A. At all times relevant to this complaint, CHSPSC has provided management services to Eastern, Mimbres, and Alta Vista pursuant to management agreements for the benefit of CHSI.

78B. CHSPSC had some responsibility to ensure that hospitals within the CHSI organization complied with Medicaid laws and regulations.

79. In July and August of 2000, defendants attempted to determine how they could pay money to the Counties in order for the Counties to make their matching payments to the State so that the defendants would receive back SCPF and SCHSP payments approximately four times the amount of the donations.

80. At that time, CHS corporate and hospital executives reviewed and discussed the relevant federal regulations restricting the use of provider donations for the non-federal share of states' Medicaid expenditures, as well as the HHS guidance on those regulations.

81. At all times relevant to this complaint, defendants were aware that federal reimbursement for Medicaid expenditures was prohibited where states and counties receive provider donations that are related directly or indirectly to Medicaid payments to the provider.

82. At all times relevant to this complaint, defendants were aware that under the SCPF and SCHSP programs, the payments to the sole community provider hospitals consisted of the amount the relevant county transferred to the State plus the federal match of approximately three times the amount the State received from the county.

83. For example, on July 25, 2004, CHS corporate Director of Strategic Analysis Ted Lomicka wrote a memorandum to CHSI Executive Vice President and Chief Financial Officer Larry Cash, in which he described New Mexico's two sole community hospital payment programs as follows:

> As a condition of participation in this program, the hospital must first pledge an unrestricted donation to the County Indigent Fund (in a specified dollar amount determined by a formula or special agreement), which the state will use to obtain Federal matching-dollars . . . .

84. In a July 27, 2000 email to a number of CHS corporate and hospital officials, Eastern Chief Financial Officer Michael Healey wrote that, with regard to New Mexico sole community supplemental funds, "County funds CAN NOT come from the hospitals."

85. On or about August 2, 2000, the New Mexico Hospitals & Health Systems Association faxed to CHS corporate and hospital executives the Medicaid regulation that describes the circumstances under which a donation will be determined to be non-bona fide, and explicitly states that "[w]hen provider-related donations are not bona fide, HCFA [now known as CMS, the federal agency that administers Medicaid on the federal level] will deduct this amount from the State's medical assistance expenditures before calculating FFP [federal financial participation]."

86. On August 7, 2000, CHS corporate officials faxed to each other HHS guidance regarding the bona fide donation regulation, with handwritten arrows pointing to certain portions of the guidance, including the points that "[a] donation from an individual provider or any health care organizational entity exceeding the monetary cap [$50,000] will require explicit authorization from HCFA prior to being considered bona fide . . .," and if "HCFA determines provider-related donations are not bona fide, HCFA will deduct this amount from the State's medical assistance expenditures before calculating FFP for the year of receipt and for any subsequent fiscal year in which such a donation is received by the State."

87. CHS corporate and hospital officials also were aware that HHS guidance further provided that "it will be the responsibility of the State to obtain the necessary certification of the fund source from the donating entity in establishing that a provider-related donation is bona fide."

88. At no time relevant to this complaint did the State seek the necessary certification of the fund source from CHS corporate and its hospitals.

89. At no time relevant to this complaint did CHS corporate and its hospitals supply the State with the necessary certification of the fund source.

90. On or about August 9, 2000, CHS corporate and hospital officials faxed to each other portions of the Medicaid Act containing the prohibition of the use of provider-related donations.

91. In an August 7, 2000 memorandum to CHS corporate Executive Vice President and Chief Financial Officer Larry Cash, CHS corporate Group Vice President Michael Portacci wrote that

> [o]ur concern over the past few weeks has been how to get $.7 M to the county for them to pay the [sole community provider] program and we receive back $2.6 M ($1.9 M net). Eastern NM and possibly Larry Carlton [CHS corporate Vice President of Revenue Management]; moreover, thought there might be a restriction on hospitals making a direct donation to the county. Within each facility, we were formulating alternative strategies to make donations to the county.

91A. Larry Carlton became CHSI Vice President - Revenue Management in 2005, and CHSI Senior Vice President - Revenue management in 2009.

92. The next day, Mr. Portacci wrote a memorandum to Mr. Cash that stated that

> [o]ur position is to go forward with unrestricted donations, preferably to the county indigent fund, thereby allowing the county to make a legal governmental fund transfer to cover their participation in the program . . . . [a]t $180 k [donation], we still come out ahead by almost $250k . . . . The last risk I would bring to your attention would be the feds determining, based upon the state reports, that the county participation in the program was funded by a provider donation, i.e., the hospital. Under this scenario, the excess or matching portion of the funds could be

> withheld from future SCH payments. Moreover, it would be budget neutral in the long-run and we would in effect collect our cash in advance.

93. Having concluded that the benefit of collecting its "cash in advance" outweighed any risk of the Federal government learning CHS corporate and hospitals were providing non-bona fide donations to the Counties, thereby allowing them to improperly obtain Federal funds, CHS corporate and hospitals initiated their scheme to fraudulently inflate the SCPF and SCHSP payments they received from the State of New Mexico.

93A. Under CHS corporate policy, the donations were required to be approved by CHS corporate officials.

93B. The donations were approved by Michael Portacci and Larry Cash.

93C. Mr. Portacci was an officer of both CHSI and CHSPSC.

93D. Mr. Cash was an officer of both CHSI and CHSPSC.

93E. In August 2000, as part of defendants' effort to provide funds to Chaves County for Chaves County to make a transfer to the State for a SCHSP payment to Eastern, CHSI approved and executed an early release of $6 million to Chaves county from an escrow account which was established as part of the purchase of Eastern by CHSI from Chaves County in 1998.

94. In an August 16, 2000 email to a number of CHS corporate and hospital officers, CHS corporate employee Gail Ferguson provided instructions from "Michael" as follows:

> Contributions/Unrestricted Donations to the County to Obtain Matching Funds: Please make sure that your payments and cash planning cycle is coordinated with Barry Stewart at corporate.

95. CHS corporate and hospitals routinely referred to and accounted for the SCPF and SCHSP payments they received net of the donations made by Eastern, Mimbres and Alta Vista.

96. For example, on or about August 17, 2004, Leanne Hacker, Eastern's Chief Financial Officer, notified Eastern and CHS corporate personnel that the hospital's "[t]otal approved amount for 7/1/04 - 06/30/05 is $5,947,336. Our matching amount this year will be a total of $1,076,680. This results in our quarterly checks from the state being, $1,486,834 our quarterly match to the county is 269,170[.] Leaving a net quarterly for sole community payments $1,217,664."

97. Similarly, on or about October 21, 2005, Lisa Parrish, Manager of the CHS corporate Revenue Management Department, informed various CHS corporate officials that SCHSP funds received by the three New Mexico hospitals net of their respective donations totaled $1,472,356. This was $148,365 more than the facilities received in net SCHSP funds the previous year.

98. In a December 31, 2005 accounting document, CHS corporate calculated the state fiscal year 2006 SCPF and SCHSP payments to its three New Mexico hospitals, less the unrestricted donations, and noted that the "[u]nrestricted donations include the unrestricted donations to the County for the supplemental payment and the quarterly payment."

99. On or about August 17, 2006, Ms. Parrish sent an email to CHS corporate and hospital personnel notifying them that the increase, net of hospital donations, in the SCHSP payments from 2006 to 2007 was $1,257,437.

100. According to Ms. Parrish, "[t]he technical term for NM's matching, is it's an 'unrestricted donation' to the county."

101. From approximately September 2000 through approximately December 2010, total SCPF and SCHSP payments to Eastern, Mimbres and Alta Vista exceeded $162 million, as set forth below:

| Hospital | Total SCPF & SCHSP |
|---|---|
| Eastern | $ 124,185,463.48 |
| Mimbres | $ 25,672,526.94 |
| Alta Vista | $ 13,104,718.92 |
| | $ 162,962,709.34 |

## EASTERN

### Overview

102. For ease of reference, Table A, attached hereto, identifies donations made by Eastern to Chaves County, transfers of matching funds from Chaves County to the State, and SCPF and SCHSP payments to Eastern.

103. Eastern has made donations to Chaves County since no later than 2000, as identified in Table A.

104. Chaves County has paid matching payments to the State for SCPF and SCHSP payments to Eastern since no later than 2000, as identified in Table A.

105. Eastern has received from New Mexico payments under the SCPF and SCHSP programs since no later than 2000, as identified in Table A.

106. All or a portion of the SCPF and SCHSP payments identified in Table A that Eastern received from New Mexico varied based only upon the amount of the donations identified in Table A given to Chaves County by Eastern.

107. Chaves County's matching payments to the State identified in Table A guaranteed to return to Eastern all or a portion of Eastern's donations to Chaves County.

108. Eastern's donations identified in Table A were non-bona fide donations.

109. Since no later than 2000, each year Eastern submitted its SCPF payment request to the State. For ease of reference, Table D attached hereto, identifies requests of SCPF and SCHSP funds made by Eastern and the funding levels approved by the State of New Mexico.

110. Since 2000, Chaves County has budgeted between $500,000 and $550,000 annually for its matching payments to the State for the SCPF program.

111. Since 2000, Chaves County has budgeted zero dollars annually for its matching payments to the State for the SCHSP program.

112. For Eastern donations related to the SCPF program, Chaves County used approximately 90 to 95 percent of the donations for county matching payments to the State, and the balance for related county administrative costs.

113. Since no later than 2000, the County Manager for Chaves County, Stan Riggs, had regular conversations with Eastern employees, including Chief Executive Officers Ron Shafer, Rich Robinson, and Bradley McGrath, and Chief Financial Officer Leanne Hacker, regarding Eastern's donations.

114. During these conversations, Mr. Riggs told the Eastern employees that in order to maximize SCPF and SCHSP payments, Eastern had to provide its donations to the county because the county was not going to provide funding beyond its budgeted level for matching payments to the State.

115. Starting in 2006, Chaves County entered into memoranda of agreement with Eastern.

116. The memoranda of agreement purported to provide that Eastern's donations were specified for identified county healthcare programs.

117. However, Eastern's donations continued to have a direct or indirect relationship to SCPF and SCHSP payments made to Eastern.

118. County officials informed Eastern personnel that if Eastern wanted to continue to receive large SCPF and SCHSP payments, it needed to continue to donate necessary funds to the county which the county would then send to the State.

**<u>Chronology</u>**

119. On or about August 25, 2000, Mr. Healey wrote to Chaves County stating that

> Enclosed please find a check for $717,422.21 representing an unrestricted donation to the Chaves County Indigent Fund on behalf of the Eastern New Mexico Medical Center. We look forward to continuing our relationship under the Sole Community Hospital Program with Chaves County and its residents.

120. On or about December 14, 2000, Eastern sent a letter to Chaves County requesting SCPF payments in the amount of $4,449,462 for the period from July 1, 2001 through June 30, 2002.

121. On or about December 14, 2000, Eastern expressed its expectation that the county's matching payments of $1,172,833 to the State would be paid as follows: $738,510 from Eastern donations and $434,323 from county funds.

122. On or about January 11, 2001, Mr. Healey wrote a letter to Chaves County stating that

> Eastern would like to inform you of our intention to donate, on an unrestricted basis to the indigent fund, $738,510 during the State of NM fiscal year 2002. This represents an amount equal to our prior year donation indexed forward at 3%, and will be disbursed to the county quarterly. We look forward to continuing our relationship under the Sole Community Hospital Program with Chaves County and its residents.

123. Eastern's request was approved at the February 14, 2001 meeting of the Chaves County Commissioners during which the County Manager Hubert Quintana stated that there

> was an agreement between Chaves County and Eastern for sole community payment adjustment. Mr. Quintana explained that this was no cost to the county and the hospital would pick up the cost.

124. Ultimately, for the period from July 1, 2001 through June 30, 2002, the county's matching payments to the State were paid by Eastern donations totaling $737,000 and $454,404 in county funds.

125. An August 21, 2001 letter from Chaves County to Eastern Chief Executive Officer Ron Shafer identifies the amount of Eastern's payments "required for" the SCPF.

126. Mr. Healey identified Eastern's payments made for the SCPF and SCHSP in an October 3, 2001 email to CHS corporate executive Dave Medley. Mr. Healey characterized Eastern's donations as "draw down match."

127. On or about January 10, 2002, Mr. Healey wrote to Chaves County requesting a Sole Community Hospital Payment Adjustment for the 2002-2003 fiscal year, and stated that as "in the past, Eastern will continue to work with Chaves County in providing for the necessary matching funds . . . ."

128. A January 11, 2002 draft letter from Mr. Healey to Chaves County states that

> Eastern New Mexico hereby pledges an unrestricted donation to the Chaves County Indigent Fund for the purpose of maintaining our current level of sole community funding for the fiscal year 2002-2003. This amount is calculated to be our current match of $737,000, plus the 2002 supplemental match of $35,135, plus a projected indexing factor of 4%, or an additional $30,885 for a total of $803,020. This donation will be made in quarterly increments to coincide with the schedule Chaves County has for matching fund submissions to the State. We look forward to continuing our relationship under the Sole Community Hospital Program with Chaves County . . . .

129. A July 26, 2002 draft letter from Eastern Chief Financial Officer Leanne Hacker to Chaves County states that

> Eastern New Mexico is revising our original pledge amount from January 11, 2002 for our unrestricted donation to the Chaves County Indigent Fund for the purpose of maintaining our current level of sole community funding for the fiscal year 2002-2003. The revision is due to the actual indexing factor used by the state, rather than the projected amount we used in January. This amount is calculated to be our current match of $737,000, plus the 2002 supplemental match of $35,135, plus the actual indexing factor of 2.7%, or an additional $20,733 for a total of $788,618. This donation will be made in quarterly increments to coincide with the schedule Chaves County has for matching fund submissions to the state. I anticipate receiving a schedule from you listing the breakdown of payments required for the Sole Community Provider Fund . . . We look forward to continuing our

relationship under the Sole Community Hospital Program with Chaves County . . . .

130. On or about September 10, 2002, Ms. Hacker submitted to Chaves County a donation for $78,265.40, stating that "[w]e look forward to continuing our relationship under the SCHP with Chaves County."

131. On or about November 25, 2002, Ms. Hacker wrote to Chaves County and stated that "the following is a breakdown of payments required from Eastern to donate for the Sole Community Provider Fund for the period of July 1, 2002 to June 30, 2003." Her letter contained a breakdown of the quarterly donations Eastern planned to make or made for the SCPF for the period between July 1, 2002 and June 30, 2003.

132. On or about November 25, 2002, Ms. Hacker wrote to Chaves County requesting a Sole Community Hospital Payment Adjustment for the 2003-04 fiscal year, and stated that as "in the past, Eastern will continue to work with Chaves County in providing for the necessary matching funds . . . ."

133. On or about August 14, 2003, New Mexico notified Chaves County that an SCHSP payment for Eastern was approved in the amount of $558,345.62, for which the State share due from Chaves County would be $142,043.13.

134. On or about the following day, New Mexico notified Eastern that an SCHSP payment for Eastern was approved in the amount of $558,345.62, for which the State share due from Chaves County was $142,043.13.

135. On or about August 20, 2003, Ms. Hacker wrote to Chaves County stating

> [e]nclosed please find a check for $142,043.13 representing an unrestricted donation to the Chaves County Indigent Fund on behalf of [Eastern]. We look forward to continuing our relationship under the Sole Community Hospital Program with Chaves County.

136. Eastern's check issuance request for this donation stated that the reason for the payment was "[s]ole community provider funds match . . . ."

137. On or about September 8, 2003, Chaves County wrote a check payable to the "Sole Community Provider Fund" for $142,043.13.

138. In an August 20, 2003 letter to Chaves County, Ms. Hacker wrote that

> Eastern New Mexico hereby pledges an unrestricted donation to the Chaves County Indigent Fund for the purpose of maintaining our current level of sole community funding for the fiscal year 2003-2004. This amount is calculated to be our current match of $788,618, plus the 2003 supplemental match of $78,265, plus the actual indexing factor of 3.5%, or an additional $30,341, for a total of $897,224. This donation will be made in quarterly increments to coincide with the schedule Chaves County has for matching fund submissions to the State.

The letter contained a schedule of quarterly payments required from Eastern to donate for the SCPF for the period between July 1, 2003 and June 30, 2004, and stated that "[w]e look forward to continuing our relationship under the Sole Community Hospital Program with Chaves County . . . ."

139. On or about November 25, 2003, Ms. Hacker wrote to Chaves County requesting a Sole Community Hospital Payment Adjustment for the 2004-05 fiscal year, and stated that as "in the past, Eastern will continue to work with Chaves County in providing for the necessary matching funds . . . ."

140. In an August 26, 2004 letter intended for delivery to Chaves County, Ms. Hacker wrote that

> Eastern New Mexico hereby pledges an unrestricted donation to the Chaves County Indigent Fund for the purpose of maintaining our current level of sole community funding for the fiscal year 2004-2005. This amount is calculated to be our current match of $897,224, plus the 2004 supplemental match of $142,043, plus the actual indexing factor of 3.6%, or an additional $37,413, for a total of $1,076,680. This donation will be made in quarterly increments to coincide with the schedule Chaves County has for matching fund submissions to the State.

The letter contained a schedule of quarterly payments required from Eastern to donate for the SCPF for the period between July 1, 2004 and June 30, 2005, and stated that "[w]e look forward to continuing our relationship under the Sole Community Hospital Program with Chaves County . . . ."

141. In the summer of 2004, CHS Corporate Revenue Manager Robert Baker first became aware that the CHS hospitals in New Mexico were making donations to their respective Counties.

142. Mr. Baker contacted New Mexico's Medical Assistance Division to verify when the hospitals should pay the Counties, and to find out when the hospitals would receive the SCPF payments.

143. Mr. Baker was told by a State employee that a hospital could never pay a county for the county's matching SCPF payment to the State because such practice would violate the federal Medicaid regulations.

144. Mr. Baker reported that a State employee informed him that a hospital could never pay a county for the county's matching SCPF payment to the State to CHS senior corporate

officials including Larry Carlton and Doug Gleeson, and expressed to them his concern that the hospitals' arrangements with the Counties looked like fraud.

145. Mr. Baker also discussed with Mr. Carlton and Mr. Gleeson the August 26, 2004 letter which Leanne Hacker intended to deliver to Chaves County.

146. Mr. Carlton hand edited Ms. Hacker's August 26, 2004 letter, deleting the details regarding the purpose, calculation methodology, and timing of the donations, and reference to Eastern looking forward to "continuing our relationship under the Sole Community Hospital Program with Chaves County . . . ."

147. Mr. Carlton instructed Mr. Baker that Eastern should send the edited version of the August 26, 2004 letter to Chaves County.

148. On or about August 30, 2004, Ms. Hacker sent Chaves County the edited version of her August 26, 2004 letter.

149. Handwritten notations were made on a copy of the original August 26, 2004 letter saying "not send *(sic)*; corp. wrote a revised version."

150. Mr. Carlton further instructed Mr. Baker to prepare a memorandum to all Revenue Managers with responsibility for CHSI's three New Mexico hospitals on how to account in CHS corporate and hospitals' accounting records for donations and SCPF payments to the hospitals so that the connection between the donations and SCPF payments would not be evident on the face of the accounting entries.

151. On or about September 21, 2004, Doug Gleeson, of the CHS corporate office, asked representatives of Eastern, Mimbres and Alta Vista a series of questions about the SCPF

program, among them whether the hospitals made donations to their respective Counties and whether they specified the purpose of the donations.

152. On or about October 12, 2004, Ms. Hacker responded that Eastern's donation "for the 04-05 fiscal year will be $1,076,680 and we no longer specify what the money is for. We used to, but our letters got changed with the help of [Revenue Management] last month."

153. In a December 8, 2004 letter to Chaves County, Ms. Hacker requested a Sole Community Hospital Payment Adjustment for 2005-2006 and stated that "[a]s in the past, Eastern will continue to work with Chaves County in providing for the necessary matching funds . . . ."

154. In a draft August 30, 2005 letter to Chaves County marked "Calculation documentation only, not actually mailed to anyone," Ms. Hacker wrote that

> Eastern New Mexico hereby pledges an unrestricted donation to the Chaves County Indigent Fund for the purpose of maintaining our current level of sole community funding for the fiscal year 2005-2006. This amount is calculated to be our current match of $1,076,680, plus the 2005 supplemental match of $346,593, plus the actual indexing factor of 3.9%, or an additional $55,508, for a total of $1,478,781. This donation will be made in quarterly increments to coincide with the schedule Chaves County has for matching fund submissions to the State.

The letter contained a schedule of quarterly payments required from Eastern to donate for the SCPF for the period between July 1, 2005 and June 30, 2006, and stated that "[w]e look forward to continuing our relationship under the Sole Community Hospital Program with Chaves County . . . ."

155. In an August 30, 2005 letter delivered to Chaves County, Ms. Hacker wrote that Eastern "hereby pledges an unrestricted donation to the Chaves County Indigent Fund. This unrestricted donation will be made in quarterly increments on the first day of the quarter

as follows . . . ." The letter contained the same schedule of quarterly payments as contained in the August 30, 2005 "Calculation documentation only" draft letter.

156. On or about February 8, 2006, Ms. Hacker wrote an email to CHS corporate official Mike Healey that referred to the August 30, 2005 "Calculation documentation only" letter and the August 30, 2005 letter delivered to Chaves County and stated that the letters "are what I am currently using for the yearly match. As you can see I have just been doing the same calculation year after year to come up with the match amount based on the formula the state uses the [sic] find out what you are eligible for in total."

157. On or about September 13, 2005, Ms. Hacker wrote an email to a number of Eastern employees in which she noted that Eastern had an "increase in charitable contributions related to the increase in our matching portion sole community Indigent funds . . . ."

158. In November 2005, Ms. Hacker noted that Eastern's charitable contributions had increased from the previous month "due to contribution to the county in order to draw down SCH funds."

159. On or about September 19, 2005, New Mexico approved a SCHSP payment for Eastern for $1,231,927.55, for which the State share due from Chaves County was $316,605.38.

160. That same day, Leanne Hacker wrote a letter to Chaves County stating

> [e]nclosed please find a check for $316,605.38 representing an unrestricted donation to the Chaves County Indigent Fund on behalf of [Eastern]. We look forward to continuing our relationship under the Sole Community Hospital Program with Chaves County.

161. Four days later, Chaves County paid $316,605.38 in matching payments to the State for SCHSP funds for Eastern.

162. In or about September or October 2005, additional SCHSP funds were available for Eastern provided the county paid a matching payment to the State in the amount of $53,168.23.

163. On or about October 12, 2005, Ms. Hacker sent Chaves County a donation for $53,168.23, stating that "[w]e look forward to continuing our relationship under the SCP program with Chaves County & its residents."

164. On or about October 21, 2005, Chaves County paid $53,168.23 in matching payments to the State for SCHSP funds for Eastern.

165. In a December 3, 2005 letter to Chaves County, Ms. Hacker requested a Sole Community Hospital Payment Adjustment for 2006-2007 and stated that "[a]s in the past, Eastern will continue to work with Chaves County in providing for the necessary matching funds . . . ."

166. From September 30, 2005 to June 30, 2006, Eastern made quarterly SCPF donations of $369,695 to Chaves County for a total of $1,478,781.

167. From September 30, 2005 to June 30, 2006, Chaves County made quarterly matching payments to the State for SCPF funds for Eastern totaling $2,130,424.

168. On or about April 4, 2006, Chaves County sent a facsimile to Ms. Hacker stating that, for the period from September 30, 2005 to June 30, 2006, "we are off about $150,000 . . . should be $500,000."

169. Between on or about April 21, 2006 and on or about May 1, 2006, the following email exchange occurred between Ms. Hacker and CHS senior corporate official Larry Carlton:

Ms. Hacker:

> Larry, Our county has indicated that for the state fiscal Year 2006, the amount we donated was short $151,643 of the amount required by the state for them to pay related to the sole community provider fund. In the past they have not shared with me what the actual request amount has been, so I was using the following formula to do the calculation: Add the previous years match (donation) plus any supplemental funds match (donation) times the indexing factor assigned by the state. In years past there has never been this issue. What I am requesting is that I am able to donate these additional funds to make them whole for the funds matched on our behalf, if I had known the figure in the beginning I would have been doing that all along anyway. I would like your approval of the request due to the scrutiny this type of transaction is under at the time.

Mr. Carlton:

> Leanne, was there formal written correspondence from the County?

Ms. Hacker:

> Not formal, they faxed me the letter they had received from the state and my donation letter and then noted the difference in the two on the fax cover sheet memo area.

Mr. Carlton:

> Leanne, if I understand correctly, had the 'state letter' and 'your donation letter' been in synch, with the 'state letter' being the accurate dollar amount, the additional money would have been donated back in 2005?

Ms. Hacker:

> That is correct. I would have basically took the amount requested, divided by 4 and made my normal quarterly donation based on that figure.

Mr. Carlton:

> Just curious, what would occur if the additional donation is not made?

Ms. Hacker:

> Our relationship currently and in the past has always been very good with our county, we have never experienced issues where they try to redirect funds to other accounts, etc. as I have heard has happened in other counties. I would have to assume they might be less willing to approve our increases in dollars requested in future years if we were not able to put up the matching funds. Given the large sum we currently get from this program, 9.3 million for the upcoming fiscal year, this would have a huge impact.

Mr. Carlton:

> Leanne, I would move forward with the additional donation.

170. On or about June 23, 2006, Chaves County paid $454,675.61 in matching payments to the state for SCPF funds for Eastern, however its payment was short by $92,876.39.

171. On or about July 5, 2006, Eastern donated $200,000 to Chaves County.

172. On or around July 11, 2006, Chaves County paid $92,876.39 in matching payments to the State for SCPF funds for Eastern.

173. On or about August 11, 2006, Eastern Chief Executive Officer Rich Robinson asked Ms. Hacker to provide feedback from a meeting she and CHS corporate personnel attended with New Mexico regarding the SCPF program. Ms. Hacker responded "we will need to make a 'random' donation now."

174. On or about August 15, 2006, Ms. Hacker wrote Messers. Medley and Robinson saying "We need to prepare for another donation to the county. The supplemental calculation is being prepared . . . Will need to donate to the county for this . . . ."

175. On or about August 17, 2006, CHS corporate and Mimbres officials understood that SCHSP funding was available for Eastern in the amount of $2,839,069, and that the county share for this funding in the amount of $819,071 was due by September 15, 2006.

176. On or about August 17, 2006, CHS corporate and Mimbres officials intended to donate $819,071 to Chaves County to secure the $2,839,069 in SCHSP funding, amounting to a total of $2,019,998 net of its donation.

177. In or about August 2006, Eastern was aware that Chaves County had paid more to the State for Eastern's SCPF funding than Eastern had donated in the amount of approximately $300,000.

178. On or about August 18, 2006, Ms. Hacker sent an email to CHS corporate official Dave Medley stating

> [t]he figures for supplemental funds came from the state, our match will need to be $819,071.36 for this. As I mentioned in a previous email, I feel we need to donate approximately 1.1 million to cover this and the short fall we have been running from last quarter. I need to cut a check next week, please advise of the amount.

179. On or about August 23, 2006, Eastern expected to donate to Chaves County $2,149,478 for fiscal year ending June 2007.

180. From September 2006 through June 2007, Chaves County's quarterly payments to the State for Eastern's SCPF funding totaled $2,649,471.

181. On or about September 18, 2006, Eastern entered into a Memorandum of Agreement (2006-2007 MOA) with Chaves County which stated that Eastern agreed to donate to

Chaves County $3,600,000 for period from September 1, 2006 through August 31, 2007, and that "these amounts relate to the services detailed under 'Scope of Services.'"

182. The amount Eastern agreed to donate under the 2006-2007 MOA was sufficient to provide the matching funds necessary for Chaves County to pay the State during state fiscal year 2007 to obtain the SCPF and SCHSP payments for Eastern.

183. Under the 2006 - 2007 MOA, Eastern would donate to Chaves County $1,345,000 in September 2006, and the balance in monthly installments of $205,000.

184. Eastern referred to the donations made under the 2006-2007 MOA as "County Donations for the Sole Community program" or as "sole community donations."

184A. The donations made under the 2006 - 2007 MOA were made for the purpose of maintaining Eastern' SCPF and SCHSP funding.

185. On or about September 26, 2006, Chaves County sent to Eastern an analysis of the county's matching payments to the State and Eastern's donations to the county as of June 30, 2006 which showed that the county had paid the State $321,338 more than it had received in donations from Eastern, and had not been reimbursed in that amount by Eastern.

186. On or about January 4, 2007, Chaves County approved Eastern's 2007 - 2008 request for SCPF funding in the amount of $12,833,556.

187. On or about January 29, 2007, Ms. Parrish sent Ms. Hacker an email requesting "some assistance on the County Donations for the Sole Community program," asking her to

review a general ledger report for Eastern. The ledger included donations made under Eastern's donation letters and the 2006-2007 MOA.

188. On or about February 28, 2007, MAD notified Chaves County it would be required to provide $3,611,620 in matching funds during the period July 1, 2007 through June 30, 2008. As a result, Eastern would receive a total of $12,650,218.00 in SCPF payments during the same period.

189. On or about July 17, 2007, Eastern entered into an MOA (2007 - 2008 MOA) with Chaves County which stated that Eastern agreed to donate to Chaves County $3,600,000 for the period September 1, 2007 through August 31, 2008, and that "these amounts relate to the services detailed under the 'Scope of Services.'"

189A. The donations made under the 2007 - 2008 MOA were made for the purpose of maintaining Eastern's SCPF and SCHSP funding.

190. Under the 2007-2008 MOA, Eastern would donate $300,000 in monthly installments to Chaves County.

191. On or about July 30, 2007, Ms. Hacker was aware that $3,202,001.59 in SCHSP funding would be available for Eastern in September 2007, and that the county match required for this funding was $898,801.85.

192. At only $3,600,000, the amount Eastern agreed to donate pursuant to the 2007-2008 MOA was not sufficient to cover the additional matching funds Chaves County would be required to pay the State in order for Eastern to receive the available SCHSP funds.

193. On or about July 30, 2007, Ms. Hacker sent an email regarding the available SCHSP funding and the required county match to CHS corporate official Mike Healey that stated "We may have to revise our agreement or something?"

194. On or about September 5, 2007, a Chaves County official sent an email to Ms. Hacker stating "[j]ust wanted to touch base regarding the Supplemental due on Sept. 19. I need an official yes or no so I can call . . . ." the State.

195. Ms. Hacker responded in an email that stated "[y]es."

196. Also on or about September 5, 2007, Eastern donated $985,000 to Chaves County.

197. On or about September 10, 2007, rather than revising their existing agreement, Eastern entered into a separate Memorandum of Agreement with Chaves County which stated that Eastern agreed to donate to Chaves County $985,000 for period from September 1, 2007 through August 31, 2008, and that "these amounts relate to the services detailed under 'Scope of Services.'"

198. On or about May 6, 2008, Chaves County sent an email to Ms. Hacker regarding the upcoming county's matching payment to the State for Eastern's SCPF funding. The email stated that the county will have to make its payment by June 13 and asked Eastern to "make arrangements to forward your donation to us no later than June 10th in order for us to make this final 4th quarter payment."

199. CHS made its $300,000 donation on or about May 21, 2008.

200. On or about March 28, 2008, Chaves County sent a facsimile to Ms. Hacker enclosing the schedule of quarterly payments due from the county to the State for Eastern's SCPF

funding between September 30, 2008 and June 30, 2009, totaling $4,749,938, and asked that Eastern "advise county if Eastern is going to be able to accommodate this payment schedule."

201. Eastern determined that it could accommodate the County's request. On or about August 28, 2008, Eastern and Chaves County entered into a new MOA covering the period September 1, 2008 through August 31, 2009 in the amount of $4,800,000. This agreement was later revised increasing the total payments to $5,906,000.

202. On or about August 8, 2008, Chaves County was notified it would be required to provide $841,165.11 in matching funds to allow Eastern to receive the SCHSP payment in September 2008.

203. On or about August 29, 2008, Eastern and Chaves County entered into another separate MOA in the amount of $870,000.

204. Eastern continues to make donations to Chaves County that have a direct or indirect relationship to SCPF and SCHSP payments made to Eastern.

## MIMBRES

### Overview

205. For ease of reference, Table B, attached hereto, identifies donations made by Mimbres to Luna County, transfers of matching funds from Luna County to the State, and SCPF and SCHSP payments to Mimbres.

206. Mimbres has made donations to Luna County since no later than 2000, as identified in Table B.

207. Luna County has paid matching payments to the State for SCPF and SCHSP payments to Mimbres and two other New Mexico sole community provider hospitals since no later than 2000, as identified in Table B.

208. Mimbres has received from New Mexico payments under the SCPF and SCHSP programs based on matching funds paid by Luna County and at least one other New Mexico county since no later than 2000, as identified in Table B.

209. All or a portion of the SCPF and SCHSP payments identified in Table B that Mimbres received from New Mexico varied based only upon the amount of the donations identified in Table B given to Luna County by Mimbres.

210. Luna County's matching payments to the State identified in Table B guaranteed to return to Mimbres all or a portion of Mimbres' donations to Luna County.

211. Mimbres' donations identified in Table B were non-bona fide donations.

212. Since no later than 2000, each year Mimbres submitted its SCPF payment request to the State. For ease of reference, Table D attached hereto, identifies requests of SCPF and SCHSP funds made by Mimbres and the funding levels approved by the State of New Mexico.

213. The then County Manager for Luna County, Scott Vinson, had regular conversations with CHS corporate and/or Mimbres employees, including Tim Schmidt, Derrick Yu, Brian Ebright, John Gallagher and Tim Adams.

214. During these regular conversations, Mr. Vinson told the CHS corporate and/or Mimbres employees that the county was using Mimbres' donations to reimburse the county for its matching payments to the State for the SCPF and SCHSP programs.

215. Starting no later than 2006, Luna County entered into memoranda of agreement with Mimbres.

216. The memoranda of agreement purported to provide that Mimbres' donations were specified for identified county healthcare programs.

217. However, Mimbres' donations continued to have a direct or indirect relationship to SCPF and SCHSP payments made to Mimbres.

<u>Chronology</u>

218. On or around July 31, 2000, Mimbres was aware that New Mexico was making available additional funds for the SCHSP.

219. In a July 31, 2000 email to CHS corporate Group Vice President Michael Portacci, Mimbres Chief Executive Officer Tim Schmidt stated that

> Luna County would have to contribute $135,751.54 in order to received (sic) $508,813.78. Of this amount, Mimbres could receive $428,799.33. I do NOT believe Luna county will contribute this amount without some deal being cut.

220. One of the options Mr. Schmidt suggested was that "Luna County fund the entire amount using dollars budgeted for ambulance service. Mimbres pay $114,403.66 for ambulance service to the city."

221. On or about August 8, 2000, Mr. Portacci wrote in an internal memorandum that CHS corporate and Mimbres officials decided to request that Luna County "participate in

federal matching funds for the Medicaid sole community provider program . . .," and that Mimbres would

> commit to getting them a check for $140k on the week of 8/21. This includes $26k additional donation above the required $114k. The county manager has already indicated that he wants something in return for their help. My guess is that he will try to negotiate up to $180k, which represents the $114 plus $65k they owe us on a cost report settlement . . . At $180k, we still come out ahead by almost $250k. I will authorize the $180k if I have to.

222. On or about August 8, 2000, Mr. Schmidt wrote to Luna County formally requesting that the county participate in the SCHSP program.

223. Mr. Schmidt further stated that he believed that Luna County must provide matching funds to New Mexico in the amount of $114,403.66 in order for Mimbres to receive back $428,799.33.

224. On or about August 9, 2000, Mr. Schmidt notified Luna County that Mimbres would be making an unrestricted donation to the county in the amount of $180,000 during the week of August 21, 2000.

225. On or about August 10, 2000, the Luna County Board approved Mimbres' request for SCHSP funding.

226. In January 2001, Mimbres entered into a Sole Community Provider Contract with Luna County.

227. The term of the contract was one year, commencing January 1, 2001.

228. Under the contract, Mimbres would receive $941,491 "subject to approval by the New Mexico Human Services Department (NMHSD). If a different sum is duly approved by NMHSD, said amount shall be the contract sum due and payable hereunder."

229. In consideration for these payments, Mimbres would "pay to the County for its Community Service Programs an payment of" $242,216.64, or 26.2 % of any amount approved by NMHSD.

230. On or about January 31, 2001, the Luna County Board approved Mimbres' request for $942,656.65 in SCPF funding for the period July 1, 2001 through June 30, 2002.

231. However, Mimbres was informed on May 17, 2001 that the State approved only $727,969 in SCPF funding for July 1, 2001 through June 30, 2002. Mimbres likewise decreased its donations to Luna County to only $185,968.40 during that period.

232. From September 17, 2001 through July 1, 2002, Mimbres made four quarterly payments of $46,492.10 to Luna County, totaling $185,968.40.

233. In or about September 2001, in order for Mimbres to receive the available $21,892 SCHSP payment, Luna County would have to provide $5,736 in matching funds to the State.

234. In or about September 2001, Mimbres paid $5,736 to Luna County.

235. In or about September 2001, Luna County paid $5,736 in matching funds to the State.

236. On or about September 28, 2001, Mimbres was paid $21,892 in SCHSP funds from the State.

237. In January 2002, Mimbres requested from Luna County payment of $779,443 from the SCPF program for the period July 1, 2002 through June 30, 2003.

238. On or about January 17, 2002, Luna County Manager Scott Vinson notified the County Board of Commissioners of Mimbres' request and stated that "the hospital provides 100% of the required match and recommended approval of the payment."

239. The Luna County Board approved the payment for Mimbres from the SCPF program.

240. On or about February 26, 2002, Mimbres was notified that it would receive a total of $770,107 in SCPF payments during the period July 1, 2002 through June 30, 2003. Of this total, $751,451 was to be derived from matching funds provided by Luna County.

241. Mimbres and Luna County continued to enter into agreements whereby Mimbres provided the SCPF matching funds to Luna County.

242. On or about August 24, 2002, Luna County wrote to Mimbres stating "The Sole Community Provider contract between [Mimbres] and Luna County first quarter is now due. The amount to be received by [Mimbres] from Luna County … will be $751,451.00." Luna County included a payment schedule establishing quarterly payments of $49,220.02 due from Mimbres.

243. From September 4, 2002 through June 9, 2003, Mimbres made four quarterly payments of $49,220 to Luna County, totaling $196,880.

244. During approximately the same period, Luna County made corresponding quarterly payments to the State.

245. On or about September 12, 2002, the Luna County Board approved SCHSP funding for Mimbres subject to Mimbres paying the match required from the county to the State.

246. On or about September 17, 2002, Mimbres paid Luna County $12,777.88.

247. On or about September 19, 2002, Luna County paid $12,777.88 in matching funds to the State.

248. Mimbres subsequently was paid $47,395.70 in SCHSP funds from the State.

249. On or about January 16, 2003, the Luna County Board approved SCPF funding for Mimbres in the amount of $822,812 for the period from July 1, 2003 to June 30, 2004.

250. On or about February 27, 2003, the State notified Mimbres it would receive a total of $830,199.78 in SCPF payments during the period July 1, 2003 through June 30, 2004.

251. On or about September 17, 2003, Luna County wrote to Mimbres stating "The Sole Community Provider contract between [Mimbres] and Luna County first quarter is now due. The amount to be received by [Mimbres] from Luna County ... will be $822,812.00." Luna County included a payment schedule establishing quarterly payments totaling $207,533.00 due from Mimbres.

252. For the period from July 1, 2003 to June 30, 2004, the Mimbres share of the Luna County matching funds paid to the State totaled $207,528.44. Mimbres made four quarterly donations during that period totaling $207,553.

253. Two Mimbres officials, Feliciano Jiron and John Osgood, attended the August 14, 2003 Luna County Board meeting to "discuss the Sole Community Provider fund."

254. During the meeting, "Mr. Giron stated they have been informed that an additional $60,000 is available to Luna County for additional funding of indigent care in the community. He said the facility in return is willing to put forward the capital to retrieve that $60,000 to continue to pay for indigent care."

255. Also during the meeting, the County Manager "commented a chunk of money was available a few years ago to hospitals that about doubled the amount of indigent money coming in and the hospital agreed to pay for the match and it has been a good partnership. The hospital is paying the 25% match and in turn they leverage three for one dollars."

256. The County Board approved the additional $60,000 in funding for Mimbres.

257. Ultimately, with matching funds of $23,190.46 provided by Luna County, the amount approved by the State was $91,157.45.

258. On or about August 20, 2003, Luna County received $23,190.46 from Mimbres.

259. On or about August 21, 2003, Luna County made a SCHSP matching payment to the State in the amount of $23,190.46.

260. On or about September 29, 2003, Mimbres received from the State a SCHSP payment of $91,157.45.

261. In or about January 2004, Mimbres requested from Luna County payment of $1,191,388.53 from the SCPF program for the period July 1, 2004 through June 30, 2005.

262. On or about January 15, 2004, the Luna County Manager advised the County Board that the requested SCPF payment

> will not cost the county anything because the hospital provides the full match. It is a 3 for 1 match so if the county puts in a dollar, the hospital gets $3.

263. The Luna County Board approved the payment for Mimbres from the SCPF program.

264. The State approved total SCPF funding of $954,526 for Mimbres for the period from July 1, 2004 to June 30, 2005.

265. On or about March 17, 2004, the State notified Luna County it would have to provide a total of $264,525 SCPF matching funds during the period July 1, 2004 through June 30, 2005.

266. In or about August 20, 2004, Mimbres was notified that SCHSP funds were available in the amount of $224,994.03, and that the matching payment due the State from Luna County was $56,586.

267. On or about September 17, 2004, the Luna County Manager reported to the County Board that "there is an opportunity for Mimbres . . . to receive an additional $224,000 in sole community provider funding. He said there is a local match of $56,586 required and, as in the past the hospital has agreed to pay the match."

268. Also on or about September 17, 2004, Mimbres made a donation to Luna County in the amount of $56,586.

269. Also on or about September 17, 2004, the Luna County Board approved the additional SCHSP funding for Mimbres.

270. On or about October 11, 2004, Mimbres official Remer DeLoach sent an email to CHS corporate official Doug Gleeson stating that "[w]e just received our supplemental of $224,994 for which we made a donation of $56,586."

271. On or about September 10, 2004, Luna County notified Mimbres that, under the Sole Community Provider Contract between Luna County and Mimbres for the period from July 1, 2004 through June 30, 2005, Mimbres had to make quarterly payments to the county totaling $248,080.46 and Mimbres would receive $946,872.

272. On or about September 13, 2004, Mimbres pledged to make quarterly donations for the same period to Luna County totaling $248,080.46.

273. On or about October 11, 2004, Mr. DeLoach sent an email with the subject "Re: Sole Community Provider and Salud Contract" to Mr. Gleeson indicating that Mimbres was "donating $62,020.13 per [quarter] for a total of $248,080.48" to Luna County.

274. In or about January 2005, Mimbres requested SCPF funding from Luna County for the period July 1, 2005 through June 30, 2006.

275. On or about January 13, 2005, the Luna County Manager stated to the County Board that

> this is an annual consideration based on the old indigent program. The county provides 25% of the funding and the money is leveraged three to one for federal dollars. In this case, the hospital has agreed to pay the entire 25% match and have for the past three years.

276. On or about January 13, 2005, the Luna County Board approved Mimbres' request for SCPF funding.

277. On or about April 14, 2005, the State notified Luna County it would have to provide a total of $367,254 SCPF matching funds during the period July 1, 2005 through June 30, 2006.

278. On or about April 21, 2005, the State notified Mimbres it would receive a total of $1,225,522 SCPF funds during the period July 1, 2005 through June 30, 2006.

279. In or about September 2005, Luna County notified Mimbres that, under the Sole Community Provider Contract between Luna County and Mimbres for the period from

July 1, 2005 through June 30, 2006, Mimbres had to make quarterly payments to the county totaling $341,680.29 and Mimbres would receive $1,217,569.

280. The September 2005 notice from Luna County to Mimbres included a "25.7% Medicaid match September 2005" quarterly payment from Mimbres to Luna County in the amount of $78,228.81.

281. On or about September 16, 2005, Mimbres paid Luna County $78,228.81.

282. On or around September 27, 2005, CHS corporate employee Lisa Parrish sent an email to Mimbres employee Dianna Ortiz asking "[h]ave you had a chance to discuss with Martha Long [Luna County employee] her calculation of Mimbres' quarterly unrestricted donations to the county?"

283. Also on or around September 27, 2005, Martha Long, a Luna County employee, sent an email to Dianna Ortiz, which Ms. Ortiz forwarded to Lisa Parrish, stating that the "$78,228.81 is the 25.70 match for the money you will receive in October 2005, and the other 3 quarters are at 28.85% match to received (sic) $1,217,569.00 for the year 7-1-05 to 6-30-06."

284. On or about September 19, 2005, Mimbres was notified by the State that SCHSP funds were approved for Mimbres in the amount of $201,128.78 and that the State share due from Luna County was $51,690.10.

285. On or about September 20, 2005, Mimbres donated $51,690.10 to Luna County. The check cited an invoice description of "SUPPLEMENTAL PAYMENT." Handwritten notations on a copy of the check include "check for county match - supplemental

payment." The Mimbres Check Request Form specified the payment was for the "sole hospital supplemental payment."

286. Handwritten notations on a Mimbres general ledger print screen dated September 27, 2005 indicate CHS considered the $51,690.10 payment to be the "supplemental contribution."

287. On or about September 29, 2005, the Luna County Board approved Mimbres' request for a SCHSP payment in the amount of $201,128.78.

288. In or around September or October, 2005, additional SCHSP funds were available for Mimbres provided the county made a matching payment to the State, making the total SCHSP payment $234,904.77.

289. On or about October 26, 2005, Mimbres paid $8,680.43 to Luna County, increasing the total Mimbres donation for the SCHSP payment to $60,370.53. On or about October 28, 2005, Luna County paid the State $8,680.43.

290. In a November 14, 2005 email, Ms. Parrish noted that the annual SCHSP payment for Mimbres was $234,905 less contribution to County $60,371 = $174,534 net."

291. On or about January 12, 2006, the Luna County Board approved SCPF funding for Mimbres in the amount of $1,510,572 for the period July 1, 2006 through June 30, 2007.

292. On or about March 9, 2006, Luna County was notified it would have to provide $452,879 in SCPF matching funds from July 1, 2006 through June 30, 2007.

293. On or about that same day, Mimbres was notified it would receive $1,515,923 in SCPF payments from July 1, 2006 through June 30, 2007.

294. On or about August 17, 2006, CHS corporate and Mimbres officials understood that SCHSP funding was available for Mimbres in the amount of $463,516 and that the county share for this funding in the amount of $133,724 was due by September 15, 2006.

295. On or about August 17, 2006, CHS corporate and Mimbres officials intended to donate $133,724 to Luna County to secure the $463,516 in SCHSP funding, amounting to a total of $329,792 net of its donation.

296. On or about September 7, 2006, the Luna County Board considered approving an SCHSP payment to Mimbres in the amount of $463,516.26.

297. The Board was informed that the county matching share was $133,724.44 and that the "county pays the money to the state and the hospital will reimburse the county with monthly payments."

298. The Board approved the SCHSP payment to Mimbres in the amount of $463,516.26.

299. On or about September 22, 2006, Mimbres entered into a Memorandum of Agreement (2006-2007 MOA) with Luna County which stated that Mimbres agreed to donate to Luna County $600,000 for the period from September 1, 2006 through August 31, 2007, and that "these amounts relate to the services detailed under "Scope of Services.'"

300. Under the 2006-2007 MOA, Mimbres would donate $150,000 to Luna County in September 2006, and the balance in monthly installments of $50,000 from December 2006 through August 2007.

301. On or about February 8, 2007, the Luna County Commission approved Mimbres' request for SCPF funding for 2007-2008 in the amount of $2,072,251.

302. In approximately September 2007, Mimbres and Luna County became aware of a significant amount of additional SCHSP funds available to facilities where counties were willing to provide matching funds. The Luna County Board of Commissioners held a special meeting on September 21, 2007 to discuss the issue. Mr. Vinson invited John Gallagher and Brian Ebright, the Mimbres Chief Executive Officer and Chief Financial Officer, respectively, to attend.

303. Mr. Vinson informed the county commissioners that while other facilities were eligible to receive the extra funds, only Luna County was considering participation. Securing the additional funds for Mimbres would require Luna County to pay the State approximately $1.8 million.

304. One of the Luna County Commissioners was concerned that the additional funds would not be used in Luna County and asked Mimbres to provide a signed document indicating the money would be utilized locally. Mr. Ebright refused, citing "internal corporate restrictions on projects" precluded him from committing to using the money in Luna County only.

305. Mr. Gallagher informed the commissioners that Mimbres intended to use the additional funds to upgrade the hospital's operating room and emergency department and to recruit new physicians and nurses.

306. Luna County made matching payments of approximately $1.8 million to the State.

307. Days later, as a result of the matching funds paid by Luna County, Mimbres received total SCHSP payments of $7,079,533.27.

308. Luna County expected that it would collect its $1.8 million matching payment back from Mimbres over subsequent years.

309. Mimbres continues to provide donations to Luna County that have a direct or indirect relationship to SCPF and SCHSP payments made to Mimbres.

## ALTA VISTA

### Overview

310. For ease of reference, Table C, attached hereto, identifies donations made by Alta Vista to San Miguel County, transfers of matching funds from San Miguel County to the State, and SCPF and SCHSP payments to Alta Vista.

311. Alta Vista has made donations to San Miguel County since no later than 2000, as identified in Table C.

312. San Miguel County has paid matching payments to the State for SCPF and SCHSP payments to Alta Vista and, at various times, one or two other New Mexico sole community provider hospitals since no later than 2000, as identified in Table C.

313. Alta Vista has received from New Mexico payments under the SCPF and SCHSP programs based on matching funds paid by San Miguel County and, at various times, one or two other New Mexico counties since no later than 2000, as identified in Table C.

314. All or a portion of the SCPF and SCHSP payments identified in Table C that Alta Vista received from New Mexico varied based only upon the amount of the donations identified in Table C given to San Miguel County by Alta Vista.

315. San Miguel County's matching payments to the State identified in Table C guaranteed to return to Alta Vista all or a portion of Alta Vista's donations to San Miguel County.

316. Alta Vista's donations identified in Table C were non-bona fide donations.

317. Since no later than 2000, each year Alta Vista submitted its SCPF payment request to the State. For ease of reference, Table D attached hereto, identifies requests of SCPF and SCHSP funds made by Alta Vista and the funding levels approved by the State of New Mexico.

318. Since no later than 2000, it was common practice for San Miguel County officials, including County Manager Les Montoya, to discuss with Alta Vista personnel how to leverage as much SCPF and SCHSP funding as possible for Alta Vista.

319. Mr. Montoya discussed with Alta Vista personnel that there was a correlation between donations from Alta Vista to the county, on the one hand, and SCPF and SCHSP matching funds paid to the State by the county, on the other hand.

320. San Miguel County made its county matching payments to the State for the SCPF and SCHSP programs from its indigent fund.

321. That fund also paid for ambulance services.

322. Alta Vista made donations purportedly for "ambulance services" which were deposited in the San Miguel County indigent fund.

323. Notwithstanding Alta Vista's characterization of its donations as for "ambulance services," the donations had a direct or indirect relationship to SCPF and SCHSP payments made to Alta Vista.

324. Alta Vista's donations "freed up" monies in the indigent fund allowing the county to maximize SCPF and SCHSP funding for Alta Vista.

325. Without the Alta Vista donations, the county would not have been able to fully fund the SCPF and SCHSP programs for Alta Vista.

326. The amounts paid by San Miguel County to the State for SCPF matching funds has varied depending on the amounts of donations it received from Alta Vista.

327. Starting no later than 2001, San Miguel County at times entered into memoranda of agreement with Alta Vista.

328. The memoranda of agreement purported to provide that Alta Vista's donations were for identified county healthcare programs or ambulance services.

329. However, Alta Vista's donations had a direct or indirect relationship to SCPF and SCHSP payments made to Alta Vista.

## Chronology

330. On or about July 18, 2000, Alta Vista was notified it would receive a total of $266,987 in SCPF payments from July 1, 2000 through June 30, 2001.

331. On or around July 19, 2000, CHS corporate and Alta Vista officials were aware that New Mexico had available SCHSP funds for Alta Vista.

332. Also on or around July 19, 2000, CHS corporate and Alta Vista officials were aware that in order for Alta Vista to receive those funds, San Miguel County had to provide the State with matching funds.

333. In an email dated July 31, 2000, Mr. Portacci wrote to Messrs. Schmidt, Shafer and Alta Vista Chief Executive Officer Jay Hodges regarding the "Supplemental Sole Community Provider Allowances" saying "Dave says there may be restrictions on the hosp. directly paying the county to cover their portion? We need to verify, then determine our course of action, i.e. ambulance, street, lights, etc."

334. In a letter dated August 8, 2000 to San Miguel County Manager Les Montoya, Mr. Hodges made a formal request for San Miguel County to participate in the SCHSP program.

335. Mr. Hodges stated that Alta Vista had the potential to receive $391,812 from the SCHSP program.

336. Mr. Hodges also stated that in order for Alta Vista to receive those funds, San Miguel County must provide matching funds to the State in the amount of $105,908.

337. Mr. Hodges further stated that "[w]hile, I realize the County probably does not have a surplus of funds to designate for the above, Northeastern Regional Hospital is willing to explore all possible means of providing assistance in order to secure the matching portion for Northeastern Regional's participation, i.e., an unrestricted donation of $105,908."

338. On or about August 16, 2000, Mr. Hodges wrote to the San Miguel County Manager saying "I am pleased to announce Northeastern Regional Hospital will be making an unrestricted donation to San Miguel County's Indigent Care Fund, $105,908." Mr. Hodges sent a copy of the letter to Mr. Portacci.

339. At the August 25, 2000 San Miguel County Board of County Commissioners' meeting, the County Board approved receipt of Alta Vista's $105,908 donation, and approved the

payment of $125,908 in county matching payments to the State in order to obtain SCHSP funds for Alta Vista and other hospitals.

340. During the August 25, 2000 County Board meeting, Alta Vista employee Van Osborn presented to the County Board Alta Vista's $105,908 check.

341. On or about September 28, 2000, Alta Vista was notified it would receive $441,062 in SCHSP funds. Of that total, $396,955 was derived from matching funds paid by San Miguel County.

342. In a January 22, 2001 email regarding Sole Community Provider Funds, Mr. Hodges reported to a number of CHS corporate and hospital officials that "San Miguel County has officially approved our request for $743,451 in Sole Community Funds for fiscal year 2001. This compares favorably to the net of $602,141 for fiscal year 2000, which was made up of our initial funding of $266,987, plus the supplemental funding of $441,062, less the donation of $105,908 that we made to the County's Indigent Care Fund."

343. Mr. Hodges further stated that "[h]owever, instead of us making a separate donation back to the county like we did last year, the county is asking us to sign a Memorandum of Agreement, that commits us to fund $93,000 in various healthcare related expenses that the county has . . . " including expenses for an "Ambulance Service Contract."

344. In April 2001, Alta Vista agreed to fund $40,000 to San Miguel County, and entered into a Memorandum of Agreement which stated that the funding was for "ambulance services."

345. On or about May 17, 2001, Alta Vista was notified it would receive a total of $709,033 in SCPF payments from July 1, 2001 through June 30, 2002.

346. Alta Vista and/or CHS corporate maintained a schedule listing thirty-nine separate donations to San Miguel County from May 21, 2001 through December 23, 2005, totaling $394,988 . This, along with a schedule of SCPF and SCHSP payments received from the State , were described as "Payments & Program Receipts DSH/SCH/SUPPLEMENTAL."

347. In a February 14, 2003 letter to San Miguel County regarding the "Sole Community Hospital Payment Supplemental," Alta Vista pledged to make a donation of approximately $20,000 to San Miguel County and noted that the "County will inform the Hospital of the amount required to achieve the maximum funding from the Sole Community Hospital."

348. In an April 10, 2003 letter to Alta Vista, San Miguel County responded and asked Alta Vista to donate $17,032.

349. On or about August 20, 2004, New Mexico notified Alta Vista that $219,135.88 was available for Alta Vista in SCHSP funds, and that the share due the State from San Miguel County for these payments was $55,112.67.

350. In an August 30, 2004 email, Alta Vista Chief Financial Officer Tim Howard notified CHS corporate personnel that

> "In order for us to receive our $219,000 [SCHSP] payment, San Miguel County must pay the State $55,000 by September 22. If the county is indeed 'out of funds' and will not meet with us prior to September 21st - it appears we may risk losing this supplemental payment. I understand other [sole community provider] hospitals may have to 'reimburse' their counties for these payments. As you may know - we contribute $40,000 per year to the county for the ambulance service in lieu of any such 'direct' [sole community provider] payments. Please advise on how we should proceed."

351. On or about September 1, 2004, San Miguel County informed Alta Vista that it did not have funds available for a matching payment to the State for the SCHSP funds.

352. On or about September 3, 2004, Alta Vista increased its donations for the "ambulance fund" and sent San Miguel County a check for $55,000 so that the County "might approve our request for the SCP Supplemental Payment of $220,000 . . . ."

353. On or about September 14, 2004, San Miguel County approved the Alta Vista SCHSP funding request, requiring the county to pay $55,112.67 in matching funds to the State.

354. On or about September 17, 2004, San Miguel County paid $55,112.67 in matching payments to the State for SCHSP funds for Alta Vista.

355. On or about September 22, 2004, in response to Mr. Gleeson's questions about the SCPF program, including whether the hospitals made donations to their respective Counties and whether they specified the purpose of the donations, Mr. Howard stated "Yes - so far this year - we have contributed $61,600 to the county to help off-set the cost of the ambulance service."

356. On or about January 3, 2005, Alta Vista made a request to San Miguel County for SCPF funding for fiscal year 2005/2006 in the amount of $822,207.

357. The County's share of the cost of that SCPF funding would be $227,612.

358. On or about January 24, 2005, San Miguel County notified Alta Vista that the county had a shortfall in its indigent fund and lacked funds to finance its programs, including its payments for the SCPF and SCHSP programs.

359. In an urgent February 1, 2005 email to CHS corporate officials regarding Alta Vista's SCPF funding, Alta Vista's Chief Financial Officer noted that San Miguel County was scheduled to meet to approve Alta Vista's SCPF request, forwarded the county's letter describing the county's lack of funds to finance its programs, described Alta Vista's 2000-2004 donations to the county as "ostensibly to defray costs of running the ambulance service . . .," and recommended that Alta Vista make an "'unrestricted donation'" from $100,000 to $200,000.

360. On or about February 14, 2005, Alta Vista notified San Miguel County that CHS Corporate had approved a $250,000 donation to San Miguel County.

361. On or about February 15, 2005, San Miguel County approved Alta Vista's SCPF funding request for $822,207.

362. In or about February 2006, Alta Vista made a request to San Miguel County for SCPF funding for fiscal year 2006/2007 in the amount of $1,103,546.

363. The County's share of the cost of that SCPF and SCHSP funding would be approximately twenty-five percent or $275,886.50.

364. On or about February 23, 2006, Alta Vista Interim Chief Financial Officer Michael Healey wrote an email to a number of CHS corporate and Alta Vista employees regarding "Sole Community Match Donation - Alta Vista" in which Mr. Healey provided a "breakdown of Alta Vista's arrangement with San Miguel County whereby Sole Community Provider funding is secured." Mr. Healey listed county matching amounts by quarter, payments to be received by the hospital by quarter, and stated that

> we have agreed to make an unrestricted donation to the County Indigent fund on the first of March and June in the above match amounts. This is a savings over the prior arrangement of $23,333 per month we donated in calendar year 2005 (about $11,000 per quarter.) So on a monthly basis for January 06 to June 06 we should be booking a net amount of $48,837.49 ((205,552-59,039.54)/3). These amounts of course will increase beginning in July of 2006 when our FY07 request of $1,103,546 (made up of our current amount of $822,207, plus the $228,789 most recent supplemental, and a 5% indexing, which will probably get finalized a little lower) goes in to affect.

365. On or about February 14, 2006, San Miguel County approved Alta Vista's SCPF and SCHSP funding request for $1,103,546.

366. On or about March 9, 2006, Alta Vista was notified it would receive a total of $1,090,933 in SCPF payments from July 1, 2006 through June 30, 2007.

367. On or about the same day, San Miguel County was notified it would have to provide matching funds totaling $333,970 during the period July 1, 2006 through June 30, 2007.

368. On or about August 17, 2006, CHS corporate and Alta Vista officials understood that SCHSP funding was available for Alta Vista in the amount of $451,448 and that the county share for this funding in the amount of $130,243 was due by September 15, 2006.

369. On or about August 17, 2006, CHS corporate and Alta Vista officials intended to donate $130,243 to San Miguel County to secure the $451,448 in SCHSP funding, amounting to a total of $321,205 net of its donation.

370. On or about September 1, 2006, Alta Vista requested that San Miguel County approve payment of $130,242.67 in county matching funds for the SCHSP program, which would generate $455,712.63 in SCHSP payments to Alta Vista.

371. During a County Board meeting on September 12, 2006, the San Miguel County Finance Division Supervisor informed the Board of this request and stated the "donation [Alta Vista] is making to the County for ambulance care, makes the available gross receipts taxes a source in which to pay this supplemental."

372. The Board approved Alta Vista's request on or about September 12, 2006.

373. On or about September 12, 2006, Alta Vista entered into a Memorandum of Agreement (2006-2007 MOA) with San Miguel County which stated that Alta Vista agreed to donate to San Miguel County $480,000 for period from September 1, 2006 through August 31, 2007, and that "these amounts relate to the services detailed under 'Scope of Services.'"

374. Under the 2006 - 2007 MOA, Alta Vista would donate $120,000 to San Miguel County in September 2006, and the balance in monthly installments of $40,000 from December 2006 through August 2007. Alta Vista routinely referred to these payments as "Sole Community Provider Donation[s]."

374A. The donations made under the 2006 - 2007 MOA were made for the purpose of maintaining Alta Vista's SCPF and SCHSP funding.

375. On or about September 13, 2006, San Miguel County wrote a check to the State for the SCHSP matching funds in the amount of $130,242.67.

376. On or about January 9, 2007, the San Miguel County Commission approved Alta Vista's request for SCPF funding for 2007 - 2008 in the amount of $1,619,500.

377. On or about August 14, 2007, Alta Vista entered into a Memorandum of Agreement (2007-2008 MOA) with San Miguel County which stated that Alta Vista agreed to donate

to San Miguel County $480,000 for period from September 1, 2007 through August 31, 2008, and that "these amounts relate to the services detailed under "Scope of Services.""

378. Under the 2007-2008 MOA, Alta Vista would donate $40,000 in monthly installments to San Miguel County. Alta Vista routinely referred to these payments as "Sole Community Provider Donation[s]."

379. On or about August 31, 2007, Brian Gibbons, the Alta Vista Chief Executive Officer, was informed by Stephanie Moore, CHS corporate Division IV Vice President of Finance, that the 2007-2008 MOA was approved by San Miguel County, and the new Alta Vista SCHSP funding request had been forwarded to the county commission. Ms. Moore added "we expect no issues from the County, and look forward to additional funding from the State of New Mexico in the coming months."

380. Alta Vista check requests for MOA payments beginning at the latest in September 2006 and continuing through at least May 2008 consistently included the description "Sole Community Provider Donation."

381. Alta Vista continues to provide donations to San Miguel County that have a direct or indirect relationship to SCPF and SCHSP payments made to Alta Vista.

## CHSI's Cash Management Program

381A. At all times relevant to this complaint, CHS/Community Health Systems, Inc. (CHS/CHSI) has been a subsidiary of CHSI.

381B. At all times relevant to this complaint, CHS/CHSI has been a holding company that holds the debt for the companies associated with CHSI, including local hospitals such as Eastern, Mimbres, and Alta Vista.

381C. Since no later than 2006, CHSI has followed a cash management program.

381D. Under the cash management program, all of CHSI's local hospitals, including Eastern, Mimbres, and Alta Vista, deposit their revenues, including Medicaid reimbursement, in local bank accounts.

381E. The local bank accounts used for deposits are zero balance accounts, which means they are zeroed out each day.

382F. Funds from the local bank accounts are moved on a daily basis to a CHSPSC account with Bank of America.

381G. CHSPSC's Bank of America account is a zero balance account, which means it is zeroed out each day.

381H. Funds from the CHSPSC Bank of America account are moved on a daily basis to a master account at Wachovia held by CHS/CHSI.

381I. CHSI’s local hospitals also have local bank accounts used for disbursements through which the hospitals make payments on their accounts payable.

381J. The local bank accounts used for disbursements are zero balance accounts, which means they are zeroed out each day.

381K. At the end of each day, funds from CHS/CHSI's master account at Wachovia are transferred to the hospitals' local bank accounts to cover the disbursements made from those accounts for that day.

381L. The same CHS/CHSI master account at Wachovia is used to receive the funds from local hospitals' receipts as well as to fund the local hospitals' disbursements.

381M. CHSI does not have a bank account.

381N. The CHS/CHSI master account at Wachovia also funds CHSPSC's activities, including the salaries of all CHSPSC officers and employees.

381O. Funds received by local hospitals such as Eastern, Mimbres and Alta Vista are transferred to the CHS/CHSI master account at Wachovia and are reflected as revenues in CHSI's SEC filings.

## THE FALSE CLAIMS

382. New Mexico drew down federal funds as reimbursement for the SCPF and SCHSP payments to defendants identified in Tables A - C.

383. The SCPF and SCHSP payments made by New Mexico to defendants identified in Tables A - C were claimed as expenditures in quarterly 64 Forms presented to the United States by New Mexico for payment or approval through June 2008. For ease of reference, the relevant 64 Forms are identified on Table E.

384. The amounts of the SCPF and SCHSP payments to defendants claimed for federal reimbursement were not reduced by the amounts of defendants' donations.

385. Before September 2001, in each 64 Form New Mexico certified that "the information shown above and on the CMS-64 Summary Sheet and the Supporting Schedules is correct to the best of my knowledge and belief."

386. Starting in September 2001, in each relevant 64 Form New Mexico certified that "[t]he required amount of state and/or local funds were available and used to match the state's allowable expenditures included in this report, and such state and/or local funds were in accordance with all applicable federal requirements for the non-federal share match of expenditures."

387. New Mexico's 64 Forms presented to the United States for payment or approval were false because defendants' donations had a direct or indirect relationship to the SCPF and SCHSP payments to defendants, and the SCPF and SCHSP payments to defendants claimed for federal reimbursement in the 64 Forms were not reduced by the amount of defendants' donations, in violation of the Medicaid statute and regulations.

388. The claiming of federal reimbursement for the SCPF and SCHSP payments to defendants, without the reduction of the amount of defendants' donations, in the relevant 64 Forms was not correct.

389. The required amounts of State and/or local funds were not available and/or not used to match the State's SCPF and SCHSP payments to defendants claimed for federal reimbursement in the relevant 64 Forms.

390. State and/or local funds used were not in accordance with all applicable federal requirements for the non-federal share match of the SCPF and SCHSP payments to defendants claimed for federal reimbursement in the relevant 64 Forms.

## CLAIMS FOR RELIEF

## COUNT ONE

**Against All Defendants**
**False Claims Act - Violation of 31 U.S.C. §3729(a)(1)**
**Causing To Be Presented To The United States False Claims**

391. The United States realleges and incorporates by reference paragraphs 1 through 390 of this Complaint, as if fully set forth herein.

392. Beginning no later than the Summer of 2000, defendants with actual knowledge, or in reckless disregard or deliberate ignorance of the truth, caused to be presented to the United States false claims for payment or approval of federal matching Medicaid funds, which are shown on Table E.

393. As a result of defendants, with actual knowledge, or in reckless disregard or deliberate ignorance of the truth, causing to be presented to the United States false claims for payment or approval, the United States paid the claims and thereby sustained damages in an amount to be determined at trial.

## COUNT TWO

### Against All Defendants
### Payment By Mistake

394. The United States realleges and incorporates by reference paragraphs 1 through 390 of this Complaint, as if fully set forth herein.

395. Beginning no later than the Summer of 2000, federal matching Medicaid payments were made to New Mexico as reimbursement for the SCPF and SCHSP payments made to defendants.

396. Those federal matching payments were made under the erroneous belief that the State's claims for federal reimbursement complied with the Medicaid statutory and regulatory prohibition on federal funding for Medicaid expenditures in instances where the state or county has received provider-related donations that have a direct or indirect relationship to Medicaid payments made to the provider.

397. The State's claims for federal reimbursement did not comply with that prohibition because defendants' donations had a direct or indirect relationship to the SCPF and SCHSP payments to defendants, and the SCPF and SCHSP payments to defendants claimed for federal reimbursement in the 64 Forms were not reduced by the amount of defendants' donations.

398. That erroneous belief was material to the federal reimbursement to New Mexico.

399. But for that erroneous belief, the United States would not have made matching Medicaid payments to New Mexico as reimbursement for the SCPF and SCHSP payments to defendants.

400. The mistaken federal payments flowed to defendants.

401. Defendants participated in and benefitted from the mistaken federal payments.

402. As a result of these mistaken federal payments flowing to defendants, the United States has been damaged and is entitled to recover those damages from defendants in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in favor of the United States as follows:

1. On Count One from defendants, jointly and severally, for treble the amount of damages sustained by the United States, in an amount to be established at trial, and all allowable penalties, fees, and costs under the False Claims Act, as amended.

2. On Count Two from defendants, jointly and severally, for damages sustained by the United States plus interest, costs, and expenses, in amounts to be established at trial.

3. All other relief as this Court may deem just and proper, together with interest and costs of this action, as appropriate.

Respectfully submitted,
TONY WEST
Assistant Attorney General, Civil Division
KENNETH J. GONZALES
United States Attorney, District of New Mexico
/s/___________________________

HOWARD R. THOMAS
Assistant United States Attorney
201 3rd Street, N.W.
Suite 900
Albuquerque, New Mexico 87102
(505) 224-1508
howard.thomas@usdoj.gov
JOYCE R. BRANDA
DANIEL R. ANDERSON
ROBERT MCAULIFFE
ELIZABETH RINALDO
UNA LEE
Attorneys
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, DC 20044

I HEREBY CERTIFY that on *6-Jun-11*, I filed the foregoing electronically through the CM/ECF system, which caused counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

*Filed Electronically on 6-Jun-11*

/s/___________________________

HOWARD R. THOMAS
Assistant United States Attorney

**TABLE A**

**Eastern**

| Donations | | County Match | | Payment to Eastern | | |
|---|---|---|---|---|---|---|
| Date | Amount | Date | Amount | Date | Payment | Amount |
| 8/25/2000 | 717,422.21 | 8/29/2000 | 717,422.00 | 9/22/2000 | SCHSP | 2,694,206.00 |
| | | 9/14/2000 | 100,007.00 | | SCPF Q1 | 407,719.25 |
| 2/5/2001 | 184,250.00 | 1/8/2001 | 115,178.00 | 1/26/2001 | SCPF Q2 | 407,719.25 |
| 5/11/2001 | 184,250.00 | 3/14/2001 | 106,616.00 | 5/7/2001 | SCPF Q3 | 407,719.25 |
| 7/27/2001 | 184,250.00 | 6/25/2001 | 106,616.00 | 7/23/2001 | SCPF Q4 | 407,719.25 |
| **SFY 2001** | **1,270,172.21** | | **1,145,839.00** | | | **4,325,083.00** |
| 9/6/2001 | 35,135.00 | 9/14/2001 | 35,135.00 | 9/28/2001 | SCHSP | 134,090.00 |
| 9/4/2001 | 184,250.00 | 9/14/2001 | 291,509.00 | 10/15/2001 | SCPF Q1 | 1,114,725.25 |
| 12/14/2001 | 184,250.00 | 12/14/2001 | 299,965.00 | 1/21/2002 | SCPF Q2 | 1,114,725.25 |
| 2/27/2002 | 184,250.00 | 3/11/2002 | 299,965.00 | 4/8/2002 | SCPF Q3 | 1,114,725.25 |
| 5/29/2002 | 184,250.00 | 6/17/2002 | 299,965.00 | 7/8/2002 | SCPF Q4 | 1,114,725.25 |
| **SFY 2002** | **772,135.00** | | **1,226,539.00** | | | **4,592,991.00** |
| 9/11/2002 | 78,265.40 | 9/25/2002 | 78,265.40 | 9/30/2002 | SCHSP | 290,301.93 |
| 8/28/2002 | 184,250.00 | 8/30/2002 | 317,347.00 | 10/21/2002 | SCPF Q1 | 1,179,194.00 |
| 11/6/2002 | 12,904.50 | | | | | |
| 11/20/2002 | 197,154.50 | 12/16/2002 | 300,749.00 | 1/6/2003 | SCPF Q2 | 1,179,194.00 |
| 2/26/2003 | 197,154.50 | 3/12/2003 | 300,749.00 | 4/7/2003 | SCPF Q3 | 1,179,194.00 |
| 4/30/2003 | 197,154.50 | | | | | |
| 7/2/2003 | 197,154.50 | 6/23/2003 | 300,749.00 | 7/14/2003 | SCPF Q4 | 1,179,194.00 |
| **SFY 2003** | **1,064,037.90** | | **1,297,859.40** | | | **5,007,077.93** |
| 8/20/2003 | 142,043.13 | 9/8/2003 | 142,043.13 | 9/29/2003 | SCHSP | 558,345.62 |
| 8/27/2003 | 224,306.00 | 9/12/2003 | 329,045.00 | 10/6/2003 | SCPF Q1 | 1,295,581.50 |
| 11/25/2003 | 44,861.20 | | | | | |
| 11/25/2003 | 224,306.00 | 12/5/2003 | 325,294.00 | 1/12/2004 | SCPF Q2 | 1,295,581.50 |
| 3/15/2004 | 224,306.00 | 3/31/2004 | 325,294.00 | 4/12/2004 | SCPF Q3 | 1,295,581.50 |
| 6/16/2004 | 224,306.00 | 6/8/2004 | 325,294.00 | 7/12/2004 | SCPF Q4 | 1,295,581.50 |
| **SFY 2004** | **1,084,128.33** | | **1,446,970.13** | | | **5,740,671.62** |
| 8/30/2004 | 346,593.12 | 9/10/2004 | 346,593.12 | 9/27/2004 | SCHSP | 1,378,103.86 |
| 9/1/2004 | 269,170.00 | 9/30/2004 | 373,374.00 | 10/11/2004 | SCPF Q1 | 1,486,834.00 |
| 12/1/2004 | 269,170.00 | 12/10/2004 | 381,539.00 | 1/17/2005 | SCPF Q2 | 1,486,834.00 |
| 12/15/2004 | 53,834.00 | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 3/2/2005 | 269,170.00 | 4/14/2005 | 381,539.00 | 4/18/2005 | SCPF Q3 | 1,486,834.00 |
| 6/1/2005 | 269,170.00 | 6/13/2005 | 381,539.00 | 7/18/2005 | SCPF Q4 | 1,486,834.00 |
| **SFY 2005** | **1,477,107.12** | | **1,864,584.12** | | | **7,325,439.86** |
| 9/21/2005 | 316,605.38 | 9/23/2005 | 316,605.38 | 9/30/2005 | SCHSP | 1,438,807.83 |
| 10/12/2005 | 53,168.23 | 10/21/2005 | 53,168.23 | | | |
| 9/7/2005 | 369,695.00 | 9/19/2005 | 487,767.00 | 9/30/2005 | SCPF Q1 | 1,900,260.50 |
| 12/7/2005 | 73,939.05 | | | | | |
| 1/9/2006 | 369,695.00 | 12/28/2005 | 547,552.00 | 1/9/2006 | SCPF Q2 | 1,900,260.50 |
| 3/1/2006 | 369,695.00 | 3/24/2006 | 547,552.00 | 4/10/2006 | SCPF Q3 | 1,900,260.50 |
| 6/30/2006 | 369,695.00 | 6/23/2006 | 454,675.61 | 7/10/2006 | SCPF Q4 | 1,900,260.50 |
| | | 7/11/2006 | 92,876.39 | | | |
| 7/5/2006 | 200,000.00 | | | | | |
| **SFY 2006** | **2,122,492.66** | | **2,500,196.61** | | | **9,039,849.83** |
| 9/12/2006 | 1,345,000.00 | 9/13/2006 | 819,071.36 | 9/29/2006 | SCHSP | 2,839,068.84 |
| | | 9/13/2006 | 676,077.00 | 10/9/2006 | SCPF Q1 | 2,345,841.25 |
| 11/10/2006 | 205,000.00 | | | | | |
| 11/15/2006 | 205,000.00 | | | | | |
| 12/20/2006 | 205,000.00 | 12/22/2006 | 657,798.00 | 1/22/2007 | SCPF Q2 | 2,345,841.25 |
| 1/24/2007 | 205,000.00 | | | | | |
| 2/28/2007 | 205,000.00 | | | | | |
| 3/21/2007 | 205,000.00 | 3/30/2007 | 657,798.00 | 4/9/2007 | SCPF Q3 | 2,345,841.25 |
| 4/25/2007 | 205,000.00 | | | | | |
| 5/16/2007 | 205,000.00 | | | | | |
| 6/27/2007 | 205,000.00 | 6/29/2007 | 657,798.00 | 7/16/2007 | SCPF Q4 | 2,345,841.25 |
| **SFY 2007** | **3,190,000.00** | | **3,468,542.36** | | | **12,222,433.84** |
| 7/18/2007 | 205,000.00 | | | | | |
| 8/29/2007 | 205,000.00 | | | | | |
| 9/5/2007 | 985,000.00 | 9/12/2007 | 898,801.85 | 9/28/2007 | SCHSP | 3,202,001.59 |
| 9/28/2007 | 300,000.00 | 10/2/2007 | 887,026.00 | 10/8/2007 | SCPF Q1 | 3,162,554.50 |
| 10/24/2007 | 300,000.00 | | | | | |
| 11/28/2007 | 300,000.00 | | | | | |
| 12/19/2007 | 300,000.00 | 12/28/2007 | 908,198.00 | 1/14/2008 | SCPF Q2 | 3,162,554.50 |
| 1/16/2008 | 300,000.00 | | | | | |
| 2/20/2008 | 300,000.00 | | | | | |
| 3/19/2008 | 300,000.00 | 3/28/2008 | 908,198.00 | 4/21/2008 | SCPF Q3 | 3,162,554.50 |
| 4/23/2008 | 300,000.00 | | | | | |
| 5/21/2008 | 300,000.00 | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 6/11/2008 | 300,000.00 | 6/13/2008 | 908,198.00 | 5/19/2008 | SCPF Q4 | 3,162,554.50 |
| **SFY 2008** | **4,395,000.00** | | **4,510,421.85** | | | **15,852,219.59** |
| 7/16/2008 | 300,000.00 | | | | | |
| 8/27/2008 | 300,000.00 | | | | | |
| 9/3/2008 | 870,000.00 | 9/18/2008 | 841,165.11 | 9/29/2008 | SCHSP | 2,888,616.00 |
| 9/24/2008 | 492,167.00 | 9/26/2008 | 1,175,824.00 | 10/20/2008 | SCPF Q1 | 4,093,836.00 |
| 10/22/2008 | 492,167.00 | | | | | |
| 11/19/2008 | 492,167.00 | | | | | |
| 12/23/2008 | 492,167.00 | 12/31/2008 | 1,191,371.00 | 1/19/2009 | SCPF Q2 | 4,093,836.00 |
| 1/21/2009 | 492,167.00 | | | | | |
| 2/25/2009 | 492,167.00 | | | | | |
| 3/25/2009 | 492,167.00 | 3/31/2009 | 1,191,371.00 | 4/13/2009 | SCPF Q3 | 4,093,836.00 |
| 4/22/2009 | 492,167.00 | | | | | |
| 5/22/2009 | 492,166.00 | | | | | |
| 6/17/2009 | 492,166.00 | 6/30/2009 | 1,191,371.00 | 7/20/2009 | SCPF Q4 | 4,093,836.00 |
| **SFY 2009** | **6,391,668.00** | | **5,591,102.11** | | | **19,263,960.00** |
| 7/22/2009 | 492,166.00 | | | | | |
| 8/26/2009 | 492,166.00 | | | | | |
| Sep-09 | 362,500.00 | 9/11/2009 | 861,761.08 | 9/28/2009 | SCHSP | 4,191,444.94 |
| | | 9/29/2009 | 803,955.00 | 10/5/2009 | SCPF Q1 | 4,989,365.75 |
| Oct-09 | 362,500.00 | 12/28/2009 | 788,995.00 | Dec-09 | SCPF Q2 | 4,989,365.75 |
| Nov-09 | 362,500.00 | | | | | |
| Dec-09 | 362,500.00 | | | | | |
| 1/15/2010 | 362,500.00 | 3/25/2010 | 730,899.00 | Mar-10 | SCPF Q3 | 4,989,365.75 |
| 2/8/2010 | 362,500.00 | | | | | |
| 3/12/2010 | 362,500.00 | | | | | |
| 4/9/2010 | 362,500.00 | 8/31/2010 | 820,309.00 | Jun-10 | SCPF Q4 | 4,989,365.75 |
| 5/19/2010 | 362,500.00 | | | | | |
| 6/16/2010 | 362,500.00 | | | | | |
| **SFY 2010** | **4,609,332.00** | | **4,005,919.08** | | | **24,148,907.94** |
| 7/14/2010 | 362,500.00 | | | | | |
| 8/13/2010 | 362,500.00 | | | | | |
| | | 9/21/2010 | 889,642.51 | Sep-10 | SCHSP | 4,269,789.87 |
| | | 9/21/2010 | 195,100.00 | | | |
| Sep-10 | 500,000.00 | 9/30/2010 | 1,220,102.00 | Sep-10 | SCPF Q1 | 6,198,519.50 |
| Oct-10 | 500,000.00 | | | | | |
| Nov-10 | 500,000.00 | | | | | |
| Dec-10 | 500,000.00 | 12/31/2010 | 1,220,102.00 | Dec-10 | SCPF Q2 | 6,198,519.50 |

| | | | |
|---|---|---|---|
| **SFY 2011** | **2,725,000.00** | **3,524,946.51** | **16,666,828.87** |
| (through 12/31/2010) | | | |
| **TOTAL** | **29,101,073.22** | **30,582,920.17** | **124,185,463.48** |

Table B

Mimbres

| Mimbres Donations | | County Match | | Payment to Mimbres | | |
|---|---|---|---|---|---|---|
| Date | Amount | Date | Amount | Date | Payment | Amount |
| 8/21/2000 | 180,000.00 | 8/24/2000 | 114,403.66 | | SCHSP | 508,844.00 |
| 9/30/2000 | | | 25,133.00 | | SCPF Q1 | 77,028.79 |
| 12/31/2000 | | | 24,681.00 | | SCPF Q2 | 77,028.79 |
| 3/31/2001 | | | 24,681.00 | 5/7/2001 | SCPF Q3 | 77,028.79 |
| 6/30/2001 | | | 24,681.00 | 7/23/2001 | SCPF Q4 | 77,028.79 |
| **SFY 2001** | **180,000.00** | | **213,579.66** | | | **816,959.16** |
| 9/24/2001 | 5,736.00 | | 5,736.00 | 9/28/2001 | SCHSP | 21,892.00 |
| 9/17/2001 | 46,492.10 | 9/13/2001 | 51,727.00 | 10/15/2001 | SCPF Q1 | 181,992.25 |
| 12/31/2001 | 46,492.10 | 12/13/2001 | 53,227.00 | 1/21/2002 | SCPF Q2 | 181,992.25 |
| 3/12/2002 | 46,492.10 | 3/14/2002 | 53,227.00 | 4/8/2002 | SCPF Q3 | 181,992.25 |
| 7/1/2002 | 46,492.10 | 6/14/2002 | 53,227.00 | 7/8/2002 | SCPF Q4 | 181,992.25 |
| **SFY 2002** | **191,704.40** | | **217,144.00** | | | **749,861.00** |
| 9/17/2002 | 12,777.88 | 9/19/2002 | 12,777.88 | 9/30/2002 | SCHSP | 47,395.70 |
| 9/4/2002 | 49,220.04 | 9/12/2002 | 56,180.00 | 10/21/2002 | SCPF Q1 | 192,526.75 |
| 12/11/2002 | 49,220.02 | 12/12/2002 | 53,242.00 | 1/6/2003 | SCPF Q2 | 192,526.75 |
| 3/3/2003 | 49,220.02 | 3/3/2003 | 53,242.00 | 4/7/2003 | SCPF Q3 | 192,526.75 |
| 6/9/2003 | 49,220.02 | 6/12/2003 | 53,242.00 | 7/14/2003 | SCPF Q4 | 192,526.75 |
| **SFY 2003** | **209,657.98** | | **228,683.88** | | | **817,502.70** |
| 8/20/2003 | 23,190.46 | 8/21/2003 | 23,190.46 | 9/29/2003 | SCHSP | 91,157.45 |
| 9/30/2003 | 52,331.00 | 9/18/2003 | 57,734.00 | 10/6/2003 | SCPF Q1 | 207,550.00 |
| 12/3/2003 | 51,734.00 | 12/5/2003 | 57,075.00 | 1/12/2004 | SCPF Q2 | 207,550.00 |
| 3/31/2004 | 51,734.00 | 3/12/2004 | 57,075.00 | 4/12/2004 | SCPF Q3 | 207,550.00 |
| 6/30/2004 | 51,734.00 | 6/25/2004 | 57,075.00 | 7/12/2004 | SCPF Q4 | 207,550.00 |
| **SFY 2004** | **230,723.46** | | **252,149.46** | | | **921,357.45** |
| 9/13/2004 | 62,020.12 | 9/10/2004 | 65,064.00 | 10/11/2004 | SCPF Q1 | 238,631.50 |
| 9/17/2004 | 56,586.00 | 9/16/2004 | 56,586.00 | 9/27/2004 | SCHSP | 224,994.03 |
| 12/17/2004 | 62,020.12 | 12/16/2004 | 66,487.00 | 1/17/2005 | SCPF Q2 | 238,631.50 |
| 3/29/2005 | 62,020.12 | 3/17/2005 | 66,487.00 | 4/18/2005 | SCPF Q3 | 238,631.50 |
| 6/22/2005 | 62,020.12 | 6/16/2005 | 66,487.00 | 7/18/2005 | SCPF Q4 | 238,631.50 |
| **SFY 2005** | **304,666.48** | | **321,111.00** | | | **1,179,520.03** |
| 9/16/2005 | 78,228.81 | 9/15/2005 | 84,084.00 | 9/30/2005 | SCPF Q1 | 306,380.50 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 9/21/2005 | 51,690.10 | 9/22/2005 | 51,690.10 | 9/30/2005 | SCHSP | 234,904.77 |
| 10/26/2005 | 8,680.43 | 10/28/2005 | 8,680.43 | | | |
| 12/19/2005 | 87,817.16 | 12/22/2005 | 94,390.00 | 1/9/2006 | SCPF Q2 | 306,380.50 |
| 3/23/2006 | 87,817.16 | 3/16/2006 | 94,390.00 | 4/10/2006 | SCPF Q3 | 306,380.50 |
| 6/12/2006 | 87,817.16 | 6/15/2006 | 94,390.00 | 7/10/2006 | SCPF Q4 | 306,380.50 |
| **SFY 2006** | **402,050.82** | | **427,624.53** | | | **1,460,426.77** |
| 10/5/2006 | 150,000.00 | 9/30/2006 | 133,724.44 | 9/29/2006 | SCHSP | 463,516.26 |
| | | 9/14/2006 | 115,563.00 | 10/9/2006 | SCPF Q1 | 378,980.75 |
| 12/31/2006 | 50,000.00 | 12/31/2006 | 112,439.00 | 1/22/2007 | SCPF Q2 | 378,980.75 |
| 1/5/2007 | 50,000.00 | | | | | |
| 2/2/2007 | 50,000.00 | | | | | |
| 3/2/2007 | 50,000.00 | 3/31/2007 | 112,439.00 | 4/9/2007 | SCPF Q3 | 378,980.75 |
| 4/6/2007 | 50,000.00 | | | | | |
| 5/4/2007 | 50,000.00 | | | | | |
| 6/1/2007 | 50,000.00 | 6/30/2007 | 112,439.00 | 7/16/2007 | SCPF Q4 | 378,980.75 |
| **SFY 2007** | **500,000.00** | | **586,604.44** | | | **1,979,439.26** |
| 7/6/2007 | 50,000.00 | | | | | |
| 8/3/2007 | 50,000.00 | 8/31/2007 | 146,741.52 | | | |
| 5/23/2008 | 60,416.00 | 9/21/2007 | 1,840,483.47 | 9/28/2007 | SCHSP | 7,079,533.27 |
| | | 9/20/2007 | 149,968.00 | 10/8/2007 | SCPF Q1 | 510,043.75 |
| 5/23/2008 | 60,416.00 | | | | | |
| 5/23/2008 | 60,416.00 | | | | | |
| 5/23/2008 | 60,416.00 | 12/21/2007 | 153,547.00 | 1/14/2008 | SCPF Q2 | 510,043.75 |
| 5/23/2008 | 60,416.00 | | | | | |
| 5/23/2008 | 60,416.00 | | | | | |
| 5/23/2008 | 60,416.00 | 4/18/2008 | 153,547.00 | 5/5/2008 | SCPF Q3 | 510,043.75 |
| 5/23/2008 | 60,416.00 | | | | | |
| 5/23/2008 | 60,416.00 | | | | | |
| 6/6/2008 | 60,416.00 | 5/22/2008 | 153,547.00 | 5/19/2008 | SCPF Q4 | 510,043.50 |
| **SFY 2008** | **704,160.00** | | **2,597,833.99** | | | **9,119,708.02** |
| Aug-08 | 60,416.00 | 9/18/2008 | 106,231.32 | 9/29/2008 | SCHSP | 364,805.36 |
| Sep-08 | 106,361.00 | 9/18/2008 | 204,942.00 | 10/20/2008 | SCPF Q1 | 688,537.50 |
| Oct-08 | 106,361.00 | | | | | |
| Nov-08 | 106,361.00 | | | | | |
| Dec-08 | 106,361.00 | 12/11/2008 | 207,652.00 | 1/19/2009 | SCPF Q2 | 688,537.50 |
| Jan-09 | 106,361.00 | | | | | |
| Feb-09 | 106,361.00 | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Mar-09 | 106,361.00 | 3/12/2009 | 207,652.00 | 4/13/2009 | SCPF Q3 | 688,537.50 |
| Apr-09 | 106,361.00 | | | | | |
| May-09 | 106,361.00 | | | | | |
| Jun-09 | 106,361.00 | 6/12/2009 | 207,652.00 | 7/20/2009 | SCPF Q4 | 688,537.50 |
| **SFY 2009** | **1,124,026.00** | | **934,129.32** | | | **3,118,955.36** |
| Jul-09 | 106,361.00 | | | | | |
| Aug-09 | 106,361.00 | | | | | |
| | | 9/11/2009 | 108,832.40 | 9/28/2009 | SCHSP | 529,340.48 |
| Sep-09 | 64,791.67 | 9/24/2009 | 104,760.00 | 10/5/2009 | SCPF Q1 | 688,537.50 |
| Oct-09 | 64,791.67 | | | | | |
| Nov-09 | 64,791.67 | | | | | |
| Dec-09 | 64,791.67 | 12/22/2009 | 102,650.00 | Dec-10 | SCPF Q2 | 688,537.50 |
| Jan-10 | 64,791.67 | | | | | |
| Feb-10 | 64,791.67 | | | | | |
| Mar-10 | 64,791.67 | 3/18/2010 | 92,524.00 | Mar-10 | SCPF Q3 | 688,537.50 |
| Apr-10 | 64,791.67 | | | | | |
| May-10 | 64,791.67 | | | | | |
| Jun-10 | 64,791.67 | 6/24/2010 | 115,715.00 | Jun-10 | SCPF Q4 | 688,537.50 |
| **SFY 2010** | **860,638.70** | | **524,481.40** | | | **3,283,490.48** |
| Jul-10 | 64,791.67 | | | | | |
| Aug-10 | 64,791.67 | | | | | |
| | | 9/16/2010 | 105,204.69 | Sep-10 | SCHSP | 539,234.71 |
| Sep-10 | 72,916.67 | 9/16/2010 | 161,974.00 | Sep-10 | SCPF Q1 | 843,036.00 |
| Oct-10 | 72,916.67 | | | | | |
| Nov-10 | 72,916.67 | | | | | |
| Dec-10 | 72,916.67 | Dec-10 | 167,461.00 | Dec-10 | SCPF Q2 | 843,036.00 |
| **SFY 2011** | **421,250.02** | | **434,639.69** | | | **2,225,306.71** |

(through 12/31/2010)

| | | | |
|---|---|---|---|
| **TOTAL** | **5,128,877.86** | **6,737,981.37** | **25,672,526.94** |

**Table C**

**Alta Vista**

| Donations | | County Match | | Payment to Alta Vista | | |
|---|---|---|---|---|---|---|
| Date | Amount | Date | Amount | Date | Payment | Amount |
| 8/18/2000 | 105,908.00 | 9/30/2000 | 125,908.00 | | SCHSP | 441,062.00 |
| | | 9/30/2000 | 21,176.00 | | SCPF Q1 | 66,746.75 |
| | | 12/31/2000 | 20,795.00 | | SCPF Q2 | 66,746.75 |
| 2/16/2001 | 105,908.00 | 3/31/2001 | 20,795.00 | 5/7/2001 | SCPF Q3 | 66,746.75 |
| | | 6/30/2001 | 20,795.00 | 7/23/2001 | SCPF Q4 | 66,746.75 |
| **SFY 2001** | **211,816.00** | | **209,469.00** | | | **708,049.00** |
| 7/9/2001 | 3,333.00 | | | | | |
| 8/2/2001 | 3,333.00 | | | | | |
| 8/28/2001 | 3,333.00 | | | | | |
| | | 9/30/2001 | 5,586.00 | 9/28/2001 | SCHSP | 21,322.00 |
| | | 9/30/2001 | 48,951.00 | 10/15/2001 | SCPF Q1 | 177,258.25 |
| 10/4/2001 | 3,333.00 | | | | | |
| 11/14/2001 | 3,333.00 | | | | | |
| 12/27/2001 | 3,333.00 | 12/31/2001 | 50,371.00 | 1/21/2002 | SCPF Q2 | 177,258.25 |
| 1/11/2002 | 3,333.00 | | | | | |
| 2/1/2002 | 3,333.00 | | | | | |
| 3/4/2002 | 3,333.00 | 3/31/2002 | 50,371.00 | 4/8/2002 | SCPF Q3 | 177,258.25 |
| 4/9/2002 | 3,333.00 | | | | | |
| 5/1/2002 | 3,333.00 | | | | | |
| 6/12/2002 | 3,333.00 | 6/30/2002 | 50,371.00 | 7/8/2002 | SCPF Q4 | 177,258.25 |
| **SFY 2002** | **39,996.00** | | **205,650.00** | | | **730,355.00** |
| 7/1/2002 | 3,333.00 | | | | | |
| 8/1/2002 | 3,333.00 | | | | | |
| 9/1/2002 | 3,333.00 | | | | | |
| | | 9/30/2002 | 12,445.18 | 9/30/2002 | SCHSP | 46,161.66 |
| | | 9/30/2002 | 51,967.00 | 10/21/2002 | SCPF Q1 | 182,585.00 |
| 10/1/2002 | 3,333.00 | | | | | |
| 11/1/2002 | 3,333.00 | | | | | |
| 12/1/2002 | 3,333.00 | | | | | |
| | | 12/31/2002 | 49,249.00 | 1/6/2003 | SCPF Q2 | 182,585.00 |
| 1/1/2003 | 3,333.00 | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2/1/2003 | 3,333.00 | | | | | |
| 3/1/2003 | 3,333.00 | 3/31/2003 | 49,249.00 | 4/7/2003 | SCPF Q3 | 182,585.00 |
| 4/1/2003 | 3,333.00 | | | | | |
| 4/10/2003 | 17,032.00 | | | | | |
| 5/2/2003 | 3,333.00 | | | | | |
| | | 6/30/2003 | 49,249.00 | 7/14/2003 | SCPF Q4 | 182,585.00 |
| **SFY 2003** | **53,695.00** | | **212,159.18** | | | **776,501.66** |
| | | 9/30/2003 | 22,586.65 | 9/29/2003 | SCHSP | 88,783.99 |
| 9/30/2003 | | 9/30/2003 | 52,590.00 | 10/6/2003 | SCPF Q1 | 199,924.25 |
| 12/31/2003 | | 12/31/2003 | 51,990.00 | 1/12/2004 | SCPF Q2 | 199,924.25 |
| 3/31/2004 | | 3/31/2004 | 51,990.00 | 4/12/2004 | SCPF Q3 | 199,924.25 |
| 6/1/2004 | 3,333.00 | | | | | |
| 6/30/2004 | | 6/30/2004 | 51,990.00 | 7/12/2004 | SCPF Q4 | 199,924.25 |
| **SFY 2004** | **3,333.00** | | **231,146.65** | | | **888,480.99** |
| 7/2/2004 | 3,333.00 | | | | | |
| 8/1/2004 | 3,333.00 | | | | | |
| 9/3/2004 | 55,000.00 | 9/30/2004 | 55,112.67 | 9/27/2004 | SCHSP | 219,135.88 |
| | | 9/30/2004 | 54,519.00 | 10/11/2004 | SCPF Q1 | 195,763.50 |
| | | 12/31/2004 | 55,711.00 | 1/17/2005 | SCPF Q2 | 195,763.50 |
| 2/8/2005 | 16,667.00 | | | | | |
| 3/5/2005 | 23,333.00 | | | | | |
| 3/31/2005 | 23,333.00 | 3/31/2005 | 55,711.00 | 4/18/2005 | SCPF Q3 | 195,763.50 |
| 4/29/2005 | 23,333.00 | | | | | |
| 6/30/2005 | 23,333.00 | 6/30/2005 | 55,711.00 | 7/18/2005 | SCPF Q4 | 195,763.50 |
| **SFY 2005** | **171,665.00** | | **276,764.67** | | | **1,002,189.88** |
| 7/8/2005 | 23,333.00 | | | | | |
| 8/5/2005 | 23,333.00 | | | | | |
| 9/9/2005 | 23,333.00 | | | | | |
| | | 9/30/2005 | 58,798.66 | 9/30/2005 | SCHSP | 228,788.58 |
| | | 9/30/2005 | 58,437.00 | 9/30/2005 | SCPF Q1 | 205,551.75 |
| 10/7/2005 | 23,333.00 | | | | | |
| 11/22/2005 | 23,333.00 | | | | | |
| 12/23/2005 | 23,333.00 | | | | | |
| | | 12/31/2005 | 65,599.00 | 1/9/2006 | SCPF Q2 | 205,551.75 |
| 3/1/2006 | 59,039.54 | 3/31/2006 | 65,599.00 | 4/10/2006 | SCPF Q3 | 205,551.75 |
| 6/1/2006 | 59,039.54 | 6/30/2006 | 65,599.00 | 7/10/2006 | SCPF Q4 | 205,551.75 |
| **SFY 2006** | **258,077.08** | | **314,032.66** | | | **1,050,995.58** |

| | | | | | | |
|---|---|---|---|---|---|---|
| 9/14/2006 | 120,000.00 | 9/13/2006 | 130,242.67 | 9/29/2006 | SCHSP | 591,336.00 |
| | | 9/30/2006 | 85,221.00 | 10/9/2006 | SCPF Q1 | 272,733.25 |
| 12/8/2006 | 40,000.00 | 12/31/2006 | 82,917.00 | 1/22/2007 | SCPF Q2 | 272,733.25 |
| 1/12/2007 | 40,000.00 | | | | | |
| 2/9/2007 | 40,000.00 | | | | | |
| 3/9/2007 | 40,000.00 | 4/3/2007 | 82,917.00 | 4/9/2007 | SCPF Q3 | 272,733.25 |
| 4/20/2007 | 40,000.00 | | | | | |
| 5/25/2007 | 40,000.00 | | | | | |
| 6/8/2007 | 40,000.00 | 6/18/2007 | 82,917.00 | 7/16/2007 | SCPF Q4 | 272,733.25 |
| **SFY 2007** | **400,000.00** | | **464,214.67** | | | **1,682,269.00** |
| 7/16/2007 | 40,000.00 | | | | | |
| 8/10/2007 | 40,000.00 | | | | | |
| 9/30/2007 | 40,000.00 | 9/19/2007 | 292,920.81 | 9/28/2007 | SCHSP | 865,410.81 |
| | | 9/17/2007 | 118,608.00 | 10/8/2007 | SCPF Q1 | 399,091.00 |
| | | 12/31/2007 | 121,439.00 | 1/14/2008 | SCPF Q2 | 399,091.00 |
| 2/1/2008 | 160,000.00 | | | | | |
| 2/8/2008 | 40,000.00 | | | | | |
| 4/24/2008 | 80,000.00 | 3/31/2008 | 121,439.00 | 4/21/2008 | SCPF Q3 | 399,091.00 |
| 5/30/2008 | 40,000.00 | | | | | |
| 6/30/2008 | 40,000.00 | 6/30/2008 | 121,439.00 | 5/19/2008 | SCPF Q4 | 399,091.00 |
| **SFY 2008** | **480,000.00** | | **775,845.81** | | | **2,461,774.81** |
| 7/29/2008 | 64,250.00 | | | | | |
| Aug-08 | 64,250.00 | | - | | SCHSP | - |
| 9/22/2008 | 64,250.00 | 9/15/2008 | 145,088.87 | 10/20/2008 | SCPF Q1 | 635,753.25 |
| | | 9/23/2008 | 48,474.13 | | | |
| 9/22/2008 | 64,250.00 | | | | | |
| 9/22/2008 | 64,250.00 | 12/19/2008 | 196,122.00 | 1/19/2009 | SCPF Q2 | 635,753.25 |
| 10/15/2008 | 64,250.00 | | | | | |
| 1/8/2009 | 64,250.00 | | | | | |
| 2/3/2009 | 64,250.00 | | | | | |
| 3/6/2009 | 64,250.00 | 3/20/2009 | 196,122.00 | 4/13/2009 | SCPF Q3 | 635,753.25 |
| 4/8/2009 | 64,250.00 | | | | | |
| 5/5/2009 | 64,250.00 | | | | | |
| 6/2/2009 | 64,250.00 | 6/26/2009 | 179,178.00 | 7/27/2009 | SCPF Q4 | 635,753.25 |
| | | 7/15/2009 | 16,944.00 | | | |
| **SFY 2009** | **771,000.00** | | **781,929.00** | | | **2,543,013.00** |
| | - | | - | | SCHSP | - |

| | | | | | | |
|---|---|---|---|---|---|---|
| | - | 9/22/2009 | 14,677.00 | 10/5/2009 | SCPF Q1 | 230,390.75 |
| | - | 12/10/2009 | 13,867.00 | | SCPF Q2 | 230,390.75 |
| | - | 3/16/2010 | 4,303.00 | | SCPF Q3 | 230,390.75 |
| | - | 6/1/2010 | 44,332.00 | | SCPF Q4 | 230,390.75 |
| **SFY 2010** | **-** | | **77,179.00** | | | **921,563.00** |
| | - | | Currently Unconfirmed | | SCHSP | Currently Unconfirmed |
| | - | 9/24/2010 | 38,793.00 | Sep-10 | SCPF Q1 | 169,763.50 |
| | - | | 40,956.00 | Dec-10 | SCPF Q2 | 169,763.50 |
| **SFY 2011** | **-** | | **79,749.00** | | | **339,527.00** |
| **(through 12/31/2010)** | | | | | | |
| **TOTAL** | **2,389,582.08** | | **3,628,139.64** | | | **13,104,718.92** |

Table D

SCPF and SCHSP Funding Requests Submitted by Eastern, Mimbres and Alta Vista

| Eastern | | | | | |
|---|---|---|---|---|---|
| Date Approved by Chaves County | SFY | SCPF Amount Requested by ENMMC | SCHSP Amount ENMMC Eligible to Receive | SCPF Amount Approved by State | SCHSP Amount Approved by State |
| 1/12/2000 | 2001 | $ 1,630,877.00 | $ 2,694,206.00 | $ 1,630,877.00 | $ 2,694,206.00 |
| 2/14/2001 | 2002 | $ 4,498,086.00 | $ 134,090.00 | $ 4,458,901.00 | $ 134,090.00 |
| 2/13/2002 | 2003 | $ 4,776,711.00 | $ 290,301.93 | $ 4,716,776.00 | $ 290,301.93 |
| 12/18/2002 | 2004 | $ 5,207,360.00 | $ 558,345.62 | $ 5,182,326.00 | $ 558,345.62 |
| 1/12/2004 | 2005 | $ 5,970,298.00 | $ 1,378,103.86 | $ 5,947,336.00 | $ 1,378,103.86 |
| 1/10/2005 | 2006 | $ 7,591,712.00 | $ 1,438,807.83 | $ 7,601,042.00 | $ 1,438,807.83 |
| 1/12/2006 | 2007 | $ 9,641,843.00 | $ 2,839,068.84 | $ 9,383,365.00 | $ 2,839,068.84 |
| 1/4/2007 | 2008 | $ 13,143,556.00 | $ 3,202,001.59 | $ 12,650,218.00 | $ 3,202,001.59 |
| 12/20/2007 | 2009 | $ 17,184,831.00 | $ 2,888,616.43 | $ 16,375,344.00 | $ 2,888,616.43 |
| 12/16/2008 | 2010 | $ 20,227,158.00 | $ 4,191,444.94 | $ 19,957,463.00 | $ 4,191,444.94 |
| 1/21/2010 | 2011 | $ 25,356,353.00 | Currently Unconfirmed | $ 24,794,078.00 | $ 4,269,789.87 |
| Total | | $ 115,228,785.00 | $ 19,614,987.04 | $ 112,697,726.00 | $23,884,776.91 |
| | | Total SCPF & SCHSP Requested | | Total SCPF & SCHSP Approved | |
| | | 134,843,772.04 | | 136,582,502.91 | |

| Mimbres | | | | | |
|---|---|---|---|---|---|
| Date Approved by Luna County | SFY | SCPF Amount Requested by Mimbres | SCHSP Amount Mimbres Eligible to Receive | SCPF Amount Approved by State | SCHSP Amount Approved by State |
| 1/13/2000 | 2001 | $ 259,661.95 | $ 508,844.00 | $ 308,115.17 | $ 508,844.00 |
| 1/31/2001 | 2002 | $ 942,656.68 | $ 21,892.00 | $ 727,969.00 | $ 21,892.00 |
| 1/10/2002 | 2003 | $ 779,443.00 | $ 47,395.70 | $ 770,107.00 | $ 47,395.70 |
| 1/16/2003 | 2004 | $ 830,199.78 | $ 91,157.45 | $ 830,199.78 | $ 91,157.45 |
| 1/27/2004 | 2005 | $ 1,214,648.63 | $ 224,994.03 | $ 954,526.00 | $ 224,994.03 |
| 1/13/2005 | 2006 | $ 1,236,122.02 | | $ 1,225,522.00 | |
| 9/29/2005 | | | $ 201,128.78 | | $ 234,904.77 |
| 10/27/2005 | | | $ 33,775.99 | | |
| 1/12/2006 | 2007 | $ 1,528,474.79 | $ 463,516.26 | $ 1,515,923.00 | $ 463,516.26 |

| | | | | | |
|---|---|---|---|---|---|
| 2/8/2007 | 2008 | $ 2,091,048.93 | | $ 2,040,175.00 | |
| | | | $ 522,769.92 | | $ 522,769.92 |
| | | | $ 6,556,763.35 | | $ 6,556,763.35 |
| 2/14/2008 | 2009 | $ 2,754,150.00 | $ 364,805.36 | $ 2,754,150.00 | $ 364,805.36 |
| 1/9/2009 | 2010 | $ 2,754,150.00 | $ 529,340.48 | $ 2,754,150.00 | 529,340.48 |
| | 2011 | Currently Unconfirmed | | $ 3,372,144.00 | 539,234.71 |
| **Total** | | **$ 14,390,555.78** | **$ 9,566,383.32** | **$ 17,252,980.95** | **$10,105,618.03** |
| | | **Total SCPF & SCHSP Requested** | | **Total SCPF & SCHSP Approved** | |
| | | **23,956,939.10** | | **27,358,598.98** | |

| Alta Vista | | | | | |
|---|---|---|---|---|---|
| Date Approved by San Miguel County | SFY | SCPF Amount Requested by AVRH | SCHSP Amount AVRH Eligible to Receive | SCPF Amount Approved by State | SCHSP Amount Approved by State |
| 2/15/2000 | 2001 | $ 266,987.00 | $ 441,062.00 | $ 266,987.00 | $ 441,062.00 |
| 1/9/2001 | 2002 | $ 743,451.00 | $ 21,322.00 | $ 709,033.00 | $ 21,322.00 |
| | 2003 | $ 744,485.00 | $ 46,161.66 | $ 730,340.00 | $ 46,161.66 |
| 2/13/2003 | 2004 | $ 800,478.00 | $ 88,783.99 | $ 799,697.00 | $ 88,783.99 |
| 12/1/2003 | 2005 | $ 783,054.00 | $ 219,135.88 | $ 783,054.00 | $ 219,135.88 |
| 2/15/2005 | 2006 | $ 822,207.00 | | $ 822,207.00 | |
| 9/27/2005 | | | $ 195,892.01 | | $ 228,788.58 |
| 2/14/2006 | 2007 | $ 1,103,546.00 | $ 591,336.00 | $ 1,090,933.00 | $ 591,336.00 |
| 1/9/2007 | 2008 | $ 1,619,500.00 | $ 509,158.61 | $ 1,596,364.00 | $ 865,410.81 |
| 2/12/2008 | 2009 | $ 2,584,863.00 | $ - | $ 2,543,013.00 | $ - |
| 2/10/2009 | 2010 | $ 2,670,164.00 | $ - | $ 921,563.00 | $ - |
| 1/12/2010 | 2011 | $ 967,641.00 | $ 736,477.26 | $ 679,054.00 | Currently Unconfirmed |
| **Total** | | **$ 13,106,376.00** | **$ 2,849,329.41** | **$ 10,942,245.00** | **$ 2,502,000.92** |
| | | **Total SCPF & SCHSP Requested** | | **Total SCPF & SCHSP Approved** | |
| | | **15,955,705.41** | | **13,444,245.92** | |

## TABLE E

### Quarterly Medicaid Statements of Expenditures for the Medical Assistance Program Submitted by the State of New Mexico to CMS

| Form | For the Quarter Ending |
|---|---|
| CMS 64 | September 30,2000 |
| CMS 64 | December 31, 2000 |
| CMS 64 | March 31, 2001 |
| CMS 64 | June 30, 2001 |
| CMS 64 | September 30,2001 |
| CMS 64 | December 31, 2001 |
| CMS 64 | March 31, 2002 |
| CMS 64 | June 30, 2002 |
| CMS 64 | September 30, 2002 |
| CMS 64 | December 31, 2002 |
| CMS 64 | March 31, 2003 |
| CMS 64 | June 30, 2003 |
| CMS 64 | September 30, 2003 |
| CMS 64 | December 31, 2003 |
| CMS 64 | March 31, 2004 |
| CMS 64 | June 30, 2004 |
| CMS 64 | September 30, 2004 |
| CMS 64 | December 31, 2004 |
| CMS 64 | March 31, 2005 |
| CMS 64 | June 30, 2005 |
| CMS 64 | September 30, 2005 |
| CMS 64 | December 31, 2005 |
| CMS 64 | March 31, 2006 |
| CMS 64 | June 30, 2006 |
| CMS 64 | September 30, 2006 |
| CMS 64 | December 31, 2006 |
| CMS 64 | March 31, 2007 |
| CMS 64 | June 30, 2007 |
| CMS 64 | September 30, 2007 |
| CMS 64 | December 31, 2007 |
| CMS 64 | March 31, 2008 |
| CMS 64 | June 30, 2008 |

| | |
|---|---|
| CMS 64 | September 30, 2008 |
| CMS 64 | December 31, 2008 |
| CMS 64 | March 31, 2009 |
| CMS 64 | June 30, 2009 |
| CMS 64 | September 30, 2009 |
| CMS 64 | December 31, 2009 |
| CMS 64 | March 31, 2010 |
| CMS 64 | June 30, 2010 |
| CMS 64 | September 30, 2010 |
| CMS 64 | December 31, 2010 |