# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA, ex rel.
ROBERT C. BAKER,

        Plaintiffs,

  v.                                    NO. CIV 05-279 WJ/WDS

COMMUNITY HEALTH SYSTEMS, INC.,
et al.,

        Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART PLAINTIFFS' MOTION TO STRIKE AFFIRMATIVE DEFENSES

THIS MATTER comes before the Court on Plaintiffs' Motion to Strike Affirmative

Defenses, filed July 14, 2011 (**Doc. 249**). Having considered the parties' briefs and the

applicable law, I find that Plaintiff's motion is well-taken for the most part and is granted except

with regard to striking the "Government knowledge" inference.

### Background

Plaintiff United States of America ("United States" or the "Government") and *Qui Tam*

Plaintiff/Relator Robert C. Baker ("Baker") (hereinafter, "Plaintiffs") move to strike the Tenth

through Sixteenth Affirmative Defenses asserted by Defendants to the Government's First

Amended Complaint (Docket Nos. 241-43, ¶¶ 412-18), and the Ninth through Fifteenth

Affirmative Defenses asserted by Defendants to Baker's Third Amended Complaint (Docket

Nos. 244-47, ¶¶ 111-17).[1]

---

[1] A "*qui tam* action" is an action brought under a statute that allows a private person to
sue for a penalty, part of which the government or some specified public institution will receive.

## I.      The Medicaid Funding Process

The legal question in the underlying case is whether Defendants' alleged conduct gives rise to liability under the False Claims Act (the "FCA"). [2] Defendants are alleged to have manipulated the Medicaid funding program by a scheme which resulted in the illegal receipt of federally funded Medicaid payments.  The complaints allege that Defendants made payments to New Mexico counties to illegally fund the New Mexico state share of Medicaid payments back to Defendant hospitals, thus knowingly causing the State of New Mexico ("the State") to make false claims for payment of Medicaid funds. The Court provides a more detailed background information here to give some context to the instant motion.[3]

A.     <u>How States Obtain Funding</u>

Medicaid programs are administered by states in accordance with federal regulations, but they are jointly financed by the federal and state governments.  In order to participate in Medicaid, New Mexico must fund a certain percentage of its total Medicaid expenditures, with the remainder being funded by the federal government.  In New Mexico, the two sources of Medicaid funding to hospitals are the Sole Community Provider ("SCP") Fund and the Sole Community Hospital Supplement Payments ("SCHSP") programs.  The SCHSP program is a

---

Black's Law Dict., 7th ed. Under the qui tam provision of the False Claims Act, any individual can sue on behalf of the United States government to recover for the government's payment of fraudulent claims. 31 U.S.C. § 3730(b).

[2]  A person violates the FCA if he or she:
(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.  31 U.S.C. § 3729(a)(1)(A) & (B).

[3]  Additional details, as well as relevant annotations for this background, can be found in the Court's other Memorandum Opinions and Orders. *See, e.g.,*, Doc. 83 at 2-5, Doc. 91 at 4-5.

kind of second-tier Medicaid funding program which provides hospitals with additional funding to the extent other Medicaid funding has not exceeded the annual federal funding limit. The State share of payments going to the SCP funds and SCHSP programs must be funded by county and local governments.

Each year, sole community provider hospitals agree with counties on the amount of SCP funding for the next fiscal year, based on the hospital's total anticipated cost of providing services to qualifying indigent residents in the coming year. The hospitals then submit payment requests to the State. The State's approval of the funding agreement triggers the county's statutory obligation to transfer funds ("Inter-Government Transfers" or "IGT's") from the county's indigent fund to the State's SCP Fund.[4] These funds may be derived from several sources, including State and local tax revenues or donations made to the counties by Medicaid provider hospitals. Counties transfer county funds to the State, which the State then combines with federal funds of approximately triple the amount of the county contribution, and then pays the hospitals the total of the combined county contribution and matching federal funds. The State obtains the federal reimbursement by drawing down federal funds made available to it. In other words, the amount of money the counties transfer to the State has a direct and logarithmic relationship to the amount of reimbursement the State (and therefore the provider hospitals) receive through the counties.

B.      How the Federal Government Determines Amount of Assistance to States

The federal government pays its share of medical assistance expenditures to the State on

---

[4]  IGT's are transfers of funds from one governmental entity to another, typically between a local government and the State. IGTs were used as the non-federal share for purposes of accessing federal Medicaid matching funds.  *U.S. ex rel. Englund v. Los Angeles County*, unpubl. opin.,2006 WL 3097941, *2 (E.D.Cal., 2006).

a quarterly basis according to statements of expenditures submitted by the State and a formula used to calculate how much of the total reported expenditures the federal government will reimburse the state. The expenditures are listed on a "Form 64" which details the state's actual recorded Medicaid expenditures, certifying that the expenditures are allowable under the Medicaid program and are based on actual expenditures and not estimates. The alleged false claims at issue in this case are "Form 64" claims submitted by the State.

In 1991, in order to curb extraordinary increases in federal Medicaid expenditures resulting from states trying to shift portions of their funding obligations to the federal government, Congress prohibited the use of health-care provider donations to fund state Medicaid spending, because such donations caused disbursement of federal matching funds with no true state contribution. The Medicaid Act's implementing regulations require a reduction in the amount the federal government provides in Medicaid expenditures if a state receives donations from health care providers unless the donations have no direct or indirect relationship to Medicaid payments to the health care provider. Allowable donations which do not require an offset are referred to as "bona fide" donations. 42 C.F.R. §§ 433.66, 433.74(d). Non-allowable donations are deducted from the State's reported expenditures by the Centers for Medicare and Medicaid Services ("CMS") before calculating the amount payable by the federal government.[5]

In this case, Plaintiffs assert that Defendants' donations had a direct or indirect relationship to the Medicaid payments they received in matching federal funds, as a direct result of fraudulent claims made in violation of the False Claims Act, and also as a result of overstating the costs of providing uncompensated indigent care. Defendants' position is that they were

---

[5] This lawsuit is brought on behalf of CMS. Doc. 54 at 10.

4

advised by the New Mexico Medical Assistance Division ("MAD") that it was permissible to make unrestricted donations to county governments in order to help the counties free up funds to generate their portion of the State's SCP program expenditures.[6]

## II.   Legal Standard

Although motions to strike a defense are generally disfavored, a Rule 12(f) motion to dismiss a defense is proper when the defense is insufficient as a matter of law.  *Anchor Hocking Corporation v. Jacksonville Electric Authority*, 419 F.Supp. 992, 1000 (M.D.Fla.1976); *see also Lunsford v. United States*, 570 F.2d 221, 228 (8th Cir. 1977).  A defense is "insufficient if, as a matter of law, the defense cannot succeed under any circumstance."  *FDIC v. Isham*, 782 F. Supp. 524, 530 (D. Colo. 1992); *see also Williams v. Provident Investment Counsel, Inc*., 279 F.Supp.2d 894, 906 (N.D.Ohio 2003) (An affirmative defense will be stricken "if it is impossible for the defendants to prove a set of facts in support of the affirmative defense that would defeat the complaint. . . ." *Openshaw v. Cohen, Klingenstein & Marks, Inc*., 320 F.Supp.2d 357, 364 (D.Md.,2004) (citing  *Williams v. Provident Investment Counsel, Inc*., 279 F.Supp.2d 894, 906 (N.D.Ohio 2003)).

Parties disagree on whether the pleading of affirmative defenses are subject to the *Iqbal/Twombly* standard.[7]  Although the Tenth Circuit has not decided this issue, this Court has previously ruled that the *Iqbal/Twombly* standard applies only to complaints and not affirmative defenses.  *See Equal Employment Opportunity Commission*, Civil No. 09-952 WJ/RHS (D.N.M.

---

[6]  MAD is the agency responsible for admnistration of the New Mexico Medicaid SCP and SCHSP programs.  *See* Doc. 283 at 6.

[7]  *See Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

May 20, 2010) (Doc. 47 at 2-4). *See also Falley v. Friends University*, 787 F.Supp.2d 1255

(D.Kan., 2011) (acknowledging split in circuits and deciding that pleading standards of *Iqbal* and

*Twombly* should be limited to complaints and not extended to affirmative defenses). Thus,

Plaintiffs' motion will be decided based on the standard set forth in Fed.R.Civ.P. 8(b)(1)(A),

which requires that defenses be articulated "in short and plain terms."

**Discussion**

Plaintiffs seek to strike the following affirmative defenses: (1) Knowledge of the alleged

fraud by the State of New Mexico; (2) Estoppel; (3) "Accordance with the Law"; (4) Laches; (5)

Waiver; (6) Failure to Mitigate; and (7) Unclean Hands. The common theme of these defenses is

that CMS agents continued to approve claims submitted by the State for Medicaid

reimbursement, despite knowledge of Defendants' alleged misconduct. Through this

acquiescence, the Government allowed the conduct to continue and thus should be estopped

from recovering damages and penalties.

**I.      Timeliness**

The threshold question is whether Plaintiffs' motion is timely. Defendants contend that

the same defenses were asserted in answers which were filed as early as July 2010, and thus both

DOJ and CMS have known of the hospitals' donations and the State's failure to report them

since at least March 2005. However, the operative pleadings are the Answers that were filed

most recently, on July 11, 2011. *See Krauss v. Keibler-Thompson Corp.*, 72 F.R.D. 615, 617

(D.C. Del.1976) (finding motion to strike was timely since it was filed within 20 days of

defendant's answer to the amended complaint); *Cowart v. City of Eau Claire*, 571 F.Supp.2d

1005, 1008 (W.D.Wis., 2008) (finding that the original complaint, answer and motion to strike

portions of the answer became moot upon filing of the amended complaint). Thus, the instant

motion to strike is timely under Rule 12(f) because it was filed on July 14, 2011, within 21 days of the filing of that Answer.

## II.      Whether the Affirmative Defenses Should be Stricken

Plaintiffs argue generally that Government claims to redress the unlawful payment of public money are not subject to equitable defenses, and therefore each one of the affirmative defenses are insufficient as a matter of law.

### A.      Whether *Richmond* Precludes Assertion of Equitable Estoppel Defense

Plaintiffs rely on *Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990) in arguing that Defendants' equitable defenses are barred.  In *Richmond*, the United States Supreme Court held that erroneous advice rendered by a Government employee to a claimant could not premise entitlement to a payment not otherwise authorized by law.  496 U.S. at 424-425.  The Supreme Court based its analysis on the Appropriations Clause and ruled that "judicial use of the equitable doctrine of estoppel cannot grant respondent a money remedy" which is contrary to a statutory appropriation.  *Id.* at 426.   The court observed that a rule of estoppel against the Government would invite "endless litigation over both real and imagined claims of misinformation, imposing an unpredictable and substantial drain on the [public treasury]." *Id.*

Asserting an estoppel defense against the Government was heavily disfavored even before the United States Supreme Court's decision in *Richmond*.   In *Heckler v. Community Health Services of Crawford County, Inc.*, the Supreme Court rejected a health care provider's attempt to avoid administrative recoupment of overpayments made under the Medicare program by asserting equitable estoppel against the Government.  467 U.S. 51, 66 (1984).  The provider had obtained double reimbursement for certain costs, in violation of the applicable statutory and regulatory scheme, after receiving assurance from the Government's contractual agent that

seeking such reimbursement was proper.  *Heckler* stressed that contractors may not rely upon the ultimately incorrect advice of government agents because "those who deal with the Government are expected to know the law and may not rely on the conduct of government agents contrary to law."  *Id.* at 63.

The Tenth Circuit follows *Richmond* squarely, with wholesale rejection of estoppel defenses against the Government.  In *Downtown Medical Center/Comprehensive Health Care Clinic v. Bowen ("Bowen")*, a Medicare provider brought action against the Secretary of Health and Human Services ("HHS") challenging the denial of reimbursement for psychological and physical therapy services.  944 F.2d 756, 770-771 (10th Cir. 1991).  The Tenth Circuit reversed the district court's decision, holding that the Medicare provider could not be reimbursed for services where the provider failed to meet regulatory criteria that it be licensed to provide those services, regardless of the fact that the provider had received erroneous advise that the services were reimbursable.  *Bowen* relied on *Richmond*, following *Richmond*'s tenet that "payments of money from the Federal Treasury are limited to those authorized by statute."  *Id.* (citing *Richmond*, 496 U.S. at 415).   In *F.D.I.C. v. Hulsey,* 22 F.3d 1472 (10th Cir. 1994) ("Hulsey"), the Tenth Circuit referenced *Richmond* in noting that courts "generally disfavor the application of the estoppel doctrine against the Government and invoke it only when it does not frustrate the purpose of the statutes expressing the will of Congress or unduly undermine the enforcement of the public laws."  22 F.3d at 1489.  *Hulsey* was an action brought by the FDIC, as successor to an insolvent lender bank, against a borrower and guarantor.  The Tenth Circuit rejected an estoppel defense asserted against the FDIC, stating that it was "far from clear that the Supreme Court would ever allow an estoppel defense against the Government *under any set of circumstances*. . . [s]uch a case has yet to be presented to the Court."  *Id.* at 1490 (emphasis

8

added) (citing *Richmond*, 496 U.S. at 422-23).

Defendants point out that equitable estoppel has been allowed as a defense against the Government, relying on *Fredericks v. C.I.R.*, 26 F.3d 433, 443 (3rd Cir. 1997) as an example.  In that case, the IRS was equitably estopped from making an assessment on taxpayer where the taxpayer reasonably relied on a written IRS form regarding the relevant statute of limitations. The court found that while IRS employees generally lack the authority to waive statutory or regulatory filing requirements, the advice given to plaintiff was within the IRS scope of authority.  *Fredericks v. C.I.R.*,  126 F.3d 433, 443 (3rd Cir. 1997).  *Fredericks* does not control here because it is not Tenth Circuit precedent, and because the affirmative and official endorsement at issue in *Fredericks* did not occur in the instant case, where the Government simply continued to approve "false" claims submitted to CMS.

Defendants also argue that *Richmond* does not govern here because the claims at issue in this case do not involve statutory appropriations mandated by Congress, but instead involve resource allocations that are dispensed through agency discretion.  This argument has no merit. While the exact *amount* of federal Medicaid reimbursement may depend on agency discretion based on the Form 64 claims processed, Congress has *mandated* a reduction in federal financial participation in Medicaid expenditures if the State receives non-allowable donations from health care providers.  These reductions are not discretionary, and thus, the claims in this case are governed by the precedent set out by the Supreme Court in *Richmond*, and followed by the Tenth Circuit in *Bowen* and *Hulsey*.

The pronouncement in *Richmond* seems clear enough in that estoppel cannot be asserted as an affirmative defense to claims involving funds from the public treasury.  *Richmond*, 496 U.S. at 431 ("The whole history and practice with respect to claims against the United States

reveals the impossibility of an estoppel claim for money in violation of a statute.").   However,

the Supreme Court stopped short of announcing a "flat rule that estoppel will never lie against

the Government" and has left the issue open.   *See Richmond*, 496 U.S. at 421 (deciding issue on

narrower ground).   In *Heckler*, the Supreme Court noted that there might be cases in the future in

which "the public interest in ensuring that the Government can enforce the law free from

estoppel might be outweighed by the countervailing interest of citizens in some minimum

standard of decency, honor, and reliability in their dealings with their Government. . . ."  467

U.S. at 60-61.  However, Defendants have offered no legal basis or otherwise persuaded the

Court that this is a case which falls into the rare category of cases in which an assertion of

estoppel should be allowed.

B.       Whether the Affirmative Defenses are Appropriately Alleged

        The Supreme Court's decision in *Richmond* precludes an assertion of an estoppel defense

against the Government, but does not necessarily foreclose all the other defenses asserted by

Defendants. The Court addresses each of these defenses in turn.

*1.      Estoppel*

        As Plaintiffs note, even if this case did not involve funds from the public treasury and

*Richmond* did not apply to this case, a claim of estoppel against the Government requires a

showing of "affirmative misconduct" by Government officials.  *See Hulsey*, 22 F.3d at 1489 ("In

addition to the traditional elements, the Supreme Court has indicated that to successfully assert

estoppel for unauthorized acts of government agents, the asserting party must show affirmative

misconduct on the part of the government.") (citing *Schweiker v. Hansen*, 450 U.S. 785, 787-90,

(1981)).

        Defendants allege that the Government "was fully informed of the alleged errors or

omissions that allegedly rendered the subject claims 'false' under the FCA and approved the claims at issue." Doc. 241-43, ¶ 413; Doc. 244-47, ¶ 112.  They contend the continued authorization of the claims constitute affirmative misconduct.  Affirmative misconduct is a high hurdle for the asserting party to overcome.  *Hulsey*, 22 F.3d at 1490.  Erroneous advice of a government agent does not rise to that level.  *Id.*; *see U.S. ex rel. Fallon v. Accudyne Corp.*, 921 F.Supp. 611, 619 (W.D.Wis.,1995) (encouraging contractor to perform contract and accept nonconforming goods does not constitute affirmative misconduct).  Affirmative misconduct means an affirmative act of misrepresentation or concealment of a material fact.  *Board of County Com'rs of County of Adams v. Isaac*, 18 F.3d 1492, 1499 (10th Cir. 1994).   No such conduct is alleged here which rises to this level, even under the liberal pleading requirements of Rule 8.

Other cases cited by Defendants as examples where the estoppel defense was allowed against the Government are not persuasive.  Some of the cases were decided prior to *Richmond* or do not mention *Richmond* in the analysis, and none of the cited cases are Tenth Circuit decisions.  *See* Doc. 283 at 18.  Therefore, the Court will strike Defendants' affirmative defense of equitable estoppel, on the basis of *Richmond*, as well as on the finding that the Answer does not sufficiently allege affirmative misconduct on the part of the Government.

2.      *Government Knowledge of the Alleged Fraud by the State of New Mexico*

Plaintiffs claim that Defendants' affirmative defense of "Government knowledge" must fail as a matter of law because there is no such thing as a "Government knowledge defense" to False Claims Act ("FCA") liability.  Plaintiffs do, however, recognize that the Tenth Circuit has acknowledged the existence of a "Government knowledge *inference*" (emphasis added). *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 951-52 (10th Cir. 1998).

11

The "Government knowledge inference" arises when the Government knows and approves of the facts underlying an allegedly false claim prior to presentment. *Burlbaw v. Orenduff*, 548 F.3d at 951-952.  The Government's knowledge of an alleged "false" claim contradicts a defendant's intent to knowingly submit a false claim.  Since the crux of an FCA violation is intentionally deceiving the Government, no violation exists where the Government has not been deceived.  *U.S. ex rel. Englund v. Los Angeles County*, 2006 WL 3097941, 12 (E.D.Cal.,2006) (citing *Ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321, 327 (9th Cir. 1995) and *Wang v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1992)).  The "Government knowledge" defense holds that the "knowing" submission of a false claim is logically impossible when responsible Government officials have been fully apprised of all relevant information. *U.S. ex rel. Lamers v. City of Green Bay*, 998 F.Supp. 971, 988 (E.D.Wis.,1998).

Thus, while Defendants may raise the "Government knowledge" defense, Plaintiffs correctly define the contours of the "defense." It does not automatically preclude a finding of scienter. *Burlbaw*, 548 F.3d at 952.[8]  Rather, Government knowledge of a false claim can create an inference that the defendant did not act with the requisite scienter.  *Burlbaw*, 548 F.3d at 952; *U.S. ex rel. Durcholz v. FKW, Inc.*, 189 F.3d at 544-45 (7th Cir. 1999) ("The Government's prior knowledge of an allegedly false claim can vitiate a FCA action.").  This means that Government knowledge of claims it knows to be false does not automatically bar the Government from

---

[8] The statutory version of the Government knowledge defense was removed from the FCA in 1986.  *See Burlbaw*, 548 F.3d at 953 n.20.  However, the Tenth Circuit has recognized its viability and stated that "there may still be occasions when the Government's knowledge of or cooperation with a contractor's actions is so extensive that the contractor could not as a matter of law possess the requisite state of mind to be liable under the FCA." Id.  at 953.   Defendants are asserting the Government knowledge defense as presently applied by the Tenth Circuit and other federal courts throughout the country.  *See* Resp. at 20, n.7.

bringing these claims, but it can be relevant and useful to determine whether a defendant

possessed the requisite scienter element under the FCA.  *Burlbaw*, 548 F.3d at 955.

The Tenth Circuit has acknowledged the viability of the "Government knowledge"

inference, and approved its use in *Burlbaw*.  In that case, the Tenth Circuit affirmed the district

court's grant of summary judgment in favor of defendants on FCA claims.  Plaintiffs alleged that

New Mexico State University ("NMSU") falsely certified to the Department of Education

("DOE") that NMSU was a "minority institution" eligible for  Department of Defense set-aside

contract grants.  It was undisputed that NMSU was "completely forthcoming" with DOE, and

that the data on which DOE relied in certifying NMSU as a minority institution was complete

and accurate.  Both NMSU and the DOE were aware of the "same universe of facts" when

defendants certified NMSU as eligible for minority institution status.  The Tenth Circuit noted

that both Government knowledge and Government cooperation were present in *Burlbaw*.  The

court also explained, relying on *Heckler*, the critical difference between using "Government

knowledge" as an inference or as a defense:

> [W]hether the government is estopped from bringing a claim because one of its
> agents assured the defendant that some action was legal presents a very different
> question than whether reliance on government assurances can be relevant to
> deciding if a defendant "knowingly" presented a false claim.

*Burlbaw*, 548 F.3d at 955.  In short, the "Government knowledge inference" helps distinguish, in

FCA cases, "between the submission of a false claim and the knowing submission of a false

claim—that is, between the presence and absence of scienter." *Burlbaw*, 548 F.3d at 951.  The

Tenth Circuit found that "Government knowledge was "only an inference" and did not

"automatically preclude a finding of scienter." *Id.* (citations omitted).  Accordingly, I will not

strike the "Government knowledge" defense, but will allow its use according to Tenth Circuit

precedent as an inference to rebut the requisite scienter needed to find liability under the FCA. As noted in *Burlbaw*, the success of the inference will depend on "the depth of the Government's knowledge of the facts underlying the allegedly false claim and the degree to which the government invites that claim." *Id*. at 954.

3.     *Accordance with the Law*[9]

Defendants claim that Plaintiffs claims are barred because they acted in accordance with the actions and regulatory interpretations of CMS agents in administering the Medicaid program and in approving the State's claims for Medicaid funding.  *See*, e.g. Ans. to Am. Compl. (Doc. 241), ¶ 414.  Plaintiffs contend that the "Accordance with the Law" defense is not a recognized defense, and appears to be an estoppel defense in disguise.  The Court agrees with this assessment.  Defendants offer no argument to the contrary except to ask that discovery be allowed to continue and to offer argument that references their estoppel arguments.  However, discovery will not provide legal support for the existence of an "accordance with the law" defense.  Also, an "accordance with the law" defense, if it existed, would fail for the same reasons that an estoppel defense cannot be asserted against the Government on Plaintiffs' FCA

---

[9] As Plaintiffs note, the Answers to the Relator's complaints may contain a drafting mistake. *See* Doc. 249 at 7, n.2.  In those Answers, Defendants allege that:

> The Relator was fully informed of the alleged errors or omissions that allegedly rendered the subject claims "false" under the FCA and approved the claims at issue in accordance with applicable statutes and regulations and the interpretations of those statutes and regulations adopted by the federal and state agencies charged with administration of the Medicaid programs.

Docs 244–47, ¶¶ 112-13.  Plaintiffs move to strike the estoppel and "accordance with the law" defenses for the additional reason that the Relator is not a government agent, but an employee of Defendant.  Defendants do not respond to this issue, and the Court need not pass on this issue in light of my rulings on both the estoppel and "accordance with the law" defenses.

claims.   The Supreme Court's holding in *Richmond* would necessarily preclude the assertion of this kind of equitable defense to the Government's claims.   Accordingly, the Court shall strike the "accordance with the law" defense.

4.      *Laches*

Defendants contend that Plaintiffs' claims are barred by the doctrine of laches, because CMS "has paid and continues to pay the State of New Mexico's claims for matching federal Medicaid funding despite its agents' or authorized representatives' knowledge" of the falsity of the claims at issue.  Docs. 241-43, ¶ 415; Docs. 244-47, ¶ 114.

The Tenth Circuit, as well as a majority of other circuits, have held that the doctrine of laches may not be asserted as a defense against the United States when it is acting in its sovereign capacity to enforce a public right or to protect the public interest, unless Congress has clearly stated an intent to the contrary.  *Cassidy Comm'n Co. v. United States*, 387 F.2d 875, 880 (10th Cir.1967), *cited in U.S. v. Wright*, 850 F.Supp. 965, 967 (D.1993) (action by United States to recover on promissory note); *U.S. v. Telluride Co.*, 146 F.3d 1241, 1246, n.7 (10th cir. 1998) (laches or neglect of duty on the part of officers of the Government is generally no defense to a suit by it to enforce a public right or protect a public interest (citing *Nevada v. U.S.*, 463 U.S. 110, 141(1983));[10]  Defendants do not offer much to rebut this rule.  The cases they do offer are not from this Circuit, and say only that under certain rare circumstances, laches may be asserted against the Government.  Defendants cite to *U. S. v. Administrative Enterprises, Inc.*, 46 F.3d 670 (7th Cir. 1995), as an example of where the defense of laches was asserted against the

---

[10]  *See also*, *U.S. v. Summerlin*, 310 U.S. 414, 416 (1940) (United States not "subject to the defense of laches in enforcing its rights"), *cited in F.D.I.C. v. Hulsey*, 22 F.3d 1472, 1490 (10th Cir. 1994);  *U.S. v. Distefano*, 279 F.3d 1241, 1245 (10th 2002) (laches may not be asserted against United States in an action brought to enforce a public right or a public interest).

Government.  However, that case cannot be considered supportive of Defendants' position.

Judge Posner wrote the opinion in *Administrative Enterprises,* emphasizing that use of laches

against the Government was not favored, and stated that its use was still an "open question" in

the Seventh Circuit.  Judge Posner suggested three limited circumstances in which laches might

apply against the Government: in only "most egregious instances"; where there was no statute of

limitations on the claim; and where the Government is seeking to enforce private rights on its

own behalf or on behalf of private parties, rather than enforcing sovereign suits.  *Id*. at 673.  In

the end, the Seventh Circuit affirmed the district court's conclusion that laches should *not* be

applied because the "compulsory process to determine liability for unpaid taxes" was a typical

example of the enforcement of a sovereign right.  *Id*. at 673.

 In another case cited by Defendants, *Cayuga Indian Nation v. Pataki*, the United States

was a plaintiff-intervenor in an Indian tribe's suit to regain possession of lands from which it

was unlawfully dispossessed in the late eighteenth century.   This case does not support

Defendants' position, either.  In *Cayuga*, the Second Circuit followed Judge Posner's analysis in

*Administrative Enterprises* regarding the limited circumstances in which laches may be used

against the Government, and concluded that the case fell into all three categories.  413 F.3d 266

(2d Cir. 2005).  First, the lawsuit was based on events that occurred two hundred years ago, and

thus was considered "about as egregious an instance of laches on the part of the United states as

can be imagined"; second, there was no operable statute of limitations until 1966 (one hundred

and fifty years after the cause of action accrued); and third, the United States intervened in the

case "to vindicate the interest of the Tribe, with whom it has a trust relationship."  Not

surprisingly, under those circumstances, the court found it appropriate to apply the defense of

laches against the United States.

This case, however, is hardly the kind of case in which calls for an exception to the general rule that laches cannot be applied against the Government.  Nor do Defendants provide any reason for making this case an exception.  Clearly, the rights which the Government seeks to vindicate here are public monies, and the delay of which Defendants complaint is not the kind of delay described in *Cayuga* which cries out for an assertion of a laches defense.  Accordingly, the Court shall strike the laches defense from the Answers.

5.      *Waiver*

In their Answers, Defendants contend that Plaintiffs' claims are "barred . . . by the doctrine of waiver" because CMS paid New Mexico's claims for Medicaid funding despite CMS's alleged knowledge of the falsity of the claims at issue.  Doc. 241-43, ¶ 416; Docs. 244-47, ¶ 115.  Plaintiffs claim that this defense is inapplicable as a matter of law for several reasons.  Since waiver is an equitable defense, it is precluded under the *Richmond* analysis for equitable estoppel.

Plaintiffs also contend that only the DOJ can waive the Government's right to sue.  The law supports this contention.  Only the DOJ has the authority to waive its rights to sue on Plaintiffs' FCA claims.  *See  U.S. ex rel. Condie v. Board of Regents of University of California*, 1993 WL 740185, 2 (N.D.Cal.,1993) ("It is undisputed, however, that the DOJ controls all litigation dealing with the FCA") (citing 49 Fed.Reg. 8889, 8896–97 (Mar. 9, 1984)) and thus, "the DOJ is the only agency that can waive prosecution of FCA claims");  *U.S. ex rel. Dye v. ATK Launch Systems, Inc.*, 2008 WL 4642164, 3 (D.Utah 2008) (defendant's waiver defenses stricken where defendant did not allege that DOJ waived rights of the United States).

Defendants allege only that CMS employees waived the Government's FCA claims, and that the term "representatives" encompasses DOJ.  However, CMS employees are not DOJ

17

employees, and CMS employees are not empowered to waive those claims.[11]  As a result,

Defendants' waiver defense cannot succeed.  Accordingly, the Court shall strike this defense as

well.

6.      *Failure to mitigate*

Defendants's defense of failure to mitigate is based on the contention that the

Government did not simply fail to stem its supposed financial losses, but actively encouraged its

agencies to continue paying federal funds to the State.  Defendants appear to be grafting a new

category of affirmative defense on what is traditionally considered to be an equitable doctrine.

*See Carrizales v. State Farm Lloyds*,  518 F.3d 343, 350 (5th Cir. 2008) ("In general, the duty to

mitigate damages is an equitable doctrine, and means a reduction in the amount of damages, not

an affirmative defense"); *Kinnee v. Shack, Inc.*. 2008 WL 4899204, 2 (D.Or. 2008) (failure to

mitigate described as "equitable defense").  Plaintiffs also appear to be relying on an estoppel-

based argument to bar the Government from pursuing the FCA claims.  As discussed previously,

equitable estoppel is not available as an affirmative defense in this case.

Moreover, Plaintiffs offer case law which holds that "the Government has no duty to

mitigate damages in fraud actions, including those under the FCA."  *Monahan,* 2009 WL

4576097, *8 (citing *Toepleman v. United States*, 263 F.2d 697, 700 (4th Cir. 1959), *cert. denied*,

359 U.S. 989 (1959)); *United States ex rel. Jordan v. Northrop Grumman Corp.*, 2002 U.S. Dist.

_____

[11] *See*, *U.S. ex rel. Monahan v. Robert Wood Johnson University Hosp. at Hamilton*,
2009 WL 4576097, 7 (D.N.J., 2009) ("Violations of the FCA. . . may only be waived by the
Department of Justice, and the unauthorized statements of United States agents may not serve to
waive the Government's claims) (citing *Sappiest v. Omaha Prop. & Casualty*, 404 F.3d 805, 809
(3d Cir.2005)); *U.S. v. Cushman & Wakefield, Inc*., 275 F.Supp.2d 763, 771 (N.D.Tex.,2002)
(waiver and ratification defense not available to defendant where defendant alleged that United
States Postal Service employees waived the Government's right to sue).

LEXIS 26622, *48-49 (C.D. Cal. Aug. 5, 2002) ("Defendant's argument that the Government had a duty to mitigate its damages to recover under the FCA in this case must fail . . . as a matter of law under the False Claims Act, the government has no legal duty to mitigate damages") (internal quotes and citations omitted).  Defendants offer no substantive argument, nor any case law from any court, which challenges Plaintiffs' position on this issue.  The Court agrees with Plaintiffs that failure to mitigate is not a proper affirmative defense or theory to assert against the Government, and the defense shall be stricken.

7.    *Unclean hands*

        Defendants assert in the Answers that Plaintiffs' claims are barred by the doctrine of "unclean hands," because government agents allegedly knowingly accepted and paid the false claims at issue and purportedly "encouraged" Defendants' fraudulent conduct by failing to prevent it.  Docs. 241-43, ¶ 418; Docs. 244-47, ¶ 117.

        Plaintiffs argue that this defense, like the other equitable doctrines, is invalid as a matter of law.  The Court agrees with Plaintiffs that the "unclean hands" doctrine does not apply here because it is an equitable doctrine that is barred for the same reason that estoppel is barred.  *See Worthington v. Anderson*, 386 F.3d 1314, 1319 (10th Cir. 2004) ("'Unclean hands' is an equitable defense").  Also, the "unclean hands" defense is not available against the Government in suits which vindicate the public interest.  *See Cushman & Wakefield*, 275 F. Supp. 2d at 773-74 (striking defense because FCA actions are suits which vindicate public interest); *U.S. v. Manhattan-Westchester Medical Services, P.C.*, 2008 WL 241079, 3 -4  (S.D.N.Y.,2008) (affirmative defenses of laches and unclean hands are unavailable against the Government) (citing *U. S. v. Angell*, 292 F.3d 333, 338 (2d Cir.2002) ("[L]aches is not available against the federal government when it undertakes to enforce a public right or protect the public interest.").

19

The only cases Defendants offer in response are non-FCA cases which cannot be read to mean that the "unclean hands" defense would be available in this case.  For example, Defendants cite to *SEC v. Rosenfeld*, 1997 WL 400131, at \*2 (S.D.N.Y. 1997) which states that the doctrine of unclean hands "may be raised against the Government," but goes further to describe such situations as *"where [the agency's misconduct [was] egregious and the resulting prejudice to the defendant rose to a constitutional level"* (emphasis added).  In *Rosenfeld*, the court held that the unclean hand doctrine was *not* applicable because the SEC "was acting to further its congressional mandate to investigate potential violations of the securities laws."  In a similar vein, Defendants also cite to *See SEC v. Nacchio*, 438 F. Supp. 2d 1266, 1287 (D. Colo. 2006) to suggest that the Court should refrain from striking the defense without first developing a more complete factual record.  However, the only reason the *Nacchio* court held off from striking the defense was because the case involved a jointly-conducted civil and criminal investigation and thus, there was a heightened attention to due process concerns.  *Id*. at 1287.  These cases have no bearing, factually or legally, on the instant case.  Accordingly, there is no basis for allowing a defense of "unclean hands" to proceed, and this defense shall likewise be stricken.

### Conclusion

In sum, the Court finds and concludes that Plaintiffs' motion to strike is timely.   The Court also finds that the United States Supreme Court's decision in *Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990) precludes an assertion of an equitable estoppel defense against the federal government, as well as other equitable defenses asserted in Defendants' Answers.  Further, even if *Richmond* did not apply, Defendants' allegations underlying the affirmative defenses do not describe or suggest affirmative misconduct which would support an estoppel defense.

The Court also finds and concludes that the "Government knowledge" defense or inference will not be stricken, but will be allowed only as an inference to rebut the requisite scienter element in an FCA claim.

The Court finds and concludes that the defenses of "accordance with the law" and "laches" are not available to be asserted against the Government and shall be stricken.  The Court shall strike the "waiver" defense because CMS employees are not empowered to waive the Government's FCA claims.  Finally, neither the defense of "failure to mitigate" nor "unclean hands" can be asserted against the Government on FCA claims.

**THEREFORE,**

**IT IS ORDERED** that the Court GRANTS IN PART Plaintiffs' Motion to Strike Affirmative Defenses **(Doc. 249)**, as described above.  The Court hereby STRIKES the affirmative defenses of: (1) Estoppel; (2) "Accordance with the Law"; (3) Laches; (4) Waiver; (5) Failure to mitigate; and (6) Unclean hands.  The Court DENIES Plaintiffs' motion with regard to the "Government knowledge" defense in that Defendants will be allowed to assert this "defense" to rebut the scienter element in the FCA claims.

_____
UNITED STATES DISTRICT JUDGE