# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

_____

UNITED STATES OF AMERICA, EX. REL.
ROBERT C. BAKER,

      Plaintiff,

      v.                                                  Civil No. 05-279 WJ/ACT

COMMUNITY HEALTH SYSTEMS, INC.,
EASTERN NEW MEXICO MEDICAL
CENTER; MIMBRES MEMORIAL
HOSPITAL; NORTHEASTERN REGIONAL
HOSPITAL; and HELENA REGIONAL
MEDICAL CENTER,

      Defendants.

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANTS' MOTION TO EXCLUDE EXPERT REPORT

THIS MATTER comes before the Court upon Defendants' Motion to Exclude Expert

Report, Testimony and Opinions and Judith A. Wagner, filed December 2, 2011 (**Doc. 360**). The

movants, collectively referred to as "Defendants" for purposes of this motion, are: Eastern New

Mexico Medical Center ("Eastern"), Mimbres Memorial Hospital ("Mimbres") and Alta Vista

Regional Hospital ("Alta Vista") (collectively, "the hospitals"), and Community Health Systems,

Inc. ("CHSI"), CHS/Community Health Systems, Inc. ("CHS/CHSI"), and Community Health

Systems Professional Services Corporation ("CHSPSC").  The Relator filed a joinder (Doc. 426)

to the Government's response (Doc. 425).  Having considered the parties' briefs and the

applicable law, I find that Defendants' motion is not well-taken and accordingly shall be

DENIED.

**Background**

This is a qui tam case[1] alleging Medicaid fraud based on violations of the False Claims Act, 31 U.S.C. § 3729(a) ("FCA").  Defendants are alleged to have manipulated the Medicaid funding program by a scheme which resulted in the illegal receipt of federally funded Medicaid payments.  In this motion, Defendants move to exclude the report, testimony and opinions of Plaintiffs' damages expert Judith A. Wagner, under Federal Rules of Evidence 104(a), 702, 703 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Ms. Wagner has opined that the damages in this case are $103,734,352.46.  Defendants claim that Ms. Wagner's methodology is flawed because it confuses the hospitals' alleged donations to their respective counties with the alleged false claims at issue in this case, thus conflating the Plaintiffs' theory of causation with their definition of damages.  They claim that Ms. Wagner bases her calculations on a speculative analysis of what the federal government would have paid to the State if the Hospitals had not made allegedly non-bona fide donations to their respective county governments, rather than what the federal government would have paid if the State's claims were not "false" as alleged.

## I.     Theory of liability

Some explanation of the connection between a health-care provider's donations to the State and Medicaid funding is necessary in order to understand Defendants' challenge to Ms. Wagner's testimony.[2]

---

[1]    A "qui tam action" is an action brought under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive. Black's Law Dict., 7th ed.

[2]    *See* Docs. 83 and 91 for more detail on the Medicaid funding process.

Medicaid programs are administered by the States in accordance with Federal regulations, but they are jointly financed by the Federal and State governments.   New Mexico hospitals receive Medicaid funding through a Sole Community Provider ("SCP") fund. Medicaid funding is supposed to compensate hospitals that participate in New Mexico's SCP fund program, a fair and reasonable amount for the care given to the indigent uninsured as well as Medicaid-eligible patients.  The amount of funding these hospitals receive is based on statements of expenditures submitted by the State of New Mexico ("State"), and a formula is used to calculate how much of the total reported expenditures the federal government will reimburse the state.  Plaintiffs allege that Defendants' fraud circumvented program-cost monitoring and resulted in payments to Defendants that vastly exceeded the program's purposes.

To recover federal funding for its Medicaid expenditures, the State submits a Form CMS-64 ("Form 64") to the federal government each quarter. This form reports the State's total actual Medicaid expenditures for the quarter, including the SCP payments made to hospitals.  In New Mexico, the State's portion of expenditures for SCP payments is derived from participating county governments through Intergovernmental Transfers ("IGTs") from those counties to the State treasury. NMSA 1978 § 27-5-6.  In turn, county IGT's to the State may be derived from several sources, including State and local tax revenues or donations made to the counties by Medicaid provider hospitals.[3]  Counties are supposed to transfer those funds to the State, which the State then combines with federal funds of approximately triple the amount of the county contribution, and then pays the hospitals the total of the combined county contribution and matching federal funds.

---

[3]  *See* 42 U.S.C. § 1396b(w); 42 C.F.R. § 433.57; NMSA 1978 §§ 27-5-6, 27-5-7.

Assuming that the expenditures reported on the State's Form 64 are complete and correct, the amount of federal funding available to the State is calculated by applying an FMAP percentage ("Federal Medicaid Assistance Percentage") to the total reported expenditure amount. For example, if the State's total reported expenditures for the quarter were $1 million and the FMAP was 75%, the federal government would provide $750,000 in funding for the State's Medicaid expenditures, and the State would be required to fund the remaining $250,000. The amount of federal contribution is called "Federal Financial Participation," or the "FFP" (Ms. Wagner refers to this as the "Federal Reimbursement").

The "donations" at issue in this case come in play because of the fact that some types of State expenditures are not eligible for matching federal funding. Donations by hospitals to states or counties are perfectly legal. However, Congress has prohibited the use of health-care provider donations to fund state Medicaid spending, because such donations (called "non-bona fide" donations) caused disbursement of federal matching funds with no true state contribution. The State is required to report *all* hospital donations on the Form 64—both permissible and impermissible—so that the federal government can properly calculate its funding obligations for the quarter. Federal regulations provide that where a donation is not "bona fide," the State's total reported expenditures are to be reduced by the amount of the donation *before* the FMAP percentage is applied to determine the federal funding obligation for those expenditures.[4] A provider-related donation is "*bona fide*" only if it has no direct or indirect relationship to Medicaid payments to the health care provider.

---

[4] *See* 42 C.F.R §433.54(e) ("When provider-related donations are not bona fide, CMS will deduct this amount from the State's medical assistance expenditures before calculating FFP."); 42 U.S.C. § 1396b(w)(1)(A)(i) (same rule).

Plaintiffs in this case allege that Defendants' donations had a direct or indirect relationship to the Medicaid payments they received under the SCP program, and consequently were non-bona fide donations.  They claim that these donations were made where counties could not meet the State's funding requirements to be able to pledge contributions on Defendants' behalf, in order for the State to be eligible for federal matching funds.  *See* Doc. 83 at 4-5 (Court's Mem.Op.& Order denying motion to dismiss Relator's Compl.).

## II.    Law on *Daubert*

In *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 597 (1993), the United States Supreme Court explained that Rule 702 assigns to the district judge a gatekeeping role to ensure that scientific testimony is both reliable and relevant. *See Dodge v. Cotter Corp*., 328 F.3d 1212, 1221 (10th Cir. 2003) (trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline).  The gate-keeping function involves a two-step analysis. First, the Court must to determine whether the expert is qualified by "knowledge, skill, experience, training or education" to render an opinion.  See Fed.R.Evid. 702.  Second, if the witness is so qualified, the Court must determine whether the expert's opinions are "reliable" under the principles set forth under *Daubert*, 509 U.S. 579, and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999); *see Ralston v. Smith & Nephew Richards, Inc*. 275 F.3d 965 (10th Cir. 2001).

To assist in the assessment of reliability, the Supreme Court in *Daubert* listed four nonexclusive factors that the trial court may consider: (1) whether the opinion at issue is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and

5

(4) whether the theory has been accepted in the scientific community. 509 U.S. at 593-94, 113 S.Ct. 2786. As noted, the list is not exclusive, and district courts applying *Daubert* have broad discretion to consider a variety of other factors. *Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167 *Dodge*, 328 F.3d at 1222.

**Discussion**

**III.     Parties' Positions on Proposed Methodology**

A.     Defendants' Position

Defendants claim that in calculating damages, Ms. Wagner is using an algebraic formula that has no relation to the federal statute and regulations governing how Medicaid funding should be calculated. Defendants object to her method in that it results in aggregate damages amounting to almost *four times* those resulting from application of the statutory formula. Defendants contend that Wagner's analysis is legally irrelevant, and that the methodology is flawed and inconsistent.

Defendants contend that the complaint in this case alleges that the false claims are the *State's* quarterly Form 64 claims for Medicaid funding from the federal government, *not* the Hospitals' allegedly improper donations. These Form 64 claims were false because they failed to report the hospitals' donations— or rather, failed to reduce the State's reported expenditures by the amount of those donations. Thus, Defendants argue, the only proper definition of damages is the difference between what the government paid on the State's Form 64 claims and what it would have paid if the State had properly reported the allegedly non-bona fide donations and had its reported expenditures reduced by the amount of the donations (which the Court will refer to as using the "administrative formula").

B.     Plaintiffs' Position

Plaintiff's position is that if the hospitals had not made non-bona fide donations, the State

would not have made SCP payments to the hospitals.  The payments would not have been made because the counties would not have made their matching contributions related to those donations.  *See* Doc. 425 at 19.

Plaintiffs reject the use of the administrative formula, advanced by Defendants, in calculating damages.  They emphasize that the administrative formula, which is part of the Medicaid Act's regulations, is pertinent only to cases where a state has not reported donations properly.   Here, Plaintiffs state that the asserted claims arise under the FCA and common law, not under the Medicaid Act.  *See* Doc. 425 at 17.  They are not alleging that the State did not fully and honestly disclose non-bona fide donations.  Thus, the administrative formula is not relevant because it has nothing to do with remedying fraud against the Government.

Under the FCA, the federal government is entitled to recover penalties "plus 3 times the amount of damages which the [United States] sustains because of the act[ion] of [the] person" who knowingly caused to be presented the false claim. 31 U.S.C. § 3729(a).  The FCA "was adopted 'for the purpose of punishing and preventing . . .  frauds. . . ,'" *United States v. Bornstein*, 423 U.S. 303, 310 n.5 (1976) (citation omitted), and "to provide for restitution to the [United States] of money taken from it by fraud. . . ." *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 551-52 (1943). "Single" damages under the FCA are intended to make the United States whole for "the amount of actual damages proved," *Hess*, 317 U.S. at 550-51, while the multiplier compensates the United States for other related losses including costs of detection and investigation, prejudgment interest, consequential damages, and relator's share.  *See Cook Cnty., Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 130-131 (2003).

## IV. Reliability

The main thrust of Defendants' challenge is to the legal relevance of Ms. Wagner's

theory, rather than the reliability of her testimony under *Daubert*.  In addition, Defendants

discuss what they consider to be flaws in Ms. Wagner's methodology.  Thus, the Court will

consider both the reliability and relevance of Ms. Wagner's opinion.  Defendants challenge Ms.

Wagner's qualifications as an expert to the extent that they argue that she is not an expert in

Medicaid funding and has never given an expert opinion in an FCA case.

The Court has considered Ms. Wagner's Curriculum Vitae and other available materials,

and notes that Ms. Wagner's experience as an expert is considerable.  She is a Certified Public

Accountant ("CPA") and is Accredited in Business Valuation and Certified in Financial

Forensics by the American Institute of Certified Public Accountants ("AICPA") and is Certified

as a Valuation Analyst by the National Association of Certified Valuation Analysts.  She has

been appointed as a Court expert witness in district courts of New Mexico, and retained as a

consulting or testifying forensic accounting expert witness in over 200 cases in the state courts of

New Mexico and the federal courts in New Mexico, Alaska, Arizona, and Michigan.  Ms.

Wagner has served on various committees and boards of the AICPA, and has been appointed as

a Receiver by state courts of New Mexico and as a Chapter 11 Trustee in cases requiring

complex accounting tracing and analysis.  *See* Defts' Ex. 1, Doc. 361-1 at 171-77 (Ex. 26,

Wagner Curriculum Vitae).[5]  I find that Ms. Wagner's opinion that defendants' donations were

related to the SCP payments does not require expertise in either Medicaid funding or in FCA

cases.  The reasons given by Defendants are insufficient to find Ms. Wagner not qualified to

provide expert testimony in this case.  *Daubert* discourages an "overly narrow test" of an

---

[5] Parties have presented their exhibits in a rather confusing fashion: Defendants numbered their exhibits attached to the motion, but designated the exhibits attached to the reply by letter.  Plaintiffs have numbered their exhibits.  For this reason, the Court will refer to exhibits by party.

expert's qualifications, particularly when the trial court has determined that expert testimony would be helpful to the trier of fact, which the Court finds it would be in this case.  *See Gardner v. Gen. Motors Corp.*, 507 F.2d 525, 528 (10th Cir. 1974) (finding both a chemical engineer and a teacher of both chemical engineering and engineering design to be qualified as experts even though one expert had more experience and training in the specifics of the limited field of expertise considered).  Therefore, Defendants' motion is denied with regard to Ms. Wagner's qualifications as an expert.

A.    Legal Relevance of Ms. Wagner's Testimony

The next hurdle in the analysis, before embarking on the more traditional *Daubert* challenge, is whether Ms. Wagner's methodology is legally irrelevant.  As mentioned above, Defendants contend that an opinion on damages should be based on the administrative formula under the Medicaid Act.  Under this formula, damages would be calculated as the difference between what the federal government paid on the State's Form 64 claims and what it would have paid if the state had properly reported the allegedly non-bona fide donations—that is, had the Form 64 claims reflected a reduction in reported expenditures by the amount of the donations. On the other hand, Plaintiffs contend that the legally correct standard calculates damages as the difference between the amount paid and the amount that would have been paid in the *absence* of the SCP payments related to Defendants' non-*bona fide* donations.  Plaintiffs argue that SCP payments related to non-bona fide donations would not have been paid and claimed, and thus the United States would have saved its contribution for those payments.

The parties appear to be following different paths to get to the same end.  Defendants acknowledge that damages are that portion of the federal reimbursement that is "in excess of the actual amount owed . . . ."  Defs. Mem., Doc. No. 361, at 14-15, n. 5.  In this case, the federal

government is alleging a "payment by mistake" claim.  Ms. Wagner's computations are based on

an assumption that FCA and/or payment-by-mistake liability have been established.  Thus,

Plaintiffs contend that "[t]he correct measure of damages is the difference between the amount

paid and the amount that would have been paid in the absence of the SCP payments related to

defendants' non-*bona fide* donations, which is precisely what Ms. Wagner has calculated.  Doc.

425 at 2.  Plaintiffs object to Defendants' theory of recovery using the administrative formula

because it would result in a "windfall" or excess profit for the hospitals, even if liability were

determined and treble damages paid out.  Defendants object to this characterization, arguing that

hospitals do not receive a "windfall" by being paid the amounts they are legally entitled to

receive.

     The Court disagrees with Defendants that Ms. Wagner's methodology is legally incorrect

or irrelevant.  The administrative scheme has its place in the Medicaid scheme.  Those

regulations clearly deal with a state's lack of compliance with federal requirements (42 C.F.R. §

430.35), or where a specific claim is not reimbursable or allowable (§ 430.42). However, the

Court has noted that they "are not a substitute to redress an alleged improper scheme on the part

of hospital providers to receive federally reimbursed Medicaid payments in violation of the

Medicaid statute and regulations." Doc. 91 at 35 (Court's Mem. Op. & Order).  In fact, there is

no set formula for measuring damages under the False Claims Act.  Damages have been

measured "in a variety of ways and the measure applied by the courts in specific cases has been

greatly influenced by the nature of the fraud and the type of [United States] transaction affected

by it." *United States v. Cabrera-Diaz*, 106 F.Supp. 2d 234, 239 (D.P.R. 2000) (determining

measure of damages in fraudulent Medicare claims by anesthesiologist was the "difference

between the amount paid out by reason of the false statements over and above what it would

have paid if the claims had been truthful").  A formula for calculating damages "must be created for each case that will provide the government with its damages directly caused by the filing of a false claim.  *U.S. ex rel. Roby v. Boeing Co.*, 79 F.Supp.2d 877, 884-885 (S.D.Ohio, 1999).  The relevant case law does not go so far as to specify a methodology for measuring damages.  The Tenth Circuit defines "injury" in an FCA claim as "the difference between what the government actually paid and the amount it would have paid in the absence of the fraudulent claim." *U.S. ex rel. Woodard v. Country View Care Center, Inc.*, 797 F.2d 888, 893 (10th Cir. 1986) (citing Eighth and Ninth Circuit cases).[6]  Because there is no one formula which has been determined to measure damages for violations of the FCA, the Court cannot find that Ms. Wagner's methodology is legally incorrect or irrelevant simply because it is not based calculations under the administrative formula.

B.    Methodology

Having determined that Ms. Wagner's opinion testimony is legally relevant, the next question is to determine whether the methodology is sound and reliable under *Daubert*.[7]

---

[6]  The parties's positions are not so far apart as one would imagine.  In fact, at one point in their briefs, Defendants state the appropriate measure of damages in a way that is consistent with Plaintiffs' position, defining damages as "the difference between what the government actually paid and the amount it would have paid in the *absence* of the fraudulent claim." *United States ex rel. Woodard v. Country View Care Ctr., Inc.*, 797 F.2d 888, 893 (10th Cir. 1986) (emphasis added); *United States v. Killough*, 848 F.2d 1523, 1532 (11th Cir. 1988) (same); *United States v. Coop. Grain & Supply Co.*, 476 F.2d 47, 62 (8th Cir. 1973) (same); *United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir. 1966).  *See* Doc. 361 at 14-15 & n.5.  It thus appears that what the parties disagree on is how the "absence" of claims is interpreted and calculated.

[7]  The Court addressed the relevance question before the reliability inquiry in this case because Defendants posed the relevance question as a legal issue.  Had the Court found that Ms. Wagner's methodology was legally irrelevant to this case, there would not have been a need to proceed to the relevance inquiry.

Defendants pose a separate challenge to the mechanics of Ms. Wagner's methodology, claiming that the methodology is flawed and inconsistent.  In determining the amount of excess federal reimbursement of the SCP payments, Ms. Wagner started out by calculating the federal reimbursement paid for the SCP payments to the hospitals.  To that number she applied a ratio of individual county matches to the total county match, to account for the fact that for some hospitals, multiple counties provided the match.  Next, Ms. Wagner multiplied the federal reimbursement from the individual county match by the ratio of the donation to the individual county match.  She did this in order to account for the fact that some county matches exceeded the amount of defendants' donations.  *See* Doc. 425 at 17 (citing to Ex. 5 at 37).

Defendants contend that Ms. Wagner cherry-picked data that supported her conclusions, and ignored entire years of data.  There is no merit to this argument. Ms. Wagner's opinion is based upon her experience as a forensic accountant, forensic accounting investigation techniques and a review of the plethora of facts and data that are part of this case, including depositions and affidavits, documents, health care reports, and county budgets and state auditor financial statements.  *See* Defts' Ex. 1 (Ex. 25).

Defendants also charge that Ms. Wagner failed to rely upon the most reliable financial information available.  For example, they contend that she should have used the counties' audited financial statements rather than data from the New Mexico Health Policy Commission ("HPC") data relating to the County Indigent Funds and the counties' payment of the county match for state fiscal years 2001 through 2009.  Simply stated, I fail to see how the HPC data is unreliable.  First, the counties' audited financial statements were apparently not reliable for all the periods involved in Ms. Wagner's analysis.  Moreover, the HPC data was not the only source of information that Ms. Wagner relied upon in forming her conclusions.  These other sources

12

included the sworn testimony of county officials, county commission minutes, accounting data, and audited financial statements, where available.  Thus, Ms. Wagner's decision to place more emphasis on one group of data versus another is a matter of weight rather than admissibility.

Defendants argue that Ms. Wagner's testimony is unreliable also because she is not relying on the "hold harmless" tests prescribed by the Medicaid regulations in order to determine whether the hospitals donations were non-bona fide or whether the alleged donations were directly or indirectly related to the SCP payments to the hospitals.  This is true to some extent.  Ms. Wagner does form an opinion concerning the relationship between the donations, the county matching funds and/or SCP payments, without considering the "hold harmless" tests to determine this relationship.  However, because Ms. Wagner is not basing her findings and opinion on the administrative formula, there is no need to be bound by the Medicaid regulations to define the relationship between the SCP payments and the donations.

Finally, Defendants argue that Ms. Wagner based her analysis on an inapplicable Government Accounting Standards Board ("GASB") Statement for conducting fund tracing, because the GASB standard has been superseded by a later version, GASB-34.  However, Defendants do not explain why a former version of the GASB is unreliable, nor is there any reason to believe that analyzing the information through the GASB-34 would have changed Ms. Wagner's opinion.  In fact, Plaintiff states that Ms. Wager's opinion would have been the same, based on either GASB standard.

Defendants have not presented a sufficient basis for the Court to exclude Ms. Wagner's opinion testimony.  They urge the Court to apply a rigid template over Ms. Wagner's testimony in order to determine whether that testimony meets the requirements of *Daubert*.  This is not necessary; the district court's gatekeeper role in *Daubert* is a flexible one.  *See* 509 U.S. at 594

& n.12.  The objective under a *Daubert* analysis is "to ensure the reliability and relevancy of expert testimony" and to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152.  This is why the unavailability of peer review for Ms. Wagner's testimony is not critical, or even necessary.  "Where there are other factors that demonstrate the reliability of the expert's methodology, an expert opinion should not be excluded simply because there is no literature on point." *Schneider ex rel. Estate of Schneider v. Fried*,  320 F.3d 396, 406 (3rd Cir. 2003).  The reliability of Ms. Wagner's testimony rests heavily on her knowledge and her experience, rather than peer review, publication and potential error rate.

Accordingly, I do not find Ms. Wagner's methodology to fail under *Daubert*.  Any objections which Defendants might have to her testimony are objections which appropriately go to weight a fact finder may give this evidence, rather than its admissibility.

## III.    Objection to Surreply

Plaintiffs object to language contained in the reply (Doc. 435) as raising new material or argument, and ask that the Court not rely upon it in ruling on the instant motion.  Docs. 443 and 445.  Defendants contend that the Court should consider those comments in the reply as rebuttal evidence.  Two of the three objections are objections to Defendants' footnotes.  One footnote refers to the "federal government's recent settlement with other private hospitals in New Mexico. . . ." and the other is an assertion by Defendants that some of the Relator's statements are "unsupported."  *See* Doc. 443.  The third objection is to a statement by Defendants that the hospitals are entitled to SCP funding in the amounts calculated by the State. This last statement does indeed appear to the Court to be rebuttal evidence to Plaintiffs'

contention that using the administrative formula to determine damages would end in a windfall of profits for Defendants.

However, these objections are overruled.  Considering the abundance of other information in the pleadings, the Court hardly relied on these footnotes in making the findings above.  Therefore, the Court denies the motion as moot.  The language to which Plaintiffs object was not considered by the Court because it simply was not necessary.

## CONCLUSION

In sum, I find and conclude that Ms. Wagner is qualified to render opinion testimony in this case that meets the reliability and relevancy requirements set forth in *Daubert*, *Kumho*, and the Federal Rules of Evidence.

**THEREFORE,**

**IT IS ORDERED** that Defendants' Motion to Exclude Expert Report, Testimony and Opinions and Judith A. Wagner **(Doc. 360)** is hereby DENIED for the above-described reasons.

_____

UNITED STATES DISTRICT JUDGE