IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,
*ex rel.* ROBERT C. BAKER,

      Plaintiffs,

v.                                      Civ. No. 05-279 WJ/ACT

COMMUNITY HEALTH SYSTEMS, INC., *et al.*,

      Defendants.

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants' Motion to Compel Production of Documents From, and For Sanctions Against, The New Mexico Human Services Department [Doc. 375]. Non-party New Mexico Human Services Department (HSD) has filed its response [Doc. 384], and Defendants have filed their reply [Doc. 403]. The Court has determined that a hearing is not necessary. For the reasons that follow, the Motion is granted in part and denied in part.

### FACTUAL BACKGROUND

This *qui tam* action was initially filed in 2005 by Relator Robert C. Baker [Doc. 1]. The United States of America (Government), through the Department of Justice (DOJ) intervened in 2009 [Doc. 31]. The facts of this case are fully set out in *United States of America, ex rel. Baker v. Community Health Systems, Inc.*, 709 F. Supp.2d 1084 (D.N.M. 2010) and other Memoranda Opinions and Orders entered in this case and will not be repeated here except as necessary. The primary issue in this case is whether Defendant hospitals made non-bona fide donations to their respective counties in order to receive federal dollars for care rendered to indigent patients.

In New Mexico, two sources of Medicaid funding to hospitals are the Sole Community Provider (SCP) fund and the Sole Community Provider Supplemental Payment (SCP Supplemental

Payment) program.  New Mexico's share of these programs to hospitals must be funded by county and local governments.  The allegation is that because Defendants knew their contributions to the SCP fund were ineligible for federal matching, they falsely characterized those payments as "unrestricted donations" in an effort to make them appear bona fide.  A provider-related donation is bona fide only if it has no direct or indirect relationship to Medicaid payments to the health care provider.  Plaintiffs allege that Defendants' donations had a direct or indirect relationship to the Medicaid payments they received under the SCP fund or SCP Supplemental Payments program and therefore were non-bona fide transactions.

**PROCEDURAL BACKGROUND**

**<u>Judge Johnson's Preservation Order</u>**

In 2009, several hospitals who are Defendants in this case, filed a Petition to Perpetuate Testimony, which opened the Court file in Civ. 09-254 WJ/ACT.  The petition culminated Judge Johnson's June 23, 2009 entry in that case of the Order Based on Parties' Stipulation Regarding Rule 27 Petition [Doc. 24] (Preservation Order).  The Preservation Order covered, among other entities, HSD.  It specifically directed HSD to "take all reasonable steps to ensure the preservation, retention, and abatement from continued or further destruction, of all documents and information from 2000 forward concerning or relating to subparagraphs a-c below . . . ."  The subparagraphs referred to provide:

> a.      county financing of indigent health care, including sources of revenue used by county governments to make contributions to the New Mexico Sole Community Provider Fund;
>
> b.      hospital or other provider donations, contributions or other funds transfers to New Mexico county governments; and
>
> c.      the disposition or destruction of the documents and information described in sub-paragraphs 3.a and 3.b [below].

2

Preservation Order [Doc. 24] at ¶ 2(a)-(c).

"Document" and "information" are defined "broadly to include all material concerning the subject matters identified above" in whatever form.  The Preservation Order is several pages long and sets forth all of the parties' stipulations concerning the storage and retrieval of the information.

.   **The Previous Motion to Compel**

In May, 2011, Defendants in this case filed a Motion to Compel Production of Documents from HSD [Doc. 216].  The Motion and supporting Memorandum [Doc. 217] stated that HSD had failed to comply with the Court's 2009 Preservation Order by allowing the destruction of electronically stored information (ESI).  The Motion requested the Court to compel production; submit claimed privileged documents for *in camera* review; and appoint an independent ESI consultant to report on the documents that should have been preserved pursuant to the Court's Preservation Order.

**Judge Schneider's Order**

Judge Schneider ruled on Defendants' Motion on August 16, 2011 [Doc. 267].  He granted the motion by ordering HSD to produce documents; told Defendants they could hire an ESI company at their own expense; and declined to rule on the privileged documents because no privilege log had been prepared.

**December Motion to Compel**

Pursuant to Judge Schneider's August 2011 Order, Defendants hired Navigant, a global expert services firm to conduct an investigation of HSD's ESI compliance.  Navigant concluded that HSD had failed to issue a litigation hold or implement a document retention process until August, 2011, which was two years after entry of the Preservation Order.  Navigant determined that

documents of critical custodians have been destroyed.   Finally, Navigant found that not all documents responsive to the subpoena had been produced.

As to the documents to which HSD claims privilege, HSD submitted a privilege log. Subsequently, HSD and Defendants submitted a Joint Status Report on Defendants' Motion to Compel Production of Documents From, and for Sanctions Against, the New Mexico Human Services Department [Doc. 459].  HSD and Defendants narrowed the documents at issue on the privilege log and the Court has now reviewed all of the documents submitted for *in camera* review.

### Issues Before the Court

The Joint Status Report [Doc. 459] identifies the following unresolved issues:

(1) documents withheld under claims of attorney client privilege and work product, all of which have been submitted to the Court for *in camera* review;

(2)  the Anna Bransford Documents identified by Navigant.  HSD wants Defendants to pay for the costs of collecting and producing all non-privileged documents; and

(3) Defendants' request for sanctions.

In addition to the foregoing three issues, on May 27, 2012 the Court issued an Order requesting supplemental briefing on whether HSD had complied with Fed.R.Civ.P. 45 and the time limits contained therein [Doc. 487].  HSD and Defendants have submitted their briefs [Doc. 500 and 497], respectively.

### DISCUSSION

#### Rule 45 Subpoenas

Under Fed.R.Civ.P. 45(c)(2)(B) a "person commanded to produce" by a subpoena is required to make a written objection within 14 days after service.  HSD was served on February 16, 2011. It is undisputed that HSD did not serve objections on Defendants or file written objections with the

4

with the Court.[1]   HSD was in communication with Defendants, however, and submitted some documents on March 3, 2011 and submitted a privilege log on March 22, 2011.  On May 5, 2011, Defendants filed their first Motion to Compel, which is discussed above.

The overwhelming majority of courts have held that non-parties withholding information under claims of privilege, or other grounds, requested by a subpoena duces tecum under Rule 45(d)(2)(A) must comply with the time requirements set forth under Rule 45(c)(2)(B).  *See, e.g.*, *Tuite v. Henry*, 98 F.3d 1411, 1416 (D.C. Cir. 1996); *Wang*, 919 F.3d at 131; *Oneida, Ltd. v. United States*, 43 Fed.Cl. 611, 614 (Fed. Cl. 1999).  In what one authority calls the "assert or waive rule," the author explains that "[e]videntiary privileges are not self-executing: the general rule is that the failure to assert a claim of privilege at the time and in the manner required by any rules or orders of the court is a waiver of the privilege." 9 C. R. Richey & J. E. Smith, *Moore's Federal Practice* § 45.61[3] (Lexis 2012). The failure to timely object may be excused if the Court finds unusual circumstances and good cause for the failure.  *Id*. at § 45.41[1][c].

One  example of good cause is "the subpoena is directed to a nonparty acting in good faith." *Id*.  Other cases and authorities find that the failure may be excused based on an examination of several factors, namely:  an absence of bad faith; status as a non-party; cooperation with the issuer of the subpoena; and ongoing communications asserting privilege.  *American Elec. Power Co. v. United States*, 191 F.R.D. 132, 137 (S.D. Ohio 1999); *Moore's Federal Practice* at § 45.41(1)©.

---

[1]  In *Wang v. Hsu*, 919 F.2d 130 (10th Cir. 1990), the court specifically said that objections to a Rule 45 subpoena must be "filed."  That language was no doubt relied upon by the court in *Creative Gifts, Inc. v. UFO*, 183 F.R.D. 568 (D.N.M. 1998).  However, the plain language of Rule 45 only requires service, not filing.  *Compare* Fed.R.Civ.P. 72 ("[a] party may *serve and file* objections") (emphasis added).

Because this determination is a matter of the Court's discretion, *Wang*, 919 F.2d at 130, I find that the ongoing discussions between HSD and Defendants concerning the privileged documents weighs in HSD's favor.  Having considered the arguments presented, the Court finds that HSD did not waive any privilege or immunity by its failure to object to the Rule 45 subpoena.  Accordingly, the Court now makes its ruling on the documents submitted for *in camera* review.

### Documents submitted for *in camera* review

Most of the documents submitted are e-mail chains.  With few exceptions, the privilege or immunity is asserted because the e-mail was sent to, copied to, or received from in-house counsel.  Some e-mails forward copies of documents to in-house counsel or in-house counsel received a copy of the document by virtue of being copied on the e-mail.

The task of reviewing these documents was far more difficult than usual for several reasons.  HSD's "business" involves the same matters that are at the heart of this litigation.   It is quite obvious that HSD's in-house counsel serve in the dual roles of business and legal advisors, but  HSD made little or no effort to differentiate between legal advice and advice given in the ordinary course of business.  Nor did HSD make an effort to advise the Court why certain e-mails or documents were protected beyond the conclusory "attorney-client/work product" designation.

Finally, HSD made no effort to organize or cross reference its documents, many of which were duplicated more than once.   A draft of a letter may be several documents removed from the e-mails concerning that letter.  In addition, there were several drafts of documents on which changes were not highlighted and there was no indication whether any of the drafts were final versions of documents shared with third parties.  To paraphrase Judge Posner, no judge should be forced to search through a privilege log  like a pig hunting for truffles. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991) ) ( "Judges are not like pigs, hunting for truffles buried in briefs." ).

6

**Attorney-client privilege**

A document "prepared for both legal and non-legal review is not privileged." *In re Air Crash Disaster at Sioux City, Iowa on July 19, 1989*, 133 F.R.D. 515, 517 (N.D. Ill. 1990). "The need to distinguish between business and legal advice often arises in the context where communications to in-house counsel are claimed privileged, as in-house counsel are frequently involved in day-to-day business aspects of the corporation." *United States of America v. Philip Morris USA, Inc.*, 2004 WL 5355972, *6 (D.D.C. 2004).

When legal and business advice are inextricably intertwined, the legal advice must predominate to retain the privilege. *Valente v. Lincoln National Corp.*, 2010 WL 3522495, *2 (D. Conn. 2010); *Burton v. R.J. Reynolds Tobacco Co.*, 200 F.R.D. 661, 670 (D. Kan. 2001). "When a document is created for simultaneous review by both legal and nonlegal personnel, for both legal and nonlegal purposes, it will likely not be construed as having the 'primary purpose' of obtaining legal advice." *Ponca Tribe of Indians of Oklahoma v. Continental Carbon Co.*, 2008 WL 4372802 (W.D. Okla. 2008) (internal quotation marks & citation omitted). Under the "predominate purpose" test, "it is not enough for the party invoking the privilege to show that a communication from corporate person[ell] to in-house counsel communicated factual information that might become relevant to the future rendering of legal advice. Instead, the communication must also either explicitly or implicitly seek specific legal advice about that factual information." *Valente*, 2010 WL3522495 at *3.

"[A]greements reached as a result of legal advice are not protected communications." *Burton*, 200 F.R.D. at 670. "[T]he mere fact of submission of a document to counsel for legal input is not a protected communication." *Id.* The privilege does not cover client communications that relate only business or technical data, where the client is not sharing that information in order to

solicit legal advice. *Monsanto Co. and Monsanto Tech. LLC v. E.I. Du Pont de Numbers and Co.*,l 2011, *2 WL 4408284 (E.D. Mo. 2011) (internal quotation marks & citation omitted).

The fact that a party had communications with its attorney is not privileged. Revelation of general topics of discussion between attorney and client does not invoke the privilege, unless such revelation also reveals the substance of a protected communication. In addition, the privilege does not protect the activities of an attorney because they are not communications. *Burton v. R.J. Reynolds Tobacco Co.*, 177 F.R.D. 491, 499 (D.Kan.1997)

Draft documents "may be considered privileged if they were prepared with the assistance of an attorney for the purpose of obtaining legal advice or, after an attorney's advice, contain information a client considered but decided not to include in the final version.  In other words, if the draft is prepared with attorney assistance, and contains words or language that do not appear in the final version, those words may be protected . . . .  But if the final version sent to a third person contains the revisions made on the draft, those revisions are not privileged." *In re Seroquel Products Liability Litigation*, 2008 WL 1995058, *3 (M.D. Fla. 2008).

"The burden rests on the proponent of the privilege to prove that the communication provides primarily legal and not business advice even for communications written by in-house counsel, especially where numerous recipients of the communication are outside the legal department." *In re Chase Bank USA, N.A. "Check Loan" Contract Litigation*, 2011 WL 3268091, *1 (N.D. Cal. 2011).

## **Work Product**

"The goal of the attorney work product doctrine is to protect an attorney's subjective analysis and substantive efforts in, or in anticipation of, litigation from use by the adverse party." *Lindley v. Life Investors Ins. Co.*, 267 F.R.D. 382, 388 (N.D. Okla. 2010)(internal quotation marks & citation

omitted). "'In anticipation of litigation' contains two related, but nevertheless distinct, concepts. One is temporal. The other is motivational." *Id.* The critical inquiry is whether the document would have been created regardless of the litigation. *Id.*

When documents are prepared for both business and litigation reasons, the work product doctrine will apply only if "the primary motivating purpose behind the creation of the [documents was] to assist in pending or impending litigation." *Adams v. Gateway, Inc.*, 2003 WL 23787856, *9 (D. Utah 2003). Even when litigation is on-going, there is no work product protection for documents prepared in the regular course of business. *In re Conagra Peanut Butter Products Liability Litigation*, 2009 WL 799422 (N.D. Ga. 2009).

In *In re Air Crash*, General Electric, a non-party, assigned attorneys overall responsibility for everything concerning the accident. 133 F.R.D. at 520. The court, in an effort to determine whether documents were work product, given that the majority of the documents were sent by, sent to or copies to an attorney, utilized Professor Moore's definition of work product: "'Subject matter that relates to the preparation, strategy, and appraisal of the strengths and weaknesses of an action, or to the activities of the attorneys involved, rather than to the underlying evidence.'" *Id.* at 519 (quoting 4 *Moore's Federal Practice*, ¶ 26.64[1] at 26-349-350 (1989)) (brackets & ellipses omitted).

### Rules applicable to both Attorney Client and Work Product

"Documents prepared for dissemination to third parties are not protected from discovery by either the attorney-client or the work product privilege. . . . Nor are the details, including drafts of the document to be published, protected." *In re Seroquel*, 2008 WL 1995058 at *3. Documents generated in the ordinary course of business -- including responding to regulatory agencies and compliance with state and federal statutory and regulatory law -- are neither privileged nor immune.

9

*Fru-Con Construction Corp. v. Sacramento Municipal Utility District*, 2006 WL 2050999, *3-4 (E.D. Calif. 2006).

"[B]ecause all privileges are 'in derogation of the search for truth,' both [the attorney client privilege and the work product doctrine] are narrowly construed." A party resisting discovery based on the attorney-client privilege or work product immunity has the burden of establishing that the privilege applies. *Peat, Marwick, Mitchell, & Co. v. West*, 748 F.2d 540, 542 (10th Cir.1984)(stating that "[a] party seeking to assert the privilege must make a clear showing that it applies").

With the foregoing rules in mind, the Court refers to the documents as they were submitted to the Court, in three sets in the notebooks, sections A, B, and C, and the Court discusses the documents by their subject matter as identified in the log by HSD.[2]

**Bed Taxes**:

B-6    July 1, 2005 draft letter from MAD to CMS.

B-16   December 9, 2003 e-mail attaching a draft of proposed legislation from Barbara Gay to HSD management team.

B-17   The proposed draft legislation (HSD's 2004 Legislative Priorities).

C-7    August 29, 2005 internal memorandum discussing documents requested by outside counsel for the Long Term Care Bed Surcharge disallowance appeal.

C-8    January 25, 2006 FAQ re bed surcharges; draft document.

C-9    October 20, 2006 FAQ re bed surcharges; draft document.

C-26   October 25, 2005 e-mail forwarding  the 10-25-05 FAQ for comments; in-house counsel is copied among other HSD employees.

---

[2] Many of the documents submitted were highlighted to show the part of the document HSD considered either privileged or immune.  The Court assumes that the document was produced to CHS in redacted form. (If the redacted document was not previously produced, it should be produced in its redacted form.) Thus, when the Court orders a redacted document to be produced, it means that the highlighted portion is not protected.

C-27   October 25, 2005 FAQ re bed surcharges; draft document.

Attorney client and work product are claimed for the Log B documents; work product only is claimed on the Log C documents.

C-7, C-8, C-9 and C-27 are work product and need not be produced.

The remaining documents in this category will be produced.  All of these documents appear to be prepared in the ordinary course of business and HSD has not shown how legal advice predominates.

**CMS FMR FY2009**.  The Court has organized this category of documents by date:

November, 2009

B-53   These e-mails concern discussions in-house counsel had with AUSA Thomas regarding the Roswell case.  This document is covered by the attorney-client privilege.

March, 2011

B-7 (and duplicate B-28) is a March 9, 2011 e-mail concerning a draft letter to be sent to CMS.

B-8 (and duplicate B-29) is the letter referred to in B-7 and dated March 10, 2011.

The Court has to assume that the letter (B-8) was sent to CMS without any argument to the contrary.  As such, neither the e-mails nor the letter are privileged.

April, 2011

A-26   April 27, 2011 e-mail chain concerning a public records request and requesting legal advice whether a document is subject to the public records act.

Attorney client privilege is claimed, but the e-mail does not reveal confidential client communications and these matters are part of HSD's regular course of business.  This document will be produced.

May, 2011

A-4   May, 12, 2011 e-mail chain concerning a public records request and information that has been sent to third parties.

Attorney client and work product are claimed, but the e-mails discuss factual matters, do not reveal confidential client communications and do not reveal counsel's legal strategy, opinions, or

theories.  In any event, this discussion would have occurred in the ordinary course of business and there is no indication that legal advice predominates.  This document will be produced.

June, 2011

A-29   These June, 2011 e-mails among HSD personnel, with counsel copied, discuss how to respond to an inquiry from the Roswell Hospital concerning CM FMR 2009.  Suggested language is included in the e-mails, but does not appear to be provided by counsel.

B-1 (and duplicate B-47).   June 6, 2011, 12:53 p.m. e-mail attaching draft document.

B-2 (and duplicate B-48)   The draft document referred to in B-1.

B-3 (and duplicate B-51)    June 6, 2011, 9:47 a.m. attaching the draft document.

B-4 (and duplicate B-52)   The draft referred to in B-3.

B-5   June 6, 2011 draft letter to CMS FMR for FY 2009.

B-49   June 7, 2011 e-mail forwarding the third draft of the document referred to in B-1 through B-4.

B-50   The third draft of the document referred to in B-1 through B-4.

Attorney client privilege and work product immunity are claimed for these documents.   B-3, B-50, and B-51 are privileged because they appear to request legal advice.  The remaining documents are largely factual and intertwine business and legal matters and there is no showing that legal advice predominates.  With regards to some of the draft documents, the Court was not advised as to any changes that reflect legal advice or whether any of the drafts was the final draft shared with a third party.  Therefore, HSD has not met its burden of showing these documents are privileged or protected and they will be produced.

August, 2011

A-33   August 2, 2011 e-mail to in-house counsel asking advice on response to inquiry about CMS FMR FY 2009.

Requests advice from in-house counsel as to how to respond to an inquiry from an attorney.  Accordingly, this document need not be produced.

**CMS 64**

A-2, A-17 and A-30 are all part of an  August 17, 2011 e-mail chain among HSD personnel concerning CMS 64 reporting and requesting advice of counsel.  These three documents are privileged and need not be produced.

A-34    July, 2011 e-mails among HSD personnel concerning Form 64 reporting; redacted e-mail is to in-house counsel.  The document will be produced with the exception of the redacted portion, which is privileged.

A-38    April, 2011 e-mails among HSD personnel, including in-house counsel, discussing response to CMS. This document will be produced with the exception of the redacted portion, which is privileged.

A-41    May 27, 2010 e-mail between HSD personnel discussing CMS Form 64. The redacted portion references communication with counsel.  This document will be produced with the exception of the redacted portion, which is privileged.

B-43    April, 2011 e-mail from in-house counsel about reporting donations and scheduling a meeting.  This document will be produced.

**IGT**

A-20, A-21 (and partial duplicate C-31), A-22        October, 2010 through December, 2010 e-mail chains asking for legal advice concerning intergovernmental transfers to fund the SCI and SCP programs.

A-27    May, 2011 e-mail chain discussing the same issues as in A-20, A-21 and A-22.

A-37    August, 2010 e-mail chain discussing the same issues as above.

B-27 and B-54 (duplicate of C-31).   December, 2010 e-mails discussing UNM IGT.

Log B-27 will be produced.  The remaining documents in this section are either privileged or work product and need not be produced.

**MOU**

A-39    September 24, 2010 e-mails, in which counsel is copied, concerning MOU between counties and UNMH.  In house counsel is asked for input on proposed responses.

A-40, B-59    July 3, 2007 e-mails concerning St. Vincent's Hospital memorandum of agreement.

B-58, B-60  MOUs with St. Vincent's Hospital.

These documents appear to be generated in the ordinary course of business.  There is no indication that legal advice predominated over business advice.  The MOUs appear to be identical and presumably at some point were submitted to a third party and are therefore not privileged.  These documents will be produced.

13

**Newspaper articles**

A-1     March 31, 2011 e-mails from and to in-house counsel and other HSD personnel concerning newspaper article in <u>Santa Fe Reporter</u>.

A-3, A-9, and A-23     March 25, 2011 e-mails among HSD personnel and copying counsel concerning Chavez County news release.

These documents appear to be generated in the ordinary course of business and do not contain legal advice.   These documents will be produced.

**SCP ATR's**

A-13 (and duplicate C-21)   February, 2011 e-mail chain discussing Sole Community ATRs.

These e-mails appear to be generated in the ordinary course of business.   However, there appears to be a reference to legal advice in the redacted portion of A-13 and C-21.   These documents will be produced with the exception of the redacted portion, which is privileged.

**SCP Program**

A-11   February, 2011 e-mail chain among HSD personnel and sent to in-house counsel concerning  financial management review draft report.

A-32    August, 2011 e-mail chain, including e-mails from third party concerning SCP fund letter.

These e-mails appear to be generated in the ordinary course of business and there is no reference to leal advice.  These documents will be produced.

**Super Supplemental**

A-7    April 25, 2011 e-mail among HSD personnel, with a copy to in-house counsel, concerning whether CMS will be issuing an opinion on the Super Supplemental.

A-19   March and April, 2011 e-mail chain among HSD personnel, including in house counsel, concerning Super Supplemental.   Some of these e-mails are duplicative of A-1 (see Newspaper Articles).

A-24   April, 2011 e-mail chain discussing the Super Supplemental and including an e-mail from an outside individual.

A-25   April, 2011 e-mail chain discussing the Super Supplemental and including an e-mail from an outside individual.

14

C-29   2011 document entitled "Super Supplemental," which lists a plan of action for the Super Supplemental.  Work product is claimed because it reflects legal advice of counsel and was prepared in anticipation of litigation.   Neither the author nor the recipients are listed.

The redactions on Log A-19 at WEIJUL00057315 -316 are  to be produced.  The remaining redactions on Log A-19 are either privileged or immune.

The remaining e-mails appear to be generated in the ordinary course of business; *i.e.*, HSD individuals are discussing options concerning the Super Supplemental.  Counsel is copied on the e-mails, and legal and business issues are intertwined, but there is no indication that legal advice predominates over business matters.  Log A-24 indicates that Log C-29 was prepared by counsel. The talking points in C-29 are merely a listing of HSD's options with regard to the Super Supplemental.   It appears that all of these documents would have been prepared in the ordinary course of business and therefore they will be produced.

### SCP Payments

A-8   April, 2011 e-mails concerning a proposed form of certificate, which was approved by in-house counsel.

A-10   February, 2011 e-mails concerning an inquiry from the CFO of CHS about second quarter payments; in-house counsel is copied.

A-12   February, 2011 e-mails on how to respond to question from third party.  In-house counsel is copied and authors one e-mail.

A-14   January, 2011 e-mails on how to respond to question from third party.  In-house counsel is the recipient.

A-18 (and duplicate B-57)     November, 2005 redacted draft bullets on HSD's issues with St. Vincent Hospital.

A-28   June, 2011 e-mails concerning meeting with state representative to discuss transfers from Los Alamos County to St. Vincent Hospital.

A-35 and A-36         August, 2011 e-mail among HSD personnel, with in-house counsel copied, about a response to State Senator Smith, which was forwarded to counsel.

C-24   Undated e-mail to in-house counsel providing information requested by counsel.

B-27, C-25, C-28, and C-34     These are duplicate documents concerning SCP  funding with St. Vincent Hospital.  The Log indicates these documents were prepared in November, 2005.

Log A-10, A-18 (and duplicate B-57), and C-24 are either privileged or are work product and not to be produced.

The remaining documents and e-mails would have been prepared in the ordinary course of business and all intertwine business and legal advice and there is no indication that legal advice predominated.  Accordingly, the remaining documents will be produced.

### SCP Certification

A-15 and A-16.  December, 2010 and January, 2011 e-mails among HSD personnel concerning correspondence to outside party about SCP certification.  The e-mails reference in-house counsel's input for the correspondence.

B-9     January, 2011 e-mail among HSD personnel, with in-house counsel copied, about certification issues.

B-10, B-11, and B-12.[3]     September, 2008 e-mail (B-10) to in-house counsel forwarding draft letter (B-11) to counties and certification form (B-12) to be returned to HSD.

B-25 is a duplicate of B-11.

B-26 is a duplicate of B-12 (without the personal e-mails).

B-38 and B-39     July, 2010 e-mails concerning Chavez County and a draft of the letter to be sent to Chavez County.

B-40, B-41 and B-42.  July, 2010 e-mails between in-house counsel and HSD personnel concerning Chavez County.

C-22     January, 2011 e-mail chain discussing certification.  The redacted portion discusses a conversation with in-house counsel about the certification process.

Of the foregoing documents, B-9, B-38, B-39 and C-22 are either attorney-client privileged or work product and need not be produced.  The last two pages of B-12 need not be produced for the reasons stated in footnote 3.

The remaining documents in this section intertwine business and legal matters and  there is no indication  that legal advice predominates.  In addition, many of these documents would  have been prepared in the ordinary course of business.  Therefore, all of the remaining documents will be produced.

---

[3]  The last two pages of B-12 are personal e-mails and not relevant to any issue in this case. Those pages do not need to be produced.

**SCP Hospital Profit Margins**

A-31, B-30 (and duplicate C-15), B-31, B-32        August, 2011 e-mail chain originating with in-house counsel concerning information for SCP Hospital profit margins.

B-33 and B-34        Table of information gathered at the request of counsel.

C-16 through C-20 and C-23  August and September, 2011 e-mail chains originating with in-house counsel concerning information for FY 2012.  (C-19 is a duplicate of C-24, which is identified as work product in the SCP Payments category.)

All of the foregoing documents are work product because they reveal the thought process, legal opinions, strategies and theories of counsel and were prepared in connection with ongoing litigation.

**St. Vincent and Christus Hospital merger**

B-18 and B-19        March 28, 2008 e-mails concerning the impending merger of St. Vincent and Christus Hospitals.  The e-mails are among various governmental personnel, including HSD, and in-house counsel is copied.

B-20    This is a draft letter to be sent to St. Vincent about the merger, dated March 27, 2008.

B-21    This is a March 21, 2008 e-mail among various governmental personnel, including HSD, and attaching a draft letter to be sent to St. Vincent; in-house counsel is copied.

B-22    This is a draft letter to be sent to St. Vincent about the merger, dated March 21, 2008.

Attorney client privilege and work product immunity[4] are claimed for these e-mails and letters.  Log B-18 and B-19 need not be produced.  The remaining documents in this section will be produced because the impending merger of these two hospitals would occur in the ordinary course of business regardless of any on-going or impending litigation.  The business and legal aspects of these documents are necessarily intertwined,  and  the documents do not demonstrate that legal advice predominates.

**Indigent Hospital and County Health Care Act**

B-44    This  July 11, 2011 e-mail is between two HSD individuals and attaches a draft of proposed legislative changes, to be submitted to the OGC.

_____

[4]  HSD also asserts executive privilege as to B-21 and B-22, but the Court understands from HSD's and CHS's Joint Status Report [Doc. 459] that executive privilege is not being asserted as to any document.

B-45    This is the draft of proposed legislative changes.

Drafting proposed legislative changes is part and parcel of HSD's business and  submitting the same to counsel for review does not constitute an attorney-client privileged communication or imbue the document with work product immunity.  These documents will be produced.

### Agreement between UNM and HSD re funding of non-Federal share of UPL

C-12, C-13, and C-14.   The Log notes these items are undated and does not provide an author or any recipients.  Work product immunity is claimed.

The drafts are different, but without a date or an author the Court cannot determine whether these drafts meet the criteria of work product.  Because HSD bears that burden of proof and no showing has been made to support the claim of immunity, these documents will be produced.

### Roswell and Baker litigation

The following documents are either privileged or covered by work product and need not be produced:

B-13   B-14   B-15   B-36   B-37   B-64   B-65   B-66

The following documents are duplicative of one another and are merely factual in nature and therefore neither privileged nor immune from discovery and will be produced.

B-35, B-46, B-55, B-56, B-61, B-62, B-63, C-1, C-2, C-3, C-4, C-5, C-6,C-33, and C-35.

### Weekly Reports

A-5 (and duplicate C-10); A-6 (and duplicate C-11).  These documents are entitled Weekly Reports, dated January 13, 2011 and January 20, 2011, respectively.

Work product is claimed for the redacted portions of these documents because they contain advice from counsel and were prepared in anticipation of litigation.  The redacted portions concern matters that would occur in the ordinary course of business and are merely factual in nature.

A-5, A-6, C-10, and C-11 will be produced without redaction.

### Conclusion

Based on the Court's *in camera* review of the documents and the legal analysis given above, the following documents need not be produced in their entirety

**A Log**:  A-2, A10, A-17, A-18, A-20, A-21, A-22, A-27, A-31, A-30, A-33, and A-37;

18

**B Log**:   B-3, B-9, B-13, B-14, B-15, B-18, B-19, B-30, B-31, B-32, B-33, B-34,

B-36, B-37, B-38, B-39, B-50, B-51, B-53, B-57, B-64, B-65, and B-66; and

**C Log**

C-7, C-8, C-9, C-15, C-16, C-17, C-18, C-19, C-20, C-23, C-24, and C-27.

The following documents contain redactions which are privileged or immune and the documents will be produced in their redacted form:

A-13, A-19 (certain portions), A-34, A-38, A-41, B-54,  C-21, C-22, and C-31.

The remaining documents identified on the privilege log will be produced within twenty (20) days of entry of this Memorandum Opinion and Order

**Anna Bransford Documents**

HSD argues the cost of producing these documents should be borne by Defendants.  As with the privileged documents, HSD failed to object within the 14 days allowed by Rule 45, which constitutes waiver in the absence of good cause. *See Scruggs v. Vance*, 2011 WL 6368297, *11 (E.D. Cal. 2011) (unpublished decision) (citing cases).    While the Court found HSD's failure to object to the privilege documents was excusable due to ongoing negotiations with Defendants concerning production of those documents and the need to provide a privilege log, the same is not true for the Anna Bransford documents.  HSD has not made a showing sufficient to excuse its failure to serve objections to the Rule 45 subpoena.   Likewise, HSD has not made a sufficient showing of undue burden to shift the cost of producing these documents to the Defendants.  Accordingly, HSD must produce the Anna Bransford documents within thirty (30) days of entry of this Order.

**Sanctions**

Given the Court's rulings that HSD waived its objections and failed to demonstrate an undue burden over the production of the Anna Bransford documents, the Court declines to assess monetary sanctions for HSD's actions and inactions.

IT IS THEREFORE ORDERED that Defendants' Motion to Compel and for Sanctions Against, The New Mexico Human Services Department [Doc. 375] is granted in part and denied in part; and

IT IS FURTHER ORDERED that the documents ordered to be produced will be produced within twenty (20) days from entry of this Order; and

IT IS FURTHER ORDERED that HSD will produce the Anna Bransford documents within thirty (30) days of entry of this order.

ALAN C. TORGERSON
United States Magistrate Judge

20