IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

---

**UNITED STATES OF AMERICA,**
ex rel ROBERT C. BAKER,

      **Plaintiffs,**

vs.                                                                                          Civ. No. 05-279 WJ/ACT

**COMMUNITY HEALTH SYSTEMS, INC.,**
et al.,

      **Defendants.**

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE GOVERNMENT KNOWLEDGE INFERENCE,
and
GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON AFFIRMATIVE DEFENSE OF GOOD FAITH RELIANCE**

THIS MATTER comes before the Court following oral argument on December 4-5, 2013, upon Plaintiffs' Motion for Partial Summary Judgment on Affirmative Defenses of Good Faith Reliance and Government Knowledge, filed March 27, 2012 (**Doc. 449**). Having reviewed the parties' briefs and applicable law, and having carefully considered counsel's arguments on these matters, I find that Plaintiff s' motion is denied in part and granted in part, in that the motion is not well-taken with regard to the Government Knowledge defense, and is well-taken with regard to the affirmative defense of good faith reliance.

**BACKGROUND**

In this case, the Government and Relator Robert C. Baker (together "Plaintiffs") allege that Defendants violated the False Claims Act ("FCA") by "causing" the submission of false claims by the New Mexico Medicaid agency seeking matching federal funding of its Sole

Community Provider (SCP) Fund program which funds health care for the indigent in this state. The Defendants are private hospitals ("Hospitals") which are subsidiaries of Community Health Systems, Inc. ("CHSI") and CHS/Community Health Systems, Inc. ("CHS/CHSI") ("Corporate Defendants").[1]  Defendant Community Health Systems Professional Services Corporation ("PSC") is a corporation that with management responsibilities in relation to the Hospitals.

Plaintiffs allege that Defendants manipulated the Medicaid funding program by donating money to counties which were directly or indirectly related to obtaining Medicaid funding. The result of this alleged conduct was the illegal receipt of federally funded Medicaid payments, in violation of the False Claims Act, 31 U.S.C. §3729(a)(1)(A) [formerly § 3729(a)(1)], and § 3729(a)(1)(B) [formerly § 3729(a)(2)] ("FCA"), and knowingly causing the State to submit false claims for Medicaid funding for the quarters ending September 30, 2000, and from March 31, 2001 through June 30, 2011.  Plaintiffs allege that the claims submitted by New Mexico's (the "State") were "false" because the State did not disclose donations made by the Hospitals to local governments on the requisite federal forms, nor did they reduce the amount claimed by the amount of these donations.

Defendants claim that they were initially directed by the State Medicaid agency, which would include the New Mexico Human Services Department ("HSD") and New Mexico's Medical Assistance Division ("MAD") of HSD to make the donations, and thus the State was well aware of the nature of the donations to counties by the defendant Hospitals, and other SCP hospitals in the State.  They claim that, despite its knowledge of these donations, the State Medicaid agency periodically submitted Form 64 claims for matching federal funding for its SCP Program payments to the Hospitals, but did not report the Hospitals' donations or included

---

[1] Throughout this litigation, as well as in the Court's Orders and Opinions, CHSI and CHS/CHSI are referred to as the "Corporate Defendants."  The Corporate Defendants own more than 130 hospitals nationwide, only a few of which are Defendants in this case.  See Doc. 453 at 3.

them on the Forms 64 (on which the State was required to report *all* provider-related donations statewide and classify each as "permissible" or "impermissible" for federal matching funds). In addition, Defendants claim that the federal government was aware of the Hospitals' donations as well as the State's failure to report the donations, and yet continued to pay on the State's claims for SCP funding.

## DISCUSSION[2]

In this motion, Plaintiffs seek to exclude affirmative defenses of good faith reliance and the Government knowledge "inference" defense.[3] The Court ruled on this motion at the hearing, denying the motion as to the Government knowledge inference, but granting the motion on the affirmative defense of good faith reliance. What follows is the Court's analysis and reasoning behind those rulings.

**I.      Government Knowledge Inference**

The Government's prior knowledge of an allegedly false claim can vitiate an FCA action. *U.S. ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542 545 (7th Cir. 1999) (citing *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir.1991)). If the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim.

---

[2] The record contains well over a thousand facts, which pertain to all Defendants. The Court selects just a few exhibits (contained within the referenced statements of facts) here as representative examples. It should be noted that documents referenced here are generally representative of all the named Hospitals and counties.

[3] These defenses are listed as the Seventh and Tenth Affirmative Defenses asserted by the CHI (corporate) defendants; and as the Sixth and Ninth Affirmative Defenses asserted by the general defendants (including the hospitals). The Court previously rejected many of the affirmative defenses pled by Defendants, in ruling on one of Plaintiffs' earlier motions to strike. See Doc. 366. The Court has already ruled that Defendants may not rely on a Government knowledge affirmative defense, although they will be allowed to assert the "defense" to rebut the scienter element in the FCA claims. *Id.* at 21. In the instant motion, Plaintiffs seek judgment as a matter of law as to Defendants' use of this inference, based on the evidence in the record.

*Id.*; *but see United States v. Incorporated Village of Island Park*, 888 F.Supp. 419, 442 (E.D.N.Y.1995) (government's knowledge not a bar to a FCA claim if the knowledge is incomplete or acquired too late in the process).  Government knowledge of a contractor's wrongdoing is no longer an automatic defense to an FCA action unless the government's knowledge of or cooperation with a contractor's actions is "so extensive that the contractor could not as a matter of law possess the requisite state of mind to be liable under the FCA." *Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519, 534 (10th Cir. 2000).

Plaintiffs seek partial summary judgment on this "inference" defense because (1) there is no evidence that the federal government "victim" knew of the falsity of the submitted claims and still approved of the claims (as opposed to the *state*); and (2) the federal government did not have "prior knowledge" of the falsity of the claims *before* the claims were submitted. The Government knowledge inference arises only when the Government knows all relevant facts "prior to presentment" of a false claim. Doc. No. 366 at 12 (emphasis added), *quoting Burlbaw v. Orenduff,* 548 F.3d 931, 951-52 (10th Cir. 1988).   Plaintiffs also argue that Defendants did not so completely share all information with the Government to the extent that a jury could reasonably find that the Government had the requisite knowledge of the falsity of the claims. Thus, Plaintiffs argue, the staff at the Centers for Medicare and Medicaid Services ("CMS") would not be able to calculate whether and by how much to reduce New Mexico's federal funding as a result of Defendants' provider-related donations made during any of the quarters covered by any Form 64.  *See* P's MSJ Doc. 582 at 22, and P-Statement of Fact ("SOF") 414 (noting that New Mexico did not report any donations in the Form 64 claims from September 2000 to quarter ending September 2011).

Plaintiffs' position is that Defendant CHSI was explicitly told by DOJ that some of its

hospitals were making inappropriate donations to certain New Mexico counties in order to obtain improper federal payments under the SCP Fund program. P-SOF 457. Plaintiffs also contend that any knowledge CMS or the State was too limited to constitute prior knowledge of false claims; that CMS did not have prior knowledge of the providers' non-bona fide donations, nor of the amount of such donations at the time of the State's submission of any Claim 64 Forms. *See* P-SOF 675-679 (indicating that State did not report donations; that CMS Dallas Office had "some questions" regarding financing of these payments, but did not have all the necessary information"); P's Ex. 588 (letter stating same); P-SOF. Plaintiffs also claim that any knowledge they had pertained to prior periods *after* the State presented each Form 64 for that period. Thus, without prior information going into the next quarters, the federal government could not take any actions to reduce the funding amount. *See, e.g., Southland Mgt. Corp.*, 326 F.3d at 682 n.27 ("the government's knowledge of a false claim would not be an effective defense if the person making the false statement did not know that the government knew it was false").[4]

The extent and nature of Defendants' disclosure is sufficiently disputed on the record, and therefore the Court cannot find, as a matter of law, that Defendants are precluded from relying on this. There is no evidence that the Hospitals were hiding the fact of the donations. D-Exs. 51, 60, 109, 110 (letters and check to HSD advising of the donations; memoranda of agreement between Luna County and Deming Hospital Corporation, and Chaves County and Roswell Hospital Corporation (d/b/a Eastern New Mexico Medical Center, or "Eastern Hospital"). The Court cannot conclude, based on the evidence in the record, that Defendants did not sufficiently disclose the necessary information to either the State or federal government

---

[4] After the end of each quarter, a state submits a CMS Form 64 to CMS for payment or approval of payment. Doc. 91 at 5 (Court Mem. Opin. & Order). The Form 64 details the state's actual recorded Medicaid expenditures, and includes schedules, Forms CMS 64.11 and 64.11A , on in which states are to report provider-related donations received by the state or local unit of government. 42 C.F.R. § 430.30(c); 7/7/10 Op. at 4; 42 C.F.R. § 433.74(a).

in order to be able to rely on a Government inference defense at trial.

Plaintiffs also argue that the Government knowledge inference is inapplicable because Defendants were not forthcoming about the conduct at issue to the extent where it cannot reasonably be accused of knowing that its conduct was impermissible. *See Shaw v. AAA Engineering & Drafting, Inc.,* 213 F.3d 519, 534 (10th Cir. 2000) (the government knowledge inference was not available because defendant was "not forthcoming). They contend that, without the State's submission of Forms 64.11 and 64.11A, CMS would have no way to know what information was missing, what donations were being made, or whether those donations were bona fide. P-SOF 446-448. For example, Plaintiffs maintain that the Hospitals could have, and should have, notified federal government officials when making their provider donations above $50,000, relying on a "pre-authorization" process contained in Federal Register preamble language. [5] *See* P-SOF 495, Resp. to D-SOF 157 (& Ex. 386). At oral argument, Plaintiffs conceded that this provision imposes no obligation on Defendant Hospitals, but nevertheless insisted that it provided some "guidance" for Defendants when they made donations over $50,000 in that Defendants should have obtained pre-authorization before such donations were made and in this way give the federal government notice in advance of these sizable donations.

Plaintiffs' reliance on this provision is misplaced. First, because the preamble language never made its way into any regulation, it cannot be material to any disclosure requirements in connection with provider donations. Medicaid regulations merely presume that donations of *less* than $50,000 a year from any health care organization are bona fide, *see* 42 CFR §433.54(d), but do not include any description of a process to be followed regarding provider

---

[5] The Court will take judicial notice of this language, even though the Court finds it is not material to any of the issues in this case. *See* 47 Fed Reg 55,118., vol. 57, no. 227 (Nov. 24, 1992).

donations in amounts larger than $50,000 annually.  Second, if the provision gives any "guidance" at all, that guidance—by its express language—is directed to the States, and not the provider Hospitals, when it is determining whether a Form 64 donation is bona fide or not.  Ex. 386, 441, 405 at 206:13-207:9; *see also* P-SOF 495 (noting that the relevant Federal Register guidance refers to the "necessary certification" the *state* must obtain in establishing that a provider-related donation is bona fide).

Plaintiffs point out that the need for an audit indicates that Defendants were not forthcoming with information regarding the donations.  However, a reasonable juror could find, based on evidence in the record, that the reason for the audit was not that the Hospitals made donations, but that the State failed to submit Forms 64.11 and 64.11A.  There is also evidence that the audit was made necessary in part because of the utter lack of clarity regarding the application of the Medicaid regulations in the area of provider donations.  D-SOF 131(B), Ex. 216, (memo from Ms. Popp regarding decision of CMS not to defer SCP fund payments due to impact on pending litigation and because the administrative regulations "are not 100% clear on how donations are analyzed"); D-Exs. 220, 221 (Ms. Popp to Mr. Frizzera, alluding to confusion on whether a disallowance or deferral should be made, given that the "analysis of provider-related donations is so complicated").

Finally, Plaintiffs argue that Defendant cannot avail themselves of a Government knowledge inference unless they knew that the *Government knew* that the claims were false. *See, e.g., Southland Mgt. Corp.*, 326 F.3d at 682 n.27 ("the government's knowledge of a false claim would not be an effective defense if the person making the false statement did not know that the government knew it was false"); *Burlbaw v. Orenduff*, 548 F.3d 931, 951-52(10th Cir. 1988) (proper focus of the scienter inquiry rests of defendant's knowledge of whether claim is

false).     While there is no indication that Defendants had specific knowledge of the findings in the 2007 Castro Report or the 2009 FMR, Defendants certainly were aware of the *federal government's* awareness of the allegedly false claims at least by 2009, if not before.  *See* Doc. 41, §1 (Sec. Am. Compl., referring to the Government's "recently announced intervention to become a co-plaintiff" in the case).    Plaintiffs also argue that neither the Government's impressions of the donations as "inappropriate," nor the Government's intervention in the case, constitute "approval."  *See Burlbaw,* 548 F.3d at 952 (government knowledge inference arises when the government knows and approves of the facts underlying an allegedly false claim prior to presentment).  However, a reasonable fact finder could infer that the Government's continued funding of SCP payments to the State, with the Government knowing that the State failed to submit the Forms 64, constituted an acquiescence of the practice which amounted to approval of the underlying conduct.  Thus, Defendants are not barred from relying on a Government knowledge inference on this basis, as well.

The above reasons support the Court's rulings at oral argument which denied Plaintiffs' motion on the Government knowledge inference, and allows Defendants to use this inference as a defense to the elements in an FCA violation claim.

## II.     Good Faith Reliance

To invoke a defense of good faith reliance, a defendant must establish two elements: "(a) full disclosure of all pertinent facts to an expert, and (b) good faith reliance on the expert's advice." *U.S. v. Miller,* 658 F.2d 235, 236-37 (4th Cir. 1981); *see also C.E. Carlson, Inc. v. SEC*, 859 F.2d 1429, 1436 (10th Cir. 1988); *United States v. Brimberry*, 961 F.2d 1286, 1290 (7th Cir. 1992) (same elements for reliance upon accountant's advice); *Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) (same); *United States v. Smith*, 523 F.2d 771, 778 (5th Cir. 1975) (same).

Defendants claim that they relied on the regulatory interpretations and judgments by State of New Mexico Medicaid program employees or officials and/or federal employees or officials, and in particular, Michael Aragon, who was the HSD employee responsible for administration of the SCP Program in 2000.  The Court granted Plaintiffs' motion, finding that Defendants had not met their burden of establishing the elements of the defense because there remain factual disputes which preclude Defendants' reliance on Mr. Aragon's advice as an absolute defense. First, there are factual disputes regarding whether Hospitals fully explained the purpose of the donations (which some evidence suggests was to free up county funds for expenditures the counties would normally be obligated to make, in order to obtain at least triple a return back from the federal government in the form of SCP funding).  Second, there are also material disputes of facts as to what Mr. Aragon told the Hospitals.

Defendants claim that their responsibility began and ended with making a donation to a county (which clearly is not unlawful in itself), knowing that the State may report it based on its determination of whether the donation was bona fide or non-bona fide.  The Hospitals then proceeded to make the donations based on the advice of Mr. Aragon, who was tasked with overseeing the program.  Defendants have argued that the defense reflects the Hospitals' understanding on how the Medicaid funding worked, based on what they were told by State officials, such as Mr. Aragon.  For example, CHS executive Larry Carlton researched the applicable regulations, including the "hold harmless" provisions describing donations that were considered impermissible or "non-bona fide." D-Ex. 45.  He told Mike Healey, the Eastern Hospital CFO by memo that Mr. Aragon was "not concerned with where the counties received their funds. . . ." D-Ex. 47.  Mr. Aragon advised that there "should be no cause for concern" "as long as the donation complies with DFA regs and there are no [IGT] problems. . . ." *Id.; see*

9

*also* D-Ex. 46 (memo from CHSI executive Michael Portacci to Larry Cash, another CHSI executive, stating that the "state Medicaid representative" told Ron Shafer, Eastern Hospital CEO, that the "feds do not really care" about provider donations "as long as it meets state requirements and an unrestricted donation would be acceptable").[6]  Thus, Defendants argue that because they depended on advice from Mr. Aragon and other state officials, they are entitled to this advice as an affirmative defense against the FCA claim.

Plaintiffs contend that Defendants cannot rely on Mr. Aragon's advice because they did not have a good faith belief in the legality of their conduct, with regard to judgments they made on regulatory interpretations—and there is some evidence of this.  They also contend that Defendants cannot rely on Mr. Aragon's advice because Mr. Aragon was not apprised of all the relevant facts concerning the purpose behind the donations, *see* P-Exs. 60, 178, 250; nor did Defendants disclose that the object of the donations was to free up county funds so counties could make the IGT's to the State, and the Hospitals could get money back for SCP funding triple the amount of the county match, *see, e.g.,* P-Exs. 5, 23, 204.  Defendants present documents which indicate that Mr. Aragon "was not aware" of any federal issues, *see* P-Ex. 385, but the Court cannot conclude from those documents that Mr. Aragon gave a green light to the Hospitals in assuring them that the donations they made would be considered bona fide under Medicaid regulations.  Plaintiffs point out that Mr. Healey and Mr. Carlton, top corporate executives, spent considerable time reviewing the regulations concerning provider donations, and understood what was permissible and what was not, and yet chose to rely on the advice of a state official who had no experience applying the laws governing donations, notwithstanding that he oversaw the administration of the SCP Program.  *See* P-Ex.15 (Healey stating he knew funds

---

[6]  Mr. Aragon's advice to the Hospitals that "unrestricted" donations were permissible holds little weight, as it begs the question of whether the donations were, in fact, bona fide or non-bona fide.

cannot come from hospitals); Ex. 300 (Lea County minutes noting the existence of a "Federal regulation limiting contributions made by the Hospitals"); P-Ex. 441 (note to Shafer and Healey marking "Urgent!" the CFR regulations pertaining to provider-related donations).

There is also evidence suggesting, if not proving, that Defendants did not act in complete good faith in asserting reliance on Aragon's advice. *See, e.g.,* P-Ex. 385 (2000 memo from Cash to Carlton and Summar noting counties can accept donations to deposit in indigent fund, but that states must report them); P-Ex. 405 (Relator advised Carlton and Gleeson about his conversation with Anna Bransford, and that donations used for SCP funding would amount to fraud, and Relator was told never to contact the State again). Finally, there is evidence of advice from state officials other than Michael Aragon countering Mr. Aragon's purported approval of the Hospitals' donations. *See* P-Ex. 432 at 122-23, (Bransford in 2007 telling Janet Gomez from Chaves County that the contribution for the SCP should not come from the actual hospital); P-SOF 519 & supp. exs. (State officials, including Carolyn Ingram and Paul Ritzma told Skadden Arps attorneys and Rachel Seifert in 2008 that money "from the hospital to give to the county and then giving that to the state was not permissible"); P-Ex. 391 (in 2007, DOJ notifying Ms. Seifert that DOJ's investigation indicated that certain CHS hospitals "have made" and may still be making, inappropriate donations to certain New Mexico counties in order to obtain improper federal payments under the SCP Fund).

Based on these disputes, Mr. Aragon's advice cannot, as a matter of law, be used to avert liability on the part of Defendants. However, this is not to say that his advice cannot be used in other ways. For example, Mr. Aragon's advice can be used as relevant evidence in the defense on the elements of an FCA claim, such as falsity and scienter.

**THEREFORE,**

11

**IT IS ORDERED** that, as the Court ruled at oral argument, Plaintiffs' Motion for Partial Summary Judgment on Affirmative Defenses of Good Faith Reliance and Government Knowledge, **(Doc. 449)** is denied in part and granted in part, in that the motion is not well-taken with regard to the Government knowledge defense, and is well-taken with regard to the affirmative defense of good faith reliance;

**IT IS FURTHER ORDERED** that, while the Court grants Plaintiffs' motion regarding the affirmative defense of good faith reliance, Defendants may use evidence on the advice they received from State officials as relevant evidence in their defense on the elements of an FCA claim.

_____
UNITED STATES DISTRICT JUDGE