# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

_____

UNITED STATES OF AMERICA,
ex rel ROBERT C. BAKER,

        Plaintiffs,

        vs.                       Civ. No. 05-279 WJ/ACT

COMMUNITY HEALTH SYSTEMS, INC.,
et al.,

        Defendants.

## MEMORANDUM OPINION AND ORDER DENYING IN PART AND GRANTING IN PART PENDING MOTIONS FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court upon the following motions:

(1)     Plaintiffs' Motion for Partial Summary Judgment on Falsity and Materiality, filed March 27, 2013 (**Doc. 448**);

(2)     Defendants' Motion for Summary Judgment, filed March 27, 2012 (**Doc. 451** (memorandum brief Doc. 571); and

(3)     Corporate Defendants' Motion for Summary Judgment, filed March 27, 2012 (**Doc. 451**) (memorandum brief 453).[1]

The Court held oral argument on these motions on December 4th and 5th, 2013. Having

reviewed the parties' briefs and applicable law, and carefully considering counsel's arguments at

hearing as well as the substantial amount of evidence presented in this case, I find that:

- both parties' summary judgment motions are DENIED on all four elements of an FCA claim (falsity, materiality, scienter and causation);

- Defendants' summary judgment motion regarding Payment by Mistake is also DENIED;

- Defendants' summary judgment motion regarding the Relator's non-intervened claims brought under 31 U.S.C. §3729(a)(2) is GRANTED; and

---

[1]  The same cover page references both of Defendants' summary judgment motions. The underlying briefs by the non-corporate Defendants were amended several times.

- the corporate Defendants' summary judgment motion is DENIED.

## BACKGROUND

In this case, the Government and Relator Robert C. Baker ("Plaintiffs") allege that Defendants violated the False Claims Act ("FCA") by "causing" the submission of false claims by the New Mexico Medicaid agency seeking matching federal funding of its programs providing health care for the indigent in this state.   The Defendants are private hospitals ("Hospitals") which are subsidiaries of Community Health Systems, Inc. ("CHSI") and CHS/Community Health Systems, Inc. ("CHS/CHSI") ("Corporate Defendants").[2]   Defendant Community Health Systems Professional Services Corporation ("PSC") is a corporation with management responsibilities in relation to the Hospitals.

## I.      False Claims Act

A defendant may be liable under the FCA for causing the presentation of a "false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A) (formerly 31 U.S.C. § 3729(a)(1)).   The FCA defines a claim as "any request or demand, whether under contract or otherwise, for money or property," some portion of which is provided by or reimbursed by the federal government.   31 U.S.C. §3729(b)(2)(A).   The relevant claims in this case are New Mexico's "Form 64" claims for federal Medicaid funds, submitted by the State to the federal government.   Congress amended the FCA under the Fraud Enforcement Recovery Act of 2009 ("FERA"), Pub L. No. 111-021, § 4(a)(1), 123 Stat. 1617, 1621 (May 20, 2009).   The amendment renumbers the paragraphs of § 3729, and also removed the requirement under §3729(a)(2) that the defendant make or use a false statement "to get" a false claim paid or approved by the government.

---

[2]   The "Hospitals" are, collectively, Roswell Hospital Corporation d/b/a Eastern New Mexico Medical Center ("Eastern"), Deming Hospital Corporation d/b/a Mimbres Memorial Hospital ("Mimbres"), and San Miguel Hospital Corporation d/b/a Alta Vista Regional Hospital ("Alta Vista") (collectively, the "Hospitals").

Under 31 U.S.C. §3729(a)(1)(A) (formerly § 3729(a)(1)), liability is imposed for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."   The post-FERA version of the provision of §3729(a)(1)(B) (formerly §3729(a)(2)) states that liability exists for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement **material** to a false or fraudulent claim."

Both the Government and Relator Baker, bring claims under § 3729(a)(1) of the FCA. (First Am. Compl., ¶¶ 391-93; Third Am. Compl., ¶¶ 94-98.)   In addition, Relator also brings a claim under FCA § 3729(a)(2). (Third Am. Compl., ¶¶ 99-102.)   See *Allison Engine Co. Inc. v. United States ex rel. Sanders*, 553 U.S. 662, 665 (2008) (Relator must prove that Defendants "intended that the false record or statement be material to the Government's decision to pay or approve the false claim.").

## II.   Overview of Medicaid Funding

Defendants are alleged to have manipulated the Medicaid funding program by a scheme which resulted in the illegal receipt of federally funded Medicaid payments.

Medicaid is a partnership between the federal government and the states.   Medicaid programs are administered by the States in accordance with Federal regulations, but they are jointly financed by the Federal and State governments.   In New Mexico, the Medicaid program is administered by New Mexico's Human Services Division ("HSD") and its Medical Assistance Division ("MAD").  New Mexico hospitals receive Medicaid funding through a Sole Community Provider ("SCP") program, consisting of an SCP fund and SCP supplemental payment program in order to provide for care to the indigent uninsured as well as Medicaid-eligible patients.[3]

---

[3]      The SCP supplemental payment program is a second-tier Medicaid funding program which provides hospitals with additional funding to the extent other Medicaid funding has not exceeded the annual federal funding limit.  For ease of reference, the Court refers to the "SCP" fund to include both of these programs.

The federal government pays a share of states' Medicaid expenditures, but it requires that the states (or their local governments) pay their share too, thus ensuring they are motivated to evaluate their Medicaid expenditures carefully and to scrutinize Medicaid programs for waste and fraud.  In order to ensure that states pay their share, Congress prohibits Medicaid providers, such as the Defendant hospitals, from subsidizing states' Medicaid expenditures.  In order to curb the potential for abuse, Congress enacted the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991 (the 1991 Act).  42 U.S.C. § 1396b(s).  This federal law prohibits federal reimbursement of state Medicaid payments if the recipient of those payments has made "non-bona fide donations" to the state or county.   Non-bona fide donations are those that have a "direct or indirect relationship" to the Medicaid payments the donor receives.  See 42 U.S.C. §1396b(w).   A provider-related donation is "bona fide" only if it has no direct or indirect relationship to Medicaid payments to the health care provider.

The amount of funding hospitals receive is based on statements of expenditures that are submitted by each state, and a formula is applied to calculate how much of the total reported expenditures the federal government will reimburse the state.   To recover this federal funding for its Medicaid expenditures, at the end of each quarter, every state must submit a Form CMS-64 ("Form 64) to the federal agency, Centers for Medicare and Medicaid Services ("CMS") for payment or approval of payment.  The Form 64 details the state's actual recorded Medicaid expenditures, and includes schedules, Forms CMS 64.11 and 64.11A , on which states are required to report provider-related donations received by the state or local unit of government.  42 C.F.R. § 430.30(c).   Federal regulations provide that where a donation is not "bona fide, the State's total reported expenditures are to be reduced by the amount of the donation before calculating the federal funding obligation for those expenditures."  42 C.F.R. § 1396b(w).

In New Mexico, the State's matching portion of expenditures for SCP payments is derived from participating county governments through Intergovernmental Transfers ("IGT's") from those counties to the State treasury.  NMSA 1978, § 27-5-6.   In turn, county IGT's to the State may be derived from several sources, including State and local tax revenues or donations made to the counties by Medicaid provider hospitals.   Counties are supposed to transfer those funds to the State, which the State then combines with federal funds of approximately triple the amount of the county contribution, and then pays the hospitals the total of the combined county contribution and matching federal funds or reimbursement ("federal financial participation," or "FPP").

## III.    Allegations of FCA Violations

Plaintiffs allege that Defendants manipulated the Medicaid funding program by donating money to counties which were directly or indirectly related to obtaining Medicaid funding.   The result of this alleged conduct was the illegal receipt of federally funded Medicaid payments, in violation of the FCA, 31 U.S.C. §3729(a)(1)(A) (formerly § 3729(a)(1)), and § 3729(a)(1)(B) (formerly § 3729(a)(2)), and knowingly causing the State to submit false claims for Medicaid funding for the quarters ending September 30, 2000, and from March 31, 2001 through June 30, 2011.   Plaintiffs allege that the claims submitted the State were "false" because the State did not disclose donations made by the Hospitals to local governments on the requisite Form 64.11 or 64.11A federal forms, nor did they reduce the amount claimed by the amount of these donations.

According to the complaints filed by the Government and the Relator (Docs. 224 & 226), between August 2000 and June 2011, Eastern New Mexico Medical Center ("Eastern"), Mimbres Memorial Hospital ("Mimbres"), and Alta Vista Regional Hospital ("Alta Vista"), made millions of dollars in donations to the counties in which they are located, and New Mexico made millions of dollars in SCP program payments to those hospitals.   Defendants admit that

they paid millions of dollars to New Mexico counties.  However, they insist that those donations had "no direct or indirect relationship" to SCP program payments.   Defendants also claim that they were initially directed by the State Medicaid agency to make the donations, and thus the State was well aware of the nature of the donations to counties by the defendant Hospitals, and other SCP hospitals in the State.   They also contend that, despite its knowledge of these donations, the State, through HSD, periodically submitted Form 64 claims for matching federal funding for its SCP Program payments to the Hospitals, but did not report the Hospitals' donations on those schedules.

## DISCUSSION

The Court has already ruled on the parties' objections to exhibits (Doc. 611), and on Plaintiffs' Motion for Partial Summary Judgment on Affirmative Defenses of Good Faith Reliance and government Knowledge.  *See* Doc. 616 (Mem. Opin. & Order).   The Court has also denied the parties' motions to dismiss, *see* Docs. 83 & 91; denied Plaintiffs' motion to dismiss Defendants' affirmative defenses, *see* Doc. 366; and denied Defendant's motion to exclude the report of Plaintiffs' expert, *see* Doc. 457.   Both parties now seek summary judgment on the elements of Falsity and Materiality.  The non-corporate Defendants also seek summary judgment on the elements of Scienter and Causation; as well as issues of Payment by Mistake and dismissal of Relators' non-intervened claims brought under 31 U.S.C. § 3729(a)(2) claims. The Corporate Defendants also seek summary judgments by separate motion.  The Court will address the common issues of falsity and materiality, and then separately address those issues which are unique to Defendants' briefs.   Finally, the Court will turn to the corporate Defendants' motion.   There are over a thousand statements of fact presented by the parties and even more exhibits supporting those facts.[4]  For reasons given below, this case presents sufficient factual

---

[4]  Plaintiffs' Statements of Fact will be referred to as "P-SOF__," while Defendants' will be cited as "D-SOF__."

disputes which preclude summary judgment on nearly every issue, and it would be impractical as well as unnecessary to list all disputes of material fact.   The Court's Memorandum Opinion and Order offers just a few of these facts to support its findings herein.

On the § 3729(a)(1)(A) (formerly §3729(a)(1)) claims presented by both the Government and Relator, the following must be shown:

(1) that Defendants presented or caused to be presented to an agent of the United States;
(2) a claim for payment;
(3) that the claim was false or fraudulent;
(4) that Defendants knew the claim was false or fraudulent; and
(5) that the falsity of the claim was material to the Government's payment decision.

31 U.S.C. § 3729(a)(1); *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.,* 543 F.3d 1211, 1219 (10th Cir. 2008).    It is undisputed that claims for payment were submitted by the State.   What is disputed is whether the claims were false or fraudulent; if so, whether Defendants were responsible for their submission, whether Defendants knew the claims were false or fraudulent; and whether the falsity of the claim (assuming they were false) was material to the Government's payment decision.

Relator also brings claims under § 3729(a)(1)(B) (formerly §3729(a)(2), in which the Government has not intervened, and which the Court will address separately, below.

**I.     FALSITY (Plaintiffs' Motion for Partial Summary Judgment on Falsity and Materiality (Doc. 448) and Defendants' Motion for Summary Judgment (Doc. 451 (memorandum brief Doc. 571).**

The Tenth Circuit recognizes two types of actionable claims under the FCA:  factually false claims and legally false claims.  *United States ex rel. Conner v. Salina Regional Health Ctr., Inc.*, 543 F.3d 1211, 1217-18 (10th Cir. 2008).   Factually false claims involve situations where something is literally incorrect in the submission to the Government for payment or approval.  *Conner*, 543 F.3d at 1217.  To be legally false, a claim must contain a false express or

implied certification of compliance with a statute, regulation, or contract provision that is a condition of Government payment. *Id.; see also Shaw v. AAA Engineering & Drafting, Inc*., 213 F.3d 519, 531 (10th Cir. 2000).   An express false certification theory applies when a government payee falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment.   *Id*. at 25 (citations omitted). An implied false certification theory applies if the underlying statutes, regulations, or contracts themselves make compliance a prerequisite to payment.   *Id*. at 26.

Plaintiffs allege that the State's use of the hospitals' non-bona fide donations to fund the SCP program violated both federal and state laws requiring that the SCP program be funded by county and federal funds, and not by payments from SCP program payment recipients. Specifically, Plaintiffs say that the claims were both factually false because the State did not include all provider-related donations on its quarterly Form 64 reports, and as a result the State claimed funding for which it was not eligible.   Whether provider donations have a "direct or indirect relationship" to Medicaid payments to the donors depends on a "hold harmless" test set forth in pertinent regulations.   See 42 CFR § 433.54(b).   In the regulation's language, provider-related donations are determined to have **no** direct or indirect relationship to Medicaid payments if those donations are NOT returned to the provider under a "hold harmless" provision.   A "hold harmless" practice exists only if one of three specific tests is met:

> (1) The amount of the payment received is positively correlated either to the amount of the donation or to the difference between the amount of the donation and the amount of the payment received under the State plan;
>
> (2) All or any portion of the payment made under Medicaid to the donor, the provider class, or any related entity, varies based only on the amount of the total donation received; or
>
> (3) The State or other unit of local government receiving the donation provides for any payment, offset, or waiver that guarantees to return any portion of the donation to the provider.

43 CFR § 433.54(c).

According to Plaintiffs, the Hospitals made donations in several ways, beginning in 2000, as a series of donations to their respective counties.   The Hospitals later standardized their donation practices through Memoranda of Understanding" ("MOA's") between the Hospitals and the counties.   Plaintiffs contend that this changed the form of the donations, but not the substance or effect, and that the MOA's were agreements between the hospitals and counties to help the counties fund the matching payments for the State share of SCP program payments in return for the county's cooperation in obtaining SCP funding for the hospitals.   The Court finds that Plaintiffs have presented evidence from which a jury could find that the Hospitals' donations were directly or indirectly related to SCP funds the Hospitals would later receive from the State. Some of this evidence demonstrates that the Hospitals provided the counties with money they would not ordinarily have available to fund their share of the match to the State:

- P-Ex. 204: Alta Vista "providing assistance in order to secure the matching portion for [the hospital's] participation;

- P-Ex. 564: chart indicating close timing of Eastern's donation and subsequent SCP funding to the hospital;

- P-SOF 85-88, P-Ex. 41: Eastern CFO Hacker indicating it was understood that Eastern's donation was related to funding received for the SCP fund program;

- P-Ex. 26: Lisa Parrish, CHS corporate revenue manager, indicating that in her discussion with CHS executive Larry Carlton, donations from the hospitals were not allowed;

- P-SOF 168 & P-Ex. 168:  deposition excerpts of De Loach, CFO of Mimbres, stating that donations to Luna county were necessary for the county to make payment;

- P-SOF 25: acknowledgement by CHS executive Dave Medley that purpose of MOA was to free up county funds;[5]

---

[5]   The Court's references to Statements of Fact include the supporting exhibits.

9

- P-SOF 88:  statements at board meeting at which Hacker requests the county to put up their matching share, and stating that the hospital would make a donation in order for the hospital to be able to receive funds;

- P-SOF 125; P-Ex. 2, 38, 47: Eastern unable to make donation to Chaves County in October 2006, the county did not make the matching payment to the State, and the State did not pay SCP funds to Eastern for that period.

- P-SOF 26: board minutes by Eastern CEO Robinson, stating that Eastern provides county with funds that the county then uses to acquire matching funds;

- P-SOF 155-156: testimony by Mimbres CEO Schmidt that county could not fund SCP payment to hospital "without a deal";

- P-SOF 238, P-Ex. 210:  description by Alta Vista CEO Hodges of MOA and county as being "related" to the SCP fund program;

- P-SOF 229: Mimbres pledged its donations based on the amounts Luna County told Mimbres the county needed to make its matching payment to the State, *see* P-Ex. 168 at 146-147;

- P-SOF 523, 524: understanding by CHS executives that the donations were being made to free up money for the county to make their contributions to the State for the SCP fund.

Plaintiffs also present evidence that, in general, when SCP funding to the Hospitals dropped, the Hospitals stopped making donations to their respective counties.  *See, e.g.,* P-SOF 150 (Eastern), P-SOF 307-308 (Alta Vista).

Defendants maintain that, while they made donations, the donations were bona fide, and further, they made these donations with the advice and knowledge of Michael Aragon, the state official who worked for HSD and administered the MAD program.  For many of the facts presented by Plaintiffs which could suggest that the donations were false in that they were directly or indirectly related to the SCP funding the Hospitals received, Defendants dispute either the competence of the documentary evidence, or Plaintiffs' characterization of the statements that are made in the exhibits.  For example, Defendants take issue with one of Plaintiffs' exhibits, Ex. 2, which is a chronological chart or table from 2000 to 2011, listing donations made

by Eastern, and the timing of SCP fund payments made to the hospital.   Defendants point out that these tables do not show any untoward connections between the timing and composition of the IGT transfers by the counties the HSD, pointing out that for many fiscal quarters there is no evidence of donations, IGT, or a State claim for reimbursement of SCP payments.   They note that there were quarters in which no donations were made by the Hospitals, and SCP fund payments were still made; or, vice versa, where donations were made by the Hospitals and the Hospitals did not receive donations for those quarters.   D-SOF 78, 79; D-Resp. to P-SOF 85-90, D-Ex. 1.   Defendants also claim that much of the witness testimony cited by Plaintiffs was either mischaracterized or incomplete.   For example, Plaintiffs refer to the deposition of CFO Healey in which Healey stated that he understood that Chaves County did not have funds for their matching payment to the State.   Defendants put those comments in context, noting that Healey also stated that he had been "told all along" by state officials that the donations made by Eastern were unrestricted and were meant to alleviate the county's burdens in order to allow it to make the transfer.    P-Ex. 5 (Healey Dep.).   Defendants also contend that state officials who administered the MAD program, particularly Aragon, had communicated with hospital and CHS executives and reassured them of the permissibility of their donations.   However, exactly what the Hospitals were told by state officials is hotly contested (see discussion on elements of Scienter and Causation, below).

Defendants also point out, correctly, that "falsity" refers to the Form 64 claims that were being submitted by the State, and on which the State—not the Hospitals—was responsible for listing donations that it considered questionable or non-bona fide.   The State's failure to do so could just as easily infer that the State found the donations made by the Hospitals to be acceptable because it considered the IGT funds from the counties to come from public sources. Defendants present their own evidence that their donations were intended to be bona fide—and

in the very least, that the federal government was unclear about how the donations should be characterized because of its own confusion on how the regulations should be interpreted, for example:

- D-Exs. 95, 99, 216; D-SOF 131(B): acknowledgment regarding lack of clarity in CMS regulations, including a lack of clear federal guidance given as a reason not to defer SCP fund payments to the State;

- D-Ex. 220 and 221: memo dated Oct. 2008 from CMS counsel Dawn Popp to CMS senior executive James Frizzera, alluding to some confusion on whether a disallowance should be made on SCP payments and that a decision to defer can not be made until a decision is made on the donation; that the "analysis of provider-related donations is so complicated. . . ."); D-Ex. 216; 42 CFR §433.54 (2006); D-SOF 131(B) (Popp – acknowledging that statute and regulations are not 100% clear on how donations are analyzed.).

- D-SOF 91: after September 2006, counties used funds which they certified as "public funds" to fund their IGT's to the State in every quarter;

- D-Ex. 130:  Chaves County Manager Riggs certifying in June 2010 that for purpose of matching, funds came from public sources; HSD authorized payment on receipt of IGT check from county;

-  D-SOF 57; SOF 62:  Prior to making any donations, representatives from the Hospitals discussed the idea of making unrestricted donations with representatives from their respective county governments;

- D-SOF 61, 62, 63, 66:  descriptions of donations which are, without exception, described as "unrestricted" donations and that donations made pursuant to MOA's between counties and hospitals placed no obligation on counties to make IGT's in support of the SCP program;

- D-SOF 148 and Resp. to D-SOF 148.7: statement by funding specialist who prepared the 2010 SCP financial investigation launched by CMS into the donations, stating that none of the three "hold harmless" tests were applicable to Hospitals' donations;[6]

- D-SOF 83-87, 90, 91, 123, 124, 133, 151: evidence concerning nature of IGT's as derived exclusively from public funds, including Declaration by Luna County Manager Scott Vinson that IGT's made during his tenure never came from Mimbres' donations and declarations by other county officials stating same;[7]

---

[6]  Plaintiffs dispute this fact, stating that as a result of these financial investigations, CMS concluded that the Hospitals' contributions to the counties were "indirectly related" to SCP funding "since they make additional funds available for state share match by freeing up funds for expenditures the county would normally be obligated to make."  P-Resp. to D-SOF 148.7.

[7]  Plaintiffs dispute these facts, maintaining that their evidence demonstrates there was a purpose behind the

- D-SOF 85: San Miguel County segregated unrestricted donations received from Alta Vista from funds used by the county to make IGT's in support of the SCP fund program;

- D-SOF 76:  statement in report drafted in 2010 by Jeoffrey Branch that SCP payments received by hospitals did not vary based only on amount of donations, but was based on CMS-approved Medicaid plan; and that no county provided for any payment, offset or waiver that guaranteed to return any portion of the donations to the hospitals.

The evidence cited above from the record is a sampling of the factual disputes regarding whether the Hospitals' donations satisfy the "falsity" element.   While it appears to be undisputed that the State did not report these donations on Forms 64.11 or 64.11A, it is unresolved whether these donations should have been considered non-bona fide.   Plaintiffs also reference Defendants' failure to follow "federal guidance" concerning a pre-authorization process for donations over $50,000.   They argue that Defendants' failure to follow this procedure is proof that they concealed information which caused the submission of false claims.   Plaintiffs' argument on this issue is sparse, and barely referred to in their briefs.  *See, e.g.,* P-SOF 495. However, at oral argument, Plaintiffs' counsel fleshed out the argument in response to the Court's inquiry. In a recent Memorandum, Opinion and Order, the Court rejected Plaintiffs' argument as having no relevance to the claims asserted against these Defendants.   *See* Doc. 616 at 6-7.   The asserted "federal guidance" is taken from a preamble in the Federal Register, imposes no legal obligation on Defendants, and in fact concerns only guidance meant to guide the *State* – not the Defendants.   Plaintiffs' own reference to this provision in their Statement of Facts acknowledges as much.  *See* P-SOF 495 ("i.e., the *State* must obtain 'advance approval') (emphasis added).

---

donations in allowing the county to make the donations.    Of course, these disputes are subject to credibility determinations, as Plaintiffs' evidence essentially attempts to refute the representations made in writing by county officials certifying the public source of the IGT funds.

In the face of disputed material facts presented by both parties, the Court cannot decide as matter of law whether the claims are false, or are not.  Thus, neither party is entitled to summary judgment on the element of falsity.

## II.     MATERIALITY:  Plaintiffs' Motion for Partial Summary Judgment on Falsity and Materiality, (Doc. 448) and Defendants' Motion for Summary Judgment (Doc. 451 (memorandum brief Doc. 571).

The Tenth Circuit requires a materiality element in an FCA claim.  *See U.S. ex rel. Conner v. Salina Regional Health Center, Inc.*, 543 F.3d 1211, 1219 (10th Cir. 2008); *see also Southland Mgmt. Corp.*, 326 F.3d 669, 679 n.3 (5th Cir. 2003).   Both parties have filed cross-motions on the issue of whether the claims were false and material.   False claims are material if they have a tendency to influence or are capable of influencing agency decision making.  *United States ex rel. Bahrani v. Conagra, Inc*., 465 F.3d 1189, 1200 (10th Cir. 2006) and *Neder v. United States*, 527 U.S. 1, 16 (1999).  "If the government would have paid the claims despite knowing that the contractor has failed to comply with certain regulations, then there is no false claim for purposes of the FCA."  *Conner*, 543 F.3d at 1219 (FCA claim actionable only if it leads the government to make a payment which it would not otherwise have made).

Defendants contend that the claims were not "material" to the funding decisions because the Government continued to make SCP payments despite not receiving Forms 64.11 and 64.11A.   Defendants submit a considerable amount of evidence supporting this argument, for example:

- D-Exs. 88, 110(A)-(C); 120, 144: 2006 CMS Financial Review Guide, indicating that CMS was aware of the State's failure to submit Forms 64.11 and 64.11A, but declined to take any action in order to improve the instant ongoing DOJ litigation; and evidence purporting to show that CMS' routine Form 64 review procedures were modified in order to "enhance" DOJ's litigation position in this case;

- D-SOF 102; D-SOF 110(A-C); D-SOF 143-49; D-SOF 180, & Ex. 223 ( filed under seal): all showing that CMS threatened to defer State's Medicaid funding as a result of the State's failure to report provider donations, but that CMS backed away from

this position when it was suggested that deferral of funds would complicate the Government's case against Defendants;

- D-SOF 110(A)-10(C): upon initiation of DOJ's investigation, CMS' routine Form 64 review procedures were "manipulated to enhance DOJ's litigation position in this case" including exhibit filed under seal stating that "Until we have a chance to talk to DOJ, please don't take any action";

- D-SOF 144:  HSD representatives warned CMS to avoid dispute with HSD regarding SCP funding that could complicate Plaintiffs' claims against Defendants in this lawsuit, whereupon CMS reversed its position and did not defer funding for New Mexico's SCP Program;

- D-SOF 110(A)-(C): containing exhibits showing CMS' interactions with the State concerning CMS' handling of the SCP program in order to further DOJ's position in this litigation;

- D-SOF 120(A):  conference call arranged to "coordinate" the government's efforts and make sure that everyone was "on the same page" because the 2006 FMR "implicated the 'same issues' and the 'same program' at issue in this litigation;

- D-SOF 120, 130-131:  2006 Financial Management Review, or FMR done in 2006, drafted by John Castro of the Dallas Regional CMS Office ["Castro Report"], which was suppressed from HSD for the stated reason that DOJ was investigating HSD;

- D-Ex. 216: filed under seal, memo from CMS general counsel Popp to Jim Frizzera regarding the questionable integrity of the Castro Report;

- D-SOF 98-102: exhibits purporting to show that CMS knew that HSD failed to complete and file Form 64.11 or 64.11A claim.[8]

Plaintiffs contest Defendants' position, noting that during the relevant time, New Mexico included SCP program payments to Defendant Hospitals in its Forms 64, but that those payments were not reduced by the Hospitals' allegedly non-bona fide donations.  Thus, they argue, the State's failure to report these donations was material to the federal government's funding decisions.   P-SOF 411-412, & supp. exhibits.   Plaintiffs do not deny that the federal government was aware that the State was not submitting Forms 64.11 and 64.11(A) but dispute that CMS had "sufficient information to calculate any required statutory reduction in federal

---

[8]   Defendants note that in December, 2011, CMS settled all claims regarding SCP Hospital donations with the State and SCP Hospitals State-Wide, but excluded all hospitals affiliated with CHSI from participating in the Settlement. D-Ex. 138.  CMS' settlement was  for substantially less than CMS' initial demand Doc. 576 at 29, n.16.

Medicaid funding at the time of receipt of any New Mexico Form 64."   In other words, Plaintiffs

contend that they would have rejected or deferred SCP fund payments to the State (and

ultimately to the Hospitals) had CMS had enough information to do so.   Plaintiffs also argue that

CMS continued to fund the SCP fund program because simply knowing that the forms had not

been submitted is not the same as knowing that the form, if it **had** been completed and

submitted, would have disclosed the non-bona fide donations.   Doc. 585 at 18.   The following

are examples of facts (accompanied by supporting exhibits) and evidence supporting Plaintiffs'

position:

- P's Resp. to D-SOF 133; D-SOF 136(A): 2008 inquiry as to whether CMS had
  determined whether the donations were non-bona fide, since an "official agency
  determination" would have compelled CMS to take "corresponding disallowance against
  the [State]. . . .";

- P-Resp to D-SOF 131(B): CMS decided not to release the report to the State "because it
  needed further work and DOJ was investigating similar issues";

- P-SOF 660-665; 682-683; 687-689, 680-687:  CMS' questioning donations made by
  Hospitals; description of the Plaintiffs' launching of investigations immediately to inquire
  into the claims process, including the Government's invention in this lawsuit;

- P-SOF 680-687 & supp. exhibits: CMS questioning donations made by Hospitals, having
  insufficient information to make a decision about the nature of donations until February
  2011 when CMS delivered its FMR draft report to the State ["Branch" Report],
  concluding that the donations were non-bona fide, *see also* D-SOF 145-146;

- P-Ex. 207: (filed under seal) indicating that in 2005, CMS was aware of the situation, and
  the DOJ was "just trying to get up to speed on the issue."  P-SOF 661.

Both parties have presented evidence which could support either side's position.

Defendants' evidence strongly suggests that the federal government was aware that the State was

not reporting the donations, either because the State considered the donations to be bona fide or

for strategic reasons related to the ongoing DOJ investigation.   Plaintiffs have submitted

evidence that the federal government continued to fund the SCP program to the State because the

State did not list any reportable donations on Forms 64.11 or 64.11A and because the federal

government did not have sufficient information to determine that deferral was appropriate. Summary judgment will be denied on the materiality element.  Defendants have presented enough evidence of knowledge by the federal government of the Hospitals' donations to the State to preclude summary judgment in favor of Plaintiffs.  Conversely, Plaintiffs have submitted just enough evidence of bureaucratic confusion and uncertainty on the part of the federal government to preclude summary judgment in favor of Defendants.

### III.    Defendants' Motion for Summary Judgment (Doc. 451 (memorandum brief Doc. 571) on element of Scienter.

Defendants move for summary judgment on the element of Scienter.  To establish liability under the FCA, Plaintiffs must prove that the Defendants presented or caused to be presented the allegedly false claims with "actual knowledge," "deliberate ignorance," or "in reckless disregard of the truth or falsity" of the claims. 31 U.S.C. § 3729(b). "[S]imple negligence does not violate the FCA.  *U.S. v. Burlbaw v. Orenduff,* 548 F.3d 931, 949 (10th Cir. 1008) (*Burlbaw II*). "[T]he requisite intent is the knowing presentation of what is known to be false, as opposed to negligence or innocent mistake." *Mikes v. Strauss*, 274 F.3d 687, 703 (2d Cir. 2001), *accord U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1020 (7th Cir. 1999) ("violations of [federal] regulations are not fraud unless the violator knowingly lies to the government about them").  The terms "knowing" and "knowingly" in the FCA "require no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(B).   It is enough that a person has actual knowledge of the information and acts in "deliberate ignorance" or "reckless disregard" of the truth or falsity of the information.  *See U.S. v. Mackby*, 261 F.3d 821, 828-29 (9th Cir. 2001) (a provider that fails to inform itself of the legal requirements for federal reimbursement acts in reckless disregard of the truth of the claims).

Defendants claim that, as a matter of law, Plaintiffs have not presented sufficient evidence concerning scienter, based on several arguments: (1) there is no evidence that the Defendants knew, recklessly disregarded or were deliberately ignorant of the State's failure to report provider donations on its Form 64 claims; (2) the Hospitals made their donations in reliance on the State's express representation that such donations were permissible; and (3) the federal government was aware of the State's failure to report the donations.  By virtue of the government's own investigation in this case, the Hospitals knew no later than early 2006 that the federal government unequivocally was aware that the State's claims failed to report provider donations, and yet the government kept paying the State's claims anyway for each and every quarter up until 2011.

A.      Defendants' Evidence on Reliance

Defendants present considerable evidence that they were not aware of the State's failure to report the donations, and that they relied on the State's express advice, specifically given by Michael Aragon of HSD, that the Hospitals' donations were permissible:

- D-SOF 81: testimony by Defendants' employees who believed "unrestricted donations" were a permissible means of providing financial assistance to county governments with the hope that the county would make IGT's in support of SCP funding for the Hospitals;

- D-SOF 137, 139:  evidence that SCP funding continued even after the government started its investigations and the hospitals took the "precautionary measure" of providing the State with quarterly and monthly letters giving "explicit notice that the county has received a provider-related donation";

- D-SOF 156(A): in February 2011, after reviewing MOA's between hospitals and counties, then-HSD acting general counsel Mark Reynolds authorized release of SCP funding to hospitals, including Mimbres and Alta Vista, despite the fact that the State did not complete Form 64.11 or Form 64.11A for the third quarter of FY 2011;

- D-SOF 123:  as result of 2006 CMS FMR ("Castro Report"), Carolyn Ingram (then-Director of New Mexico's Medicaid program) required all counties participating in SCP Program to certify that IGT's in support of SCP payments were "funded" by "public funds."  Defendants use this fact to show that they were aware of the State's

position that claims for FFP relating to SCP payments were proper so long as the counties' IGT's were from public funds;

- D-SOF 126(A),133, 136(A)-36(B): evidence that despite the State's and CMS' knowledge of these donations, neither the State nor CMS ever instructed any SCP hospital to cease making donations;

- D-SOF 142(A): refers to Exs. 125 & 232, DOJ and HSD representatives met to discuss the hospitals' letters to DOJ.  The letters from the hospitals gave explicit notice to the counties that the donations that were made were "not conditional" on whether the hospital ultimately received SCP funds;

- D-SOF 56: 2000 communication from CSC exec regarding conference with other CSC executives and Ron Shafer (then-Eastern CEO) regarding a "risk" that the federal government would determine that hospital donations could result in withholding SCH payments, but that the Medicaid representative (assumed to be Mr. Aragon) that "an unrestricted donation met state requirements":

- D-SOF 50-59: evidence concerning Aragon's advice given to hospitals and PSC execs, and review of Medicaid regulations by hospital and PSC representative to determine whether unrestricted donations by the hospitals to county government could be made "with the hope that the counties would be able to fund IGT's in support of the SCP program;

- D-Ex. 6:  Healey deposition, stating that his understanding of Aragon's advice was that the hospitals could donate as long as they did not obligate the county to fund the IGT.

B.    Defendants' Evidence on Government Knowledge

The Court has previously ruled that Defendants may not rely on the federal government's knowledge of the State's failure to report the donations as an affirmative defense to preclude liability under the FCA, but may assert the "defense" in order to rebut the scienter element.  *See* Doc. 366 at 21. The Government's knowledge of an alleged "false" claim contradicts a defendant's intent to knowingly submit a false claim.  In the Tenth Circuit, an FCA defendant is entitled to summary judgment "when the government, with knowledge of the facts underlying an allegedly false claim, authorizes the contractor to make that claim." *Burlbaw*, 548 F.3d at 952 (affirming grant of summary judgment on this basis).  "In such a situation, an inference arises that the contractor has not 'knowingly' presented a fraudulent or false claim." *Id.; see also*

*United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 (4th Cir. 2002) ("[T]he government's knowledge of the facts underlying an allegedly false record or statement can negate the scienter required for an FCA violation.").

Defendants present evidence to show that the federal government had sufficient knowledge of the State's failure to report the donations in order to take action on the deficient Forms 64 prior to the submission of the claims for payment.   It is undisputed that the State never filed either Form 64.11 or 64.11A for any of the relevant fiscal quarters to include impermissible, or non-bona fide donations.   The record also indicates that the federal government knew by the summer of 2006 that this lawsuit had been filed, that hospitals across the State were making donations and that the State was not reporting them.    D-SOF 98-102; D's Ex. 79, Ex. 22 (Cano Dep).   The State's response to the Government's inquiry was to require the counties to certify by notary that the IGT's, or county match payments to the State in support of SCP payments, were comprised of solely public funds.   D-SOF 91-92, 123; Defs. Ex. 99 at HSD-3989; D-Ex. 231 (Bransford's e-mail directing counties to "make sure they certify that it is public funds.").    In 2008, the Hospitals began the practice of routinely sending letters transmitting donations to their counties and copying HSD in order to provide the agency with explicit notice that the counties had received a "provider-related" donation.  D-Exs. 125, 133.

CMS conducted Financial Management Reviews, or FMR's (the Castro Report in 2006-07, and the 2009 FMR), triggered by the Relator's complaint in this case and media coverage of the situation.   D's SOF 115-119, 164.   The investigation concluded that four non-defendant hospitals had made non-bona fide provider-related donations to county governments during the review period, that the State had failed to report these donations, and that the donations were continuing.   D-SOF 120-31; D-SOF 146.    Yet, despite these explicit conclusions, the federal government, through CMS, continued to fund the State's Form 64 claims each and every quarter

through 2011 without making any adjustments for these known donations.  D-SOF 181.   There

is evidence the federal government could have deferred SCP payments in advance for the next

quarter until the State's submissions could be investigated, based on the State's continued

omission of the Forms 64, and the knowledge that the private Defendant Hospitals were

continuing to make donations which the FMR had already concluded were impermissible under

Medicaid regulations.   See D-Ex. 207 (showing by Frizzera and Fan, both senior CMS

executives about the donations).   Instead, Jim Frizzera decided to suppress the results of the

Castro Report because of the ongoing investigation by the Department of Justice ("DOJ").  D-

SOF 131; D-SOF 131(A)-(B); D-SOF 633.   Defendants present other evidence supporting a

Government knowledge inference in the following statements of fact, for example:

- D-SOF 215 (exhibits filed under seal): CMS executives noting that the State Form 64.11 did not list entries under Donations and Taxes for FY 2000 –FY 2007;

- D-SOF 131(A)-31(B), in 2007, following Castro's March 2007 Report, CMS attorney Dawn Popp advised CMS executives to wait to "get a green light from DOJ before actually sending the report to New Mexico or taking action on the recommendation, just to ensure that those actions don't undermine the litigation":

- D-SOF 136(A)-36(D): no official agency determination ever made by CMS that the donations made by Defendant hospitals were non-bona fide and therefore not eligible for FPP.  *See also* Ex. 228 (filed under seal): stating that no CMS official determination made regarding nature of donations, the rationale being that the counties still had sufficient General Revenue to fund the IGT and indigent care services even had they not received the donations.

C.     Plaintiffs' Position and Evidence on Scienter Element

Plaintiffs contend there is sufficient evidence of scienter to preclude summary judgment

for Defendants on the scienter element based on evidence related to: (1) Defendants' knowledge

of the falsity of the relevant information; (2) Defendants' knowledge about the statutory

prohibition on donations with any "relationship to" Medicaid payments; and (3) knowledge by

both the Hospitals and Corporation Defendants knew that their donations had a "relationship to"

SCP Program payments.  Evidence that Defendants knew that their donations had a "relationship

to" SCP program payments is based on the following examples from the record:

- Eastern: P-SOF 56-57, 59, 61-64, 69, 71, 75, 79-80: Eastern promising to "work with Chaves County in providing for the necessary matching funds" for the county's SCP program funding payments; identifying the purpose of its donation checks as "Sole Community provider funds match" or variations of the phrase;

- P-SOF 84, 88, 504-05: Leanne hacker, Eastern CFO, promising the county that Eastern would "contribute [the county's match] for [the county]" so that 'we can get those funds down to the hospital'";

- Mimbres: P-SOF 155, 158, 162, 318: CEO Tim Schmidt to Michael Portacci, CHSI group VP, acknowledging that Luna County would not contribute "without some deal being cut"[SOF 155]; P-SOF 218 (county calling Mimbres to sign the MOA which the hospital acknowledged had to signed "so that we can get paid";

- P-SOF 169, 186, 2024, 207, 215-216: description of payments to Luna County as "Sole community provider supplemental Allocation," "to fund [the SCP fund program]; P-SOF 198-199 (description of donation as "to acquire SOLE Community supplemental payment."); SOF 218 (providing for Mimbre's donations to the county "so that we can get paid";

- Alta Vista Regional Hospital:  P-SOF 232: letter by Jay Hodges, Alta Vista's CEO to Les Montoya, San Miguel County Manager, copying Michael Portacci (CHSI Group VP) and other CHS execs, that the County "probably does not have a surplus of funds" to secure the matching portion for the hospital's participation in SCP program funding;

- P-SOF 246: Alta Vista CFO pledging donation in "the amount required to achieve the maximum funding from the Sole Community Hospital.";  and P-SOF 259-60 (another Alta Vista CFO citing the contribution as payment "in lieu of" direct SCP payments and acknowledging risk of losing supplemental payment if the county is "out of funds");

- P-SOF 279: interim CFO describing an "arrangement with San Miguel County whereby Sole Community Provider funding is secured," in which the hospital would make a donation to the county in the same amount as the county's SCP program funding obligations;

- P-SOF 285, 293: Alta Vista Controller approving 17 separate check requests describing the purpose of Alta Vista's payments to San Miguel County as "Sole Community Provider Donation";

. . . and, evidence of knowledge by Corporate Defendants, who allegedly coordinated and approved of the Hospitals providing donations to the counties which had a "relationship to" SCP program payment:

- P-SOF 3-4: e-mail from Michael Healey, Eastern CEO, announcing to hospital executives in July 2000 that "[w]e . . . are prepared to explore options with regards to obtaining as much [] match" from counties as possible.   CHS executive Larry Carlton made handwritten notes on the e-mail calculating the reimbursement from a $1 million in donations to the county); P-SOF 5 (describing Eastern's planned donation to Chaves County as "seed money" for the "sole comm [sic] provider fund."); P-SOF 13, 19, 157 (internal memoranda indicating that the donations would enable counties to make county match payments and that Luna County wanted something "in return for their help"  beyond the required match amount);

- P-SOF 75: letter from Eastern CFO Hacker pledging an "unrestricted donation" for the purpose of "maintaining our current level of sole community funding for the fiscal year 2004-2005. . . This donation will be made in quarterly increments to coincide with the schedule Chaves County has for matching fund submissions to the State";

- P-SOF 511-512: Baker disagreed with Carlton's position that the payments were not related to reimbursement, based on Baker's communications with Eastern's CFO Leanne Hacker.  Baker testified later that Carlton realized he couldn't call the donation "unrestricted" if, in the same letter we're telling them what to do with the money."  Baker testified that Carlton proceeded to edit out "nearly every word of that letter" such that "the remaining shell of the letter has no indication of the true nature of the transaction":

- P-SOF 158:  in 2000, CHSI Group VP Michael Portacci approved donation from Mimbres after learning that Luna County had "implied" that its SCP program funding was contingent upon receiving a $180,000 donation;

- P-SOF 279, 522:  Eastern CFO Ron Healey sent Michael Portacci (CHSI Group VP), Gleeson Doug Gleeson (a CHSPSC employee) and Dave Medley (CHS Executive) an update on the "arrangement with San Miguel County whereby Sole Community Provider funding is secured."  Gleeson, copying Portacci, thanked Healey for setting up the arrangement and getting "everyone educated as to how to proceed like [Eastern] and [Mimbres]";

- P-16, 523:  testimony of Dave Medley (CHS executive) that he understood thatt donations were made "in order to help [the counties] with some of their expenditures in hopes of freeing up monies so that the counties would then be able to make IGT's to the State for the Medicaid program";

- P-SOF 524-26; 527: 5/21/04 e-mail from Doug Gleeson (CHSPSC employee) and Medley (CHS executive), indicating that both understood that San Miguel County's

requests for the hospital's continued participation in funding for ambulance service needed to be continued if the hospital wanted to continue acquiring "sole community status" ("I don't believe that anyone from the county is holding a gun at our head but they are very aware of how much this status means to the hospital (est. $800k-$100k annually) . . . I believe that we should probably continue the donation"' SOF 528 (Gleeson describing the relationship between the counties' SCP program match payments and the hospitals' donations as: "this is what we [the counties] do for you and what we would like to see you [the hospitals] something for us";

- P-SOF 94-95, 275 (Lisa Parrish, CHS corporate revenue manager, acknowledged that donations were "for the supplemental payment" and to fund the counties SCP payments.

At oral argument, Plaintiffs frequently referred to Defendants' Exhibit 48 by way of showing knowledge and intent on the part of Defendants. In that exhibit, which is a memo from Michael Portacci to Larry Cash, Portacci, states that it was:

> [o]ur position is to go forward with unrestricted donations, preferably to the county indigent fund, thereby allowing the county to make a legal government fund transfer to cover their participation in the program.

D-Ex. 48 at 2. Portacci then refers to the "risk" of "the feds determining. . . that the county participation in the program as funded by a provider donation . . ." which would mean that the matching portion of the funds "could be withheld from future" Medicaid payments. D-Ex. 48 at 2. Plaintiffs argue that this reference to a "risk" shows that Defendants knew that provider donations were prohibited, yet were willing to proceed with making the donations, regardless of possible consequences if the federal government became aware of the nature of the donations. However, Portacci's statements could just as easily mean that, even if the Hospitals made unrestricted donations (which is the stated intention on the memo), the federal government could decide to withhold SCP fund payments if the county funded the IGT's with provider donations. This would be a true statement consistent with the legal reality under CMS regulations concerning provider donations. As with many of the exhibits in the form of letters

and memos, the meaning behind the statement is subject to different reasonable interpretations, all subject to scrutiny by a jury.

     D.     <u>Summary Judgment for Defendants on the Scienter Element is Denied</u>

Defendants would be entitled to summary judgment on this element if they can show that there is no factual basis suggesting that they had either actual knowledge, deliberate ignorance, or were in reckless disregard of the truth or falsity of the claims which were submitted by the State for SCP funding.   Defendants attribute any responsibility for such knowledge to the State, since the State, not the Hospitals, submitted the Forms 64 claims to the federal government.  *See* P-Ex. 585 (showing that Larry Carlton researched the provider donations issue in 2000 and noted that federal law requires that states must report the donations).   Their position is that in giving explicit notice to the State that their counties were receiving provider-related donations, the Hospitals absolved them of any and all liability under the FCA.   However, as Plaintiffs point out, the proper test is not simply whether the State reported the donations on the Forms 64, but whether the Hospitals knew or intended that the donations they made were non-bona fide because they had a relationship to SCP payments they ultimately received—in other words, whether Defendants were aware of, or recklessly indifferent to, the falsity of the relevant information.  31 U.S.C. §3729(b)(1).   Defendants claim that the State was not concerned about the Hospitals' donations as long as the counties certified that the IGT's were derived from public funds.  This argument may explain why the State never reported the donations, but it does not necessarily lead to the conclusion that Defendants have not violated the FCA.  If the Hospitals, in collaboration with the counties, acted in such a way so as to allow the State to believe the IGT funds were solely from public funds, then a reasonable juror could certainly infer "knowledge" or "scienter" on Defendants' part.

Defendants also claim that they "believed" that their "unrestricted donations" were a permissible means of providing financial assistance to county governments with the "hope" that the county would make IGT's in support of SCP funding for the Hospitals.   If all the evidence presented by Plaintiffs showed merely "hope" on the part of the Hospitals, summary judgment would indeed be appropriate.   However, Plaintiffs have presented some evidence from which a fact finder could infer that the donations were made as seed money for at least triple a return in the form of Medicaid funding.   Whether the donations in fact had a direct or indirect relationship to the SCP payments, and if so,[9] whether Defendants knew of this relationship, is a question a jury must decide.

Defendants argue that the federal government's knowledge of the donations is sufficient to award them summary judgment on the scienter element.   Government knowledge of a false claim is irrelevant "if the person making the false statement did not know that the government knew it was false."   *Southland Mgmt. Corp.,* 326 F.3d 669, 682 n.9 (5th Cir. 2003) (*en banc*). However, a jury could infer that Defendants were aware that the Government "knew" that the statements were false (that is, that the Forms 64 did not list the non-bona fide donations), based on the Government's stated disapproval of the Hospitals' donations and its continued approval of the claims.[10]

Defendants rely heavily on *U.S. ex rel. Rose v. East Texas Med'l Center Reg'l Healthcare System*, 2008 WL 4056601, at 9 (E.D. Tex. Aug. 28, 2008) (granting summary judgment to defendant healthcare system where the entity selected by the State to assist in implementing the Texas Medicaid program advised the defendant how to set up the funding mechanism, and defendant relied on that advice).   *Rose* is not helpful to Defendants on the

---

[9]   Obviously, if the claims submitted by the State are found not to be "false" as defined under the FCA, then the other elements cannot be met.   All elements must be satisfied in order for liability to be found under the statute.
[10]   Technically, the "false statement" is the submission of Forms 64 by the State.   However, the Hospital Defendants can be considered to have made the false statements if the other elements are proved.

scienter element.   In the *Rose* case, the nature of advice given to the hospital (structuring IGT transfers based on the process recommended by the advisor entity) was undisputed, where in the instant case, the characterization of Aragon's advice is disputed.   Aragon may have told CHS executives that "unrestricted" donations were allowed, as long as they did not obligate the counties to use the donations to fund the IGT's.   However, none of this advice definitively answers whether the donations given by the Hospitals were in fact "unrestricted" and whether the understandings and agreements the Hospitals had with the counties led to the counties' use of these funds for the IGT's.[11]   Accordingly, Defendants are not entitled to summary judgment on the scienter element.

Defendants also compare their alleged conduct to the defendant in *Burlbaw* by way of distancing themselves from any conduct prohibited under the FCA.   *See U.S. ex rel. Burlbaw v. Orenduff*, 400 F.Supp.2d 1276, 1389 (D.N.M. 2005) (*Burlbaw I*) (it "cannot be an actionable violation of the FCA for an individual to provide truthful information to the government, in order to allow the government to determine whether or not that information established eligibility for a certain program.").   *Burlbaw I,* 400 F.Supp.2d at 1276.   In *Burlbaw I*, Defendant New Mexico State University ("NMSU") submitted a complete and accurate enrollment data which the Department of Energy ("DOE") used to prepare lists of "minority institutions" eligible for Government grants.   The Department of Defense ("DOD") relied upon DOE's lists to create its own lists of institutions eligible for DOD grants, and relied on DOE's list to advise NMSU that it was eligible for DOD grants.   A qui tam Plaintiff sued, contending that NMSU was not eligible for the grants, but the Tenth Circuit held that NMSU "was completely forthcoming with the DOE" by providing accurate information to the DOE and not withholding any relevant data.   548

---

[11]   It goes without saying that at trial, the counties' certification of the IGT funds as public would be subject to the same scrutiny by the fact finder.   Certification of the funds as having come from  public sources does not necessarily mean that they did.

F.3d at 953-54.   Citing *Burlbaw I,* Defendants here contend that their donations did not violate

the FCA because, like NMSU, they relied on the State's advice in doing so.   In fact, they claim

that HSD gave them the idea of making the donations in the first place.  *See* Doc. 571 at 47

("there is no evidence disputing that the original idea of making donations to counties to assist

them in funding the SCP program came from HSD, not the Defendants.").  The problem here is

that the defendant's conduct in *Burlbaw* is not completely analogous to Defendants' conduct in

this case.  Based on the evidence submitted by Plaintiffs, a jury could find that Defendants in this

case were not being completely open regarding the purpose behind the donations.    Further, as

mentioned previously, the nature of Michael Aragon's advice is disputed, and thus it is not clear

at all that HSD gave Defendants the "original idea of making donations to counties.

Plaintiffs argue that the Government's alleged knowledge of the State's failure to submit

Forms 64 does negate Defendants' scienter because Defendants were not sufficiently engaged in

"ongoing dialogue" with the Government about the underlying conduct to rely on that inference.

In order to benefit from this inference, Tenth Circuit law requires that a defendant must show

that it was so "forthcoming" and cooperative in disclosing the relevant facts to the Government

that the defendant could not have known that its conduct was improper.  *See Burlbaw,* 548 F.3d

at 952-53.   As the Court previously discussed, the Hospitals were under no obligation to be

"forthcoming" with the federal government in the sense that they were obligated to communicate

their intent to make donations to the counties to CMS.   However, based on facts presented by

Plaintiffs, it is not clear to what extent the Government knew of communications between the

Hospitals and counties which could infer an impermissible purpose behind the donations.

Plaintiffs also present evidence that CMS was still trying to collect more facts before

making a determination on deferral of SCP payments (see discussion on materiality element,

above).   For all these reasons, disputes of fact exist on the scienter element as well as on the extent of the Government's knowledge, and summary judgment will be denied on this basis.

### IV.   Defendants' Motion for Summary Judgment (Doc. 451 (memorandum brief Doc. 571) on element of Causation.

The FCA does not impose liability on parties "merely for failing to prevent the fraudulent acts of others."   *United States ex rel. Sikkenga v. Regence BlueCross BlueShield of Utah*, 472 F.3d 702, 714 (10th Cir. 2006).  Rather, liability attaches to "affirmative acts" that cause or assist the presentation of false claims.   *Sikkenga,* 472 F.3d at 713.  A defendant's conduct "causes" a false claim where the submission of the claim was the foreseeable and intended result of the defendant's actions.  *Id*. (adopting "proximate cause" rather than "but for" approach to causation).  Under § 3729(a)(1)'s requirement that a person "cause" a false claim to be presented, the appropriate focus of the inquiry is on "the specific conduct of the person from whom the Government seeks to collect."  *United States v. Bornstein*, 423 U.S. 303, 313, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976).

The appropriate inquiry under § 3729(a)(1) is whether Defendants' specific conduct caused the presentment of a false claim.    However, mere knowledge of the falsity of claims is insufficient to establish liability under the FCA.  *Sikkenga,* 472 F.3d at 714*; see also United States ex rel. Shaver v. Lucas W. Corp*., 237 F.3d 932, 933 (8th Cir. 2001) (even if the defendant knew a third-party would submit Medicare claims originating with the defendant, defendant "cannot be said to have 'caused' [the] medical bill claims to be submitted to the government). The FCA does not require that Defendants commit an act that is wrongful or illegal in itself, in order to constitute an affirmative act under the FCA.   *United States ex rel. Franklin v. Parke-Davis*, 2003 WL 22048255 (D.Mass. Aug 22, 2003); *see also, Shaw v. AAA Eng'g & Drafting, Inc*., 213 F.3d 519, 531 (10th Cir. 2000).

A.      Defendants' Position and Supporting Evidence on Causation

Defendants' position is that there is no evidence that they had any communications with the State during the period at issue in this case regarding the content of the State's Form 64 claims, including what the State reported or did not report in those claims.   They also claim that there is no evidence that Defendants made any misrepresentations or concealed any facts that could have affected the manner in which the State accounted for, formulated, and submitted its Form 64 claims, or the federal government's decision to fund the State's claims.   Defendants stipulate to making the donations and receiving SCP fund payments, and maintain that they did not receive any money to which they were not entitled.   Defendants point out that it is not illegal for providers to make donations, and disagree that their donations had a relationship to the funds they received.   They distinguish cases cited by Plaintiffs, such as *U.S. ex rel Schmidt v. Zimmer, Inc.*, 386 F.3d 235, p242 (3rd Cir. 2004) and *Franklin*, noting that in those cases, defendants had engaged in underlying illegal activity.[12]   The Hospitals maintain that they committed no illegal actions, and that their hope of receiving Medicaid funds after making what they assert were "unrestricted" donations, is insufficient to result in liability under the FCA.   No illegal actions were committed by the Hospitals, and while Defendants anticipated receiving Medicaid funds after making what they allege to be "unrestricted" donations, expecting such funds is mere knowledge, and as such is insufficient to result in liability under the FCA.

The Hospitals deny that their actions had any bearing on the submission of false claims because the State—not the Hospitals—had the responsibility of reporting impermissible donations.   To the extent Defendants argue they are absolved of any liability because the State's actions (or failure to act) constituted an intervening force, the Court has rejected such a theory.

---

[12]   The *Zimmer* case involved kickbacks taken by a medical provider and an orthopedic implant seller, and in *Franklin*, a pharmaceutical company allegedly engaged in an unlawful course of fraudulent conduct  including knowingly making false statements to doctors that caused them to submit claims that were not eligible for Medicaid reimbursement.

*See* Doc. 91 at 22 (Mem. Opin. & Order) (finding that liability can attach under the FCA even if the donations themselves did not contain a false statement within).   The State knew about the provider donations and the MOA's between the Hospitals and the counties, yet never reported any of the Hospitals' donations in the Form 64 claims.   D-Exs. 40, 41, 42 (Decl. of Vinson, Gonzales, & Montoya), 51, 144; D-SOF 126(A)).   Defendants also point out that they hid nothing, and that the fact of their donations was the subject of public meetings and records.   *See, e.g.,* D-Exs. 109, 110.[13]

  B. <u>Plaintiffs' Position and Supporting Evidence on Causation</u>

   Plaintiffs argue that summary judgment for Defendants on the causation element should be denied.   They contend that Defendants affirmatively acted to pledge to donate funds that were necessary in order to receive SCP payments, and that there is evidence that the State's failure to report the donations as non-bona fide was intended and foreseeable by Defendants, such as:

- P-SOF 578: testimony that Eastern funded the SCP program "through their donation" and that the "bulk of the money" the County approves for its matching payment to the State "is the donated money from the hospital";

- P-Ex. 5: Eastern CEO exploring "options" regarding maximizing the amount of SCP funding it would receive in September 2000;

- P-SOF 235-240:  listing exhibits indicating MOA between Alta Vista and San Miguel County relating to monthly installments "relating to the Sole Community Provider Funds" (P-Ex. 210);

- P-Ex. 230: letter from Melinda Gonzales, San Miguel County Finance Supervisor to Tim Howard, Alta Vista CFO in 2004, stating that "it would be more advantageous to both parties involved if [Alta Vista] would assist with the ambulance services rather than potentially having to cut or reduce services or funding within the indigent fund"; *see* P-SOF 259-262 (Howard's memos to CHS personnel advising of intent to increase annual subsidy to county's ambulance fund);

---

[13]   It is not clear why the state did not report any of the donations on the Forms 64; possibly, it did not do so because it believed the IGT's were coming from public funds, as the counties had certified.   However, the issue here is whether the named Defendants caused the State to present a false claim (assuming the claims to be false at this point).

- P-Ex. 580: Chaves County receiving advice of counsel "as to how to structure donations to avoid having to report that the donation was made for a quid pro quo for indigent healthcare"; *see also* P-Ex. 465 at 209 (Chaves County never told Bransford that it was structuring the donations to avoid having to report them to the State);

- P-SOF 510: CHS executive Larry Carlton edited Eastern's donation letter to eliminate references to the relationship between the donations and the SCP program, and had Baker (the Relator in this case) instruct the hospitals to use his edited letter as the "model" donation letter," told Baker to never call the State again to discuss anything he didn't understand, and "never say fraud in his office again. Plaintiffs point to a similar example where Alta Vista CFO Tim Howard described the purpose of its donations as "ostensibly" for "ambulance service" (a permissible use for donations), inferring that it was not the real reason.

Also, in contrast to Defendants' assertions that they had no communications with the State during the relevant time regarding the content of the State's Form 64 claims, Plaintiffs present evidence that Defendants were in contact State officials such as Anna Bransford, who made it clear at various times from 2004 to 2008, that donations from the Hospitals to pay the counties to fund the match would amount to fraud. *See* Resp. to D-SOF 180; P-SOF 457, 507-509; 515-517 (Anna Bransford informing hospital controller that it would be considered "money laundering" if a hospital paid a county to fund the match); *see also* P-Ex. 405 at 16-:12–161:16; P-Ex. 467 at 215:8-14.

C.   Summary Judgment for Defendants on the Causation Element is Denied

Plaintiffs have presented sufficient evidence to withstand summary judgment for Defendants, and from which a jury could plausibly infer that Defendants' conduct was directed to influence the federal government's decisions in Medicaid reimbursements. Specifically, a jury could reasonably find that the Hospitals made donations to the counties with the counties' acquiescence in order to help the counties fund their match to the State; that as a result of their agreements with the counties, the Hospitals foresaw, expected and even intended that there would be no reason for the State to report these donations as non-bona fide in its Forms 64.11 and 64.11A); and that the Hospitals engaged in this conduct in order to receive back their

investment in at least triple the amount in the form of SCP funds from the State.   Thus, Defendants are not entitled to summary judgment on this element.

V.      **Defendants' Motion for Summary Judgment (Doc. 451 (memorandum brief Doc. 571) on Payment of Mistake and Relator's non-intervened claims brought under 31 U.S.C. §3729(a)(2).**

A.      Payment by Mistake

The Government brings an additional claim under the common law for payment by mistake.  Doc. 226, §§394-402.   The Government is entitled to obtain repayment from a third party into whose hands the mistaken payments flowed where the party participated in and benefitted from the tainted transaction.   *LTV Education Sys., Inc. v. Bell*, 862 F.2d 1168, 1175 (5th Cir. 1989).   To succeed on this claim, the government must demonstrate that (1) the payments were made, (2) under the belief that they were properly owed, (3) that belief being erroneously formed, and (4) the mistaken belief was material to the decision to pay."   *United States v. Medica-Rents Co.*, 2006 WL 247896, at *9 (N.D. Tex. Jan. 31, 2006); *see also United States ex rel. Trim v. McKean*, 31 F. Supp. 2d 1308, 1316 (W.D. Okla. 1998).

Defendants seek summary judgment on this issue, contending that the Government can't prove this claim basically because it cannot prove either that the State's claims were "false" or that the funding of the State's claims was improper.  Defendants' stance is that the funding of the State's claims was entirely proper because the donations were bona fide and that payment of the claims was not a "mistake" because the federal government (CMS) knew all along of the State's failure to report the hospitals' donations.  *See e.g.*, D-SOF 181(A)-81(C) (supporting exhibits & evidence that CMS knew no later than March 2005 that the hospitals were making donations to county governments which the State failed to report); D-SOF 181(J)-81(K) (evidence that CMS' funding reviews and approvals of the State's Form 64 claims were manipulated by both CMS and DOJ to further Plaintiffs' position in this litigation, including  Exs. 220, 221, 223 & 224,

filed under seal, indicating there was knowledge of State's failure to report, but discussion about whether disallowances for funding should be deferred in light of DOJ's lawsuit).

Summary judgment is precluded on this claim for the same reasons as it was denied on the merits of the FCA claim.    There are factual disputes regarding whether the donations were false, that is, whether the State share was funded by non-bona fide donations.  *See, e.g.,* P-SOF 5, 11, 155, 158, 232, and discussion above, on falsity element.   It is also disputed whether these claims influenced the Government's decision to make payments (that is, whether the false claims were material).  *See* P-SOF 455-456, 666-668 and discussion above, on materiality.   The nature and extent of the Government's knowledge of the donations made by the Hospitals is also the subject of considerable dispute.  There is evidence that the Government knew about the State's failure to report the Hospitals' donations on Forms 64, yet still paid; and, on the opposite side of the coin, evidence that the Government was still in the process of gathering information in order to determine the appropriate measure to be taken.  For these reasons, Defendants are not entitled to summary judgment on the Government's claim of "payment by mistake."

B.    Relator's non-intervened claims brought under 31 U.S.C. §3729(a)(2)

In addition to claims which both parties bring under 31 U.S.C. §3729(a)(1), Relator also brings a claim under § 3729(a)(2).[14]   *See* Third Am. Compl., §§ 99-102; Doc. 452 at 14.)   In order for Relator to establish a violation under § 3729(a)(2) for claims submitted before May 20, 2009, he must establish that Defendants "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."   For claims affected by the FERA, that is, claims submitted on or after May 20, 2009, Relator must establish that Defendants "knowingly ma[de], use[d], or cause[d] to be made

---

[14]   The Government takes no position with respect to these arguments, since only Baker asserts them.  See Doc. 583 at 60, n.37 (referring to claims as "non-intervened" claims).

or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).  *See Allison Engine Co. Inc. v. United States ex rel. Sanders*, 553 U.S. at 665.

The non-intervened claims involve allegations against the former Triad Hospitals, Carlsbad Medical Center ("Carlsbad") and Lea Regional Medical Center ("Lea Regional"). CHS acquired these hospitals in July of 2007, when a subsidiary of CHS/CHSI merged with Triad Hospitals, Inc.  D-SOF 7; *see also* Doc. 448 at 41 n.13.[15]  In these claims, Relator asserts that the former Triad Hospitals ("Defendants" for purposes of this section) used records or statements designed to disguise the purportedly "non-bona fide" nature of the Hospitals' otherwise open donations, and submitted misleading reports of their indigent care costs to counties in order to justify increased SCP funding requests, which allegedly caused the State to submit false claims to the Government.

Defendants now seek summary judgment on a jurisdictional basis regarding claims asserted against Carlsbad and Lea Regional—who are not named Defendants in this lawsuit. Here, the question is whether Relator has standing to assert claims against the former Triad Hospitals which seek to impute liability to the Corporate Defendants (or "CHS/CHSI"). Defendants offer other grounds for summary judgment as well, claiming that Relator is not an original source of the information giving rise to allegations against the former Triad Hospitals, and that the §3729(a)(2) claims fail on their merits.   The Court finds no need to address the merits of the claims brought against the former Triad Hospitals because the Court finds that it has no jurisdiction over these claims.

Under the FCA, there is a jurisdictional prohibition over claims based on public disclosure where the person bringing the action is not the original source of the information.  *See*

---

[15]   Triad Hospitals, Inc. survived the merger and is now known as Triad Healthcare Corporation.  D-SOF 7. Relator is not pursuing allegations against MountainView Regional ("Mountain View"), a former Triad Hospital, presumably because as Mountain View did not make donations to the county.   See Doc. 452 at 22, n.8 & Doc. 469 at 1, n.3.

31 U.S.C. §3730(e)(4)(A).   The FCA jurisdictionally bars a relator's action if it is based on allegations or transactions already in the public domain – unless the relator can show that he is an "original source" of the information on which the allegations are based.   *In re Natural Gas Royalties Qui Tam Litigation, Grynberg v. Pacific Gas and Electric Co., et al.*, 562 F.3d 1032, 1034 (10th Cir. 2009).   "Information means that which the relator's allegations are based, rather than the information on which the publicly disclosed allegations that triggered the public-disclosure bar are based."   *See Rockwell Intern. Corp. v. U.S.*, 549 U.S. 457, 458 (2007); *U.S. ex. rel King v. Hillcrest Health Ctr., Inc.*, 264 F.3d 1271, 1280 (10th Cir. 2001).[16]

The jurisdictional inquiry under §3730(e)(4)(A) involves four questions, which can be summed up as asking whether the relator's complaint is "based upon" "public disclosure," and if so, whether the relator qualifies as an "original source" under the provision.   The "public disclosure" questions must be answered first before analyzing whether the relator is an original source.[17]   If the court determines that the answer to the questions involving public disclosure is "no," then the inquiry is complete and §3730(e)(4) does not bar the relator's complaint.   *United States ex rel. Fine v. MK-Ferguson Co.*, 99 F.3d 1538, 1544 (10th Cir.1996).   Public disclosure

---

[16]   The full-blown inquiry for "public disclosure" issues can be found in one of the Court's previous Memorandum Opinion and Orders.   *See* Doc. 83.   There, the Court addressed the question of whether these claims are jurisdictionally barred against the former Triad Hospitals because the allegations against these Defendants are identical to the allegations against the named Defendant Hospitals set forth in previous complaints that were filed. The Court found that assertions regarding those entities were not barred "by virtue of the sole fact that a previous complaint had been filed against Defendant CHS" and that because the former Triad Hospitals were not named as Defendants in the Second Amended Complaint, they were mentioned only "in order to further define Defendant CHS." Doc. 83 at 20-21.   The Court also found that while allegations related to the "inflation" claims in the Third Amended Complaint were based upon a "prior public disclosure," those claims were not jurisdictionally barred because Relator had shown he qualified as an "original source" under §3730(e)(4)(B).   Doc. 83 at 57.   In those findings, the Court did not consider whether these allegations could in fact impute liability against the corporate Defendants, based on evidence that is now available and at issue.

[17]   The inquiry involves these four questions:
    (1) whether the alleged "public disclosure" contains allegations or transactions from one of the listed sources;
    (2) whether the alleged disclosure has been made "public" within the meaning of the False Claims Act;
    (3) whether the relator's complaint is "based upon" this "public disclosure"; and, if so,
    (4) whether the relator qualifies as an "original source" under section 3730(e)(4)(B).
*United States ex rel. Fine v. MK-Ferguson Co.*, 99 F.3d 1538, 1544 (10th Cir.1996).

occurs when "allegations of fraud are revealed to members of the public with no prior knowledge thereof." *U.S. ex rel. Ramseyer v. Century Healthcare Corp*., 90 F.3d 1514, 1521 (10th Cir. 1996).   At the hearing, counsel addressed the question of whether Baker's allegations against the former Triad Hospitals were based on prior public disclosures. In determining whether the relator's qui tam complaint in an action under the False Claims Act (FCA) was based upon the publicly disclosed allegations or transactions, the test is whether substantial identity exists between the publicly disclosed allegations and the qui tam complaint. 99 F.3d at 1040.[18]

Defendants contend that the conduct Baker alleges which is related to Carlsbad and Lea Regional was publicly disclosed long before Baker's filed the second amended complaint (Doc. 41, July 2, 2009), which first raised the allegations relating to these hospitals.   A variety of newspaper articles publicly disclosed the alleged conduct with respect to Carlsbad and Lea Regional, including Santa Fe and Carlsbad publications in June 2006.   *See, e.g.,* D-SOF 115; D-Ex. 92.   Also, CMS conducted two financial management reviews ("FMR") to inquire into donations practices by providers, the first one in 2006, indicating that the alleged misconduct surfaced and had come to the attention of the federal government at that time, if not before.   As a result of the 2006 FMR, CMS held conferences with HSD representatives in 2006, informing state officials of the preliminary findings (later reflected in the "Castro Report."   The Court is persuaded and now concludes that these public disclosures, represented by the newspaper articles and the FMR's, sufficed to make Relator's assertions against the former Triad Hospitals "based upon" that information.   Plaintiffs claim that the FMR cannot be the basis for public disclosure, since Defendants have always taken the position that the State has known, at least since 2004, that CHS was involved in some kind of donation activity.   However, whether the State knew "all

---

[18]   Recent amendments to §3730(e)(4)(A) in 2010 do not substantively affect the Court's analysis here.  *See* Pub.L. 111-148, Title X, § 10104(j)(2), Mar. 23, 2010, 124 Stat. 901; Pub.L. 111-203, Title X, § 1079A(c), July 21, 2010, 124 Stat. 2079.).

along" that the donations were being made, it is fair to say that the State had no knowledge of alleged misconduct (the conduct alleged by Relator against the former Triad Hospitals) based on those donations until the preliminary findings were made and were shared with HSD officials.

Of all the issues presented in this case in the parties' motions, this is the one issue on which the Court will grant summary judgment.   The Court agrees with Defendants that Relator Baker cannot claim to be an original source of any information relating to Carlsbad and Lea Regional, based on the following undisputed facts:  (1) from November 2001 until November 2004, Baker worked in the Revenue Department of Community Health Systems Professional Service Corporation ("PSC"), which provides consulting and management services to the Hospitals; (2) Baker was never at any time employed by CHSI, CHS/CHSI, or the Hospitals; and (3) CHS/CHSI, through its subsidiary that merged with the Triad Hospitals, did not have any relation to Carlsbad and Lea Regional until late July 2007.   Defendants also submit that Baker does not have any personal knowledge of any donations made by Carlsbad, Lea Regional or MountainView, nor of any SCP payments made to those hospitals (D-SOF 41-44).  This fact is essentially undisputed.  Baker left his employment with PSC before the former Triad Hospitals became affiliated with CHSI.   He has also admitted in his depositions that, prior to his communications with his attorneys, he had no knowledge whatsoever regarding these hospitals. D-SOF 41-44; Ex. 25 (Baker Dep.) at 231:6-233:7 (stating that it was a "fair statement" that he had no knowledge, independent of communications with counsel, regarding the additional hospitals acquired from Triad by CHS).   For these reasons, Baker is not an "original source" of the allegations against the former Triad Hospitals.

Plaintiffs offer no material facts to rebut these assertions, except to state that Baker had personal knowledge of the "practice of CHS corporate entitles of causing New Mexico hospitals to make donations to New Mexico counties for the purpose of funding SCP program county

match payments."   Resp. to D-SOF 43.   However, these facts do not specifically rebut Defendants' statements regarding Baker's lack of personal knowledge regarding Carlsbad or Lea Regional, and the Court does not consider them as either material or relevant.    Plaintiffs also argue that, even assuming that media coverage constituted public disclosure (which Plaintiffs would be hard put to challenge), Baker nevertheless qualifies as an original source because he has knowledge that is independent of, and materially adds to, the publicly disclosed allegations or transactions.  Plaintiffs maintain that Baker did not need to be an employed insider to qualify as an original source, and the fact that he left his employment before the former Triad Hospitals became affiliated with CHSI is not relevant to the inquiry because he still knew people who worked in the Triad group.    Plaintiffs seem to equate Baker's continued relationship with individuals who still worked at his former employment with having independent knowledge of the publicly disclosed allegations at issue.  The Court does not agree with this reasoning, particularly in light of Baker's own statements disavowing any personal knowledge regarding the conduct of these hospitals.

Accordingly, Defendants are entitled to summary judgment on the non-intervened claims brought by Relator under § 3729(a)(2).

## IV.   Corporate Defendants' Motion for Summary Judgment, filed March 27, 2012 (Doc. 451) (memorandum brief 453).

The final issue for the Court to consider is whether the Corporate Defendants (CHSI and CHS/CHSI) should be dismissed from this lawsuit.   Defendants contend that the conduct alleged against the Hospitals cannot be attributed to them, because they do not operate any of the Hospitals or control the day-to-day operations of the Hospitals. Rather, those operations are the responsibility of the Hospitals as delegated to their respective Officers, Boards of Directors and

Boards of Trustees, and as designated in the management agreements between the Hospitals and PSC. Corporate Defendants also claim that the Hospitals are not agents for PSC or themselves.

The general rule is that a parent is not liable for the acts of its subsidiaries. *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal citations omitted); *see also Jemez Agency, Inc. v. CIGNA Corp.*, 866 F.Supp. 1340, 1343 (D.N.M. 1994). Directors and officers holding positions with a parent and its subsidiary can and do "change hats" to represent the two corporations separately, despite their common ownership. *Bestfoods*, 524 U.S. at 69. A presumption exists that the directors are "wearing their subsidiary hats" and not their "parent hats" when acting for the subsidiary. *Id*. The burden falls on plaintiffs to rebut this presumption. *Id*. at 70.

Defendants do not deny having knowledge of what their subsidiaries were doing, but point out that "mere knowledge by the Corporate Defendants is insufficient to impose liability on the parent company." *United States ex rel. Bartlett v. Tyrone Hosp., Inc*., 234 F.R.D. 113, 125-26 (W.D. Pa. 2006) (finding no vicarious FCA liability against parent because "knowledge [of violations] does not equate to causing the false claims and submission of false records").[19]

Plaintiffs contend that the *Bestfoods* argument does not apply in this case because there is no evidence that individuals who acted as dual officers ever claimed to act for the subsidiary (as opposed to actions taken for the Corporate Defendants) when they took the actions in question. They also argue that it is not clear where, and for what actions the Corporate Defendants donned the hats of subsidiary officers. Plaintiffs claim that the Corporate Defendants devised and facilitated the allegedly fraudulent scheme to obtain Medicaid funds, and authorized and funded the (allegedly) non-bona fide donations.[20] To that end, Plaintiffs provide numerous facts to support their argument that the Corporate Defendants were directly involved in the allegedly fraudulent conduct. The substance of these facts are not disputed; rather, Defendants dispute the characterization of the facts:

---

[19] The exception to this would be if the parent company was the subsidiary's alter ego. See United States v. Universal Health Servs-., Inc., No. 1:07-CV-00054, 2010 WL 4323082, at *4 (W.D. Va. Oct. 31, 2010) (A parent company's "knowledge of FCA violations by [a subsidiary] and failure to investigate or solve the [violation] does not serve to impose vicarious liability on the parent company without piercing the corporate veil.") (citing United States ex rel. Farmer v. City of Houston, 523 F.3d 333, 334 (5th Cir. 2008) (granting summary judgment in a FCA action where contractor knew of inflated invoices)). However, Plaintiffs do not advance this theory, since they contend Defendants were directly involved in the alleged fraudulent scheme.

[20] Plaintiffs note that by claiming that individuals like Portacci Carlton, Cash and Seifert acted solely in their capacities as PSC officers, the Corporate Defendants are attempting to pin the allegedly unlawful conduct on PSC, and distance themselves from PSC, which has not joined in the instant motion.

*Corporate Defendants Helped Devise & Implement Fraudulent Scheme:*

- P-SOF 13: memo written by CHSI Group VP Michael Portacci in August 2000 to CHSI Executive VP and CFO Larry Cash regarding "federal matching funds available through the county Medicaid sole community provider program. The memo noted a "concern" over "how to get $7.5 [million] to [Chaves county]" in order for the county to pay the SCP funds and for the hospital to 'receive back $2.6M ($1.9 M net)." The memo acknowledged the restriction on hospitals making direct donations to the county, and stated that "we were formulating alternative strategies to make donations to the county";

- P-SOF 14, 480: CHSI hospitals needed corporate office approval to make donations above $5,000, and approvals were made by Portacci and Cash to move forward with making donations to the counties to free up funds for the counties' contributions to the State for SCP program funding for the hospitals;

- P-SOF 20, 461: Portacci instructed PSC employee Gail Ferguson to send the hospitals an e-mail on August 16, 2000 to "make sure [their] payments and cash planning cycle is coordinated with Barry Stewart [VP & Treasurer of CHSI] at corporate";

- P-SOF 19: August 2000 memo from Portacci to Cash acknowledging that "the feds" might see through the plan[21];

- P-SOF 10: Discussion between Eastern CEO Ron Shafer and Rachel Seifert (CHSI's VP, Gen. Counsel & Secretary): Seifer's notes from that conversation state "2.6M or more oppty. . . $700,000 needed as seed money" and "sole comm provider fund";

- P-Exs. 21 & 23: Memo from Portacci to Cash about formulating strategies for donating money to the county in order to reduce the "risk" of the "unlikely event of the county keeping [the hospital's] money and not paying the state . . . .";

*Corporate Defendants Helped to Conceal the Fraud After Relator Baker Discovered It:*

- P-SOF 484, 508: Relator learned of the donations in 2004, and contacted Anna Bransford at the state's Medicaid Assistance Division (a division of HSD), who told him that a hospital never could pay a county for the county's matching SCP payment to the State because that would violate the federal Medicaid regulations and would constitute fraud. Baker conveyed this information to CHS senior corporate officials (including Larry Carlton & PSC officer Doug Gleeson). Carlton called Baker to his officer to meet with him and Gleeson, and Carlton was "livid" that Baker had called

---

[21] The memo stated:

The last risk I would bring to your attention would be the feds determining, based upon the state reports, that the county participation in the program was funded by a provider donation, i.e., the hospital. Under this scenario, the excess or matching portion of the funds could be withheld from future SCH payments.

the State to discuss the SCPF program; Carlton told Baker it was none of his business and told Baker to "leave it alone" (P-SOF 509-10);

- P-SOF 75, 512: Eastern CFO Leanne Hacker drafted a letter she intended to send to Chaves County which linked a forthcoming "unrestricted donation" to "the purpose of maintaining our current level of [SCP] funding. The letter also stated that Eastern looked forward to "continuing our relationship under the Sole Community Hospital Program with Chaves County";

- P-SOF 486: Carlton later hand-edited Hacker's letter, deleting its statements about the purpose of the donation, the calculation methodology, the timing of the quarterly increments and the reference to Eastern's continuing the SCHP funding relationship with Chaves County. The letter was later used as a "Model County Indigent Donation Letter";

- P-SOF 97: e-mail dated April 2006 from Eastern CFO Hacker to CHS executive Larry Carlton in which Hacker requested authority to "donate . . . additional funds" toward "funds matched [by the State] on our behalf. . . ." When Carlton asked Hacker what would happen if the additional donation were not made, Hacker responded "I would have to assume they might be less willing to approve our increases in dollars requested in future years if we were not able to put up the matching funds";

- P-SOF 24-25, 489: In 2005 after CHSI was advised that it was under an FCA investigation, Defendants entered into Memoranda of Agreement (MOA) with the counties for the purpose of freeing up county funds for the counties to make matching payments to the State . P-SOF 24-25. The language in the MOA's made it appear that the donations were for particular purposes. Portacci (CHSI Group VP) signed at least two of the MOA's.

Defendants use a centralized cash management system where Hospitals deposit their revenues (including Medicaid reimbursement) in their separate and distinct local bank accounts that maintain a "zero balance", and kept a strict accounting system. In this way, the Hospitals were able to maintain "zero balance" accounts. The Hospitals draw funds from their own accounts in order to pay accounts payable. Under the Corporate Defendants' cash-management system, each hospital issued checks for expenses out of its local disbursement account. At the end of the day, the bank holding the local account "settles up" with the "master account," by the master account transferring to the local account only the exact amount necessary to satisfy the presented checks. See Doc. 462 at 8 (P-SOF 481-83. Plaintiffs contend that this system still

allowed CHS/CHSI, and not PSC, to control the master bank accounts from which the Hospitals paid their bills on an as-needed daily basis.  P-SOF 481-83.

Defendants have, as expected, provided declarations attesting to the fact that corporate officers who were also directors of PSC were wearing their "PSC hats" when they discussed or made decisions regarding the donations.   Nevertheless, Plaintiffs have submitted sufficient evidence to put the credibility of these individuals at issue.  The Court has previously ruled that these declarations are admissible and are "of course, . . . subject to credibility and weight" by the jury.  Doc. 611 at 15 (Mem.Opin. & Order overruling Pltffs' objections to declarations).  Plaintiffs claim that during this litigation, Defendants have "deliberately obfuscated which corporate entity—PSC, CHS/CHSI, or CHSI—was being represented or discussed at any given time."  Doc. 462 at 14.   For example, during Larry Cash's January 10, 2010 deposition, defense counsel stated, "And, Counsel, just to be clear and it's fine with me if we use CHS interchangeably with PSC if that's how you'd like to conduct the examination."  P-SOF 491.  Such testimony, as with the other evidence presented by Plaintiffs, can certainly be viewed by a fact finder as an attempt to blur the line between actions taken on behalf of the corporation or its subsidiary.

The Court finds that the evidence offered by Plaintiffs suggest that the Corporate Defendants were directly involved in the allegedly fraudulent scheme which resulted in the illegal receipt of federally funded Medicaid payments.   As such, this constitutes rebuttal evidence to the *Bestfoods* presumption that directors are wearing their "subsidiary hats," and not their "parent hats" when acting for the subsidiary.   In *U.S. ex. rel. Hocket v. Columbia/HCA Healthcare Corp.*, 498 F.Supp.2d 25, 63 (D.D.C. 2007), summary judgment was denied where the evidence was not "strong," but was nonetheless "part of the larger mosaic that creates genuine issues of material fact. . . ."   The parent corporation was five levels up from the

subsidiary, yet the district court denied summary judgment based on "some evidence" of involvement by parent corporation officials.   *Id.*   Here also, the Corporate Defendants claim to be multiple levels up from the hospitals in the corporate hierarchy, and yet there is factual evidence from which a reasonable juror could find that corporate officers were acting on behalf of CHS/CHSI rather than on behalf of PSC or any of the corporate subsidiaries.   Accordingly, the Corporate Defendants are not entitled to summary judgment.

     **THEREFORE,**

     **IT IS ORDERED** that:

(1)    Plaintiffs' Motion for Partial Summary Judgment on Falsity and Materiality, filed March 27, 2013 **(Doc. 448)** is hereby DENIED for reasons described above in this Memorandum Opinion and Order;

(2)    Defendants' Motion for Summary Judgment, filed March 27, 2012 **(Doc. 451)** (memorandum brief Doc. 571) is GRANTED in part only as to the non-intervened claims brought by Relator under §3729(a)(2), and is DENIED as to all other issues raised in the motion; and

(3)    Corporate Defendants' Motion for Summary Judgment, filed March 27, 2012 **(Doc. 451)** (memorandum brief 453) is DENIED for reasons described in this Memorandum Opinion and Order. [22]

                                       _____

                                  UNITED STATES DISTRICT JUDGE

---

[22]  It may appear that the rulings are inconsistent for Defendants' motion for summary judgment, which was filed as Docket 451.  However, as noted in n.1 above, Defendants decided to use the same cover page (Doc. 451) for *both* the Hospital Defendants' Motion for Summary Judgment, as well as the Corporate Defendants' Motion for Summary Judgment, even though both sets of Defendants filed separate memorandum briefs.  The brief filed by the Hospital Defendants (Doc. 571) raises completely different issues than the brief filed by the Corporate Defendants (Doc. 453).  Thus, the Court's rulings actually refer to the underlying memorandum briefs filed by the parties.